UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re

)  Case No. _____
)
)  **Notice of Preliminary Hearing on Motion**
)      **For Use of Cash Collateral**
)      **To Obtain Credit**
)  **(Check One)**

Debtor(s)

YOU ARE NOTIFIED THAT:

1. The undersigned moving party, _____, filed a Motion
   For Use of Cash Collateral ☐ To Obtain Credit (check one). The motion is attached and it
   includes (1) the statement required by Local Bankruptcy Form (LBF) 541.5 and (2) the following
   allegations:

   a. The immediate and irreparable harm that will come to the estate pending a final hearing is
      _____
      _____
      _____.

   b. The amount of ☐ cash collateral ☐ credit (check one) necessary to avoid the harm detailed
      above prior to the final hearing is _____.

2. The name and service address of the moving party's attorney (or moving party, if no attorney) are:
   _____.

3. A preliminary hearing on the motion will be held as follows:

   **Date:** _____ **Time:** _____ **Location:** _____

   Testimony will be received if offered and admissible.

4. If you wish to object to the motion, you must do one or both of the following:

   a. attend the preliminary hearing.

   b. file a written response, which states the facts upon which you will rely, with the clerk at 1050 SW 6th
      Ave. #700, Portland OR 97204 or 405 E 8th Ave. #2600, Eugene OR 97401.

   If the response is filed within three business days before the hearing, notify the judge's chambers by
   telephone immediately after filing the document, as required by Local Bankruptcy Rule (LBR) 9004-1(b).

**541.1 (12/1/2018)**          Page 1 of 2

Case 19-62584-pcm11   Doc 7   Filed 08/22/19

5. I certify that on _____ this notice and the motion were served pursuant to Federal Rule of Bankruptcy Procedure (FRBP) 7004 on the debtor(s), any debtor's attorney, any trustee, any trustee's attorney, members of any committee appointed under 11 U.S.C. § 1102 or elected pursuant to 11 U.S.C. § 705 or its authorized agent [or, if no committee in a chapter 11 case, on all creditors listed on the list filed pursuant to FRBP 1007(d)], any creditors' committee attorney, the U.S. Trustee, and all entities with any interest in the cash collateral subject to this motion, whose names and addresses used for service are as follows:

_____   OSB #
Signature of Moving Party or Attorney

_____
(If debtor is movant) Debtor's Address & Last 4 Digits of Taxpayer ID#(s)

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
  Direct Dial:  503.802.2013
  Facsimile:    503.972.3713
  E-Mail:       albert.kennedy@tonkon.com
Timothy J. Conway, OSB No. 851752
  Direct Dial:  (503) 802-2027
  Facsimile:    (503) 972-3727
  E-Mail:       tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
  Direct Dial:  (503) 802-2169
  Facsimile:    (503) 972-3867
  E-Mail:       michael.fletcher@tonkon.com
Ava L. Schoen, OSB No. 044072
  Direct Dial:  (503) 802-2143
  Facsimile:    (503) 972-3843
  E-Mail:       ava.schoen@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

        Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc.,<br><br>                    Debtor. | Case No. 19-62584-pcm11 |
| In re<br><br>Hermiston Foods, LLC,<br><br>                    Debtor. | Case No. 19-33102-pcm11 |
| In re<br><br>Quincy Foods, LLC,<br><br>                    Debtor. | Case No. 19-33103-pcm11<br><br>**DEBTORS' MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS**<br><br>*EXPEDITED HEARING REQUESTED* |

**Page 1 of 20** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                ON INTERIM AND FINAL BASIS

1        Debtors and Debtors-in-Possession NORPAC Foods, Inc. ("NORPAC"), Hermiston

2    Foods, LLC ("Hermiston Foods"), and Quincy Foods, LLC ("Quincy Foods") (together,

3    "Debtors") hereby move this Court for entry of interim and final orders authorizing them to

4    obtain secured credit for the purposes and on the terms set forth herein.  In support of this

5    Motion, Debtors incorporate the statements contained in the Declarations of Shawn Campbell

6    and Winston Mar in Support of First Day Motions ("First Day Declarations") filed

7    contemporaneously herewith, and further respectfully state as follows:

8                     **JURISDICTION AND VENUE**

9        1.       On August 22, 2019 ("Petition Date") Debtors filed voluntary petitions for

10   relief under Chapter 11 of the Bankruptcy Code with the clerk of this Court.  Debtors

11   continue to operate their business and manage their assets as debtors-in-possession pursuant

12   to Bankruptcy Code Sections 1107(a) and 1108.

13       2.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and

14   1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The

15   bases for the relief requested herein are Sections 105, 361, 362, 363 and 364 of the

16   Bankruptcy Code, Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules, and Rule

17   4001-1 of the Local Rules.

18       3.       Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

19                **SUMMARY OF RELIEF REQUESTED**

20       4.       Debtors, pursuant to Sections 105, 361, 362, 363, 364 and 507 of the

21   Bankruptcy Code, Rules 2002, 4001, 6004, and 9014 of the Bankruptcy Rules, and

22   Rule 4001-1 of the Local Rules, request the immediate entry of an interim order (the "Interim

23   Order") substantially in the form attached hereto as **Exhibit 1**:

24          (a)       authorizing Debtors to obtain secured Postpetition financing on a

25   superpriority basis (the "DIP Facility") subject only to the Carveout (defined herein), and the

26   Permitted Liens (as defined in the Credit Agreement (defined herein));

**Page 2 of 20** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                  ON INTERIM AND FINAL BASIS

1           (b)      authorizing Debtors to execute and enter into the Fourteenth

2  Amendment to Credit Agreement (the "Fourteenth Amendment")[1], which amends the Credit

3  Agreement dated as of November 15, 2017, among Debtors, as borrowers (in such capacity,

4  the "Borrowers"), the guarantors from time to time party thereto, and CoBank, ACB, a

5  federally chartered instrumentality of the United States ("CoBank"), both in its capacity as

6  sole lender (when referenced solely in its lender capacity, the "Lender") and in its capacity as

7  administrative agent for the Lenders (when referenced solely in its administrative agent

8  capacity, the "Administrative Agent") (as amended, including as amended by the Fourteenth

9  Amendment, the "Credit Agreement") (a copy of which, incorporating all amendments (but

10  excluding schedules and exhibits), has been filed with the Court, is available on the Court's

11  website and is also available upon request by contacting counsel for Debtors), and to perform

12  such other and further acts as may be required in connection with the Credit Agreement and

13  the Loan Documents (as defined in the Credit Agreement);

14           (c)      granting superpriority administrative expense claims to CoBank for the

15  Postpetition financing payable from, and having recourse to all of the prepetition and

16  Postpetition property of Debtors' estates (the "Estates") and all proceeds thereof (except for

17  avoidance actions and the proceeds of avoidance actions) subject only to the Carveout and the

18  Permitted Liens, and granting liens for the Postpetition financing to CoBank in all Postpetition

19  Collateral (defined herein) in accordance with the Fourteenth Amendment, the Credit

20  Agreement, and this Final Order;

21           (d)      scheduling a final hearing (the "Final Hearing") to consider entry of a

22  final order authorizing, among other things, Debtors to obtain financing under the DIP

23

24

---

25  [1] The Credit Agreement, without exhibits and schedules, is attached as <u>Exhibit 1</u> to the Declaration of Shawn Campbell.  The Fourteenth Amendment, without exhibits, is attached

26  hereto as **Exhibit 2**.

**Page 3 of 20** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                  ON INTERIM AND FINAL BASIS

1  Facility, the Fourteenth Amendment, and the Credit Agreement on a final basis (the "Final

2  Order").

3                    **SUMMARY OF MATERIAL TERMS OF DIP FACILITY**

4        5.      The material terms of the DIP Facility are: [2]

5              (a)    <u>DIP Facility</u>.  The DIP Facility will be comprised of a committed,

6  secured revolving line of credit in an aggregate principal amount not to exceed $102,500,000

7  (the "Aggregate Revolving Credit Commitment Amount")(, which is $15,000,000 higher than

8  the $87,500,000 Aggregate Revolving Credit Commitment Amount in effect immediately

9  prior to the Petition Date (the "Prepetition Revolving Commitment Level").

10             (b)    <u>Maximum Available Amount</u>.  As of any day, an amount equal to:

11                  (i)      the Aggregate Revolving Credit Commitment Amount; minus

12                  (ii)     the aggregate outstanding principal balance of all DIP

13  Advances as of such day; minus

14                  (iii)    the outstanding prepetition Revolving Credit Exposure as of

15  such day.

16             (c)    <u>Maturity Date</u>.  The DIP Facility shall mature, and all indebtedness

17  related to the Revolving Note shall be due and payable in full in cash, on the earliest to occur

18  of (i) October 31, 2019, or (ii) upon the closing of any sale of all or substantially all of the

19  assets of Borrowers pursuant to Section 363 of the Bankruptcy Code or any other sale process.

20             (d)    <u>Interest Rate</u>.  Outstanding DIP Advances in excess of the Prepetition

21  Revolving Commitment Level as of any day shall bear interest at the Base Rate plus 9.75%.

22  All other outstanding DIP Advances and all Prepetition Indebtedness shall bear interest in

23  _____

24  [2] The description of the DIP Facility contained in this Motion is a summary only and should
    not be construed as modifying or limiting the terms thereof.  In the event of a conflict
    between the provisions of the Interim Order (or Final Order, as applicable), the Motion and
25  the Loan Documents, the provisions of the Interim Order (or Final Order, as applicable) shall
    govern.  Capitalized terms used but not defined herein shall have the meanings assigned to
26  such terms in the Financing Agreement.

**Page 4 of 20** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                          ON INTERIM AND FINAL BASIS

accordance with the existing terms of the Credit Agreement.  Base Rate is defined as a fluctuating rate per annum equal to the highest of (i) the Prime Rate, (ii) 50 basis points plus the Federal Funds Effective Rate, and (iii) 100 basis points plus the Adjusted LIBOR rate for an Interest Period of one month.

The interest rates applicable to Prepetition Indebtedness shall each be increased by an additional margin of 2.0% per annum, which reflects the Default Rate in effect prior to and as of the Petition Date.  Following the effectiveness of the DIP Facility, the Obligations will not bear interest at the Default Rate until the occurrence of a Postpetition Event of Default.

(e)    Default Interest Rate.  Upon the occurrence and during the continuance of an Event of Default occurring Postpetition, all Obligations shall bear interest at the Default Rate.

(f)    Postpetition Collateral.  The DIP Facility and any other Postpetition Indebtedness will be secured by a first-priority perfected security interest and lien in favor of CoBank on all Collateral plus all other assets of Borrowers (collectively, the "Postpetition Collateral"), subject only to (i) valid, perfected, prior, non-avoidable, prepetition liens permitted under Section 7.2 of the Credit Agreement; and (ii) the Carveout.

(g)    Carveout.  A "carveout" from CoBank's prepetition and postpetition claims (whether secured or unsecured), including CoBank's superpriority claim, for unpaid administrative expenses, specifically amounts: (i) payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Bankruptcy Court, and (ii) fees and expenses of attorneys and financial advisors employed by Borrowers and the official committee of unsecured creditors (including allowed expenses of the members of such statutory committees) pursuant to Sections 327 and 1103 of the Bankruptcy Code (a) which were provided for in the Budget and incurred prior to an Event of Default but not yet paid; and (b) an aggregate amount not to exceed $300,000 for reasonable fees and expenses incurred following a postpetition Event of

**Page 5 of 20** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

Default; but specifically excluding any success, completion or similar fees. The Carveout shall exclude any fees and expenses incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief invalidating, setting aside, avoiding, subordinating, or otherwise adversely affecting CoBank's claims against the bankruptcy estate of the debtors-in-possession in the Bankruptcy Cases (including the Prepetition Indebtedness, the postpetition Indebtedness, and CoBank's liens on the Collateral).

(h)    Use of Proceeds.  Proceeds shall be used to provide for working capital, and other general corporate purposes and administrative expenses of Borrowers during their Chapter 11 bankruptcy cases (the "Bankruptcy Cases"), in accordance with the Budget.[3] No proceeds of the DIP Facility shall be used to pay any fees or expenses incurred at any time in connection with any action which seeks to invalidate, avoid, subordinate or otherwise impair the claims of CoBank under any of the Loan Documents or in connection with the DIP Facility, or any liens or priorities created under the Loan Documents or in connection with the DIP Facility, or which seeks to recover on any claims against or transfers made to CoBank.

(i)    Priority of DIP Advances.  All indebtedness, liabilities and other obligations of Borrowers under the DIP Facility (including, without limitation, all DIP Advances), all obligations owing under any cash management arrangement with CoBank and all other Postpetition indebtedness to CoBank will have superpriority administrative expense status and be secured by a first priority perfected security interest and lien on the Postpetition Collateral, subject only to valid, perfected, prior, non-avoidable, prepetition liens permitted under Section 7.2 of the Credit Agreement and the Carveout.

---

[3] The Budget is attached as Exhibit 1 to the Declaration of Winston Mar filed contemporaneously herewith.

**Page 6 of 20** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

| 1 |           (j)    <u>Adequate Protection and Cash Collateral</u>. Borrowers shall continue to |

(j)     <u>Adequate Protection and Cash Collateral</u>.  Borrowers shall continue to pay all amounts and fees required under the Loan Documents, including, without limitation, all regularly scheduled principal payments and interest thereon.  Borrowers will stipulate that, prior to the DIP Facility Maturity Date, Borrowers (i) will not seek authority for any use of cash collateral of CoBank without the prior written consent of CoBank (other than as contemplated by this Term Sheet); (ii) without the prior written consent of CoBank, will not sell, lease or otherwise transfer any collateral other than inventory in the ordinary course of business in accordance with the Budget; (iii) will not seek to prime any lien of CoBank in any of the Collateral or Postpetition Collateral; (iv) will not obtain any DIP financing (other than the DIP Facility) until (a) all other indebtedness, liabilities and other obligations (other than contingent indemnification obligations) at any time owing by Borrowers to CoBank have been paid in full in cash and (b) all commitments of CoBank under the DIP Facility and the Loan Documents have been terminated, (v) will keep insured and properly care for all tangible collateral; and (vi) will account for all cash collateral of CoBank.  Any use of cash collateral shall be treated as a simultaneous reduction of Prepetition Indebtedness and an increase in post-petition Indebtedness, in each case by the amount of such use of cash collateral. Borrowers agree that none of the collateral of CoBank shall be subject to any surcharge under Section 506(c) of the Bankruptcy Code and the "equities of the case" exception in Section 552 of the Bankruptcy Code shall not apply with respect to any such collateral.

(k)     <u>DIP Facility Fees</u>.  Borrowers agree to pay to CoBank (i) a fee in an amount equal to $150,000 due and payable in cash on the closing date of the DIP Facility, and (ii) a fee in an amount equal to $150,000 due and payable in cash on the DIP Facility Maturity Date.  Borrowers agree that all such fees are fully earned as of the closing date of the DIP Facility and, once paid, shall not be refundable under any circumstances.

**Page 7 of 20** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                      ON INTERIM AND FINAL BASIS

1    (l)    Letter of Credit Fee.  The Applicable Letter of Credit Fee Rate shall be

2    increased by an additional margin of 2% per annum, which reflects the Default Rate that was

3    in effect prior to and as of the Petition Date.

4    (m)    Unused Commitment Fee.  Borrowers agree to pay to CoBank an

5    Unused Commitment Fee on the average daily unused available portion of the Aggregate

6    Revolving Commitment Amount at the rate of 0.375% per annum (calculated on a 360-day

7    basis) in accordance with Section 2.7 of the Credit Agreement.

8    (n)    Mandatory Prepayments.  Borrowers shall prepay the Obligations in

9    accordance with the following (each, a "Mandatory Prepayment Trigger"):

10    (i)    Immediately upon any Disposition (including, without

11    limitation, the sale of Inventory), Borrowers shall prepay the Obligations in an aggregate

12    amount equal to 100% of the Net Cash Proceeds of such Disposition.

13    (ii)    Not later than one Business Day following the receipt by any

14    Loan Party of the proceeds of insurance, condemnation award, or other compensation in

15    respect of any Casualty Event or series of related Casualty Events affecting any property of

16    any Loan Party, Borrowers shall prepay or cause such other Loan Party to prepay the

17    Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such

18    Casualty Event(s).

19    (iii)    On Friday of each week, Borrowers shall prepay the

20    Obligations in an amount equal to the amount by which the aggregate account balance in all

21    deposit accounts and securities accounts of Borrowers as of the opening of business on such

22    date exceeds the sum of (a)  $1,500,000 plus (b) the aggregate amount of operating and non-

23    operating disbursements permitted for the following week as set forth in the Budget.

24    (iv)    Immediately upon any Equity Issuance, Borrowers shall prepay

25    the Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such

26    Equity Issuance.

**Page 8 of 20** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1            (v)      Immediately upon the receipt of the Net Cash Proceeds of any

2    Debt Incurrence, Borrowers shall prepay the Obligations in an amount equal to 100% of the

3    amount of such Net Cash Proceeds.

4            (o)      <u>Application of Mandatory Prepayments</u>.  All prepayments upon the

5    occurrence of a Mandatory Prepayment Trigger shall be remitted to CoBank for application

6    first, ratably to all outstanding prepetition Swing Line Loans, second, ratably to all

7    outstanding prepetition Revolving Loans, third, ratably to all outstanding Term Loans, fourth,

8    ratably to all outstanding Postpetition Swing Line Loans, fifth, ratably to all outstanding

9    Postpetition Revolving Loans, sixth, to Cash Collateralize outstanding Letter of Credit

10    Obligations and, seventh, to the remaining Obligations in such order as CoBank may

11    determine in its sole discretion until paid in full.

12            (p)      <u>Retention of Counsel and Consultants; Reimbursement of Expenses</u>.

13    Borrowers will reimburse CoBank on demand for all costs and expenses incurred by CoBank

14    in connection with the DIP Facility and the Loan Documents (the "Costs and Expenses") as

15    currently provided in the Loan Documents and authorize CoBank to advance funds under the

16    DIP Facility for immediate application to the Costs and Expenses.  The Costs and Expenses

17    described in the Budget are for information purposes only, and the Costs and Expenses may

18    be greater or less than the amounts set forth in the Budget.

19            (q)      <u>Loan Covenants/Reporting Requirements</u>.  The loan covenants will

20    include the following:

21            (i)      The DIP Facility will contain the covenants, representations

22    and warranties under the Credit Agreement.

23            (ii)      Borrowers will not seek any other debtor-in-possession

24    financing during the pendency of its bankruptcy proceedings unless such financing is

25    sufficient in amount and is actually used to fully repay all Prepetition Indebtedness, all DIP

26    Advances and all other Postpetition indebtedness of Borrowers to CoBank.

**Page 9 of 20** -    DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                              ON INTERIM AND FINAL BASIS

1                (iii)      Borrowers shall not use any funds or the proceeds of any DIP

2  Advance in a manner or for a purpose other than in accordance with the Credit Agreement,

3  this Term Sheet and the Budget, or on such other terms as CoBank may agree.

4                (iv)     Borrowers shall not grant any new liens in favor of any Person

5  (other than CoBank) on any of the Collateral or Postpetition collateral or seek to prime any

6  Lien of CoBank on any of the Collateral or the Postpetition Collateral.

7                (v)      Borrowers shall have entered into binding asset purchase

8  agreement(s) with one or more prospective purchasers for the sale of all or substantially all of

9  the assets of Borrowers, on terms acceptable to CoBank.

10              (vi)     Not later than September 27, 2019, the Bankruptcy Court shall

11  have entered an order or orders approving bidding procedures for the sale of all or

12  substantially all of the assets of Borrowers, which such order or orders shall be in form and

13  substance acceptable to CoBank.

14             (vii)    Not later than October 28, 2019, the Bankruptcy Court shall

15  have entered orders approving the sale of all or substantially all of the assets of Borrowers,

16  on such terms acceptable to CoBank in its sole discretion, which orders shall be in form and

17  substance acceptable to CoBank.

18             (viii)   Without the prior written consent of CoBank, Borrowers will

19  not sell, lease or otherwise transfer any assets of Borrowers other than inventory in the

20  ordinary course of business in accordance with the Budget.

21             (ix)     All disbursements of Borrowers shall be consistent with the

22  Budget.

23             (x)      Borrowers shall not permit actual Net Cash Flow as reported

24  each week and calculated as of Friday of the preceding week for the four-week period then

25  ending to be less than 85% of Net Cash Flow forecasted for such period in the Budget.

26

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1         (xi)    Borrowers shall not open any new deposit or securities

2 accounts; provided however, Borrowers may open deposit accounts if such account is subject

3 to a first-priority perfected lien in favor of CoBank.  Promptly upon request by CoBank,

4 Borrowers shall deliver to CoBank a fully-executed deposit account control agreement in

5 form and substance acceptable to CoBank.

6         (xii)    Borrowers shall pay all regularly scheduled principal payments

7 and interest on the Prepetition Indebtedness and the DIP Advances as and when due under

8 the Loan Documents.

9         (xiii)    Borrowers' use of cash collateral as of any week shall not

10 exceed the aggregate amount of operating and non-operating disbursements permitted for

11 such week as set forth in the Budget.

12     (r)    <u>Events of Default</u>.  Events of Default will include:

13         (i)    Any default (not otherwise in existence as of the date of

14 commencement of the Bankruptcy Cases) shall occur in the performance, or breach, of any

15 covenant or agreement set forth herein or under the Loan Documents;

16         (ii)    The order entered by the Bankruptcy Court approving the

17 terms of the DIP Facility, or any portion thereof, shall be vacated, reversed or modified.

18         (iii)    Any party shall successfully challenge the validity, perfection

19 or priority of any prepetition Liens in favor of CoBank.

20         (iv)    Relief from the automatic stay shall be granted in favor of any

21 other secured creditor to foreclose on any collateral of CoBank.

22         (v)    A Chapter 11 Trustee or examiner with expanded powers shall

23 be appointed, or the Bankruptcy Cases shall be converted to cases under Chapter 7 of the

24 Bankruptcy Code.

25         (vi)    The Bankruptcy Cases shall be dismissed.

26

**Page 11 of 20 -** DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1   (vii)   The "Events of Default" under the Credit Agreement, as

2   amended by the Fourteenth Amendment.

3          (s)   <u>Rights and Remedies</u>.   Upon the occurrence of any Event of Default,

4   CoBank may, in its sole discretion, (i) cease funding any advances under the DIP Facility, and

5   (ii) file an affidavit with the Bankruptcy Court certifying the occurrence of the Event of

6   Default.  CoBank shall, contemporaneously with the filing of such an affidavit with the

7   Bankruptcy Court, serve via email a copy of the affidavit on Borrowers and its counsel, the

8   U.S. Trustee's office, and counsel for any official creditors' committee.  Contemporaneously

9   with the filing and service of the affidavit, CoBank may request (and Borrowers shall

10  cooperate in scheduling) an expedited hearing regarding relief from the automatic stay for

11  CoBank to enforce its rights and remedies under the Loan Documents and applicable law.

12  Borrowers agree that such expedited hearing may be heard as early as forty-eight (48) hours

13  after CoBank files such affidavit.  Borrowers may file a response with the Bankruptcy Court

14  opposing relief from the automatic stay, which response must be limited to whether an Event

15  of Default has occurred that has not been cured.  Borrowers agree that if the Bankruptcy Court

16  determines that an uncured Event of Default has occurred, the Bankruptcy Court may enter an

17  order terminating the automatic stay so that CoBank may enforce its rights and remedies.  If

18  Borrowers fail to file a response, the Bankruptcy Court may enter an order terminating the

19  automatic stay, which Borrowers agree may be entered.

20          Without limiting any of the foregoing, the obligation of CoBank to

21  fund any DIP Advance will be subject to the condition that, on the date of such DIP

22  Advance, no Event of Default has occurred and is continuing or would result from such DIP

23  Advance.

24          (t)   <u>Documentation</u>.   All advances under the DIP Facility shall be deemed

25  additional advances under the Credit Agreement and shall be governed by the terms and

26  conditions thereof (as amended by the Fourteenth Amendment), and shall be subject to the

**Page 12 of 20** - DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440
Case 19-62584-pcm11   Doc 7   Filed 08/22/19

rights and priorities set forth in orders of the Bankruptcy Court approving or authorizing the
DIP Facility and all motions relating thereto, all of which shall be in form and substance
acceptable to CoBank in its sole discretion.  The Credit Agreement will be amended by the
Fourteenth Amendment to reflect the inclusion of the DIP Facility and the other terms and
conditions outlined herein.  In connection with such amendment, Borrowers will execute and
deliver or cause to be executed and delivered such documents, instructions, certificates and
assurances as CoBank may reasonably request.

(u)     Release.  Borrowers shall absolutely and unconditionally release and
forever discharge CoBank and any and all of its participants, parent corporations, subsidiary
corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof,
together with all of the present and former directors, officers, agents, consultants and
employees of any of the foregoing, from any and all known claims, demands or causes of
action of any kind, nature or description, whether arising in law or equity or upon contract or
tort or under any state or federal law or otherwise, which Borrowers has had, now has or has
made claim to have against any such Person for or by reason of any act, omission, matter,
cause or thing whatsoever arising from the beginning of time to and including the date of the
execution of the Fourteenth Amendment, whether such claims, demands and causes of action
are matured or unmatured.

**DISCLOSURES REQUIRED BY LBF 541.5**

6.     Debtors hereby identify the following provisions identified in LBF 541.5 that
will be included in the Financing Agreement, the Interim Order or the Final Order.

(a)     "*Provisions or findings of fact that bind Debtors, the estate and/or all
parties in interest with respect to the validity, perfection, relative priority or amount of the
secured party's lien or debt.*"  As a condition to providing the DIP Facility, CoBank has
required that Debtors make certain acknowledgments and admissions with respect to the
Prepetition Indebtedness (see Interim Order).  The Interim Order provides that Debtors'

**Page 13 of 20** - DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

1  acknowledgments and admissions shall be binding on its Estate, all parties in interest,

2  including, without limitation, any Committee, unless the Committee or other party in interest

3  has filed an adversary proceeding or contested matter challenging any such

4  acknowledgements or admissions no later than October 17, 2019, and provides further that if

5  no such adversary proceeding or contested matter is timely commenced as of such date, the

6  Prepetition Indebtedness of CoBank shall constitute allowed secured claims, not subject to

7  objection or subordination and otherwise unavoidable, and the prepetition liens of CoBank on

8  the Prepetition Collateral shall be deemed legal, valid, binding, perfected, not subject to

9  defense, counterclaim, offset of any kind or subordination, and otherwise unavoidable.  The

10  above provisions are justified because Debtors do not dispute the validity, perfection, relative

11  priority or amount of CoBank's lien or debt and on multiple occasions prepetition

12  acknowledged the amount of debt owing to CoBank.  The provision also allows ample time

13  for the Committee or other non-Debtor parties to analyze and, if necessary, challenge the

14  acknowledgments or admissions.

15              (b)      *"Any language that characterizes any postpetition payments as*

16  *payments of interest, fees or costs on a prepetition loan."*  The Fourteenth Amendment

17  requires Postpetition principal and interest payments on prepetition debt.  The Fourteenth

18  Amendment requires Debtors to pay over to CoBank all cash proceeds (and cash equivalents)

19  of Collateral for application to the Prepetition Indebtedness and the Postpetition Indebtedness

20  as provided in the Fourteenth Amendment.  In addition, the Fourteenth Amendment requires

21  Debtors to pay all scheduled principal and interest payments on term debt owing to CoBank.

22  The above provisions are required by CoBank as a condition to provide the amount of

23  financing requested by Debtors, and on the financial terms agreed to by CoBank.  Including

24  these provisions is justified in that no other financing is available without a priming lien and

25  the cost, delay, and risk of attempting a priming contest with CoBank would jeopardize or

26

**Page 14 of 20** -  DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

eliminate Debtors' opportunity to close its contemplated transaction and preserve the going concern value of Debtors' business.

(c) *"Waiver of Bankruptcy Code § 506(c) right to seek to charge collateral of secured party for the trustee's expenses in preserving or disposing of assets for the benefit of the secured party."* The Fourteenth Amendment and Interim Order provide that none of CoBank's Collateral shall be subject to any surcharge under Section 506(c) of the Bankruptcy Code. Debtors believe the above provision is justified because CoBank is over-secured, so there should be no need to surcharge CoBank's collateral.

(d) *"Waiver or release by debtor or the estate of any or all claims debtor/estate may have against the lender/secured party, including waiver of avoiding power causes of action against the lender/secured party or against insiders of the lender/secured party."* Pursuant to the Fourteenth Amendment, Debtors release CoBank from any and all known claims. Debtors believe the above provision is justified because Debtors are not aware of any claims it has against CoBank, and on multiple occasions prepetition (including in connection with the Express pharmacy sales) Debtors waived any claims it may have against CoBank.

(e) *"Waiver by debtor or the estate of the right to seek to "prime" the secured position of the lender/secured party under Item Bankruptcy Code §364(d)."* The Fourteenth Amendment prohibits Debtors from seeking any other debtor-in-possession financing during the pendency of its bankruptcy proceedings unless such financing is sufficient in amount and is actually used to fully repay in full all obligations and indebtedness Debtors to CoBank. Debtors believe the above provision is justified because the CoBank financing is designed to provide Debtors with sufficient financing such that Debtors will not need to seek alternative DIP financing.

(f) *"Waiver, effective on default, or expiration of a prior court order, of Debtors' right to move for a court order pursuant to Bankruptcy Code § 363(c)(2)(B),*

**Page 15 of 20** - DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

*authoring the use of cash collateral in the absence of the secured party's consent."* The Fourteenth Amendment provides that Debtors will not seek authority for the use of cash collateral of CoBank without the prior written consent of CoBank. Debtors believe the above provision is justified because the CoBank financing is designed to provide Debtors with sufficient financing such that Debtors should not need to seek use of CoBank's cash collateral.

7. The above items were required by CoBank as a condition to CoBank agreeing to provide the DIP Facility. For the reasons set forth above and for the reasons set forth below under the section titled "**THE DIP FINANCING SHOULD BE APPROVED**," Debtors believe the DIP Facility should be approved notwithstanding the inclusion of the above provisions.

## GENERAL BACKGROUND FACTS

8. NORPAC, a farmer-owned cooperative, along with its wholly-owned subsidiaries Hermiston Foods and Quincy Foods, is the largest independent, standalone processor of high-quality organic and conventional frozen vegetables and fruits in the Pacific Northwest. NORPAC owns raw processing plants in Brooks, Oregon, and Stayton, Oregon, a packaging plant and corporate headquarters building in Salem, Oregon, a harvesting operation in Hermiston, Oregon, and a raw processing, roasting, and packing plant in Quincy, Washington. Debtors have over 1,125 full-time employees along with up to 1,100 seasonal employees.

9. Debtors have a diverse supplier base built on an extensive network of over 220 contract growers made up of family-owned farms (145 farms in Oregon and 75 farms in Washington) spanning more than 40,000 acres. Debtors have long-term, established relationships with a global blue-chip customer base of over 1,250 customers, spanning the retail, foodservice, club, export, and industrial channels.

**Page 16 of 20** - DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1       10.     Additional information and background regarding Debtors' history, assets,

2 structure, operations, and business are contained in the Declaration of Winston Mar in

3 Support of First Day Motions filed contemporaneously herewith.

4                 **DEBTORS' NEED FOR DIP FINANCING**

5       11.     Debtors' cash flow budget projects that Debtors will need approximately

6 $15,000,000 of Postpetition financing in the next eight weeks. The projected borrowing

7 requirements result primarily from the seasonality of Debtors' business. Debtors need to

8 fund the harvest, purchase, and processing of fruits and vegetables.

9       12.     Debtors require the DIP Facility to continue to operate as a going concern, to

10 pay employees and trade creditors, and to preserve the value of their assets. Absent such

11 financing, Debtors' estates will be immediately and irreparably harmed. Debtors believe that

12 consummation of the DIP Facility is in the best interest of Debtors' estates.

13             **THE DIP FACILITY SHOULD BE APPROVED**

14       13.     The DIP Facility is a result of extensive negotiations between Debtors and

15 CoBank.

16       14.     Prior to filing, Debtors spoke with four other potential DIP financing sources

17 (including OPC). No lender was willing to provide DIP financing without a priming lien that

18 would be superior to CoBank's liens and security interests. CoBank is not willing to consent

19 to subordinate to any other DIP lender. Consequently, any alternative financing would

20 require a "priming" contest with CoBank that would be expensive and risky, and would cause

21 delay and uncertainty that would jeopardize the operations of Debtors and the opportunity to

22 realize going concern value for Debtors' operations.

23       15.     After considering all aspects of the DIP Facility, Debtors determined in the

24 exercise of their business judgment that it was in the best interest of Debtors and their estates

25 to obtain the DIP Facility from CoBank. Obtaining financing from CoBank (Debtors'

26

**Page 17 of 20** - DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

existing lender) provides greater certainty to critical suppliers, employees and other

interested parties, and helps to ensure a smooth transition into Chapter 11.

16.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to

obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of

the Bankruptcy Code, the court may authorize a debtor-in-possession to obtain credit or incur

debt that has priority over "ordinary" administrative expenses and, in particular, "(a) with

priority over any or all administrative expenses of the kind specified in Section 503(b) or

507(b) of this title; (b) secured by a lien on property of the estate that is not otherwise subject

to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."

11 U.S.C. § 364(c)(l)-(3).

17.     Other than the requirement of notice and a hearing, the only statutory

prerequisite under Section 364(c) for obtaining credit on a secured and superpriority basis is

that the debtor-in-possession must be unable to obtain credit allowable as an "ordinary"

administrative expense.  11 U.S.C. § 364(c)(2); *see also In re Garland Corp.*, 6 B.R. 456,

461 n.11 (B.A.P. 1st Cir. 1980) (secured credit under Section 364(c)(2) is authorized, after

notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Ames

Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y 1990) (debtor must show that it has

made a reasonable effort to seek other sources of financing under Sections 364(a) and (b) of

the Bankruptcy Code).

18.     Debtors are unable to obtain adequate unsecured credit allowable under

Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  Debtors are also

unable to obtain secured credit under Section 364(c) and (d) of the Bankruptcy Code on

equal or more favorable terms than those set forth in the Financing Agreement and Loan

Documents.  The terms of the DIP Facility are fair and reasonable, were negotiated by the

parties at arm's length and in good faith and, in Debtors' business judgment, are the best

available to Debtors under present market conditions and Debtors' financial circumstances.

**Page 18 of 20** -  DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    19.    Courts generally give broad deference to the business decisions of a debtor.

2    *See, e.g.*, *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Institutional*

3    *Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Air Lines, Inc.)*, 780

4    F.2d 1223, 1226 (5th Cir. 1986); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel*

5    *Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Walter v. Sonwest Bank* (*In re Walter*), 83 B.R.

6    14 (B.A.P. 9th Cir. 1987) (quoting *In re Cont'l*, 780 F.2d at 1226).  In particular, a

7    bankruptcy court should defer to a debtor's reasonable business judgment regarding the need

8    for financing so long as the proposed financing agreement does not contain terms that

9    leverage the bankruptcy process or benefit a third party rather than the bankruptcy estate.

10    This was explained by the bankruptcy court in *In re Ames*:

11          [A] court's discretion under Section 364 is to be utilized on
              grounds that permit reasonable business judgment to be exercised
12          so long as the financing agreement does not contain terms that
              leverage the bankruptcy process and powers or its purpose is not
13          so much to benefit the estate as it is to benefit a party-in-interest.

14    115 B.R. at 40.

15    20.    Here, Debtors' decision to obtain the DIP Facility from CoBank represents a

16    sound exercise of their business judgment.  The DIP Facility provides Debtors with the

17    funding it needs to meet its operational needs and fund its restructuring costs.  Without the

18    financing, Debtors' going concern value and the value of their assets will be lost.

19                        **INTERIM APPROVAL SHOULD BE GRANTED**

20    21.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to

21    use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days

22    after the service of such motion.  Upon request, however, the Court is empowered to conduct

23    a preliminary expedited hearing on the motion and authorize the use of cash collateral and

24    the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a

25    debtor's estate pending a final hearing.

26

**Page 19 of 20** -   DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
                      ON INTERIM AND FINAL BASIS

22. Pursuant to Bankruptcy Rules 4001(b) and (c), Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize Debtors to borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to avoid immediate and irreparable harm and prejudice to Debtors' estates and all parties-in-interest; and (b) schedule a hearing to consider entry of a final order.

23. Debtors have an urgent and immediate need for cash to preserve and maximize the value of their assets. Currently, Debtors do not have sufficient unencumbered funds with which to do so. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, Debtors will be immediately and irreparably harmed.

**NOTICE**

24. Notice of this Motion has been given to, among other parties, (a) Bank's attorneys, (b) the United States Trustee, (c) creditors holding the 30 largest unsecured claims. Further notice is impractical in the circumstances. Debtors submit that the foregoing constitutes good and sufficient notice and that no other or further notice need be given in the circumstances.

WHEREFORE, Debtors request entry of an order granting the relief requested herein, setting a final hearing on the Motion, and such other and further relief as is appropriate.

DATED this 22nd day of August, 2019.

TONKON TORP LLP

By */s/ Albert N. Kennedy*
　　Albert N. Kennedy, OSB No. 821429
　　Timothy J. Conway, OSB No. 851752
　　Michael W. Fletcher, OSB No. 010448
　　Ava L. Schoen, OSB No. 044072
　　Attorneys for Debtors

**Page 20 of 20** -  DEBTOR'S MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT
ON INTERIM AND FINAL BASIS

# EXHIBIT 1 TO MOTION

**PROPOSED FORM OF INTERIM ODER**

1   Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
        Direct Dial:  503.802.2013
2       Facsimile:    503.972.3713
        E-Mail:       albert.kennedy@tonkon.com
3   Timothy J. Conway, OSB No. 851752
        Direct Dial:  (503) 802-2027
4       Facsimile:    (503) 972-3727
        E-Mail:       tim.conway@tonkon.com
5   Michael W. Fletcher, OSB No. 010448
        Direct Dial:  (503) 802-2169
6       Facsimile:    (503) 972-3867
        E-Mail:       michael.fletcher@tonkon.com
7   Ava L. Schoen, OSB No. 044072
        Direct Dial:  (503) 802-2143
8       Facsimile:    (503) 972-3843
        E-Mail:       ava.schoen@tonkon.com
9   TONKON TORP LLP
    888 SW Fifth Avenue, Suite 1600
10  Portland, OR 97204-2099

11          Attorneys for Debtors

12

13              UNITED STATES BANKRUPTCY COURT

14                   DISTRICT OF OREGON

15  | In re | Case No. 19-62584-pcm11 |
16  | NORPAC Foods, Inc., | |
17  | Debtor. | |

18  | In re | Case No. 19-33102-pcm11 |
19  | Hermiston Foods, LLC, | |
20  | Debtor. | |
21  

22  | In re | Case No. 19-33103-pcm11 |
23  | Quincy Foods, LLC, | **INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS** |
24  | Debtor. | |
25  

26

**Page 1 of 19 -**   INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
            OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1          This matter came before the Court on August _____, 2019, upon Debtors' Motion for

2 Interim and Orders Authorizing Debtors to Obtain Secured Credit [ECF No. _____] (the

3 "Motion") dated August 23, 2019, filed by Debtors ("Debtors") in the above-captioned

4 Chapter 11 case (the "Case" and, with the consolidated Chapter 11 cases of all Debtors, the

5 "Cases") pursuant to Sections 105, 361, 362, 363, 364 and 507 of Title 11 of the United

6 States Code, 11 U.S.C. §§ 101 et. seq. (as amended, the "Bankruptcy Code"), Rules 2002,

7 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

8 Rules") and Rule 4001-1 of the Local Rules (the "Local Rules") of the United States

9 Bankruptcy Court for the District of Oregon, requesting, among other things entry of interim

10 and final Orders (this "Order"):

11          (i)      Authorizing Debtors to obtain secured postpetition financing on a super-

12 priority basis (the "DIP Facility") subject only to the Carveout (defined herein), and the

13 Permitted Liens (as defined in the Credit Agreement (defined herein)); (ii) authorizing

14 Debtors to execute and enter into the Fourteenth Amendment to Credit Agreement (the

15 "Fourteenth Amendment"), which amends the Credit Agreement dated as of November 15,

16 2017, among Debtors, as borrowers (in such capacity, "Borrowers"), the guarantors from

17 time to time party thereto, and CoBank, ACB, a federally chartered instrumentality of the

18 United States ("CoBank"), both in its capacity as sole lender (when referenced solely in its

19 lender capacity, "Lender") and in its capacity as administrative agent for Lenders (when

20 referenced solely in its administrative agent capacity, the "Administrative Agent") (as

21 amended, including as amended by the Fourteenth Amendment, the "Credit Agreement") (a

22 copy of which, incorporating all amendments (but excluding schedules and exhibits), has

23 been filed with the Court, is available on the Court's website and is also available upon

24 request by contacting counsel for Debtors), and to perform such other and further acts as may

25 be required in connection with the Credit Agreement (as defined in the Credit Agreement);

26

**Page 2 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
                  OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1        (ii)      Granting super-priority administrative expense claims to CoBank for the

2 postpetition financing payable from, and having recourse to all of the prepetition and

3 postpetition property of Debtors' estates (the "Estates") and all proceeds thereof (except for

4 avoidance actions and the proceeds of avoidance actions) subject only to the Carveout and

5 the valid, duly perfected, unavoidable prior prepetition Permitted Liens, and granting liens

6 for the postpetition financing to CoBank in all Postpetition Collateral (defined herein) in

7 accordance with the Credit Agreement, and this Order;

8        (iii)     Scheduling a final hearing (the "Final Hearing") to be held on

9 September _____, 2019, to consider entry of an Order authorizing, among other things,

10 Debtors to obtain financing under the DIP Facility, the Credit Agreement, on a final basis

11 (the "Order");

12        (iv)     A Hearing on the Motion having been held before the Court on August _____,

13 2019, to consider entry of this Interim Order, appearances being noted on the record, Debtors

14 and CoBank having agreed to the entry of this Interim Order, all objections to the Order

15 being resolved, overruled, or withdrawn, and after due deliberation and consideration and

16 sufficient cause appearing therefor; now, therefore,

17       IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, THAT:

18      1.     <u>Jurisdiction; Petition Date</u>

19        (a)     This Court has jurisdiction to hear this Motion pursuant to 28 U.S.C.

20 §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(D), (K), (M), and

21 (O).

22        (b)     On August 22, 2019, Debtors filed their Chapter 11 petitions (the

23 "Petition Date").  Since the Petition Date, Debtors have remained in possession and control of

24 their assets as debtors-in-possession pursuant to Sections 1107 and 1108 of Title 11 of

25 Bankruptcy Code.

26

**Page 3 of 19** -  INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

2. <u>Disposition</u>. The Motion is hereby granted, effective as of the date of the filing of the Motion, on an interim basis on the terms set forth herein. Any objections to the Motion or to the relief sought in the Motion have been resolved, withdrawn, or are hereby overruled on the merits. This Order shall be valid, binding in all parties-in-interest and fully effective on a final basis upon entry by the Court.

3. <u>Notice</u>. The Interim Hearing with respect to the Motion was held pursuant to the authorization of Bankruptcy Rule 4001(c)(2).

4. <u>Debtors' Stipulations Regarding Prepetition Indebtedness</u>. In connection with the Credit Agreement, the other Loan Documents, and this Order, Debtors acknowledge, represent, stipulate, and agree (subject to paragraph 21 below) that:

(a) The Administrative Agent, on behalf of Lenders (as defined in the Credit Agreement), is the holder of a claim immediately prior to the filing of the petitions, against Debtors in the approximate sum of $125,179,773.94 consisting of borrowings of $123,226,611.31, accrued interest of $1,948,564.12, accrued fees of $4,598.51, plus all other costs, fees and obligations owing, including, without limitation, all costs and expenses of administration, collection and enforcement incurred by the Administrative Agent prior to the Petition Date (the "Prepetition Indebtedness"). To the extent permitted under Section 506(b) of the Bankruptcy Code, CoBank is also entitled to interest accrued after commencement of the Cases and the reasonable fees, costs and charges referred to in Section 506(b).

(b) The Prepetition Indebtedness is evidenced by, without limitation, (i) the Credit Agreement; (ii) outstanding principal obligations of no less than $36,621,623.99 pursuant to a Term Loan Note dated November 15, 2017, by the Borrowers in favor of CoBank; (iii) outstanding principal obligations of no less than $82,500,000.00 pursuant to a Revolving Note dated November 15, 2017, by the Borrowers in favor of CoBank; (iv) no less than $800,000 in Letter of Credit Obligations (as defined in the Credit Agreement); (v) outstanding principal obligations of no less than $4,104,987.32 on all Swing Line Loans

**Page 4 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1  made under the Loan Documents; (vi) and by certain other documents relating to the

2  foregoing, including the Loan Documents.

3        (c)    Payment of the Prepetition Indebtedness is absolutely and

4  unconditionally due and payable, without defense, offset, or counterclaim, and Debtors waive

5  and release (i) any right to object to the allowance of, and any defense with respect to, the

6  Prepetition Indebtedness; and (ii) any right to contest the priority, perfection or validity of the

7  liens securing such Prepetition Indebtedness.

8        (d)    Pursuant to Section 552(b) of the Bankruptcy Code and the Loan

9  Documents, including, without limitation, a Security Agreement dated as of November 15,

10  2017 among Borrowers and the Administrative Agent and certain Mortgages (as defined in

11  the Credit Agreement) entered into by Borrowers prior to the Petition Date, the Prepetition

12  Indebtedness is secured by a security interest and lien in substantially all of Debtors' real and

13  personal property, whether now owned or existing or hereafter acquired or arising, including,

14  without limitation, all accounts, chattel paper and electronic chattel paper, deposit accounts,

15  documents, equipment, general intangibles, goods, instruments, investment property,

16  intellectual property rights, inventory, letter of credit rights, letters of credit, together with all

17  substitutions and replacements for and products of any of the foregoing, the proceeds of any

18  and all of the foregoing and all proceeds and products of such collateral security acquired by

19  the Estates after the commencement of the Cases (such collateral security, proceeds and

20  products are to the extent valid, enforceable, secured, perfected and unavoidable: herein called

21  the "Prepetition Collateral").

22       5.    Findings Regarding the DIP Facility Based on the Record at the Hearing

23        (a)    It is necessary for Debtors to obtain postpetition financing for a period

24  of time and in an amount which would allow Debtors to continue to operate as a going

25  concern, to enable Debtors to continue to operate their cooperative, to pay employees, and to

26  preserve the value of their assets. An immediate need exists for Debtors to obtain further

**Page 5 of 19 -**   INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
                  OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1  credit from CoBank. Without such funds Debtors will not be able to continue the operation of

2  their business and to pay their employees, and reorganization, including a Specified Sale (as

3  defined herein) may become impossible.

4  (b)  CoBank has indicated a willingness to extend postpetition secured

5  credit under the terms and conditions of this Order and the Credit Agreement. Debtors are

6  unable to obtain financing on terms more favorable than terms offered by CoBank under the

7  Credit Agreement and are unable to obtain adequate unsecured credit allowable under

8  Section 503(b)(1) of the Bankruptcy Code as an administrative expense. Debtors are also

9  unable to obtain secured credit under Section 364(c) and (d) of the Bankruptcy Code on terms

10  more favorable than those set forth in the Credit Agreement.

11  (c)  The terms of the Credit Agreement are fair and reasonable, were

12  negotiated by the parties at arm's length and in good faith and are the best available to

13  Debtors under present market conditions and Debtors' financial circumstances. Based on the

14  foregoing, any credit extended under the Credit Agreement by CoBank is extended in good

15  faith, as that term is used in Section 364(e) of the Bankruptcy Code.

16  (d)  Debtors, in order to satisfy their need for postpetition financing, as

17  determined in the exercise of their sound business judgment, desire the Court to enter this

18  Order. Entry of this Order is necessary to prevent irreparable harm to Debtors, including the

19  harm that would result from the disruption of Debtors' business, will increase the possibilities

20  for a successful reorganization, including a Specified Sale, as a going concern, and is in the

21  best interest of Debtors' Estates. Absent entry of this Order, Debtors' Estates will be

22  immediately and irreparably harmed. Consummation of the DIP Facility is in the best interest

23  of Debtors' Estates.

24  6.  Authorization of the DIP Facility and Fourteenth Amendment

25  (a)  Borrowers are authorized to enter into the DIP Facility and the

26  Fourteenth Amendment and to incur postpetition debt under the DIP Facility pursuant to the

**Page 6 of 19** -  INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1  terms of the Credit Agreement and this Order.  To the extent of any conflict between this

2  Order and the Fourteenth Amendment, this Order shall govern.

3         (b)    In accordance with the terms of this Order and the Credit Agreement,

4  the DIP Facility shall be used to (i) fund the working capital requirements and other financing

5  needs of Debtors during the pendency of the Cases, (ii) pay other costs and expenses of the

6  administration of the Case, and (iii) pay fees and expenses (including, without limitation,

7  attorney's fees and advisory fees owed to CoBank , including, without limitation, reasonable

8  fees and expenses incurred prior to the commencement of the Case).  Use of funds shall

9  further be consistent with the Budget attached hereto as **Exhibit 1**, which may be amended

10  from time to time by delivery of a revised and updated Budget by Debtors to CoBank and

11  which shall be effective and become the Budget referred to herein only upon written approval

12  of such amended Budget by CoBank in its reasonable discretion.  Compliance with the Budget

13  shall be determined as follows: actual Net Cash Flow as reported by Wednesday of each week

14  and calculated as of Friday of the immediately preceding week for the four-week period then

15  ending shall not be less than 85% of Net Cash Flow forecasted for such four-week period as

16  set forth in the Budget then in effect.  The DIP Facility shall not be used to pay any fees or

17  expenses incurred at any time in connection with the filing or prosecution of any action which

18  seeks to invalidate, challenge, dispute, avoid, subordinate or otherwise impair the claims of

19  the Administrative Agent or any Lenders, or any liens or priorities in favor of the

20  Administrative Agent (on behalf of Lenders), or which seeks to recover on any claims against

21  or transfers made to the Administrative Agent or any Lenders; provided, however, that the

22  Committee may investigate the liens, security interests, and claims of the Administrative

23  Agent and Lenders.

24         (c)    Subject to the Local Rules, any and all fees and expenses paid or

25  required to be paid in connection with the Credit Agreement shall be paid by Debtors as

26  detailed therein.

**Page 7 of 19** -   INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
                  OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1         (d)      Debtors are hereby authorized and directed to pay the DIP Facility Fee

2  (as defined in the Fourteenth Amendment) in accordance with Section 2.7(b) of the Credit

3  Agreement.

4         (e)      In furtherance of the foregoing and without further approval of the

5  Court, Debtors are authorized and directed on a final basis to perform all acts, to make,

6  execute and deliver all instruments and documents (including the execution or recordation of

7  security agreements, mortgages and financing statements) that may be required or necessary

8  (including necessary by reason of request by CoBank) for Debtors' performance under the

9  Credit Agreement or this Order.

10         (f)      Upon satisfaction of the conditions precedent set forth in the Credit

11  Agreement and the entry of this Order, obligations, agreements and covenants of Debtors

12  under the Credit Agreement shall be valid and binding and enforceable against Debtors under

13  the terms of the Credit Agreement and this Order.  Subject to paragraph 21 below, no

14  payment, advance, financial accommodation, transfer, or grant of security under the Credit

15  Agreement or this Order shall be voidable or recoverable under the Bankruptcy Code or under

16  any applicable law (including Section 502(d) of the Bankruptcy Code), or subject to any

17  defense, reduction, setoff, recoupment or counterclaim.

18        7.     <u>DIP Facility Advances; Effective Date</u>

19         (a)      Revolving advances made under the DIP Facility from and after the

20  DIP Facility Effective Date (defined herein) until the DIP Facility Maturity Date (defined

21  herein) shall be governed by the terms and conditions of the Credit Agreement and this Order,

22  including, without limitation, the terms and conditions governing the applicable interest rates.

23  The "DIP Facility Maturity Date" shall mean the earliest of (i) October 31, 2019, (ii) the

24  closing of a sale of all or substantially all of the assets of Debtors pursuant to a sale under

25  Section 363 of the Bankruptcy Code (a "Specified Sale," as further defined in the Credit

26  Agreement), or (iii) the effective date of a confirmed plan under Section 1129 of the

**Page 8 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 Bankruptcy Code.  The "Postpetition Indebtedness" shall be all Obligations (as such term is

2 defined in the Credit Agreement) arising subsequent to the Petition Date, including

3 postpetition interest.  The "DIP Facility Effective Date" shall be the date upon which the

4 Court enters this Order.

5         (b)     CoBank shall not be required to extend credit under the DIP Facility

6 unless and until CoBank and its legal counsel are satisfied that:  (i) the conditions precedent

7 for such credit extensions set forth in the Credit Agreement have been met; and (ii) no Event

8 of Default under this Order has occurred.

9         8.     Postpetition Indebtedness; Liens and Priority

10         (a)     The Postpetition Indebtedness shall be:

11         (i)     allowable under Section 503(b)(1) of the Code as an

12 administrative expense with priority pursuant to the provisions of Section 364(c)(1) of the

13 Code over all other administrative expenses of the kind specified in Section 503(b) or

14 Section 507(b) of the Code and all other expenses and claims, subject only to the Carveout;

15 provided however, such claims shall not extend to the avoidance actions and the proceeds

16 thereof under Sections 544, 547, 548, 549 and 553 of the Bankruptcy Code (the "Avoidance

17 Actions");

18         (ii)     secured by (and the Administrative Agent (on behalf of

19 Lenders) is hereby granted) a security interest in and lien on all present and future property of

20 the Estates, including both real and personal property, whether now owned or existing or

21 hereafter acquired or arising by the Estates, including specifically and without limitation (but

22 specifically excluding the Avoidance Actions):  (A) all of the Estates' now owned or existing

23 or hereafter acquired or arising accounts, chattel paper and electronic chattel paper, deposit

24 accounts, documents, equipment, general intangibles, goods, instruments, investment

25 property, intellectual property rights, inventory, letter of credit rights, letters of credit, and

26 any items in any lockbox account; together with (i) all substitutions and replacements for and

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1    products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all

2    accessories, attachments, parts, and repairs now or hereafter attached or affixed to or used in

3    connection with any goods; (iv) all warehouse receipts, bills of lading and other documents

4    of title now or hereafter covering any of the foregoing; (v) all collateral subject to the lien of

5    any security document in favor of the Administrative Agent; (vi) any money, or other assets

6    of Debtors that may or hereafter come into possession, custody or control of the

7    Administrative Agent or any Lenders; (vii) proceeds of any and all of the foregoing; (viii)

8    books and records of Debtors, including all mail or electronic mail addressed to Debtors;

9    (ix) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in

10   which Debtors now have or hereafter acquire any rights; and (x) all proceeds and products of

11   such collateral security acquired by the Estates, (B) the Prepetition Collateral, (C) all real

12   estate of the Estates; provided, however, that no lien shall attach directly to any of Debtors'

13   leasehold interests, but shall only attach to the proceeds of the sale or disposition of such

14   lease, unless (i) expressly permitted by the terms of that lease, or (ii) Debtors have consent of

15   the applicable landlord to grant the Administrative Agent a lien or deed of trust on such

16   leasehold, and (D) all proceeds, products, rents, issues and profits of all of the foregoing (all

17   herein referred to as the "Postpetition Collateral"), which lien and security interest shall have

18   priority over all other liens, claims and expenses in Debtors' Cases except with respect to the

19   (i) Carveout, (ii) all other valid, duly perfected, unavoidable prior prepetition Permitted

20   Liens, and (iii) valid beneficiaries of assets subject to a trust arising under PACA (as defined

21   in the Credit Agreement). The liens and security interests granted above to secure payment

22   of the Postpetition Indebtedness shall be valid and enforceable regardless of whether the

23   Court determines that some or all of the security interests and liens held by the

24   Administrative Agent in the Prepetition Collateral are unenforceable for any reason.

25        9.    Perfection of CoBank Liens; Termination. Entry of this Order automatically

26   perfects the liens granted by paragraph 8 of this Order.

**Page 10 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1    10.    CoBank; Use of Collateral; Adequate Protection; Application of Funds

2            (a)    Any cash collateral of Lenders used by Debtors since the

3    commencement of Debtors' Cases shall constitute Postpetition Indebtedness under the DIP

4    Facility.

5            (b)    Any use of cash collateral shall be treated as a simultaneous reduction

6    of Prepetition Indebtedness and an increase in Postpetition Indebtedness, in each case by the

7    amount of such use of cash collateral.

8            (c)    Debtors' use of CoBank's cash collateral as of any week shall not

9    exceed the aggregate amount of operating and non-operating disbursements permitted for such

10   week as set forth in the Budget.

11           (d)    Debtors shall account for all cash proceeds (and cash equivalents) of

12   Collateral, and such accounting shall be applied to the Prepetition Indebtedness and the

13   Postpetition Indebtedness as provided in the Credit Agreement.

14           (e)    Absent manifest error, application of funds by CoBank to the

15   reduction of the Prepetition Indebtedness or the Postpetition Indebtedness shall be final.

16   Nothing shall impair the validity of such application or such security interest or lien, subject

17   to paragraph 21 below.

18   11.    Events of Default.  The Events of Default contained in the Credit Agreement

19   (as amended by the Fourteenth Amendment) are hereby approved and incorporated herein by

20   reference.  For the avoidance of doubt, the failure of Debtors to meet any of the Milestones

21   included as Affirmative Covenants in the Credit Agrement (each as defined in the Credit

22   Agreement), shall be Events of Default.  Such Milestones include:

23           (a)    As contained in Section 6.14(b) of the Credit Agreement, by

24   September 27, 2019, the Bankruptcy Court shall have entered an order or orders approving

25   bidding procedures for the Specified Sale, which such order or orders shall be in form and

26   substance acceptable to the Administrative Agent in its sole discretion;

**Page 11 of 19** -  INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1         (b)     As contained in Section 6.14(c) of the Credit Agreement, by

2 October 28, 2019, the Bankruptcy Court shall have entered orders approving the sale of all or

3 substantially all of the assets of Borrowers, on such terms acceptable to the Administrative

4 Agent in its sole discretion which orders shall be in form and substance acceptable to the

5 Administrative Agent in its sole discretion; and

6         (c)     As contained in Section 6.14(c) of the Credit Agreement, by

7 October 31, 2019, the transactions contemplated in the Specified Sale Order shall have been

8 consummated.

9      For the further avoidance of doubt, the failure of Debtors to comply with all Negative

10 Covenants in the Credit Agreement (each as defined in the Credit Agreement), shall be

11 Events of Default, including but not limited to new Section 7.19 of the Credit Agreement

12 which provides:

13        (a)     Borrowers will not seek any debtor-in-possession financing (other than

14 the financing provided under [the Credit] Agreement) until (a) all Prepetition Letters of Credit

15 have been terminated, cash collateralized in an amount equal to 105% of the aggregate face

16 amount of such Prepetition Letters of Credit, or supported by one or more letters of credit

17 naming the Administrative Agent as beneficiary with terms and conditions (and issued by one

18 or more financial institutions) acceptable to the Administrative Agent in its sole discretion,

19 (b) all other Obligations (other than contingent indemnification obligations) at any time owing

20 by Borrowers to the Administrative Agent or any Lender have been paid in full in cash and

21 (c) all commitments of Lenders under the Loan Documents (including, without limitation,

22 under the DIP Facility) have been terminated.

23        (b)     Borrowers shall not open any new deposit, securities or commodity

24 accounts, except (i) accounts maintained with the Administrative Agent or (ii) deposit

25 accounts maintained with other financial  institutions so long as such account is subject to a

26 first-priority perfected Lien in favor of the Administrative Agent and Borrowers have

**Page 12 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1  delivered to the Administrative Agent a fully-executed deposit account control agreement in

2  form and substance acceptable to the Administrative Agent.

3          (c)     Without the prior written consent of the Administrative Agent, no

4  proceeds of the DIP Facility shall be used in a manner or for a purpose other than in

5  accordance with the Budget and this Agreement.

6          (d)     Borrowers shall not grant any new Liens in favor of any Person (other

7  than the Administrative Agent and Lenders) on any of the Collateral or Postpetition

8  Collateral, nor seek to prime any Lien of the Administrative Agent or Lenders on any of the

9  Collateral or the Postpetition Collateral.

10         12.    <u>Remedies</u>.  Upon the occurrence of an Event of Default:

11          (a)     CoBank and the other Lenders may refuse to make revolving

12  advances; and

13          (b)     the Administrative Agent shall be entitled to relief from the automatic

14  stay to enforce its rights and remedies under this Final Order, the Credit Agreement, the Loan

15  Documents and any applicable law upon filing an affidavit (the "<u>Affidavit</u>") with the Court

16  certifying the occurrence of an Event of Default.  Contemporaneously with such filing, (i) the

17  Administrative Agent shall serve a copy of the Affidavit upon Debtors, the Committee and the

18  U.S. Trustee's Office, and (ii) the Administrative Agent may request an expedited hearing

19  regarding relief from the automatic stay, which such hearing may be scheduled within four

20  business days of the filing of the Affidavit.  Debtors, the Committee and the Office of the

21  U.S. Trustee shall be entitled to file a response to the Affidavit with the Court, but such

22  response must be limited to whether an Event of Default has occurred that has not been cured.

23  Such response shall be served on counsel to the Administrative Agent.  If Debtors, the

24  Committee, and the Office of the United States Trustee fail to file such a response, the Court

25  may enter an order terminating the automatic stay.

26

**Page 13 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

13. <u>Application of Proceeds Upon Sale</u>. Upon the consummation of a Specified Sale or a sale of any of Debtors' assets and the entry of the Specified Sale Order by the Court, all proceeds from such sale shall immediately be turned over to CoBank to be applied to the outstanding amounts owing in accordance with the Loan Documents pursuant to Section 2.13 of the Credit Agreement.

14. <u>No Marshaling</u>. In no event shall CoBank be subject to the equitable doctrine of marshaling or any similar doctrine.

15. <u>Retention of Counsel and Consultants; Costs and Expenses</u>. CoBank is authorized to retain such counsel and consultants (including financial consultants and investment bankers) as CoBank may determine from time to time in its reasonable discretion. Payment of fees and expenses incurred by CoBank in connection with the Loan Documents, the Cases, and all matters related to any of the foregoing, including, without limitation, all fees and disbursements of legal counsel of CoBank, all fees and disbursements of consultants to CoBank (including financial consultants), all appraisal fees, all title costs or fees, filing fees, mortgage registry tax, recording and other out-of-pocket expenses incurred by CoBank shall be paid by Debtors pursuant to the terms of the Credit Agreement, subject to the procedures set forth in the Local Rules.

16. <u>Allowance for Improvements made by the Estates</u>. In consideration of Debtors' use of the Collateral in accordance with the Loan Documents, and in view of the effect of such use, (i) the Collateral shall not be subject to any surcharge under Section 506(c) of the Bankruptcy Code and (ii) the "equities of the case" exception in section 552 shall not apply with respect to the Collateral.

17. <u>Successors and Assigns</u>. Except as otherwise stated herein, the provisions of this Final Order shall be binding upon all persons and entities and shall inure to the benefit of CoBank, Debtors and their respective successors and assigns, including, without limitation, any subsequent Chapter 11 or Chapter 7 trustee.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

18. <u>Carveout for United States Trustee Fees and Professional Fees</u>. Subject to the terms and conditions contained in this paragraph 18, all prepetition and postpetition claims (whether secured or unsecured) of CoBank, including CoBank's super-priority administrative expense claim, are subordinate to the Carveout (as defined below). As used herein, the term "Carveout" shall mean unpaid Administrative Expenses (a) payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Court; and (b) fees and expenses of attorneys and financial advisors employed by Debtors and the Committee (including allowed expenses of the members of such statutory committees) pursuant to Sections 327 and 1103 of the Bankruptcy Code (i) which were provided for in the Budget and incurred prior to an Event of Default but not yet paid; and (ii) an aggregate amount not to exceed $300,000 for reasonable fees and expenses incurred following a Postpetition Event of Default; but specifically excluding any success, completion or similar fees. The Carveout shall exclude any fees and expenses incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief invalidating, setting aside, avoiding, subordinating, or otherwise adversely affecting CoBank's claims against the Estates (including the Prepetition Indebtedness, the Postpetition Indebtedness, and CoBank's liens on the Collateral) each a Challenge (as defined herein).

19. <u>Stay; Modification</u>. No subsequent stay, modification, termination, failure to extend the term, or vacation of this Order shall affect, limit or modify the validity, priority or enforceability of any liability of Debtors under the Credit Agreement, or any lien or security interest granted to CoBank under such documents. All credit extended under the Credit Agreement is made in reliance on this Order, and, except as set forth below, the obligations incurred by Debtors to CoBank under the Credit Agreement cannot be subordinated, lose superpriority status, or be deprived of the benefit of the senior liens granted to CoBank, by any subsequent order in Debtors' Chapter 11 Cases or converted Chapter 7 cases. The

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1   provisions of this Order dealing with the liability of Debtors under the Credit Agreement

2   shall not be modified or superseded by any order confirming a plan of reorganization

3   (including the use of the cram-down provisions of section 1129(b) of the Code) in Debtors'

4   Cases.  If any party shall appeal any order approving the DIP Facility or shall successfully

5   challenge the validity, perfection, or priority of any pre-petition liens in favor of the

6   Administrative Agent (on behalf of Lenders), Lenders may terminate their commitment to

7   fund any DIP Advances (as defined in the Credit Agreement) and stop funding any DIP

8   Advances upon written notice to Debtors**.**

9        20.   <u>Preservation of Rights Under This Order</u>.  The provisions of this Order and

10   any actions taken pursuant hereto shall survive entry of any order which may be entered

11   (a) converting Debtors' Cases to Chapter 7 cases, (b) confirming or consummating any plan

12   of reorganization of Debtors or (c) dismissing Debtors' Cases or any subsequent Chapter 7

13   cases pursuant to Sections 303, 305, or 1112 of the Bankruptcy Code, and the terms and

14   provisions of this Order as well as the priorities in payment, liens, and security interests

15   granted pursuant to this Order and the Credit Agreement shall continue in this or any

16   superseding case under the Bankruptcy Code, and such priorities in payment, liens and

17   security interests shall maintain their priority as provided by this Order until all Obligations

18   are indefeasibly paid and satisfied.

19        21.   <u>Challenge of Claim or Lien</u>.  The acknowledgements and admissions of

20   Debtors in paragraph 4 of hereof shall be binding on their Estates and all parties in interest,

21   including, without limitation, any Committee, unless the Committee or other party in interest

22   has filed an adversary proceeding or contested matter challenging any such

23   acknowledgements or admissions (each a "<u>Challenge</u>"), no later than October 17, 2019

24   subject to extension or written consent of CoBank and the Committee or order of the court

25   for cause.  If no such adversary proceeding or contested matter is timely commenced as of

26   such date, the Prepetition Indebtedness of CoBank shall constitute allowed secured claims,

**Page 16 of 19** -  INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

1 not subject to objection or subordination and otherwise unavoidable, and the pre-petition

2 liens of CoBank on the Prepetition Collateral shall be deemed legal, valid, binding, perfected,

3 not subject to defense, counterclaim, offset of any kind, or subordination, and otherwise

4 unavoidable except with respect to the value of the Prepetition Collateral which may be

5 challenged at any time in the Cases without regard to the limitations of this paragraph.

6       22. <u>Disgorgement; Recharacterization</u>. Any and all payments made to CoBank

7 pursuant to this Order including, but not limited to principal, interest, fees, and expenses,

8 shall be subject to disgorgement and/or recharacterization (for example, a payment of interest

9 may be recharacterized to pay down principal) upon a successful Challenge.

10       23. <u>Right to Credit Bid</u>. The right of CoBank to credit bid the obligations owed to

11 CoBank by Debtors (pursuant to Section 363(k) of the Bankruptcy Code), in whole or in part,

12 in connection with any sale or disposition of assets in the Cases (including in connection with

13 a plan of reorganization for which confirmation is sought under Section 1129(b)(2)(A)(i)) is

14 hereby expressly reserved and preserved by this Order.

15       24. <u>Amendments and Modifications</u>. Debtors and CoBank may enter into any

16 non-material amendments or modifications to the Credit Agreement without notice or a

17 hearing or further order of this Court; provided, however, that any such modifications shall

18 be filed with the Court and shall not be adverse to Debtors or their Estates.

19       25. <u>Invoicing</u>. Following entry of this Interim Order and continuing thereafter for

20 so long as the Obligations are outstanding, CoBank is authorized to issue invoices to Debtors

21 regarding the Obligations and any related fees, expenses, and interest in accordance with

22 CoBank's prior pre-petition practice, such issuances shall not be deemed to be in violation

23 Section 362 of the Bankruptcy Code.

24       26. <u>Order Governs</u>. Except as otherwise specifically provided in this Order, in

25 the event of a conflict between the provisions of this Order, the Motion, and the Loan

26 Documents, the provisions of this Order shall govern.

**Page 17 of 19** - INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO
OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

27.     Final Hearing.  The final hearing on approval of the DIP Facility is scheduled for September _____, 2019 at _____ prevailing Pacific time in Courtroom No. 4 of the United States Bankruptcy Court, 1050 SW Sixth Avenue, Portland, Oregon.

28.     Notice of Final Hearing.  The final hearing on approval of the DIP Facility is scheduled for September _____, 2019 at _____ prevailing Pacific time in Courtroom No. 4 of the United States Bankruptcy Court, 1050 SW Sixth Avenue, Portland, Oregon.

29.     Notice of Final Hearing; Objections to Entry of Final Order.  The Debtor shall mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing, including notice that Debtors will seek at the Final Hearing a waiver of rights under Section 506(c) of the Bankruptcy Code) within three business days from the date of entry of this Interim Order to the parties that received notice of the Interim Hearing, any other party that has filed a request for notices with the Court, to the Office of the United States Trustee and to counsel for any Committee that may be appointed in the Case. Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file and serve such objection so as to be received no later than September _____, 2019, at 4:00 p.m. prevailing Pacific time on the following:

(a)     Tonkon Torp LLP; 1600 Pioneer Tower; 888 SW Fifth Avenue; Portland, Oregon 97204; Attention: Albert Kennedy; Albert.Kennedy@tonkon.com;

(b)     Faegre Baker Daniels, LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, Minnesota 55402; Attention: Michael Stewart, Breia Schleuss and Colin Dougherty; Michael.Stewart@Faegrebd.com; Breia.Schleuss@Faegrebd.com; Colin.Dougherty@Faegrebd.com;

(c)     Miller Nash LLP, 3400 U.S. Bancorp Tower, 111 S.W. Fifth Avenue, Portland, Oregon 97204; Attention: Teresa Pearson; Teresa.Pearson@MillerNash.com;

(d)     Office of the United States Trustee for the District of Oregon.

# # #

**Page 18 of 19** -  INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

1 | I certify that I have complied with the requirements of LBR 9021-1(a).

2 | Presented by:

3 | TONKON TORP LLP

4 |

5 | By _____
Albert N. Kennedy, OSB NO. 821429
6 | Timothy J. Conway, OSB No. 851752
Michael W. Fletcher, OSB No. 010448
7 | Ava L. Schoen, OSB No. 044072
888 S.W. Fifth Avenue, Suite 1600
8 | Portland, OR 97204-2099
Telephone: 503-221-1440
9 | Facsimile: 503-274-8779
E-mail: al.kennedy@tonkon.com
10 | tim.conway@tonkon.com
michael.fletcher@tonkon.com
11 | ava.schoen@tonkon.com
Attorneys for Debtors

12 | cc: List of Interested Parties

13 |

**Page 19 of 19 -** INTERIM ORDER GRANTING DEBTORS' MOTION FOR AUTHORIZATION TO OBTAIN SECURED CREDIT ON INTERIM AND FINAL BASIS

# EXHIBIT 1 TO ORDER

**Budget**

**NORPAC Foods, Inc.**

*DIP Budget Forecast*
*($s in 000s)*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8/23/19 | 8/30/19 | 9/6/19 | 9/13/19 | 9/20/19 | 9/27/19 | 10/4/19 | 10/11/19 | 10/18/19 | 10/25/19 | 11/1/19 | 11/8/19 | 11/15/19 | |
| **Total Net Sales** | $6,452 | $6,130 | $4,521 | $4,521 | $4,521 | $4,759 | $7,923 | $7,923 | $7,923 | $7,923 | $7,316 | – | – | $69,912 |
| **Receipts** | | | | | | | | | | | | | | |
| Accounts Receivable Collections | 4,899 | 4,805 | 3,925 | 5,090 | 5,930 | 6,060 | 5,252 | 4,990 | 5,025 | 6,157 | 8,153 | – | – | $60,285 |
| Estimated Asset Sale Proceeds | – | – | – | – | – | – | – | – | – | – | 154,312 | – | – | $154,312 |
| Total | 4,899 | 4,805 | 3,925 | 5,090 | 5,930 | 6,060 | 5,252 | 4,990 | 5,025 | 6,157 | 162,465 | – | – | 214,597 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Salaried Payroll and Related Taxes | 597 | – | 597 | – | 597 | – | 597 | – | 597 | – | 597 | 4,200 | 20 | $7,799 |
| Hourly & Seasonal Labor | 2,000 | 1,010 | 1,621 | 817 | 1,515 | 939 | 1,440 | 746 | 1,486 | 766 | 1,367 | 1,400 | – | $15,105 |
| Workers Compensation Payouts | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | – | – | $165 |
| Grower Payables | 471 | 465 | 465 | 3,153 | 1,025 | 248 | 248 | 1,259 | 2,512 | 282 | 282 | – | – | $10,411 |
| Payroll Related Insurance & Benefits | 300 | 300 | 1,200 | 300 | 300 | 300 | – | 1,200 | 300 | 300 | 300 | 1,200 | – | $6,000 |
| Ingredients | 500 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | 1,154 | – | – | $12,038 |
| Broker | – | – | 316 | – | – | – | 261 | – | – | – | 330 | – | – | $908 |
| Utilities | – | – | 163 | 325 | 325 | 325 | 190 | 190 | 190 | 190 | 190 | – | – | $2,088 |
| Insurance | 100 | – | – | 225 | – | – | – | – | 225 | – | – | – | – | $550 |
| Freight | 577 | 577 | 577 | 577 | 577 | 577 | 577 | 577 | 577 | 577 | 577 | – | – | $6,346 |
| Storage | 500 | – | 500 | 500 | 1,200 | – | 500 | 500 | 1,200 | – | 500 | – | – | $5,400 |
| Packaging | 516 | 516 | 381 | 381 | 381 | 381 | 634 | 634 | 634 | 634 | 585 | – | – | $5,676 |
| Selling & Marketing | 25 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | 115 | – | – | $1,179 |
| Other | 300 | 520 | 600 | 600 | 600 | 600 | 520 | 520 | 520 | 520 | 400 | 260 | 260 | $6,220 |
| Total | 5,900 | 4,673 | 7,703 | 8,161 | 7,804 | 4,655 | 6,251 | 6,910 | 9,524 | 4,552 | 6,412 | 7,060 | 280 | 79,884 |
| **Net Cash Flow from Operations** | (1,001) | 132 | (3,778) | (3,070) | (1,874) | 1,405 | (998) | (1,920) | (4,499) | 1,605 | 156,053 | (7,060) | (280) | 134,713 |
| **Non-Operating / Restructuring Disbursements** | | | | | | | | | | | | | | |
| Professional / UST Fees | 733 | – | 50 | – | 205 | – | 200 | – | – | 962 | – | 150 | – | $2,300 |
| Insurance - Transaction Related | – | – | – | – | – | – | – | – | – | 500 | – | – | – | $500 |
| Utility Deposits | – | – | – | 1,150 | – | – | – | – | – | – | – | – | – | $1,150 |
| Other Legal | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Accounting | – | – | 34 | – | – | – | 34 | – | – | – | – | – | 34 | $101 |
| DIP Fees | – | 150 | – | – | – | – | – | – | – | – | 150 | – | – | $300 |
| CoBank Loan Interest | – | – | – | – | – | – | 3,441 | – | – | – | 1,288 | – | – | $4,729 |
| **Net CF before Borrowing** | (1,734) | (18) | (3,828) | (4,254) | (2,079) | 1,405 | (4,639) | (1,954) | (4,499) | 143 | 154,615 | (7,210) | (314) | 125,633 |
| CoBank DIP Facility Draw / (Repayment) | – | 6,323 | 7,753 | 9,345 | 8,009 | 4,655 | 9,891 | 6,944 | 9,524 | 6,014 | (68,457) | – | – | $0 |
| CoBank Pre-Petition Loan Draw / (Repayment) | 93 | (11,547) | (3,925) | (5,090) | (5,930) | (6,060) | (5,252) | (4,990) | (5,025) | (6,157) | (70,046) | – | – | $(124,022) |
| **Net Change in Cash** | (1,641) | (5,242) | – | – | – | – | – | – | – | – | 16,112 | (7,210) | (314) | 1,611 |
| **Cash Account** | | | | | | | | | | | | | | |
| Beginning Balance | $8,384 | $6,742 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $17,612 | $10,402 | $6,742 |
| Cash Collections | 4,899 | 4,805 | 3,925 | 5,090 | 5,930 | 6,060 | 5,252 | 4,990 | 5,025 | 6,157 | 162,465 | – | – | 209,698 |
| CoBank DIP Facility Draw / (Repayment) | – | 6,323 | 7,753 | 9,345 | 8,009 | 4,655 | 9,891 | 6,944 | 9,524 | 6,014 | (68,457) | – | – | (124,022) |
| CoBank Pre-Petition Loan Draw / (Repayment) | 93 | (11,547) | (3,925) | (5,090) | (5,930) | (6,060) | (5,252) | (4,990) | (5,025) | (6,157) | (70,046) | – | – | 0 |
| Cash Disbursements | (6,633) | (4,823) | (7,753) | (9,345) | (8,009) | (4,655) | (9,891) | (6,944) | (9,524) | (6,014) | (7,850) | (7,210) | (314) | (82,331) |
| **Ending Balance** | $6,742 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $1,500 | $17,612 | $10,402 | $10,088 | $10,088 |
| CoBank Facility Availability | | $20,324 | $16,496 | $12,242 | $10,163 | $11,568 | $6,929 | $4,975 | $476 | $619 | | | | |
| Liquidity (Cash + Avail.) | 6,742 | 21,824 | 17,996 | 13,742 | 11,663 | 13,068 | 8,429 | 6,475 | 1,976 | 2,119 | 17,612 | 10,402 | 10,088 | |
| memo: | | | | | | | | | | | | | | |
| Professional fee accrual | | ($855) | ($674) | ($443) | ($437) | ($251) | ($70) | 111 | 292 | ($249) | ($81) | 86 | 227 | |
| (net of est. retainer balances) | | | | | | | | | | | | | | |

**Exhibit 1**
1 of 3

8/22/2019

**NORPAC Foods, Inc**
*DIP Budget Forecast*

### SUMMARY OF ASSUMPTIONS

| Overview |
|---|

- DIP Budget forecast assumes Chapter 11 filing on 8/22 with signed APA for the sale of substantially all assets

- Assumes asset sale transaction close 10/31/19

- Assumed Cash Proceeds at close based on terms of signed APA (with closing adjustment based on projected Inventory and Grower Payable levels)
  - $149.5M (less $10M holdback), plus projected inventory adjustment, less proj. Grower Payables balance, plus 50% of AR balance (assumed $25m, conservative)

| DIP Facility Structure & Terms: |
|---|

| | |
|---|---|
| Facility Structure | - Assumes structured as gradual/creeping roll-up: |
| |   - Incremental $15M in committed availability (in addition to existing $87.5M pre-petition commitment) |
| |   - Initial excess cash and all post-petition cash collections paydown the pre-petition Revolving Credit Facility balance |
| |   - Cash advanced in amounts sufficient to fund projected weekly disbursements and maintain a minimum cash balance of $1.5M |
| |     - Total facility balance not to exceed $102.5M ($87.3M Pre-Petition RCF Balance + $15M Incremental DIP Commitment) |
| DIP Fees & Interest | - 15.25% interest rate on balance of all post-petition advances (Prime Rate + 9.75%) |
| | - 1% Upfront Fee ($150k) |
| | - 1% Exit Fee ($150k) |
| | - 0.375% unused commitment fee |

| Receipts: |
|---|

| | |
|---|---|
| Sales | *Base Forecast* - Sales and allowances and discounts are based on FY2019 actual results with no growth. Interpacker sales have been adjusted upwards due to sales to Simplot, while industrial sales have been adjusted downwards by 25% as compared to FY19 to reflect lost sales to competitors who offered 90 - 120 day terms.  Pack revenue has been removed and freight and storage revenue is the same as it was in FY2019. |
| | - Assuming 5% reduction to base sales forecast in first four weeks post filing for potential business disruption related to the Chapter 11 filing |
| Collections | Collections are based on average days sales outstanding of 30 days, except for Retail (3 weeks to collect) and Export and Industrial (6 weeks to collect) |
| | - Assuming slower collections in the first four weeks post-filing (10% reduction); catching up over the following six weeks |

| Operating Disbursements: |
|---|

| | |
|---|---|
| Salaried Payroll | Based on current run rate; Includes an assumed $500k in key employee retention bonuses paid following the asset sale close |
| | - Assumes 2 weeks of accrued payroll paid out week following close |
| | - Assumes $2.5M in accrued vacation paid out week following close |
| Hourly & Seasonal Labor | Based on FY 2019 run-rate for same time period, adjusted for Quincy and Hermiston being paid bi-weekly |
| | - Assumes accrued payroll paid out week following close (2 weeks at Quincy/Hermiston, 1 week at Norpac) |
| Workers Comp Payouts | Continued funding post-petition at current run-rate |
| Grower Payables | Based on detailed Latest Crop Year 2019 projections. No payments for Crop Year 2018 |
| Payroll Related Insurance & Benefits | Current run-rate |
| Seed | No seed purchases in projection period |

**Exhibit 1**
**2 of 3**
8/22/2019

**NORPAC Foods, Inc**

*DIP Budget Forecast*

#### SUMMARY OF ASSUMPTIONS

*(Cont'd)*

| | |
|---|---|
| <u>Ingredients</u> | Forecast based on FY2019 run-rate far same time period |
| <u>Broker</u> | 1% of sales (historical average) |
| <u>Utilities</u> | Based on FY2019 run-rate for same time period |
| <u>Insurance</u> | Projected payment schedule |
| <u>Freight</u> | Based on FY2019 run-rate for same time period |
| <u>Storage</u> | Run Rate; Approximately ~$2.2M per month |
| <u>Packaging</u> | Based on FY2019 run-rate for same time period |
| <u>Selling & Marketing</u> | Based on FY2019 run-rate for same time period |
| <u>Other</u> | Based on FY2019 run-rate for same time period |

### Non-Operating / Restructuring Disbursements

| | |
|---|---|
| <u>Professional / UST Fees</u> | Based on fee estimates for each professional; Paid monthly, with 20% holdback on Debtor Counsel and UCC professionals |
| <u>Insurance - Transaction Related</u> | Assumed $500k for extended product liability coverage, paid week prior to transaction close |
| <u>Utility Deposits</u> | Assumes $1.2M, based one-month run rate |
| <u>Accounting</u> | Management estimate based on past experience |
| <u>DIP Fees & Interest</u> | As stated above: $15M incremental facility; 15.25% rate; 1% up-front fee, 1% exit fee, 0.375% unused commitment fee<br>- All Post-Petition Draws<br>- DIP interest paid only on portion of total CoBank balance (DIP + Pre-Petition RCF) which exceeds $87.5M |
| <u>Pre-Petition Loan Interest</u> | 11% annual interest (Prime rate + 5.5%), paid quarterly; 1-month (October) accrued interest payoff included week of transaction close (11/1) |

**Exhibit 1**
**3 of 3**

8/22/2019

# EXHIBIT 2 TO MOTION

## Fourteenth Amendment to Credit Agreement

**FOURTEENTH AMENDMENT TO CREDIT AGREEMENT**

This Amendment is dated as of August *[__]*, 2019 by and among Norpac Foods, Inc., an Oregon cooperative corporation (the "Parent"), each of the Parent's Subsidiaries identified on the signature pages hereof (together with the Parent, collectively, the "Borrowers"), the Lenders signatories hereto, and CoBank, ACB, a federally chartered instrumentality of the United States ("CoBank"), in its capacity as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

The Borrowers, the Guarantors from time to time party thereto, the Lenders from time to time party thereto and the Administrative Agent are parties to a Credit Agreement dated as of November 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Credit Agreement"). As used in these recitals, capitalized terms defined in the Credit Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

On August *[__]*, 2019, the Borrowers filed a petition under Chapter 11 of the Bankruptcy Code. The Borrowers intend to act as debtors-in-possession of their bankruptcy estate in the Bankruptcy Cases. The Borrowers have requested that the Administrative Agent and the DIP Lenders provide debtor in possession financing to the Borrowers in the Bankruptcy Cases under the terms and conditions of the Credit Agreement as amended by this Amendment, and the Borrowers have requested that the Administrative Agent and the Lenders agree to certain amendments to the Credit Agreement to incorporate such financing. The Administrative Agent and the Lenders are willing to grant such requests subject to the terms and conditions of this Amendment and the Credit Agreement as amended hereby.

Now, therefore, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Definitions**. As used herein, capitalized terms defined in the Credit Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

2. **Acknowledgments and Agreements**. Each Borrower hereby reaffirms, acknowledges and agrees as follows:

(a) *Recitals*. The Recitals to this Amendment are true and correct.

(b) *Loan Documents*. Each Loan Document to which such Borrower is a party is the valid and binding agreement of such Borrower, enforceable in accordance with its terms, and as to each of which there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(c) *Indebtedness*. The Obligations are not subject to any restriction, setoff, deduction, claim, counterclaim or defense of any Borrower of any kind or character whatsoever.

(d) *Collateral*. The Administrative Agent, for itself and on behalf of the Lenders, has a valid, enforceable and first-priority perfected security interest in and Lien on all assets and property of each Borrower to secure the payment and performance of the Obligations, as to which collateral there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(e)     *Outstanding Loans.*  As of August 22, 2019, (i) the outstanding principal balance of all Revolving Loans made under the Loan Documents was $82,500,000.00 together with accrued and unpaid interest thereon of $1,257,277.40 and an Unused Commitment Fee of $116.71; (ii) the Letter of Credit Obligations were $800,000.00 together with the accrued and unpaid Letter of Credit Fees in the aggregate amount of $4,477.78; (iii) the outstanding principal balance of all Swing Line Loans made under the Loan Documents was $~~4,007,084.82~~4,104,987.32 together with accrued and unpaid interest thereon of $60,655.34; and (iv) the outstanding principal balance of the Term Loan made under the Loan Documents was $36,621,623.99 together with accrued and unpaid interest thereon of $558,103.51.

(f)     *Default Interest.*  In accordance with Section 2.4(e) of the Credit Agreement, the principal amount of all Obligations have been bearing interest at the Default Rate and the rates applicable to Letter of Credit Fees were increased to the Default Rate, effective as of May 24, 2019.

(g)     *Specified Defaults.*  The Specified Defaults (as defined in the Forbearance Agreement and Second Amendment to Credit Agreement dated as of July 12, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Forbearance Agreement</u>")) have occurred and are continuing as of the date hereof.  As a result of the Specified Defaults, (i) the Lenders do not have any obligation to make any Loan, (ii) the Issuing Lender does not have any obligation to issue any Letter of Credit, and (iii) the Administrative Agent and the Lenders are entitled to exercise rights and remedies under the Loan Documents and all other rights and remedies otherwise available to them, including, without limitation, the right to demand immediate payment of the entire outstanding principal balance of the Loans, all unpaid accrued interest thereon and all other Obligations.  In addition, each Borrower acknowledges and agrees that commencement of the Bankruptcy Cases on the Petition Date constitutes an Event of Default under Section 9.1(k) of the Credit Agreement.

(h)     *No Waiver of Defaults or Rights and Remedies.*  Neither this Amendment, nor any action taken in accordance with this Amendment or any other Loan Document, nor any correspondence, any oral or written communications, nor any making of any Loan or issuing of any Letter of Credit, nor any acceptance of repayment of any Loan or other amount, nor any forbearance, amendment or consent or any other action or omission on the part of the Administrative Agent or any Lender shall be, or shall be construed to be, a waiver, modification or release of any Default or Event of Default (including, without limitation, any Specified Default), as to which all rights and remedies of the Administrative Agent and each Lender are and shall continue at all times to be expressly reserved by the Administrative Agent and the Lenders.

(i)     *Conduct.*  The Administrative Agent and the Lenders have fully and timely performed all of their obligations and duties in compliance with the Loan Documents and applicable law, and have acted reasonably, in good faith and appropriately under the circumstances.

(j)     *Engagement of Consultants by Administrative Agent.*  Without limiting any provision of the Credit Agreement, including but not limited to Sections 6.6 and 11.3(a) thereof, the Borrowers (x) acknowledge that the Administrative Agent may from time to time engage financial advisors or other consultants on terms and conditions acceptable to the Administrative Agent, in each case at the Borrowers' expense, (y) agree that the Borrowers shall, and shall cause their officers, employees and advisors to, cooperate with any such advisors and consultants and provide all information reasonably requested by any such advisor or consultant, which information shall be true, correct and complete, and (z) agree that the Borrowers shall, promptly after demand therefor, reimburse the Administrative Agent for all costs, fees, charges and disbursements of each such advisor or consultant.  The Borrowers hereby acknowledge and agree that no Loan Party may rely on any statements made by, or any analysis, reports or other documents (if any) prepared and/or provided by, a financial advisor or other consultant of the Administrative Agent or any Lender.

**Exhibit 2**
**2 of 30**

3. **Amendments to the Credit Agreement**. The Credit Agreement is hereby amended as follows:

(a) <u>Amendment to Section 1.1 of the Credit Agreement (Certain Definitions)</u>. Section 1.1 of the Credit Agreement is amended by adding or amending and restating, as the case may be, the following definitions:

"<u>Administrative Expenses</u>" means (i) the allowed fees and expenses of the clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b), and (ii) the allowed fees and expenses payable under Sections 330 and 331 of the Bankruptcy Code to professional persons retained by the Borrowers pursuant to an order of the Bankruptcy Court or by any statutory committee appointed in the Bankruptcy Cases; <u>provided</u>, <u>however</u>, "Administrative Expenses" shall not include any fees or expenses incurred, directly or indirectly, in respect of, arising from or relating to (a) the initiation or prosecution of any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims or causes of action against the Administrative Agent or any Lender or with respect to this Agreement or any of the other Loan Documents, the Obligations or the Pre-Petition Indebtedness or (b) hindering, delaying or otherwise attempting to prevent the enforcement by the Administrative Agent or any Lender of its Liens or realization upon any Collateral.

"<u>Aggregate Revolving Credit Commitment Amount</u>" means $102,500,000, constituting the sum of the Revolving Commitments of the Revolving Lenders, subject to adjustment in accordance with Sections 2.12 and 2.13.

"<u>Applicable Letter of Credit Fee Rate</u>" means 6.50% per annum.

"<u>Applicable Margin</u>" means, as of any day, the percentage rate per annum equal to: (a) 6.50% with respect to any Term Loans bearing interest at the LIBOR Rate Option, (b) 5.50% with respect to any Term Loans bearing interest at the Base Rate Option, (c) 5.50% with respect to any Swing Line Loans, Revolving Loans and other Obligations (other than Term Loans) bearing interest at the Base Rate Option to the extent the aggregate outstanding principal balance thereof is less than the Pre-Petition Revolving Commitment Level as of such day, and (d) 9.75% with respect to any Swing Line Loans, Revolving Loans and other Obligations (other than Term Loans) bearing interest at the Base Rate Option to the extent the aggregate outstanding principal balance thereof is equal to or greater than the Pre-Petition Revolving Commitment Level as of such day.

"<u>Avoidance Actions</u>" means avoidance actions and the proceeds thereof under sections 544, 547, 548, 549 and 553 of the Bankruptcy Code.

"<u>Bankruptcy Cases</u>" means the Chapter 11 bankruptcy cases of the Borrowers, consolidated for administrative purposes and pending before the Bankruptcy Court entitled **\*[In re NORPAC Foods, Inc.,** *et al.***]\***, Case No. **\*[_____]\***, including without limitation any adversary proceedings, jointly administered cases or other ancillary proceedings.

"<u>Bankruptcy Code</u>" means 11 U.S.C. § 101 et seq.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Oregon, including any judge presiding over the Bankruptcy Cases.

**Exhibit 2**
**3 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (i) the Prime Rate, (ii) fifty basis points (0.50%) plus the Federal Funds Effective Rate, and (iii) except during any period in which a notice given pursuant to Section 3.3 is in effect, one hundred basis points (1.00%) plus the Adjusted LIBOR Rate for an Interest Period of one month commencing on such day. Any change in the Base Rate as of any day due to a change in the calculation or the components thereof shall be effective at the opening of such day of business on such day and without necessity of notice being provided to any Borrower or any other Person.

"Base Rate Option" means the option of the Borrowers to have Loans bear interest at the rate and under the terms set forth in Section 2.4(b)(i).

"Budget" has the meaning specified in Section 6.1(g)(i).

"Carveout" means a carveout from the Administrative Agent's pre-petition and post-petition claims (whether secured or unsecured), including its Superpriority Claim, for unpaid Administrative Expenses (a) payable pursuant to 28 U.S.C. § 1930(a)(6) and fees payable to the clerk of the Court; and (b) fees and expenses of attorneys and financial advisors employed by the Debtors and the Committee (including allowed expenses of the members of such statutory committees) pursuant to sections 327 and 1103 of the Bankruptcy Code (i) which were provided for in the Budget and incurred prior to an Event of Default but not yet paid; and (ii) an aggregate amount not to exceed $300,000 for reasonable fees and expenses incurred following a Post-Petition Event of Default; but specifically excluding any success, completion or similar fees. The Carveout shall exclude any fees and expenses incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief invalidating, setting aside, avoiding, subordinating, or otherwise adversely affecting Administrative Agent's claims against the bankruptcy estate of the debtors-in-possession in the Bankruptcy Cases (including the Pre-Petition Indebtedness, the Post-Petition Indebtedness, and the Administrative Agent's liens on the Collateral).

"Cash Management Services" means treasury, depository, overdraft, credit or debit card, electronic funds transfer and other similar cash management services and arrangements, including, without limitation, all services and arrangements under the CoBank Cash Management Agreement.

"DIP Advance" means a Post-Petition Revolving Loan, Post-Petition Swing Line Advance and any other Borrowing following the Petition Date, and any Use of Cash Collateral.

"DIP Facility" means the Revolving Credit Facility (including the Swing Line Facility and Letter of Credit Facility, each constituting a sub-facility of the Revolving Credit Facility) made available to the Borrowers commencing on the Fourteenth Amendment Effective Date pursuant to Sections 2.2, 2.3 and 2.9, including, without limitation, all DIP Advances.

"DIP Facility Commitment Termination Date" means the DIP Facility Maturity Date or any earlier date on which the DIP Facility is terminated in accordance with this Agreement.

US.124136204.08124136204.09

**Exhibit 2**
**4 of 30**
Case 19-62584-pcm11    Doc 7    Filed 08/22/19

"DIP Facility Fees" means the fees set forth in Section 2.7(b).

"DIP Facility Maturity Date" means the earliest to occur of (i) October 31, 2019, (ii) the closing of a Specified Sale (as defined herein), or (iii) the effective date of a confirmed plan under section 1129 of the Bankruptcy Code.

"DIP Lender" means CoBank (and any participant, successor or assign thereof) and each other Lender under the DIP Facility.

"Final Order" means the final order, in form and substance satisfactory to the Administrative Agent in its sole discretion, entered by the Bankruptcy Court, which, among other things, (i) approves the Fourteenth Amendment, this Agreement as amended thereby and the other Loan Documents, (ii) authorizes the Borrowers to enter into the Fourteenth Amendment, this Agreement as amended thereby and the other Loan Documents and the financing contemplated therein, (iii) grants Superpriority Claims in the Bankruptcy Cases with respect to the Post-Petition Indebtedness and all obligations owing under any CoBank Cash Management Agreement or any Cash Management Services arrangement with the Administrative Agent or any Affiliate thereof, and (iv) provides that all Post-Petition Indebtedness and all obligations owing by the Borrowers under any such Cash Management Services arrangement are secured by a first priority perfected Lien on the Post-Petition Collateral, subject only to valid, perfected, non-avoidable prior pre-petition Permitted Liens and the Carveout.

"Fourteenth Amendment" means that certain Fourteenth Amendment to Credit Agreement dated as of August *[___]*, 2019, by and among the Borrowers, the Lenders and the Administrative Agent.

"Fourteenth Amendment Effective Date" means the date that all of the conditions in Section 7 of the Fourteenth Amendment have been satisfied.

"Interest Payment Date" means (a) with respect to all Swing Line Loans, Revolving Loans, Unused Commitment Fees and other Obligations (other than Term Loans), the last day of each calendar month, (b) with respect to all Term Loans, the last day of each calendar quarter, (c) the Maturity Date and (d) the Termination Date.

"Interim Order" means the interim order, in form and substance acceptable to the Administrative Agent in its sole discretion, entered by the Bankruptcy Court, which, among other things, on an interim basis, (i) approves the Fourteenth Amendment, this Agreement as amended thereby and the other Loan Documents, (ii) authorizes the Borrowers to enter into the Fourteenth Amendment, this Agreement as amended thereby and the other Loan Documents and the financing contemplated therein, (iii) grants Superpriority Claims in the Bankruptcy Case with respect to the Post-Petition Indebtedness and all obligations owing under any CoBank Cash Management Agreement or any Cash Management Services arrangement with the Administrative Agent or any Affiliate thereof, and (iv) provides that all Post-Petition Indebtedness and all obligations owing by the Borrowers under any such Cash Management Services arrangement are secured by a first priority perfected Lien on the Post-Petition Collateral, subject only to valid, perfected, non-avoidable prior pre-petition Permitted Liens and the Carveout.

"Letter of Credit" means a Pre-Petition Letter of Credit.

US.124136204.08124136204.09

**Exhibit 2**
**5 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

"Milestones" means the milestones described in Section 6.14.

"Obligation" means any obligation or liability of any of the Loan Parties, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, under or in connection with this Agreement, the Notes, the Letters of Credit, the Fee Letter or any other Loan Document whether to the Administrative Agent, any of the Lenders or their Affiliates or other persons provided for under such Loan Documents, including, without limitation, any obligation or liability of any of the Loan Parties owing to the Administrative Agent, the Issuing Lender or any Lender or Affiliate thereof arising prior to the Petition Date and any obligation or liability of any of the Loan Parties owing to the Administrative Agent, the Issuing Lender or any Lender or Affiliate thereof arising after the Petition Date (including, without limitation, all DIP Advances).

"Petition Date" means the date when the Borrowers filed their petitions commencing the Bankruptcy Cases.

"Post-Petition Collateral" means all present and future property of the Borrowers' estates (the "Estates"), including both real and personal property, whether now owned or existing or hereafter acquired or arising by the Estates, including specifically and without limitation (but specifically excluding the Avoidance Actions): (A) all of the Estates' now owned or existing or hereafter acquired or arising accounts, chattel paper and electronic chattel paper, deposit accounts, documents, equipment, general intangibles, goods, instruments, investment property, intellectual property rights, inventory, letter-of-credit rights, letters of credit, and any items in any lockbox account; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering any of the foregoing; (v) all collateral subject to the Lien of any security document in favor of the Administrative Agent; (vi) any money, or other assets of the Borrowers that may or hereafter come into possession, custody or control of the Administrative Agent or any Lender; (vii) proceeds of any and all of the foregoing; (viii) books and records of the Borrowers, including all mail or electronic mail addressed to the Borrowers; (ix) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrowers now have or hereafter acquire any rights; and (x) all proceeds and products of such collateral security acquired by the Estates, (B) all Collateral (including all pre-petition collateral), (C) all real estate of the Estates provided, however, that no lien shall attach directly to any of the Borrowers' leasehold interests, but shall only attach to the proceeds of the sale or disposition of such lease, unless (i) expressly permitted by the terms of that lease, or (ii) the Borrowers have consent of the applicable landlord to grant the Administrative Agent a lien or deed of trust on such leasehold, and (D) all proceeds, products, rents, issues and profits of all of the foregoing.

"Post-Petition Event of Default" means an Event of Default arising after the Petition Date.

"Post-Petition Indebtedness" means all Obligations of the Borrowers arising on and after the Petition Date, including post-petition interest.

US.124136204.08124136204.09

**Exhibit 2**
**6 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

"Post-Petition Revolving Loans" means revolving loans advanced under Section 2.2, 2.3(e) or 2.9 on or after the Petition Date.

"Post-Petition Swing Line Loans" means swing line loans advanced under Section 2.3 on or after the Petition Date.

"Pre-Petition Indebtedness" means that portion of the Obligations arising prior to the Petition Date, together with all interest continuing to accrue thereon and all fees and expenses relating thereto.

"Pre-Petition Letters of Credit" means the following letters of credit issued by the Issuing Lender:

| L/C Number | Date Issued | Beneficiary | Face Amount |
|------------|-------------|-------------|-------------|
| 00651787 | April 23, 2018 | Safety National Casualty Corporation | $800,000 |

"Pre-Petition Revolving Commitment Level" means $87,500,000.

"Pre-Petition Revolving Loans" has the meaning set forth in Section 2.2(a).

"Pre-Petition Swing Line Loans" has the meaning set forth in Section 2.3(a).

"Projected Sale Date" has the meaning specified in Section 6.14(d).

"Revolving Loans" means the Pre-Petition Revolving Loans and the Post-Petition Revolving Loans.

"Revolving Loan Maturity Date" means the DIP Facility Maturity Date.

"Specified Sale" has the meaning specified in Section 6.14(a).

"Specified Sale Order" has the meaning specified in Section 6.14(c).

"Superpriority Claim" means a claim against the Borrowers in the Bankruptcy Cases that is an administrative expense claim having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

"Swing Line Loans" means the Pre-Petition Swing Line Loans and the Post-Petition Swing Line Loans.

"Use of Cash Collateral" means, following the Petition Date, any use by any Borrower of any cash proceeds of Collateral or Post-Petition Collateral to payment of any debt, liability or other obligation of any Borrower (other than to repayment of the Obligations).

(b)     Amendment to Section 2.2 of the Credit Agreement (Revolving Loans and DIP Facility).  Section 2.2 of the Credit Agreement is amended and restated in its entirety to read as follows:

"2.2     **Revolving Loans and DIP Facility**.

US.124136204.08124136204.09

**Exhibit 2**
**7 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

(a)     <u>Revolving Loans</u>.

(i)     <u>Pre-Petition Revolving Loans</u>.  The Revolving Lenders have made revolving advances to the Borrowers under the revolving line of credit facility as set forth and described in Section 2.2 of this Agreement prior to the Petition Date (collectively, the "<u>Pre-Petition Revolving Loans</u>").  The aggregate outstanding principal balance of the Pre-Petition Revolving Loans immediately prior to the Petition Date was *[$_____]*.$82,500,000.00.  The Borrowers' obligation to pay the Pre-Petition Revolving Loans is secured by the Collateral. The Pre-Petition Revolving Loans shall constitute Revolving Loans for purposes of this Agreement, shall continue to be secured by the foregoing Collateral, and shall be repayable in accordance with this Agreement.

(ii)     <u>Post-Petition Revolving Loans</u>.  Subject to the terms and conditions hereof and relying upon the representations and warranties of the Loan Parties set forth herein and in the other Loan Documents, each Lender severally agrees to make Post-Petition Revolving Loans to the Borrowers at any time or from time to time on or after the Fourteenth Amendment Effective Date to the DIP Facility Commitment Termination Date, provided, that before and after giving effect to each such Revolving Loan (i) the aggregate principal amount of such Lender's Revolving Loans shall not exceed its Available Revolving Commitments, (ii) the Revolving Credit Facility Usage shall not at any time exceed the Aggregate Revolving Credit Commitment Amount and (iii) no Post-Petition Event of Default has occurred and is continuing or would result therefrom.  Within such limits and subject to the other provisions of this Agreement, the Borrowers may borrow, repay and reborrow pursuant to this Section 2.2.  All Post-Petition Revolving Loans and other Post-Petition Indebtedness shall be entitled to super-priority administrative expense status and secured by the Post-Petition Collateral.

(b)     <u>Revolving Loan Requests</u>.  The Borrowers may from time to time prior to the DIP Facility Commitment Termination Date request the Revolving Lenders to effect a Borrowing under the Revolving Credit Facility by delivering to the Administrative Agent, not later than 11:00 a.m. one Business Day prior to the proposed Borrowing Date, a duly completed Loan Request.  Each such Loan Request shall be irrevocable and shall specify the aggregate amount of the proposed Revolving Loans comprising each Borrowing. Unless otherwise approved by the Administrative Agent in its sole discretion, each shall be in a minimum amount of $1,000,000 or, if less, the remaining amount available to be drawn under the Revolving Credit Facility.

(c)     <u>Nature of Lenders' Obligations with Respect to Revolving Loans</u>.  Each Lender shall be obligated to participate in each request for Revolving Loans pursuant to this Section 2.2 in accordance with its Pro Rata Share.  The obligations of each Lender hereunder are several.  The failure of any Lender to perform its obligations hereunder shall not affect the obligations of the Borrowers to any other party nor shall any other party be liable for the failure of such Lender to perform its obligations hereunder.  Other than Revolving Loans in repayment of Swing Line Loans in accordance with Section 2.3(e) and/or Reimbursement Obligations in accordance with Section 2.9(c), the Lenders shall have no obligation to make Revolving Loans hereunder on or after the Revolving Loan Maturity Date.

(d)     Repayment of Revolving Loans.  Notwithstanding anything herein or in any other Loan Document to the contrary, the Borrowers shall repay the entire outstanding principal amount of Revolving Loans, together with all outstanding interest thereon and unpaid fees with respect thereto and all other outstanding Post-Petition Indebtedness, on the Revolving Loan Maturity Date."

(c)     Amendment to Section 2.3 of the Credit Agreement (Swing Line Loans).  Section 2.3(a) of the Credit Agreement is amended and restated in its entirety to read as follows:

"2.3     **Pre-Petition Swing Line Loans**.

(a)     Swing Line Loans.

(i)     Pre-Petition Swing Line Loans.  The Swing Line Lender has made swing line advances to the Borrowers under the swing line facility as set forth and described in Section 2.3 of this Agreement prior to the Petition Date (collectively, the "Pre-Petition Swing Line Loans").  The aggregate outstanding principal balance of the Pre-Petition Swing Line Loans immediately prior to the Petition Date was *[$————]*.$4,104,987.32.  The Borrowers' obligation to pay the Pre-Petition Swing Line Loans is secured by the Collateral.  The Pre-Petition Swing Line Loans shall constitute Swing Line Loans for purposes of this Agreement, shall continue to be secured by the foregoing Collateral, and shall be repayable in accordance with this Agreement.

(ii)     Post-Petition Swing Line Loans (Sub-Facility of the DIP Facility).  Subject to the terms and conditions hereof and relying upon the representations and warranties of the Loan Parties set forth herein and in the other Loan Documents, the Swing Line Lender agrees to make Post-Petition Swing Line Loans to the Borrowers at any time or from time to time on or after the Fourteenth Amendment Effective Date to the DIP Facility Commitment Termination Date, provided, that before and after giving effect to each such Revolving Loan (i) the aggregate amount of Swing Line Loans shall not exceed the Swing Line Commitment, (ii) the Revolving Credit Facility Usage shall not exceed the Aggregate Revolving Commitment Amount and (iii) no Post-Petition Event of Default has occurred and is continuing or would result therefrom.  Within such limits and subject to the other provisions of this Agreement, the Borrowers may borrow, repay and reborrow pursuant to this Section 2.3.  All Post-Petition Swing Line Loans and other Post-Petition Indebtedness shall be entitled to super-priority administrative expense status and secured by the Post-Petition Collateral."

(d)     Amendment to Section 2.4(a) of the Credit Agreement (Interest Rate Provisions Generally).  Section 2.4(a) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(a)     Generally.  The Borrowers shall pay interest in respect of the outstanding unpaid principal amount of the Base Rate Loans and Fixed Rate Loans.  Subject to the provisions of this Agreement, solely with respect to Term Loans, the Borrowers may select different Interest Rate Options and different Interest Periods and Quoted Rate Periods to apply to different Borrowings under the Term Loan Facility at any time outstanding and may convert to or renew one or more Interest Rate Options with respect to all or any portion of any such Borrowing (subject to the minimum amounts set forth in Section

9

**Exhibit 2**
**9 of 30**
Case 19-62584-pcm11     Doc 7     Filed 08/22/19

2.4(c)); provided that there shall not be at any one time outstanding more than 10 Borrowings of LIBOR Rate Loans or more than 10 Borrowings of Quoted Rate Loans. From and after the Fourteenth Amendment Effective Date, no Revolving Loans, Swing Line Loans or other Obligations (other than Term Loans) may bear interest at any Interest Rate Option other than the Base Rate Option. If at any time the designated rate applicable to any Loan made by any Lender exceeds the Maximum Rate, the rate of interest on such Lender's Loan shall be limited to such Lender's Maximum Rate."

(e)    Amendment to Section 2.4(b) of the Credit Agreement (Interest Rate Options). Section 2.4(b) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(b)    Interest Rate Options. Swing Line Loans, Revolving Loans and all other Obligations not constituting Term Loans shall bear interest calculated based upon the Base Rate Option. Subject to the limitations set forth in Section 3.4, the Borrowers shall have the right to select from the following Interest Rate Options applicable to Term Loans:

(i)    Base Rate Option: An option to pay interest at a fluctuating rate per annum equal to the Base Rate in effect as of any date of determination plus the Applicable Margin as of such date;

(ii)    LIBOR Rate Option: An option to pay interest at a fluctuating rate per annum equal to the Adjusted LIBOR Rate with respect to the applicable Interest Period and as in effect as of any date of determination plus the Applicable Margin as of such date; or

(iii)    Quoted Rate Option: An option to pay interest at a rate per annum equal to the Quoted Rate with respect to the applicable Quoted Rate Period."

(f)    Amendment to Section 2.4(e) of the Credit Agreement (Default Rate). Section 2.4(e) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(e)    Default Rate. To the extent permitted by Law, immediately upon the occurrence and during the continuation of a Post-Petition Event of Default, the principal amount of all Obligations shall bear interest at the Default Rate and the rates applicable to Letter of Credit Fees shall be increased to the Default Rate. The Borrowers acknowledge that the increase in rates referred to in this Section 2.4(e) reflects, among other things, the fact that such Loans or other amounts have become a substantially greater risk given their default status and that the Lenders are entitled to additional compensation for such risk; and all such interest shall be payable by the Borrowers upon demand by the Administrative Agent."

(g)    Amendment to Section 2.5(a) of the Credit Agreement (Conversion or Continuation of Interest Rate Options with Respect to Base Rate Loans). Section 2.5(a) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(a)    [Reserved.]"

(h)    Amendment to Section 2.5(d) of the Credit Agreement (Procedures for Determining Quoted Rate and Quoted Rate Periods). Section 2.5(d) of the Credit Agreement is amended by deleting "under the Revolving Credit Facility or the Term Loan Facility" and inserting "under the Term Loan Facility" in substitution therefor.

US.124136204.08124136204.09

**Exhibit 2**
**10 of 30**
Case 19-62584-pcm11    Doc 7    Filed 08/22/19

(i)     <u>Amendment to Section 2.7 of the Credit Agreement (Fees)</u>.  Section 2.7 of the Credit Agreement is amended by (i) renumbering clause (b) thereof as new clause (c) and (ii) inserting a new clause (b) immediately after clause (a) thereof to read as follows:

"(b)     <u>DIP Facility Fees</u>.  In addition to all other interest, fees and expenses, the Borrowers shall pay to the Administrative Agent, for the pro rata account of each DIP Lender (including each participant thereof), (i) a fee in an amount equal to $150,000 due and payable in cash on the Fourteenth Amendment Effective Date and (ii) a fee in an amount equal to $150,000 due and payable in cash on the DIP Facility Maturity Date (the fees set forth in the foregoing clauses (i) and (ii), collectively, the "<u>DIP Facility Fees</u>"). The Borrowers agree that all such fees are fully earned as of the Fourteenth Amendment Effective Date and, once paid, shall not be refundable under any circumstances."

(j)     <u>Amendment to Section 2.9(a) of the Credit Agreement (Issuance of Letters of Credit)</u>.  Section 2.9(a) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(a)     <u>Pre-Petition Letters of Credit</u>.  The Issuing Lender has issued the Pre-Petition Letters of Credit prior to the Petition Date.  The Pre-Petition Letters of Credit shall constitute Letters of Credit for purposes of this Agreement.  The Borrowers acknowledge and agree that the Issuing Lender has no obligation to issue, extend, amend or otherwise modify the Pre-Petition Letters of Credit or any other Letters of Credit. Notwithstanding anything herein or in any other Loan Document to the contrary, in no event shall any Pre-Petition Letter of Credit expire later than the Letter of Credit Expiration Date."

(k)     <u>Amendment to Section 2.12(b) of the Credit Agreement (Voluntary Prepayment Waterfall)</u>. Section 2.12(b) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(b)     <u>All Prepayment Notices Shall Be Irrevocable</u>.  The principal amount of the Loans for which a prepayment notice is given, together with interest on such principal amount except with respect to Loans to which the Base Rate applies, shall be due and payable on the date specified in such prepayment notice as the date on which the proposed prepayment is to be made.  All Term Loan prepayments permitted pursuant to this Section 2.12 shall be applied to the unpaid installments of principal of the Term Loan in the inverse order of scheduled maturities.  Except as provided in Section 2.4, if the Borrowers prepay a Loan but fail to specify the applicable Class and/or Borrowing that the Borrowers intend to prepay, then such prepayment shall be applied <u>first</u>, ratably to all outstanding Pre-Petition Swing Line Loans, <u>second</u>, ratably to all outstanding Pre-Petition Revolving Loans, <u>third</u>, ratably to all outstanding Term Loans, <u>fourth</u>, ratably to all outstanding Post-Petition Swing Line Loans, <u>fifth</u>, ratably to all outstanding Post-Petition Revolving Loans, <u>sixth</u>, to Cash Collateralize outstanding Letter of Credit Obligations and, <u>seventh</u>, to the remaining Obligations in such order as the Administrative Agent may determine in its sole discretion. Any prepayment hereunder shall be subject to the Borrowers' Obligation to indemnify the Lenders under Section 3.5."

(l)     <u>Amendment to Section 2.13 of the Credit Agreement</u>.  Section 2.13 of the Credit Agreement is amended and restated in its entirety to read as follows:

"2.13    **Mandatory Prepayments**.

**Exhibit 2**
**11 of 30**

(a)     <u>Overadvance</u>.  If the Revolving Credit Facility Usage exceeds the Aggregate Revolving Credit Commitment Amount at any time (each, an "<u>Overadvance</u>"), the Borrowers shall prepay the Revolving Loans (or Cash Collateralize Letter of Credit Obligations, if prepayment in full of the Revolving Loans is not sufficient) in such amounts as shall be necessary so that Revolving Credit Facility Usage does not exceed the Aggregate Revolving Credit Commitment Amount.

(b)     <u>Disposition of Assets</u>.  Immediately upon any Disposition, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such Disposition.  Notwithstanding anything herein to the contrary, no such mandatory prepayment shall constitute or be deemed to constitute a cure of any Default or Event of Default arising as a result of the Disposition giving rise to such prepayment obligation.

(c)     [Reserved].

(d)     <u>Casualty Events</u>.  Not later than 1 Business Day following the receipt by any Loan Party of the proceeds of insurance, condemnation award, or other compensation in respect of any Casualty Event or series of related Casualty Events affecting any property of any Loan Party, the Borrower shall prepay or cause such other Loan Party to prepay the Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such Casualty Event(s).

(e)     <u>Excess Cash Sweep</u>.  From and after the Fourteenth Amendment Effective Date, on Friday of each week the Borrowers shall prepay the Obligations in an amount equal to the amount by which the aggregate account balance in all deposit accounts and securities accounts of the Borrowers as of the opening of business on such date exceeds the sum of (i) *[$1,500,000 / $2,000,000]* plus (ii) the aggregate amount of operating and non-operating disbursements permitted for the following week as set forth in the Budget.

(f)     <u>Equity Issuances</u>.  Immediately upon any Equity Issuance, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such Equity Issuance.

(g)     <u>Debt Incurrence</u>.  Immediately upon the receipt of the Net Cash Proceeds of any Debt Incurrence, the Borrowers shall prepay the Obligations in an amount equal to 100% of the amount of such Net Cash Proceeds.  Notwithstanding anything herein to the contrary, any such prepayment shall not constitute or be deemed to be a cure of any Default or Event of Default arising as a result of such Debt Incurrence.

(h)     <u>Application Among Obligations</u>.  All prepayments pursuant to this Section 2.13 shall be applied, <u>first</u>, ratably to all outstanding Pre-Petition Swing Line Loans, <u>second</u>, ratably to all outstanding Pre-Petition Revolving Loans, <u>third</u>, ratably to all outstanding Term Loans, <u>fourth</u>, ratably to all outstanding Post-Petition Swing Line Loans, <u>fifth</u>, ratably to all outstanding Post-Petition Revolving Loans, <u>sixth</u>, to Cash Collateralize outstanding Letter of Credit Obligations and, <u>seventh</u>, to the remaining Obligations in such order as the Administrative Agent may determine in its sole discretion.

12

(i)    Interest Payments; Application Among Interest Rate Options. Subject to Section 2.13(h), all prepayments required pursuant to this Section 2.13 shall first be applied to Base Rate Loans, then to LIBOR Rate Loans, and then to Quoted Rate Loans.  In accordance with Section 3.5, the Borrowers shall indemnify the Lenders for any loss or expense, including loss of margin, incurred with respect to any such prepayments applied against LIBOR Rate Loans on any day other than the last day of the applicable Interest Period or against Quoted Rate Loans on any day other than the last day of the applicable Quoted Rate Period."

(m)    Amendment to Section 5.19 of the Credit Agreement (Solvency).  Section 5.19 of the Credit Agreement is amended and restated in its entirety to read as follows:

"5.19    **[Reserved]**."

(n)    Amendment to Section 6.1 of the Credit Agreement (Reporting Requirements). Section 6.1 of the Credit Agreement is amended by: (i) amending and restating each of subsections (d) and (e)(iii) thereof to each read as "[Reserved]"; (ii) renumbering clause (g) thereof as new clause (h); and (iii) inserting a new clause (g) immediately after clause (f) thereof to read as follows:

"(g)    Budget.

(i)    A detailed 13-week cash flow forecast and budget in form and substance satisfactory to the Administrative Agent (with such supporting detail as the Administrative Agent or its financial advisors may request) on the following dates and for the periods set forth below (the initial budget, together with the following updates thereto which are acceptable to the Administrative Agent, the "Budget"): (a) on or before the filing of the Petition Date, the Borrowers shall have delivered to the Administrative Agent a Budget for the 13-week period following the week ended August 16, 2019; and (b) by Wednesday of each week, a rolling 13-week Budget for the Borrowers calculated with true, correct and complete data as of the immediately preceding Friday as certified by a Compliance Officer of the Borrowers and reviewed by the CRO, together with a report setting forth actual Net Cash Flow for the four-week period ending on such Friday and identifying and explaining any material variances of actual Net Cash Flow for such four-week period compared to Net Cash Flow forecasted for such period as set forth the most recently accepted Budget.  Each update to the Budget shall be further accompanied by (i) a variance analysis to the most recently accepted Budget, including a comparison of actual performance with the Budget for the immediately prior week, and a narrative explaining deviations greater than 10% over Budget on a single line item, and (ii) a detailed accounting of each Use of Cash Collateral during such prior week.  Each update to the Budget and all such variances shall be acceptable to the Administrative Agent in its reasonable discretion before it accepts such update as the "Budget" for purposes of this Agreement.

(ii)    On a weekly basis on a day and time to be mutually agreed upon, one or more Compliance Officers of the Borrowers and the CRO shall hold a telephonic conference with the Administrative Agent and any financial advisor or other consultant of the Administrative Agent (if applicable), to provide updates relative to (1) the Bankruptcy Case, (2) the Borrowers' operating performance, including but not limited to any variances described in the foregoing subsection

13

**Exhibit 2**
**13 of 30**
Case 19-62584-pcm11    Doc 7    Filed 08/22/19

(g)(ii) above, and (3) potential Dispositions of assets, the exploration of strategic alternatives, and any other relevant matters.

(iii) Promptly upon request, the Borrowers shall deliver to the Administrative Agent any other information the Administrative Agent may reasonably request, including, without limitation, the status of any recapitalization or reorganization plan of the Borrowers and any other business plans of the Borrowers.

(iv) The Borrowers acknowledge and agree that the costs and expenses of the Administrative Agent and the Lenders set forth in the Budget are for information purposes only and such costs and expenses may be greater or less than the amounts set forth in the Budget."

(o) Amendment to Section 6.11 of the Credit Agreement (Use of Proceeds). Section 6.11 of the Credit Agreement is amended and restated in its entirety to read as follows:

"6.11 **Use of Proceeds; Disbursements**.

(i) The proceeds of the Term Loan and any Revolving Loans made on the Closing Date shall be used for the prepayment of the obligations described in Section 4.1(a)(xi), all obligations owed to the Lenders under that certain Third Amended and Restated Loan and Security Agreement, dated as of October 30, 2015, as amended and supplemented from time to time, and for general corporate purposes of the Borrowers and their Subsidiaries not in contravention of any Laws. The proceeds of all other Revolving Loans and Swing Line Loans shall be used for working capital and general corporate purposes of the Borrowers and their Subsidiaries not in contravention of any Laws, including the payment of certain fees and expenses incurred in connection with this Agreement.

(ii) Unless the Administrative Agent has provided its prior written consent, proceeds of the DIP Facility shall be used only to provide for the Borrowers' working capital and other general corporate purposes and Administrative Expenses during the Bankruptcy Cases in accordance with the Budget and this Agreement, including the Carveout. No proceeds of the DIP Facility shall be used to pay any fees or expenses incurred at any time in connection with the filing or prosecution of any action which seeks to invalidate, challenge, dispute, avoid, subordinate or otherwise impair the claims of the Administrative Agent and the DIP Lenders under any of the Loan Documents or in connection with the DIP Facility, or any Liens or priorities created under the Loan Documents or in connection with the DIP Facility, or that seeks to recover on any claims against or transfers made to the Administrative Agent or the DIP Lender; provided, however, that an official committee of unsecured creditors may utilize up to *[$_____]*$25,000 to investigate the Liens and claims by and against the Administrative Agent and the DIP Lender.

(iii) All disbursements of the Borrowers shall be consistent with the Budget."

14

**Exhibit 2**
**14 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

(p)    Amendment to Article VI of the Credit Agreement (Affirmative Covenants). Article VI of the Credit Agreement is amended by inserting a new Section 6.14 immediately after Section 6.13 thereof to read as follows:

"6.14    **Milestones**.

(a)    By August 12, 2019 (or upon such later date as agreed in writing between the Borrowers and the Administrative Agent), the Borrowers shall have entered into binding asset purchase agreement(s) with one or more prospective purchasers (subject to only customary conditions precedent, not including financing conditions) for the sale of all or substantially all of the assets of the Borrowers, on such terms acceptable to the Administrative Agent in its sole discretion (the "Specified Sale").

(b)    By September 20, 2019, the Bankruptcy Court shall have entered an order or orders approving bidding procedures for the Specified Sale, which such order or orders shall be in form and substance acceptable to the Administrative Agent in its sole discretion.

(c)    By October 18, 2019, the Bankruptcy Court shall have entered orders approving the sale of all or substantially all of the assets of the Borrowers, on such terms acceptable to the Administrative Agent in its sole discretion (the "Specified Sale Order") which orders shall be in form and substance acceptable to the Administrative Agent in its sole discretion.

(d)    By October 31, 2019 (the "Projected Sale Date"), the transactions contemplated in the Specified Sale Order shall have been consummated."

(q)    Amendment to Article VII of the Credit Agreement (Negative Covenants).  Article VII of the Credit Agreement is amended by (i) renumbering Section 7.19 thereof as Section 7.20 and (ii) inserting a new Section 7.19 immediately after Section 7.18 thereof to read as follows:

"7.19    **Additional Covenants**.

(a)    The Borrowers will not seek any debtor-in-possession financing (other than the financing provided under this Agreement) until (a) all Pre-Petition Letters of Credit have been terminated, cash collateralized in an amount equal to 105% of the aggregate face amount of such Pre-Petition Letters of Credit, or supported by one or more letters of credit naming the Administrative Agent as beneficiary with terms and conditions (and issued by one or more financial institutions) acceptable to the Administrative Agent in its sole discretion, (b) all other Obligations (other than contingent indemnification obligations) at any time owing by the Borrowers to the Administrative Agent or any Lender have been paid in full in cash and (c) all commitments of the Lenders under the Loan Documents (including, without limitation, under the DIP Facility) have been terminated.

(b)    The Borrowers shall not open any new deposit, securities or commodity accounts, except (i) accounts maintained with the Administrative Agent or (ii) deposit accounts maintained with other financial  institutions so long as such account is subject to a first-priority perfected Lien in favor of the Administrative Agent.  Promptly upon request by the Administrative Agent, the

US.124136204.08124136204.09

**Exhibit 2**
**15 of 30**

Borrowers shall deliver to the Administrative Agent a fully-executed deposit account control agreement in form and substance acceptable to the Administrative Agent with respect to each deposit, securities or commodity account of any Borrower.

(c)     Without the prior written consent of the Administrative Agent, no proceeds of the DIP Facility shall be used in a manner or for a purpose other than in accordance with the Budget and this Agreement.

(d)     The Borrowers shall not grant any new Liens in favor of any Person (other than the Administrative Agent and the Lenders) on any of the Collateral or Post-Petition Collateral, nor seek to prime any Lien of the Administrative Agent or the Lenders on any of the Collateral or the Post-Petition Collateral.

(e)     The Borrowers' Use of Cash Collateral as of any week shall not exceed the aggregate amount of operating and non-operating disbursements permitted for such week as set forth in the Budget.  Any Use of Cash Collateral shall be treated, for accounting purposes, as a simultaneous reduction of Pre-Petition Indebtedness and an increase in Post-Petition Indebtedness, in each case by the amount of such Use of Cash Collateral."

(r)     Amendment to Section 8.6 the Credit Agreement (Maximum Cumulative Cash Flow Variance).  Section 8.6 of the Credit Agreement is amended and restated in its entirety to read as follows:

"8.6     **Maximum Cumulative Cash Flow Variance**.  The Loan Parties shall not permit actual Net Cash Flow as reported by Wednesday of each week and calculated as of Friday of the immediately preceding week for the four-week period then ending to be less than 85% of Net Cash Flow forecasted for such four-week period as set forth in the Budget then in effect."

(s)     Amendment to Section 9.1 of the Credit Agreement (Events of Default).  Section 9.1 of the Credit Agreement is amended by:

(i)     amending and restating subsection (c) thereof to read as follows:

"(c)     Breach of Other Covenants.

(i)     Any of the Loan Parties shall default in the due observance or performance of any covenant, obligation, condition or provision under Sections 6.1, 6.2(a), 6.4, 6.6, 6.8, 6.9(b), 6.9(c), 6.10, 6.11, 6.13, 6.14, 9.2(f), 9.2(g), Article VII or Article VIII; or

(ii)     Any of the Loan Parties shall default in the due observance or performance of any covenant, obligation, condition or provision under this Agreement or any other Loan Document (exclusive of those defaults set forth elsewhere in this Section 9.1) and such default shall remain unremedied for a period of 5 Business Days;" and

US.124136204.08124136204.09

**Exhibit 2**
**16 of 30**
Case 19-62584-pcm11     Doc 7     Filed 08/22/19

(ii)     adding new subsections (r) through (v) to the end of Section 9.1 to read as follows:

"(r)     <u>Disturbance to Interim or Final Order</u>.  Either the Interim Order or the Final Order, or any portion thereof, shall be vacated, reversed or modified or any party shall appeal the Final Order;

(s)     <u>Challenge of Liens</u>.  Any party shall successfully challenge the validity, perfection or priority of any pre-petition Liens in favor of the Administrative Agent or any Lender;

(t)     <u>Relief in Favor of Other Secured Creditor</u>.  Relief from the automatic stay under the Bankruptcy Code shall be granted in favor of any other secured creditor to foreclose on any Collateral;

(u)     <u>Conversion</u>.  A Chapter 11 Trustee or examiner with expanded powers shall be appointed, or the Bankruptcy Cases shall be converted to a case under Chapter 7 of the Bankruptcy Code;

(v)     <u>Dismissal of Bankruptcy Cases</u>.  The Bankruptcy Cases shall be dismissed."

(t)     <u>Amendment to Section 9.2(e) of the Credit Agreement (Application of Proceeds)</u>. Section 9.2(e) of the Credit Agreement is amended and restated in its entirety read as follow:

"(e)     <u>Application of Proceeds</u>.  Upon the occurrence of a Post-Petition Event of Default, any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the Issuing Lender (including fees, charges and disbursements of counsel to the respective Lenders and the Issuing Lender and amounts payable under Article X), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, Letter of Credit Borrowings and other Obligations, and fees (including Letter of Credit Fees), ratably among the Lenders and the Issuing Lender in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Pre-Petition Indebtedness ratably among the Lenders and the Issuing Lender in proportion to the respective amounts described in this clause *Fourth* payable to them;

*Fifth*, to the Administrative Agent for the account of the Issuing Lender, to Cash Collateralize that portion of Letter of Credit Obligations comprised of the aggregate undrawn amount of Letters of Credit;

US.124136204.08124136204.09

**Exhibit 2**
**17 of 30**
Case 19-62584-pcm11    Doc 7    Filed 08/22/19

*Sixth*, to payment of that portion of the Obligations constituting unpaid principal of the Post-Petition Indebtedness ratably among the Lenders and the Issuing Lender in proportion to the respective amounts described in this clause *Sixth* payable to them;

*Seventh*, to payment of all other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause *Seventh* held by them; and

*Last*, the balance, if any, after Payment In Full of all of the Obligations, to the Loan Parties or as otherwise required by Law."

(u)    Amendment to Article IX of the Credit Agreement (Events of Default). Article IX of the Credit Agreement is amended by inserting a new Section 9.3 immediately after Section 9.2 thereof to read as follow:

"9.3    **Affidavit Following Post-Petition Event of Default**. Without limiting Section 9.2, upon the occurrence of any Post-Petition Event of Default, the Administrative Agent may, in its sole discretion, file an affidavit with the Bankruptcy Court certifying the occurrence of such Post-Petition Event of Default. The Administrative Agent shall, contemporaneously with the filing of any such affidavit with the Bankruptcy Court, serve via e-mail a copy of the affidavit on Borrowers and their counsel, the U.S. Trustee's office, and counsel for any official creditors' committee. Contemporaneously with the filing and service of any such affidavit, the Administrative Agent may request (and the Borrowers shall cooperate in scheduling) an expedited hearing regarding relief from the automatic stay for the Administrative Agent to enforce its rights and remedies under the Loan Documents and applicable law. The Borrowers agree that such expedited hearing may be heard as early as four Business Days after the Administrative Agent files such affidavit. The Borrowers may file a response with the Bankruptcy Court opposing relief from the automatic stay, which response must be limited to whether a Post-Petition Event of Default has occurred that has not been cured. The Borrowers agree that if the Bankruptcy Court determines that an uncured Post-Petition Event of Default has occurred, the Bankruptcy Court may enter an order terminating the automatic stay so that the Administrative Agent may enforce its rights and remedies. If the Borrowers fail to file a response, the Bankruptcy Court may enter an order terminating the automatic stay, which the Borrowers agree may be entered."

(v)    Amendment to Exhibit C to the Credit Agreement (Compliance Certificate). Exhibit C attached to the Credit Agreement is deleted and replaced in its entirety with Exhibit C to this Amendment.

4.    **References**. All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby, and any and all references in any other Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby.

5.    **No Other Changes**. In the event of a conflict or inconsistency between (x) any of this Amendment or the Credit Agreement as amended hereby (each, an "**Amendment Document**") and (y) any other Loan Document, the applicable Amendment Document shall govern and such other Loan Document shall be deemed amended to the extent of such inconsistency or conflict. Except as amended by this Amendment, all terms, provisions, and conditions of the Credit Agreement and the other Loan Documents, and all documents executed in connection therewith, shall continue in full force and effect and shall remain enforceable and binding in accordance with their respective terms.

18

6.     **Representations and Warranties**.  Each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a)     Each Borrower has all requisite power and authority, corporate or otherwise, to execute and deliver this Amendment and any other documents delivered hereunder and to perform its obligations under this Amendment, the Credit Agreement as amended hereby, and the other Loan Documents.  This Amendment and the other Loan Documents have been duly and validly executed and delivered to the Administrative Agent by the applicable Borrower, and this Amendment, the Credit Agreement as amended hereby and the other Loan Documents constitute such Borrower's legal, valid and binding obligations, enforceable in accordance with their terms.

(b)     The execution, delivery and performance by each Borrower of this Amendment, and the performance of the Credit Agreement as amended hereby and the other Loan Documents to which such Borrower is a party, have been duly authorized by all necessary corporate or other action of such Borrower and do not and will not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate such Borrower's Organizational Documents or any provision of any law, rule, regulation or order presently in effect having applicability to such Borrower, (iii) result in a breach of, or constitute a default under, any indenture or agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien of any nature upon or with respect to any of the properties now owned or hereafter acquired by any Borrower (other than as required under the Loan Documents or as otherwise permitted by the Loan Documents).

(c)     (i) The representations and warranties of each Borrower in the Credit Agreement and the other Loan Documents which are not otherwise qualified by materiality shall be true, correct and complete in all material respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all material respects as of the applicable earlier date(s); and (ii) the representations and warranties of each Borrower in the Credit Agreement and the other Loan Documents which are qualified by materiality shall be true, correct and complete in all respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all respects as of the applicable earlier date(s).

7.     **Conditions to Effectiveness**.  Section 3 of this Amendment shall be effective only if the Administrative Agent has received, on or before the date of this Amendment (or such later date as the Administrative Agent may agree in writing), each of the following, each in form and substance acceptable to the Administrative Agent in its sole discretion:

(a)     this Amendment, duly executed and delivered by each Borrower and the Lenders;

(b)     copies of all "first day pleadings" in the Bankruptcy Cases acceptable to the Administrative Agent in its reasonable discretion;

(c)     evidence of entry by the Bankruptcy Court on or before the date that is 5 Business Days after the Petition Date of the Interim Order in form and substance acceptable to the Administrative Agent in its sole discretion, after adequate notice to all parties entitled to service, which, among other provisions, (i) approves this Amendment, the Credit Agreement as amended hereby and the other Loan Documents, (ii) authorizes the Borrowers to enter into this Amendment, the Credit Agreement as amended hereby and the other Loan Documents and the financing

19

**Exhibit 2**
**19 of 30**

Case 19-62584-pcm11     Doc 7     Filed 08/22/19

contemplated therein, (iii) grants Superpriority Claims in the Bankruptcy Cases with respect to the Post-Petition Indebtedness and all obligations owing under any CoBank Cash Management Agreement or any other Cash Management Services arrangement with the Administrative Agent or any Affiliate thereof, and (iv) provides that all Post-Petition Indebtedness and all obligations of the Borrowers owing under any such Cash Management Services Arrangement are secured by a first priority perfected Lien on the Collateral, subject only to valid, perfected, non-avoidable prior pre-petition Permitted Liens and the Carveout;

(d)    a copy of the Budget for the 13-week period following the week ended August 16, 2019, which Budget shall have been delivered to the Administrative Agent on or before the Petition Date;

(e)    a certificate of the secretary or assistant secretary of each Borrower, certifying (i) a true, correct and complete copy of the resolutions of such Borrower authorizing the execution, delivery and performance of this Amendment, (ii) true, correct and complete copies of such Borrower's Organizational Documents as in effect on the date hereof certified by the appropriate state official where such documents are filed in a state office (if so filed or required to be so filed), and (iii) certifying the officers of such Borrower that are presently authorized to execute and deliver this Amendment and the other Loan Documents, together with true signatures of each such officer;

(f)    a true, correct and complete certification regarding beneficial ownership of legal entity customers;

(g)    payment of the DIP Facility Fee due and payable on the Fourteenth Amendment Effective Date;

(h)    payment of all other fees and expenses of the Administrative Agent (including the fees and expenses of the Administrative Agent and its counsel, advisors and consultants) to the extent invoiced prior to the date hereof; and

(i)    such other assurances, certificates, documents, consents, reports or opinions as the Administrative Agent may require.

8.    **General Provisions**.

(a)    <u>Release</u>.  Each Borrower hereby absolutely and unconditionally releases and forever discharges each of the Administrative Agent and Lenders, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns, together with all of the present and former Directors, officers and employees, agents, attorneys and consultants of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which such Borrower has had, now has or has made claim to have against any such Person for or by reason of any act, omission, matter, cause or thing whatsoever occurring or arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

(b)    <u>Costs and Expenses</u>.  Each Borrower hereby reaffirms its agreement under Section 11.3 of the Credit Agreement, among other things, to pay or reimburse the Administrative Agent, any Lender or the Issuing Lender on demand for all out-of-pocket expenses incurred by the Administrative Agent, any Lender or the Issuing Lender (including the fees, charges and

US.124136204.08124136204.09

**Exhibit 2**
**20 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

disbursements of counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for the Administrative Agent, any Lender or the Issuing Lender), in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the other documents, agreements and certificates contemplated hereunder (whether or not the transactions contemplated hereby or thereby shall be consummated), in connection with any Debtor Relief Proceeding with respect to any Loan Party or in connection with the enforcement or protection of its rights.  Each Borrower hereby authorizes CoBank to make DIP Advances at any time and from time to time for immediate application to such payment or reimbursement of any such fees, costs or expenses under this subsection (b), Section 11.3 of the Credit Agreement or any other provision of the Loan Documents.

(c)  No Waiver.  The execution of this Amendment or any documents, agreements and certificates contemplated hereunder shall not be deemed to be a waiver of any Default or Event of Default or any other breach, default or event of default under any Loan Document or other document held by the Administrative Agent or any Lender, whether or not known to the Administrative Agent or any Lender and whether or not existing on the date of this Amendment.

(d)  Loan Document.  The parties hereto hereby acknowledge and agree that this Amendment shall constitute a Loan Document for all purposes of the Credit Agreement and the other Loan Documents.  This Amendment, together with the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents, comprise the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

(e)  Successors and Assigns.  This Amendment shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors and assigns, except that none of the Borrowers may assign or transfer its respective rights or obligations hereunder.

(f)  Severability.  Should any provision of this Amendment be deemed unlawful or unenforceable, said provision shall be deemed several and apart from all other provisions of this Amendment, and all remaining provisions of this Amendment shall be fully enforceable.

(g)  Governing Law.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF COLORADO.

(h)  Headings.  The captions or headings in this Amendment are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Amendment.

(i)  Counterparts.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Amendment, taken together, shall constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Amendment by facsimile or by e-mail transmission of a PDF or similar copy shall be equally as effective as delivery of a manually executed counterpart of this Amendment.  Any party delivering an executed counterpart signature page to this Amendment by facsimile or by e-mail transmission shall also deliver a manually executed counterpart of this Amendment but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect of this Amendment.

*Signature pages follow.*

US.124136204.08124136204.09

**Exhibit 2**
**21 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**NORPAC FOODS, INC.**, as Borrower

By: _____
Name:   Richard M.  Munekiyo
Title:    Secretary, Treasurer and Chief Financial Officer

**HERMISTON FOODS, LLC**, as Borrower

By: _____
Name:   Richard M.  Munekiyo
Title:    Secretary, Treasurer and Chief Financial Officer

**QUINCY FOODS, LLC,** as Borrower

By: _____
Name:   Richard M.  Munekiyo
Title:    Secretary, Treasurer and Chief Financial Officer

Signature Page to Fourteenth Amendment to Credit Agreement

**Exhibit 2**
**22 of 30**
Case 19-62584-pcm11    Doc 7    Filed 08/22/19

**COBANK, ACB,** as Administrative Agent and as Lender

By: _____
Name:     Justin A.  Barr
Title:      Vice President

Signature Page to Fourteenth Amendment to Credit Agreement

Exhibit 2
23 of 30
Case 19-62584-pcm11    Doc 7    Filed 08/22/19

EXHIBIT C

COMPLIANCE CERTIFICATE

Financial Statement Date: _____

To: CoBank, ACB, as Administrative Agent
6340 S. Fiddlers Green Circle
Greenwood Village, Colorado 80111
Attention: Credit Information Services
Fax: (303) 224-6101
Email: CIServices@cobank.com

Reference is made to that certain Credit Agreement dated as of November 15, 2017 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; the terms defined therein being used herein as therein defined), by and among NORPAC Foods, Inc., an Oregon cooperative corporation ("**NORPAC**"), Hermiston Foods, LLC, an Oregon limited liability company ("**Hermiston**"), and Quincy Foods, LLC, a Washington limited liability company ("**Quincy**"; together with NORPAC and Hermiston, the "**Borrowers**"), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and CoBank, ACB, as administrative agent (the "**Administrative Agent**"). Any capitalized terms used but not defined in this Certificate shall have the meaning given to such terms in the Credit Agreement.

The undersigned hereby certifies, solely in his or her corporate capacity and not individually, as of the date hereof that he/she is an officer of each of the Borrowers, and that, as such, he/she is authorized to execute and deliver this Certificate to the Administrative Agent on behalf of each of the Borrowers, and that:

1. Attached hereto as <u>Annex I</u> are the following (check all that apply):

☐ *[within 30 days after the end of each month]* the interim financial statements and narrative management discussion required under Section 6.1(a) of the Credit Agreement, which financial statements have been prepared in accordance with GAAP consistently applied;

☐ *[90 days after the end of each fiscal year]* the audited annual financial statements and accountant letter required under Section 6.1(b) of the Credit Agreement, which financial statements have been prepared in accordance with GAAP consistently applied;

☐ *[not later than 30 days prior to the commencement of each fiscal year]* the annual budget and any forecasts or projections of the Borrowers required under Section 6.1(e)(i) of the Credit Agreement;

☐ *[not later than Wednesday of each week]* a rolling 13-week Budget for the Borrowers calculated with true, correct and complete data as of the immediately preceding Friday and reviewed by the CRO, together with a report setting forth actual Net Cash Flow for the four-week period ending on such Friday and identifying and explaining any material variances of actual Net Cash Flow for such four-week period compared to Net Cash Flow forecasted for such period as set forth the most recently accepted Budget and a variance analysis to the most recently accepted Budget, including a comparison of actual performance with the Budget for the immediately prior week, and a narrative explaining

C-1

**Exhibit 2**
**24 of 30**

deviations greater than 10% over Budget on a single line item, as required under Section 6.1(g)(i) of the Credit Agreement;

☐ *[within 5 Business Days after the end of each month]* a written report of each market launch, non-disclosure agreement, qualification cut-off date, final bid selection, Joint Venture proposal and closing of any Planned Asset Sale, sale of any frozen soup business or other potential sale of assets by any Borrower or Joint Venture outside of the ordinary course of business or of any Joint Venture and related documents required under Section 6.1(e)(iv)(B) of the Credit Agreement;

☐ *[to the extent necessary under Section 6.1(e)(ii) of the Credit Agreement]* reports, including management letters submitted, to the Borrowers by independent accountants in connection with any annual, interim or special audit; and

☐ *[within 5 days after approval by the Borrowers' Board of Directors]* copies of the Crop Economic Value Determination and the Pool Economic Value Determination (as such terms are used in the Borrowers' business), including an explanation of any adjustments, as required under Section 6.1(e)(v) of the Credit Agreement.

2.      The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made under his/her supervision, a detailed review of the transactions and condition (financial or otherwise) of the Borrowers and their respective Subsidiaries during the accounting period covered by the attached financial statements.

3.      A review of the activities of the Borrowers and their respective Subsidiaries during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Borrowers and their respective Subsidiaries performed and observed all their obligations under the Loan Documents, and to the best knowledge of the undersigned at the end of such fiscal period there did not exist any Default or Event of Default [or, if a Default or Event of Default exists, describe its nature, period of existence and what action Borrower has taken and is taking with respect thereto].

4.      The representations and warranties of the Borrowers contained in Article V of the Credit Agreement, or which are contained in any document furnished at any time under or in connection with the Loan Documents, are true and correct, in all material respects, on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct, in all material respects, as of such earlier date.

5.      The financial covenant analyses and information attached as <u>Annex II</u> hereto are hereby made a part hereof and are true and accurate for the applicable period on and as of the date of this Certificate.

*Signature page follows.*

US.~~124136204.08~~124136204.09

**Exhibit 2**
**25 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

IN WITNESS WHEREOF, the undersigned has executed this Certificate on behalf of the Borrowers as of _____, 20__.

**NORPAC FOODS, INC.**                    **HERMISTON FOODS, LLC**

By: _____     By: _____
Name: _____     Name: _____
Title: _____     Title: _____


**QUINCY FOODS, LLC**

By: _____
Name: _____
Title: _____

C-3

FINANCIAL STATEMENTS

*See attached.*

US.124136204.08124136204.09

Exhibit 2
27 of 30

Case 19-62584-pcm11    Doc 7    Filed 08/22/19

## FINANCIAL COVENANT CALCULATIONS

| I. | **Section 8.1 Minimum EBITDA** |
|----|-------------------------------|

|  |  |  |
|---|---|---|
| 1. | Consolidated Net Income | $ _____ |
| 2. | plus income tax expense (net of tax refunds) | $ _____ |
| 3. | plus interest expense (including without limitation, implicit interest expense on Capital Leases) | $ _____ |
| 4. | plus depreciation and amortization expense | $ _____ |
| 5 | plus any noncash expenses or charges for such period | $ _____ |
| 6. | minus non-operating gains (including, without limitation, extraordinary or nonrecurring gains, gains from discontinuance of operations and gains arising from the sale of assets other than inventory or property, plant and equipment) | $ _____ |
| 7. | minus non-operating losses | $ _____ |
| 8. | minus any other comprehensive income | $ _____ |
| 9. | minus cash payments made during such period in respect of non-cash charges described in line 5 taken in a prior period | $ _____ |
| 10. | Consolidated EBITDA: (line 1 plus lines 2 through 5 minus lines 6 through 9) | $ _____ |
|  | Minimum Required EBITDA | $ _____ |
|  | In Compliance | __Yes ____No |

**Covenant:** Prior to and including March 31, 2019, the Loan Parties shall not permit EBITDA, calculated as of the last day of each fiscal quarter of the Borrowers for the fiscal quarter then ended, to be less than $1,000,000.

| II. | **Section 8.2 Minimum Cash Interest Coverage Ratio** |
|-----|------------------------------------------------------|

|  |  |  |
|---|---|---|
| 1. | Consolidated EBITDA (see line (I)(10) above) | $ _____ |
| 2. | Consolidated cash interest expense | $ _____ |
| 3. | less amortization of debt issuance costs | $ _____ |
| 4. | Interest Expense (line 2 minus line 3) | $ _____ |
| 5. | Cash Interest Coverage Ratio (line 1 : line 4) | : 1.00 |
|  | Minimum Required Cash Interest Coverage Ratio | : 1.00 |
|  | In Compliance | __Yes ___No |

**Covenant:** The Loan Parties shall not permit their Cash Interest Coverage Ratio, calculated as of the end of each fiscal quarter of the Borrowers for the 4 fiscal quarters then ended, to be less than the rate set forth below opposite such date:

| | |
|---|---|
| December 31, 2017 | (1.00):1.00 |
| March 31, 2018 | 1.00:1.00 |

US.124136204.08124136204.09

**Exhibit 2**
**28 of 30**
Case 19-62584-pcm11   Doc 7   Filed 08/22/19

**~~IV~~III. Section 8.3 Minimum Total Equity**

| | | |
|---|---|---|
| 1. | Consolidated total assets | $ _____ |
| 2. | <u>less</u> Consolidated total liabilities | $ _____ |
| 3. | Borrowers' Total Equity (line 1 minus line 2) | $ _____ |
| | Minimum Required Total Equity | $ _____ |
| | In Compliance | __Yes ____No |

**Covenant:**

     (a)     The Loan Parties shall not permit the Borrowers' Total Equity, calculated as of the end of each fiscal quarter of Parent for such quarter, to be less than the amount set forth below opposite such date:

| December 31, 2017 | $30,000,000 |
|---|---|
| March 31, 2018 | $32,000,000 |

     (b)     From March 31, 2018 to and including March 31, 2019, the Loan Parties shall not permit the Borrowers' Total Equity, calculated as of the last day of each calendar month, to be less than $23,000,000.

**IV.     Section 8.4 Maximum Debt to Capitalization**

| | | |
|---|---|---|
| 1. | Consolidated total debt <u>plus</u> (to the extent not already included) | $ _____ |
| 2. | obligations for borrowed money | $ _____ |
| 3. | obligations for the deferred purchase price of acquired assets | $ _____ |
| 4. | Capital Leases | $ _____ |
| 5. | Synthetic Lease Obligations | $ _____ |
| 6. | letters of credit outstanding | $ _____ |
| 7. | any guaranty given by a Borrower with respect to liabilities of a type described in the foregoing | $ _____ |
| 8. | <u>minus</u> long term debt associated with Borrowers' Salem OR office building and cold storage facility | $ _____ |
| 9. | Subtotal: (line 1 plus lines 2 through 7 minus line 8) | $ _____ |
| 10. | Borrowers' Total Equity (see line (III)(3) above) | $ _____ |
| 11. | Subtotal: (line 9 plus line 10) | $ _____ |
| | Debt to Capitalization Ratio (line 9 : line 11) | _____ : 1.00 |
| | Maximum Debt to Capitalization Ratio | _____ : 1.00 |
| | In Compliance | __Yes ____No |

**Covenant:** The Loan Parties shall not permit Debt to Capitalization Ratio, calculated as of the end of each fiscal quarter of the Borrowers for the 4 fiscal quarters then ended, to be greater than the amount set forth below opposite such date:

| December 31, 2017 | 0.90:1.00 |
|---|---|
| March 31, 2018 | 0.90:1.00 |

C-6

US.~~124136204.08~~124136204.09

| | | |
|---|---|---|
| **V.** | **Section 8.5 Maximum Capital Expenditures** | |

|  |  |
|---|---|
| Capital Expenditures | $_____ |
| Maximum Capital Expenditures | $_____ |
| In Compliance | ___Yes  ___No |

**<u>Covenant</u>:**

     (a)     The Loan Parties shall not permit their Capital Expenditures, during the period from April 1, 2017 through March 31, 2018, to be greater than $13,500,000 in the aggregate; and

     (b)     The Loan Parties shall not permit their Capital Expenditures, during the period from April 1, 2018 through March 31, 2019, to be greater than $14,000,000 in the aggregate.

| | | |
|---|---|---|
| **VI.** | **Section 8.6 Maximum Cumulative Cash Flow Variance** | |

|  |  |
|---|---|
| Actual Net Cash Flow for 4-week period ending _____, 2019 | $_____ |
| Forecasted Net Cash Flow for such period in the Budget | $_____ |
| Variance | _____% |
| In Compliance | ___Yes  ___No |

**<u>Covenant</u>:** The Loan Parties shall not permit actual Net Cash Flow as reported by Wednesday of each week and calculated as of Friday of the immediately preceding week for the four-week period then ending to be less than 85% of Net Cash Flow forecasted for such four-week period as set forth in the Budget then in effect.

C-7

US.124136204.08124136204.09

**Exhibit 2**
**30 of 30**

Case 19-62584-pcm11    Doc 7    Filed 08/22/19