1  Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
       Direct Dial:  503.802.2013
2      Facsimile:    503.972.3713
       E-Mail:       albert.kennedy@tonkon.com
3  Timothy J. Conway, OSB No. 851752
       Direct Dial:  (503) 802-2027
4      Facsimile:    (503) 972-3727
       E-Mail:       tim.conway@tonkon.com
5  Michael W. Fletcher, OSB No. 010448
       Direct Dial:  (503) 802-2169
6      Facsimile:    (503) 972-3867
       E-Mail:       michael.fletcher@tonkon.com
7  Ava L. Schoen, OSB No. 044072
       Direct Dial:  (503) 802-2143
8      Facsimile:    (503) 972-3843
       E-Mail:       ava.schoen@tonkon.com
9  TONKON TORP LLP
   888 SW Fifth Avenue, Suite 1600
10 Portland, OR 97204-2099

11     Attorneys for Debtors

12

13               UNITED STATES BANKRUPTCY COURT

14                    DISTRICT OF OREGON

15 In re                              Case No. 19-62584-pcm11

16 NORPAC Foods, Inc.,

17                  Debtor.

18 In re                              Case No. 19-33102-pcm11

19 Hermiston Foods, LLC,

20                  Debtor.

21

22 In re                              Case No. 19-33103-pcm11

   Quincy Foods, LLC,                 **DECLARATION OF SHAWN
23                                     CAMPBELL IN SUPPORT OF FIRST
                    Debtor.           DAY MOTIONS**
24

25

26

**Page 1 of 5** -  DECLARATION OF SHAWN CAMPBELL IN SUPPORT OF FIRST DAY
                   MOTIONS

I, Shawn Campbell, hereby declare that the following statements are true to the best of my knowledge and belief, that I am competent to testify to the matters stated herein, and that I understand they are made for use as evidence in court and are subject to penalty for perjury.

1. I joined NORPAC Foods, Inc. ("NORPAC") as chief operating officer in 2016 and was promoted to president in 2017. I am currently president of NORPAC. I have personal knowledge of the facts stated in this Declaration. If called as a witness, I could and would testify competently to these facts.

2. On August 22, 2019 (the "Petition Date"), Debtors and Debtors-in-Possession NORPAC, Hermiston Foods, LLC ("Hermiston"), and Quincy Foods, LLC ("Quincy") (together, "NORPAC" or "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code.

3. Promptly after filing their Chapter 11 petitions, Debtors filed certain applications, motions, and proposed orders (the "First Day Motions"). Debtors request that Orders be entered on each of the First Day Motions, as each constitutes a critical element in achieving a successful reorganization of Debtors for the benefit of all parties-in-interest.

## THE DEBTORS

4. Founded in 1924 and headquartered in Salem, Oregon, NORPAC (and its subsidiaries) is the largest processor of frozen vegetables and fruits in the Pacific Northwest. NORPAC is a cooperative owned by over 140 members. Quincy and Hermiston are single-member limited liability companies whose sole member is NORPAC. Debtors own and operate raw processing plants in Brooks, Oregon, and Stayton, Oregon, a packaging plant in Salem, Oregon, and a raw processing, packaging, and roasting facility in Quincy, Washington. Each of the plants have associated cold storage facilities. Debtors also have a harvesting operation in Hermiston, Oregon. Debtors have cultivated a diverse supplier base built on a network of over 220 contract growers spanning more than 40,000 acres. Debtors' growers are made up of

**Page 2 of 5** - DECLARATION OF SHAWN CAMPBELL IN SUPPORT OF FIRST DAY MOTIONS

family-owned and run farms focused on providing quality vegetables and fruits. Debtors have the ability to process 23 different fruits and vegetables and have established relationships with a customer base of over 1,250 buyers spanning the retail, food service, club, export, and industrial markets worldwide.

5.  Debtors' sales have exceeded $310 million in each of the last three fiscal years.

6.  Debtors employ more than 1,125 full-time employees and over 1,100 seasonal employees during the harvest and processing season. Debtors are the largest unionized agricultural employer in Oregon, with approximately 2,000 union members. NORPAC has contracts with Teamsters Local 324, Teamsters Local 670, Teamsters Local 760, and the International Union of Operating Engineers Local 701.

7.  Debtors sponsor a single-employer defined benefit plan and participate in three multi-employer pension plans, including the Western Conference of Teamsters Pension Plan, the Oregon Processors Seasonal Employees Pension Plan, and the Central Pension Fund of the International Union of Operating Engineers. Outside consultants have estimated the withdrawal liabilities for the three multi-employer pension plans to total more than $5 million. The consultants estimate that the deficit of the single-employer defined benefit plan could exceed $20 million.

**THE ASSET SALE**

8.  In May of 2018, NORPAC engaged the investment banking firm of D.A. Davidson & Co. to render financial advisory and investment banking services in connection with NORPAC's financial and strategic alternatives, including purchase, merger, consolidation, reorganization, or other transaction of a like nature. D.A. Davidson has a mergers and acquisition platform with broad industry expertise and worldwide capabilities. D.A. Davidson contacted 166 potential strategic and financial investors. Seventy-two non-disclosure agreements were executed. Four letters of intent or indications of interest were executed.

**Page 3 of 5** - DECLARATION OF SHAWN CAMPBELL IN SUPPORT OF FIRST DAY
     MOTIONS

Extensive negotiations were conducted with a highly qualified and motivated party. However, D.A. Davidson was unable to conclude a transaction and their engagement was terminated in June of 2019.

9. With the assistance of SierraConstellation Partners, LLC ("Sierra") and after almost six weeks of negotiation, Debtors entered into an Asset Purchase Agreement (the "APA") with Oregon Potato Company ("OPC"). Pursuant to the APA, Debtors agreed to sell substantially all of their assets, with the exception of the processing plant in Stayton, their investment in CoBank, certain life insurance policies, and other nominal assets. The purchase price is $149,500,000, plus the value of accounts receivable, plus an adjustment for an increase in the value of inventory, less the amount due to growers at the closing of the 2019 crop. OPC will assume and pay all amounts due to growers for the 2019 crop. Debtors believe the sale will generate funds sufficient to pay all secured and priority claims and leave sufficient funds for a meaningful distribution to unsecured creditors.

10. The APA requires that Debtors initiate a voluntary case under Chapter 11 of Title 11 of the United States Code and close the transaction contemplated by the APA pursuant to an order of the United States Bankruptcy Court authorizing the sale pursuant to 11 U.S.C. § 363(b) and related provisions. Debtors have filed these bankruptcy cases because Debtors believe the APA and contemplated sale process will maximize the value of Debtors' assets for the benefit of Debtors' estates and all creditors.

**DEBT STRUCTURE**

11. Debtors are co-borrowers under a Credit Agreement dated November 15, 2017 with CoBank, ACB, in its capacity as administrative agent for the Lenders as defined in the Credit Agreement. Debtors' obligations to CoBank under the Credit Agreement total approximately $124,000,000 and are secured by all or substantially all assets and property of each of the Debtors. A true copy of the Credit Agreement (without exhibits) is attached hereto as **Exhibit 1**. Attached as **Exhibits 2, 3** and **4** are true copies of the First, Tenth, and Thirteenth

Page 4 of 5 - DECLARATION OF SHAWN CAMPBELL IN SUPPORT OF FIRST DAY MOTIONS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

Amendments to Credit Agreement. Debtors are in default in the performance of their obligations under the Credit Agreement and Debtors have been operating for several months under a series of forbearance agreements.

12. Because of the seasonality of Debtors' business, Debtors have an immediate need for up to $15 million in additional credit accommodations from CoBank in order to maintain their operations as a going concern, close the transaction contemplated by the APA, and maximize the value of their assets for the benefit of their estates and all creditors. Without such additional funds, Debtors will not be able to continue the operation of their business, pay their employees, and preserve the value of their assets.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

This Declaration was executed on this 22nd day of August, 2019.


*/s/ Shawn Campbell*
Shawn Campbell

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

# EXHIBIT 1

## CREDIT AGREEMENT

**CREDIT AGREEMENT**

**by and among**

**NORPAC FOODS, INC.**

**and**

**EACH OF ITS SUBSIDIARIES PARTY HERETO,**

**as Borrowers,**

**THE LENDERS PARTY HERETO**

**and**

**COBANK, ACB, as Administrative Agent**

_____

**COBANK, ACB, as Lead Arranger and Sole Bookrunner**

**Dated as of November 15, 2017**

US.114420341.12

**Exhibit 1**
**1 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

# TABLE OF CONTENTS

**Page**

I. CERTAIN DEFINITIONS .................................................................................................. 1
    1.1    Certain Definitions ......................................................................................... 1
    1.2    Construction .................................................................................................. 34
    1.3    Accounting Principles ................................................................................... 34
    1.4    UCC Terms .................................................................................................... 35
    1.5    Rounding ....................................................................................................... 35
    1.6    Letter of Credit Amounts .............................................................................. 35
    1.7    Covenant Compliance Generally .................................................................. 35
    1.8    Administration of Rates ................................................................................ 35

II. CREDIT FACILITIES ................................................................................................... 36
    2.1    Term Loan ..................................................................................................... 36
    2.2    Revolving Loans ........................................................................................... 36
    2.3    Swing Line Loans ......................................................................................... 37
    2.4    Interest Rate Provisions ................................................................................ 39
    2.5    Interest Periods ............................................................................................. 40
    2.6    Making of Loans ........................................................................................... 42
    2.7    Fees ............................................................................................................... 43
    2.8    Notes ............................................................................................................. 43
    2.9    Letter of Credit Subfacility .......................................................................... 44
    2.10    Payments ....................................................................................................... 51
    2.11    Interest Payment Dates ................................................................................. 51
    2.12    Voluntary Prepayments and Reduction of Commitments ............................ 51
    2.13    Mandatory Prepayments ............................................................................... 53
    2.14    Sharing of Payments by Lenders .................................................................. 54
    2.15    Defaulting Lenders ....................................................................................... 55
    2.16    Cash Collateral ............................................................................................. 58
    2.17    CoBank Capital Plan ..................................................................................... 58
    2.18    Cash Management ......................................................................................... 59
    2.19    Joint and Several Liability of Borrowers ...................................................... 60
    2.20    Protective Advances ..................................................................................... 60

2.21     Option to Extend Maturity Date ............................................................ 61

III. INCREASED COSTS; TAXES; ILLEGALITY; INDEMNITY ......................................... 62

3.1      Increased Costs ............................................................................ 62

3.2      Taxes ..................................................................................... 63

3.3      Illegality ................................................................................ 67

3.4      LIBOR Rate Option Unavailable; Interest After Default ..................................... 67

3.5      Indemnity ................................................................................. 68

3.6      Mitigation Obligations; Replacement of Lenders............................................. 69

3.7      Survival .................................................................................. 70

IV. CONDITIONS OF LENDING AND ISSUANCE OF LETTERS OF CREDIT ................. 70

4.1      First Loans and Letters of Credit ........................................................ 70

4.2      Each Loan or Letter of Credit ............................................................ 73

V. REPRESENTATIONS AND WARRANTIES............................................................ 73

5.1      Organization and Qualification............................................................ 73

5.2      Compliance With Laws...................................................................... 74

5.3      Title to Properties ...................................................................... 74

5.4      Investment Company Act ................................................................... 74

5.5      Event of Default ......................................................................... 74

5.6      Subsidiaries and Owners................................................................... 74

5.7      Power and Authority; Validity and Binding Effect ......................................... 74

5.8      No Conflict; Material Agreements; Consents................................................ 75

5.9      Litigation................................................................................ 75

5.10     Financial Statements ..................................................................... 75

5.11     Margin Stock.............................................................................. 76

5.12     Full Disclosure .......................................................................... 76

5.13     Taxes .................................................................................... 76

5.14     Intellectual Property; Other Rights ...................................................... 77

5.15     Liens in the Collateral .................................................................. 77

5.16     Insurance ................................................................................ 77

5.17     ERISA Compliance.......................................................................... 77

5.18     Environmental Matters..................................................................... 78

5.19     Solvency.................................................................................. 78

5.20     Sanctions; Anti-Terrorism Laws; Anti-Corruption Laws ..................................... 78

**Exhibit 1**
**3 of 132**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

5.21 Compliance with Food Security Act and Agricultural Lien Statutes ................... 79

5.22 Agricultural Licenses ........................................................................................ 79

## VI. AFFIRMATIVE COVENANTS ................................................................................. 79

6.1 Reporting Requirements ..................................................................................... 79

6.2 Preservation of Existence, Etc. ......................................................................... 82

6.3 Payment of Liabilities, Including Taxes, Etc. ................................................... 82

6.4 Maintenance of Insurance .................................................................................. 82

6.5 Maintenance of Properties and Leases .............................................................. 82

6.6 Visitation Rights ................................................................................................ 83

6.7 Keeping of Records and Books of Account ...................................................... 83

6.8 Compliance with Laws; Use of Proceeds .......................................................... 83

6.9 Further Assurances ............................................................................................ 84

6.10 CoBank Equity .................................................................................................. 85

6.11 Use of Proceeds ................................................................................................. 85

6.12 Updates to Schedules ........................................................................................ 85

6.13 Post-Closing Deliveries ..................................................................................... 86

## VII. NEGATIVE COVENANTS ....................................................................................... 88

7.1 Indebtedness ....................................................................................................... 88

7.2 Liens ................................................................................................................... 88

7.3 Affiliate Transactions ........................................................................................ 88

7.4 Loans and Investments ....................................................................................... 89

7.5 Dividends and Related Distributions ................................................................. 89

7.6 Liquidations, Mergers, Consolidations, Acquisitions ...................................... 89

7.7 Dispositions of Assets or Subsidiaries .............................................................. 90

7.8 Use of Proceeds .................................................................................................. 90

7.9 Subsidiaries, Partnerships and Joint Ventures .................................................. 91

7.10 Continuation of or Change in Business ............................................................. 91

7.11 Fiscal Year ......................................................................................................... 91

7.12 Issuance of Equity Interests .............................................................................. 91

7.13 Changes in Organizational Documents .............................................................. 91

7.14 Negative Pledges ............................................................................................... 91

7.15 Anti-Terrorism Laws; Anti-Corruption Laws ................................................... 92

7.16 Material Agreements .......................................................................................... 92

**Exhibit 1**
**4 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

| | | |
|---|---|---|
| 7.17 | Member Marketing Contract | 92 |
| 7.18 | Producer Payment Pool | 92 |
| 7.19 | Independence of Covenants | 92 |
| VIII. | FINANCIAL COVENANTS | 92 |
| 8.1 | Minimum EBITDA | 92 |
| 8.2 | Minimum Cash Interest Coverage Ratio | 93 |
| 8.3 | Minimum Total Equity | 93 |
| 8.4 | Maximum Debt to Capitalization | 93 |
| 8.5 | Maximum Capital Expenditures | 94 |
| IX. | EVENTS OF DEFAULT | 94 |
| 9.1 | Events of Default | 94 |
| 9.2 | Consequences of Event of Default | 97 |
| X. | THE ADMINISTRATIVE AGENT | 99 |
| 10.1 | Appointment and Authority | 99 |
| 10.2 | Rights as a Lender | 99 |
| 10.3 | No Fiduciary Duty | 99 |
| 10.4 | Exculpation | 100 |
| 10.5 | Reliance by the Administrative Agent | 100 |
| 10.6 | Delegation of Duties | 100 |
| 10.7 | Filing Proofs of Claim | 101 |
| 10.8 | Resignation of the Administrative Agent | 101 |
| 10.9 | Resignation of Swing Line Lender or Issuing Lender | 102 |
| 10.10 | Non-Reliance on the Administrative Agent and Other Lenders | 103 |
| 10.11 | No Other Duties, etc. | 103 |
| 10.12 | Authorization to Release Collateral and Guarantors | 103 |
| 10.13 | Compliance with Flood Laws | 104 |
| 10.14 | No Reliance on the Administrative Agent's Customer Identification Program | 104 |
| XI. | MISCELLANEOUS | 104 |
| 11.1 | Modifications, Amendments or Waivers | 105 |
| 11.2 | No Implied Waivers; Cumulative Remedies | 106 |
| 11.3 | Expenses; Indemnity; Damage Waiver | 107 |
| 11.4 | Holidays | 108 |

**Exhibit 1**
**5 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

11.5    Notices; Effectiveness; Electronic Communication ............................................ 109

11.6    Severability ................................................................................................... 110

11.7    Duration; Survival............................................................................................ 110

11.8    Successors and Assigns.................................................................................... 111

11.9    Confidentiality ................................................................................................ 115

11.10   Counterparts; Integration; Effectiveness............................................................ 116

11.11   CHOICE OF LAW; SUBMISSION TO JURISDICTION; WAIVER OF
        VENUE; SERVICE OF PROCESS; WAIVER OF JURY TRIAL.................... 117

11.12   USA Patriot Act Notice ................................................................................... 118

11.13   Payments Set Aside ......................................................................................... 118

11.14   Interest Rate Limitation ................................................................................... 118

XII. GUARANTY.......................................................................................................... 119

12.1    Guaranty......................................................................................................... 119

12.2    Payment.......................................................................................................... 119

12.3    Absolute Rights and Obligations ...................................................................... 119

12.4    Currency and Funds of Payment........................................................................ 121

12.5    Subordination .................................................................................................. 121

12.6    Enforcement.................................................................................................... 121

12.7    Set-Off and Waiver .......................................................................................... 122

12.8    Waiver of Notice; Subrogation ......................................................................... 122

12.9    Reliance........................................................................................................... 123

12.10   Joinder............................................................................................................ 124

**Exhibit 1**
**6 of 132**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (this "Agreement") is dated as of November 15, 2017 and is made by and among Norpac Foods, Inc., an Oregon cooperative corporation ("Parent") and each of Parent's Subsidiaries identified on the signature pages hereof, as borrowers, each of the Guarantors (as hereinafter defined), the Lenders (as hereinafter defined), and CoBank, ACB, in its capacity as Administrative Agent (as hereinafter defined).

The Borrowers have requested that the Lenders provide to the Borrowers (a) commitments to fund a revolving credit facility in an aggregate principal amount at any time outstanding not to exceed $120,000,000, as such aggregate commitment amount may be increased or reduced from time to time in accordance herewith, and (b) a term loan facility in an aggregate principal amount equal to $71,375,000, all as more particularly set forth in, and subject to the terms and conditions of, this Agreement.

In consideration of their mutual covenants and agreements hereinafter set forth and intending to be legally bound hereby, the parties hereto covenant and agree as follows:

## I. CERTAIN DEFINITIONS

1.1     **Certain Definitions**.    In addition to words and terms defined elsewhere in this Agreement, the following words and terms shall have the following meanings, respectively, unless the context hereof clearly requires otherwise:

"Account" has the meaning set forth in the UCC.

"Account Debtor" means any Person who is obligated under an Account.

"Adjusted LIBOR Rate" means, with respect to an Interest Period, an interest rate per annum (rounded upward, if necessary, to the next whole multiple of 1/100 of 1%) equal to (a) the LIBOR Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate for such Interest Period.

"Administrative Agent" means CoBank, in its capacity as administrative and collateral agent under the Loan Documents.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with the Person specified.

"Aggregate Revolving Credit Commitment Amount" means the aggregate of the Revolving Commitments of all of the Lenders at any time.  On the Closing Date the Aggregate Revolving Loan Commitment Amount shall be $120,000,000.  If not previously reduced pursuant to the terms of this Agreement, on October 1, 2018 the Aggregate Revolving Commitment Amount shall be $110,000,000.  Then, if not subsequently reduced pursuant to the

**Exhibit 1**
**7 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

terms of this Agreement, and only if the Borrowers exercise the option to extend the Maturity Date under Section 2.21, from the November 16, 2019 the Aggregate Revolving Commitment Amount shall be $100,000,000. In each instance of a reduction of the Aggregate Revolving Commitment Amount, the Revolving Commitment of each Revolving Lender shall be reduced pro rata.

"<u>Aggregate Term Loan Commitment Amount</u>" means the aggregate of the Term Loan Commitments of all of the Lenders at any time, subject to the reductions provided for in this Agreement. On the Closing Date the Aggregate Term Loan Commitment Amount shall be $71,375,000.

"<u>Agricultural Bond</u>" means each bond required to be posted by a Loan Party pursuant to any Agricultural Lien Statutes, which such bond is (a) necessary to obtain or retain any Agricultural License of such Loan Party or (b) otherwise required for such Loan Party to conduct its business.

"<u>Agricultural License</u>" means each license, permit or other approval held (or required to be held) by a Loan Party pursuant to any Agricultural Lien Statutes applicable to such Loan Party.

"<u>Agricultural Lien Statutes</u>" means, collectively, PACA, PASA, the Food Security Act and all other Laws that could create or give rise to any Lien, trust, charge, encumbrance or claim, including without limitation any "agricultural lien" (as defined in the UCC), in or against (a) any portion of the "farm products" (as defined in the UCC) or any other agricultural products purchased, stored or otherwise handled by any Loan Party, by any Person from whom any Loan Party purchases goods or by any other Person from whom such first Person purchases or otherwise receives goods in the ordinary course of business, or (b) any products, proceeds or derivatives of any such farm product or other agricultural product (including, without limitation, any accounts receivable arising from the sale of any such farm product, other agricultural product or any products, proceeds or derivatives thereof).

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to any Loan Party or any Subsidiary from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder.

"<u>Anti-Terrorism Laws</u>" means any Laws relating to terrorism, "know your customer" or money laundering, including Executive Order No. 13224, the USA Patriot Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Laws may from time to time be amended, renewed, extended, or replaced).

"<u>Applicable Food and Feed Safety Law</u>" means each applicable Law with respect to the safety of food and feed products, including without limitation the FDA Food Safety Modernization Act, Pub. L. No. 111-353, 124 Stat. 3885 (2011) and corresponding rules and regulations.

"<u>Applicable Letter of Credit Fee Rate</u>" means the percentage rate per annum then in effect according to the Pricing Grid below the heading "Revolving Credit Facility – Applicable Margin."

"<u>Applicable Margin</u>" means the percentage spread to be added to the Floating Rate or Adjusted LIBOR Rate based on the Pricing Grid below the heading "Term Loan Facility - Applicable Margin" or "Revolving Credit Facility – Applicable Margin," as applicable.

"<u>Applicable Unused Commitment Fee Rate</u>" means the percentage rate per annum then in effect according to the Pricing Grid below the heading "Unused Commitment Fee."

"<u>Approved Fund</u>" means any Fund that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Assignment and Assumption</u>" means an assignment and assumption agreement entered into by a Lender and an assignee permitted under Section 11.8, in substantially the form of <u>Exhibit A</u> or any other form approved by the Administrative Agent.

"<u>Authorized Officer</u>" means, with respect to any Loan Party, the Chief Executive Officer, President, Chief Financial Officer, Secretary, Assistant Secretary, Treasurer or Assistant Treasurer of such Loan Party or such other individuals, designated by written notice to the Administrative Agent from the Borrower, authorized to execute notices, reports and other documents on behalf of the Loan Parties required hereunder. The Borrower may amend such list of individuals from time to time by giving written notice of such amendment to the Administrative Agent.

"<u>Available Revolving Commitment</u>" means, with respect to any Revolving Lender, an amount equal to such Lender's Revolving Commitment <u>minus</u> the outstanding principal amount of its Revolving Loans <u>minus</u> such Lender's Pro Rata Share of Letter of Credit Obligations, if any, <u>minus</u> such Lender's Pro Rata Share of the aggregate outstanding amount of Swing Line Loans, if any.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrowers</u>" means Norpac Foods, Inc., a cooperative corporation organized and existing under the laws of the State of Oregon, and each of its Subsidiaries identified on the signature pages of this Agreement.

"<u>Borrowing</u>" means as of any date of determination (a) with respect to LIBOR Rate Loans outstanding as of such date, a borrowing consisting of Loans of the same Class and having the same Interest Period, and (b) with respect to Floating Rate Loans, all Floating Rate Loans outstanding as of such date regardless of Class.

"<u>Borrowing Base</u>" means, at any time, an amount equal to:

(i)      the sum of:

(A)     65% of the Eligible Inventory; and

(B)     85% of the Eligible Accounts; less

(C)     book overdrafts, Demand Patron Notes, and the sum of the aggregate amount of reserves, if any, established by Administrative Agent and (without duplication) the aggregate amount of non-member Producer payables. Administrative Agent shall have the right to establish reserves or require deductions in such amounts, and with respect to such matters (including but not limited to, amounts secured by Liens in favor of Producers, payables to other packers, payables to warehousemen and amounts in excess of individual customer concentration limits), as Administrative Agent in its sole discretion shall deem necessary or appropriate.

in any case, computed in accordance with the most recent Borrowing Base Report submitted to, and accepted by, the Administrative Agent.

"Borrowing Base Report" means a report in substantially the form attached hereto as Exhibit B or such other form agreed upon by the Borrower and the Administrative Agent, duly completed by the Borrower, pursuant to which the Borrower sets forth each element of the Borrowing Base and its calculation as of a particular date.

"Borrowing Date" means, with respect to any Loan, the date for the making thereof or the renewal or conversion thereof at or to the same or a different Interest Rate Option, which shall be a Business Day.

"Business Day" means any day other than a Saturday or Sunday or a legal holiday on which banks are authorized or required to be closed for business in Denver, Colorado or New York, New York and if the applicable Business Day relates to any LIBOR Rate Loan or Quoted Rate Loan, or to the setting of the Floating Rate determined by reference to the Weekly Reset LIBOR Rate, such day must also be a day on which dealings in Dollar deposits by and between banks are carried on in the London interbank market.

"Capital Expenditures" means, with respect to any Person, the aggregate costs incurred by such Person during any measuring period for the acquisition of any fixed assets or improvements or replacements of, substitutions for or additions to any existing asset resulting in a future economic benefit to such Person, and that are required to be capitalized in accordance with GAAP.

"Capital Lease" means any lease of real or personal property that is required to be capitalized under GAAP or that is treated as an operating lease under regulations applicable to the Borrower and its Subsidiaries but that otherwise would be required to be capitalized under GAAP.

"Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

**Exhibit 1**
**10 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

"Cash Collateralize" means with respect to the Obligations or Guaranteed Liabilities, to deposit in a Controlled Account or to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Lender or Lenders, as collateral for Letter of Credit Obligations, or obligations of Lenders to fund participations in respect of Letter of Credit Obligations, or Fronting Exposure, cash or deposit account balances or, if the Administrative Agent and the Issuing Lender shall agree in their sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to the Administrative Agent and each applicable Issuing Lender.

"Cash Equivalents" means:

(a) direct obligations of the United States of America or any agency or instrumentality thereof or obligations backed by the full faith and credit of the United States of America maturing in 12 months or less from the date of acquisition;

(b) commercial paper maturing in 180 days or less rated not lower than A-1, by Standard & Poor's or P-1 by Moody's on the date of acquisition;

(c) demand deposits, time deposits or certificates of deposit maturing within one year in commercial banks that are organized under the laws of the United States or any state thereof or is a foreign bank or branch or agency thereof acceptable to the Administrative Agent and, in any case, have combined capital and surplus of at least an amount equal to $1,000,000,000; and

(d) money market or mutual funds whose investments are limited to those types of investments described in clauses (a)-(c) above.

"Cash Interest Coverage Ratio" means the ratio of the Borrowers' Consolidated EBITDA to Interest Expense.

"Casualty Event" means, with respect to any property of any Person, any loss of or damage to, or any condemnation or other taking of, such property for which such Person or any of its Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation, implementation or application thereof by any Official Body or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of Law) by any Official Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of Law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

**Exhibit 1**
**11 of 132**

"Change of Control" means any event, circumstance or occurrence that results in (a) the Borrower ceasing to be a cooperative organized under Oregon Revised Statutes Chapter 62 or a successor statute of similar import, (b) one or more Persons (other than Producers who are Patrons of the Borrower) acquiring or otherwise obtaining or holding voting Equity Interests in the Borrower that, in the aggregate constitute 5% or more of the voting Equity Interests of the Borrower, (c) the Borrower failing to own, directly or indirectly through another wholly-owned Subsidiary, all issued and outstanding Equity Interests of each other Loan Party, or (d) a change in the composition of the Governing Board of the Borrower such that continuing directors cease to constitute more than 50% of the Borrower's Governing Board. As used in this definition, "continuing directors" means, as of any date, (y) those Directors of the Borrower who assumed office prior to such date, and (z) those Directors of the Borrower who assumed office after such date and whose appointment or nomination for election by the Borrower's members was approved by a vote of the Borrower's Governing Board or nominating committee of the Governing Board in accordance with the Borrower's bylaws.

"Class" means, when used in reference to any Loan, whether such Loan is a Revolving Loan, Swing Line Loan or Term Loan and, when used in reference to any Commitment, whether such Commitment is a Revolving Commitment or a Term Loan Commitment.

"Closing Date" means the Business Day on which each of the conditions precedent in Section 4.1 has been satisfied or waived by the Required Lenders.

"CoBank" means CoBank, ACB, a federally chartered instrumentality of the United States, its successors and assigns.

"CoBank Cash Management Agreement" means any Master Agreement for Cash Management and Transaction Services between CoBank and the Borrower, including all exhibits, schedules and annexes thereto and including all related forms delivered by the Borrower to CoBank related in connection therewith; provided that, the Borrower shall have elected pursuant to its rule set instructions or similar document to have its accounts that are subject to the CoBank Cash Management Agreement settle against the Swing Line Loan and such election shall not have been modified.

"CoBank Equities" has the meaning specified in Section 6.10.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means the collateral subject to any of the Collateral Documents or any other real or personal property of the Loan Parties, in each case pledged to or for the benefit of the Lenders as security for the Obligations; provided, however, that "Collateral" shall not include any Excluded Property.

"Collateral Documents" means (i) the Security Agreement, (ii) the Intellectual Property Security Agreement, (iii) the Mortgages, and (iv) any other document pursuant to which the Borrower or any other Loan Party has granted a Lien to or for the benefit of the Lenders to secure all or a portion of the Obligations.

**Exhibit 1**
**12 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

"Commitment" means as to any Lender the aggregate of its Revolving Commitment (including any Swing Line Commitment of a Swing Line Lender) and Term Loan Commitment, and "Commitments" means the aggregate of the Revolving Commitments (including any Swing Line Commitment of a Swing Line Lender) and Term Loan Commitments of all of the Lenders.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), and any successor statute.

"Compliance Certificate" means a certificate of the Borrower, signed by a Compliance Officer of the Borrower, substantially in the form of Exhibit C hereto.

"Compliance Officer" means the Chief Executive Officer, President or Chief Financial Officer of the Borrower or any Loan Party, as the case may be.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" means, when used with reference to financial statements or financial statement items of any Person, such statements or items on a consolidated basis in accordance with applicable principles of consolidation under GAAP.

"Consolidated Net Income" means, for any period, the net income (or loss) of the Borrowers for such period, determined on a Consolidated basis, without duplication, in accordance with GAAP; provided, that in calculating Consolidated Net Income of the Parent and its Subsidiaries for any period, there shall be excluded (a) the net income (or loss) of any Person (other than a Subsidiary which shall be subject to clause (c) below), in which the Parent or any of its Subsidiaries has a joint interest with a third party, except to the extent such net income is actually paid in cash to the Borrowers or any of their Subsidiaries by dividend or other distribution during such period, (b) the net income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrowers or any of their Subsidiaries or is merged into or consolidated with any Borrower or any of its Subsidiaries or that Person's assets are acquired by any Borrower or any of its Subsidiaries except to the extent included pursuant to the foregoing clause (a), and (c) the net income (if positive), of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary to the Borrowers or any of their Subsidiaries of such net income (i) is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Subsidiary or (ii) would be subject to any taxes payable on such dividends or distributions, but in each case only to the extent of such prohibition or taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion or Continuation Notice" has the meaning specified in Section 2.5.

"Customer Prepayments" means amounts paid to a Loan Party by a customer (a) with respect to Inventory prior to the delivery of such Inventory, or (b) with respect to Inventory that has been delivered to a customer but for which such cost has not yet been billed.

"Debt Incurrence" means the incurrence by the Borrowers on or after the Closing Date of any Indebtedness other than the Obligations.

"Debt to Capitalization Ratio" means the ratio of Borrowers' Consolidated total debt (inclusive of (i) obligations for borrowed money, (ii) obligations for the deferred purchase price of acquired assets, (iii) Capital Leases, (iv) Synthetic Lease Obligations, (v) letters of credit outstanding, and (vi) any guaranty given by a Borrower with respect to liabilities of a type described in the foregoing, but exclusive of long term debt associated with Borrowers' Salem OR office building and cold storage facility) to Borrowers' total debt plus Total Equity.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtor Relief Proceeding" means any proceeding seeking a decree or order for relief in respect of any Loan Party or Subsidiary in a voluntary or involuntary case under any applicable Debtor Relief Law.

"Default" means any event or condition that with notice or passage of time, or both, would constitute an Event of Default.

"Default Rate" means, as of any date of determination, the following: (a) for each Loan, the Interest Rate Option then in effect with respect thereto (as determined without giving effect to this definition) plus an additional margin of 2.0% per annum, (b) for Letter of Credit Fees, the Applicable Letter of Credit Fee Rate as of such date plus an additional margin of 2.0% per annum and (c) for all other Obligations, the rate determined in accordance with the Floating Rate Option as of such date plus an additional margin of 2.0% per annum.

"Defaulting Lender" means, subject to Section 2.15(b), any Lender that (i) has failed to (a) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrowers in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (b) pay to the Administrative Agent, the Issuing Lender, the Swing Line Lender or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit or Swing Line Loans) within two Business Days of the date when due, (ii) has notified the Borrowers, the Administrative Agent or the Issuing Lender or Swing Line Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition

precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (iii) has failed, within three Business Days after written request by the Administrative Agent or the Borrowers, to confirm in writing to the Administrative Agent and the Borrowers that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (iii) upon receipt of such written confirmation by the Administrative Agent and the Borrowers), or (iv) has, or has a direct or indirect parent company that has, (a) become the subject of a proceeding under any Debtor Relief Law, or (b) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (i) through (iv) above shall be conclusive and binding absent manifest error, and, subject to any cure rights expressly provided above, such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.15) upon delivery of written notice of such determination to the Borrowers, the Issuing Lender, the Swing Line Lender and each Lender.

"<u>Demand Patron Note</u>" means a promissory note or other evidence of indebtedness of the Borrowers that (A) is due on demand or (B) is in favor of a Patron or employee that is due within one year of the date of determination.

"<u>Director</u>" means, with respect to any Person, (a) if such Person is a corporation, a member of the Governing Board of such Person, (b) if such Person is a limited liability company, a governor, manager or managing member of such Person and (c) if such Person is a partnership, a general partner of such Person.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property or asset by any Person.

"<u>Dollar</u>," "<u>Dollars</u>," "<u>U.S. Dollars</u>" and the symbol "<u>$</u>" means lawful money of the United States of America.

"<u>Drawing Date</u>" has the meaning specified in Section 2.9(c)(i).

"<u>EBITDA</u>" means for any period of determination, the Consolidated Net Income of the Borrowers plus (a) without duplication and to the extent deducted in determining net income for such period, the sum of (i) income tax expense for such period (net of tax refunds), (ii) interest expense (including without limitation, implicit interest expense on Capital Leases), (iii) all amounts attributable to depreciation and amortization expense for such period, and (iv) any noncash expenses or charges for such period, minus (b) without duplication and to the extent

**Exhibit 1**
**15 of 132**

included in Consolidated Net Income, (i) non-operating gains (including, without limitation, extraordinary or nonrecurring gains, gains from discontinuance of operations and gains arising from the sale of assets other than inventory or property, plant and equipment) during such period, (ii) similarly, non-operating losses during such period, (iii) any other comprehensive income and (iv) any cash payments made during such period in respect of non-cash charges described in clause (a)(iv) taken in a prior period.

"Eligible Accounts" means an account receivable of a Borrower denominated in Dollars that is (i) arising from bona fide sales of goods actually shipped, or for which title has been transferred, or for services fully rendered by the Borrower, (ii) due within 60 days from the date of the original invoice or, if the Account Debtor is a Producer and the Account arises from the sale of seed or chemicals, due within the current crop year, (iii) net of offsets, cross-aging, counterclaims, deductions and amounts held in trust for tax obligations and excise taxes, (iv) legally valid and enforceable, (v) in compliance with all applicable laws and regulations and (vi) determined by the Administrative Agent, in its reasonable judgment, to be eligible for inclusion in the Borrowing Base; provided, however, that without limiting the Administrative Agent's discretion, the following shall not constitute Eligible Accounts:

(a) Accounts that do not consist of valid, bona fide accounts receivable and contract receivables, each owed to and owned by the Borrowers arising out of resulting from goods actually sold and shipped, or for which title has been transferred, or for services fully rendered by the Borrowers;

(b) Accounts with respect to which the Administrative Agent does not have a first priority Lien, including, without limitation, Accounts evidenced by an "instrument" or "chattel paper" (as each such term is defined in the UCC) not in the possession of Administrative Agent;

(c) Accounts that are otherwise eligible with respect to which the Account Debtor is owed a credit, discount, allowance, rebate or other similar adjustment by the Borrowers, but only to the extent of such credit, discount, allowance, rebate or other similar adjustment;

(d) if such Accounts are owed by an Account Debtor that is not domiciled in the U.S.;

(e) Accounts with respect to which the Account Debtor is any Governmental Authority, unless such Account has been duly assigned to the Administrative Agent in accordance with all applicable Laws (including, without limitation, the Federal Assignment of Claims Act of 1940, as amended, if applicable) so that the Administrative Agent is recognized by the Account Debtor to have all of the rights of an assignee of such Account;

(f) Accounts with respect to which the Account Debtor is an Affiliate of the Borrowers or a director, officer, agent, stockholder or employee of the Borrowers or any of its Affiliates (except to the extent such Account arises from the sale of seed, chemicals or by-products to Producers);

**Exhibit 1**
**16 of 132**
Case 19-62584-pcm11　　Doc 16　　Filed 08/22/19

(g)     Accounts due from an Account Debtor if (i) more than fifty percent of the aggregate amount of Accounts of such Person to the Borrowers collectively has at the time remained unpaid for more than 90 days from the date of the original invoice or, if the Account Debtor is a Producer and the Account arises from the sale of seed or chemicals in the current crop year, beyond the current crop year, or (ii) such Account Debtor is in default on any other Indebtedness owed by such Person to the Borrowers (unless such Account is no more than 30 days past due from the original due date);

(h)     Accounts with respect to which there is any potential offset or counterclaim or unresolved dispute with the respective Account Debtor reasonably likely to be resolved in favor of such Account Debtor (but only to the extent of such potential offset or counterclaim or unresolved dispute);

(i)     Accounts with respect to an Account Debtor whose obligations owing to Borrowers exceed 10% of all Eligible Accounts (or, with respect to Sam's Club and WalMart (combined), 30% of all Eligible Accounts; provided, however, that any such percentage in excess of 10% shall be subject to adjustment down to 10% at any time in the sole discretion of Administrative Agent), to the extent of the obligations owing by such Account Debtor in excess of such percentage,

(j)     Accounts with respect to which the Account Debtor is the subject of any bankruptcy, reorganization, receivership, or other Debtor Relief Proceeding;

(k)     Accounts with respect to which the Account Debtor's obligation to pay is conditional or subject to a repurchase obligation or right to return or with respect to which the goods or services giving rise to such Account have not been shipped or for which title has not be transferred (or performed, as applicable) and accepted by such account debtor, including progress billings, bill and hold sales, guarantied sales, sale or return transactions, sales on approval or consignment sales;

(l)     Accounts with respect to which the Account Debtor is located in the states of New Jersey, Minnesota or West Virginia or any other state that, to the best knowledge of the Borrowers, denies creditors access to its courts in the absence of a Notice of Business Activities Report or other similar filing, unless the Borrowers have either qualified as a foreign corporation authorized to transact business in such state or have filed a Notice of Business Activities Report or similar filing with the applicable state agency for the then current year;

(m)     Accounts with respect to which the Account Debtor is a creditor of the Borrowers (other than any Lender), if such Account Debtor has not waived its right of off-set with respect to such Accounts to the satisfaction of the Administrative Agent; provided, however, that any such Account shall only be ineligible as to that portion of such Account which is less than or equal to the amount owed by the Borrowers to such Account Debtor;

**Exhibit 1**
**17 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(n)     Accounts that arise from the sale of inventory that has not yet been shipped to the applicable Account Debtor in the event the Administrative Agent in its reasonable discretion determines that such Accounts are unlikely to be collectible; and

(o)     Accounts sold by the Borrowers for discounting or factoring purposes.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under Sections 11.8(b)(iii), 11.8(b)(v) and 11.8(b)(vi) (subject to such consents, if any, as may be required under Section 11.8(b)(iii)).

"<u>Eligible Inventory</u>" means Inventory of Borrowers consisting of first quality raw materials (including seed), work in process (solely to the extent of bright canned goods and frozen bulk fruit and vegetables) and finished goods held for sale in the ordinary course of Borrowers' business that complies with each of the representations and warranties respecting Eligible Inventory made by Borrowers in the Loan Documents, and that is not excluded as ineligible by virtue of the one or more of the criteria set forth below; provided, however, that such criteria may be fixed and revised from time to time by Administrative Agent in its sole discretion to address the results of any audit or appraisal performed by Administrative Agent from time to time after the Closing Date. In determining the amount to be so included, Inventory shall be valued at the lower of cost, market value or net realizable value on a basis consistent with Borrowers' historical accounting practices. (For the sake of clarity, bulk inventories of frozen fruits and vegetables included in Eligible Inventory shall be valued on a fully loaded cost basis without regard to the absorption line item shown on Borrowers' monthly balance sheet (unless negative) for periods other than fiscal year end.) An item of Inventory shall not be included in Eligible Inventory if:

(a)     a Borrower does not have good, valid, and marketable title thereto,

(b)     it is not located at one of the locations owned by a Borrower and located in the United States or Canada set forth on <u>Schedule E-1</u>, or is in transit from one such location to another such location,

(c)     it is located on real property leased by a Borrower or in a contract warehouse, or at a processor, unless it is (i) at Administrative Agent's request, in its sole discretion, subject to an access agreement in favor of the Lenders executed by the lessor, warehouseman, or processor, as the case may be, in form and substance satisfactory to the Administrative Agent in its sole discretion and (ii) segregated or otherwise separately identifiable from goods of others, if any, stored on the premises,

(d)     it is not subject to a valid and perfected and first priority Administrative Agent's Lien,

(e)     it consists of goods returned or rejected by a Borrower's customers for reasons related to quality, or goods held for quality control, or

(f)     it consists of goods that are obsolete or slow moving (including all finished canned or bulk goods more than three years from their pack date), restrictive or custom items, work-in-process (other than canned bright goods or frozen bulk fruits and

**Exhibit 1**
**18 of 132**

vegetables), or goods that constitute spare parts, packaging and shipping materials, supplies used or consumed in a Borrower's business, bill and hold goods, defective goods, "seconds," or Inventory acquired on consignment.

"Environmental Indemnity" means the Environmental Indemnity Agreement substantially in the form of Exhibit J hereto.

"Environmental Laws" means any and all applicable current and future federal, state, local and foreign Laws and any consent decrees, concessions, permits, grants, franchises, licenses, agreements or other restrictions of a Governmental Authority or common Law causes of action relating to: (i) protection of the environment or natural resources from, or emissions, discharges, releases or threatened releases of, Hazardous Materials in the environment including ambient air, surface, water, ground water or land, (ii) the generation, handling, use, labeling, disposal, transportation, reclamation and remediation of Hazardous Materials; (iii) human health as affected by Hazardous Materials; (iv) the protection of endangered or threatened species; and (v) the protection of environmentally sensitive areas.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrowers or any other Loan Party directly or indirectly resulting from or based upon (i) violation of any Environmental Law; (ii) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials; (iii) exposure to any Hazardous Materials; (iv) the release or threatened release of any Hazardous Materials into the environment; or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Issuance" means any issuance or sale by the Parent or any of its Subsidiaries of any Equity Interests at any time after the Closing Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"ERISA Affiliate" means, at any time, any trade or business (whether or not incorporated) under common control with any Loan Party such that such trade or business, together with such Loan Party and all other ERISA Affiliates, are treated as a single employer under Section 414 of the Code and Section 4001(b)(1) of ERISA.

**Exhibit 1**
**19 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

"ERISA Event" means (i) a reportable event (under Section 4043 of ERISA and regulations thereunder) with respect to a Pension Plan; (ii) a withdrawal by a Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (iii) a complete or partial withdrawal by a Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (iv) the filing of a notice of intent to terminate, the treatment of an amendment to a Pension Plan or a Multiemployer Plan as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (v) an event or condition that constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (vi) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; or (vii) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA.

"Event of Default" means any of the events described in Section 9.1 and referred to therein as an "Event of Default."

"Excluded Property" means (a) any permit, license, agreement or other asset (i) that, by its terms or by the terms of any agreement governing such asset, prohibits or requires the consent of any Person other than the Borrowers and their Affiliates which has not been obtained as a condition to the creation by the applicable Loan Party of a Lien on any right, title or interest therein, or (ii) to the extent that any applicable Law prohibits the creation of a Lien thereon, but only, with respect to the prohibition in clauses (i) and (ii), to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other applicable Law, (b) those assets as to which the Administrative Agent determines in its sole discretion that the burdens or other adverse consequences of obtaining such security interest are excessive in relation to the value of the security to be afforded thereby, and (c) intent-to-use" trademark applications prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent that the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of the applicable grantor's right, title or interest therein or in any trademark issued as a result of such application under applicable law; provided, however, "Excluded Property" shall not include any proceeds, products, substitutions or replacements of Excluded Property except to the extent that such proceeds, products, substitutions or replacements otherwise constitute Excluded Property.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are Other Connection Taxes, (ii) in the case of a Lender, U.S. federal withholding Taxes imposed on

14

**Exhibit 1**
**20 of 132**

Case 19-62584-pcm11   Doc 16   Filed 08/22/19

amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (a) such Lender acquires such interest in such Loan or Commitment (other than pursuant to an assignment request by the Borrowers under Section 3.6) or (b) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.2, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with Section 3.2 and (iv) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001.

 "Facility" means, collectively, the Revolving Credit Facility, the Term Loan Facility, the Swing Line Facility and the Letter of Credit Facility.

"Farm Credit Lender" means a federally-chartered Farm Credit System lending institution organized under the Farm Credit Act of 1971.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the rate of interest per annum (rounded upward, if necessary, to the nearest whole multiple of 1/100th of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on such date, or if no such rate is so published on such day, on the most recent day preceding such day on which such rate is so published.

"Fee Letter" means that certain fee letter dated as of November 15, 2017 among the Borrowers and the Administrative Agent, together with any other fee letters entered into between the Borrower and the Administrative Agent from time to time.

"Fixed Rate Loan" means any LIBOR Rate Loan or Quoted Rate Loan.

"Floating Rate" means the Weekly Reset LIBOR Rate; provided, however, that upon the occurrence of any event specified in Section 3.3 or 3.4, "Floating Rate" means an annual rate equal to the Prime Rate plus 1.00%.

"Floating Rate Loan" means a Loan bearing interest calculated in accordance with the Floating Rate Option.

"Floating Rate Option" means the option of the Borrower to have Loans bear interest at the rate and under the terms set forth in Section 2.4(b)(i).

**Exhibit 1**
**21 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

"<u>Flood Laws</u>" means, collectively, (i) the National Flood Insurance Act of 1968, (ii) the Flood Disaster Protection Act of 1973, (iii) the National Flood Insurance Reform Act of 1994 and (iv) the Flood Insurance Reform Act of 2004, in each case, as now or hereinafter in effect, and any successor statute thereto, and all such other applicable Laws related thereto.

"<u>Food Security Act</u>" means 7 U.S.C. Section 1631, and any successor statute thereto, together with each Law establishing a "central filing system" (as defined in 7 U.S.C. Section 1631) that has been certified by the Secretary of the United States Department of Agriculture.

"<u>Foreign Lender</u>" means (i) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (ii) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the Laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"<u>Fronting Exposure</u>" means, at any time there is a Defaulting Lender, (i) with respect to the Issuing Lender, such Defaulting Lender's Pro Rata Share of the outstanding Letter of Credit Obligations with respect to Letters of Credit issued by the Issuing Lender other than Letter of Credit Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof, and (ii) with respect to the Swing Line Lender, such Defaulting Lender's Pro Rata Share of outstanding Swing Line Loans made by the Swing Line Lender other than Swing Line Loans as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders.

"<u>Fund</u>" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>GAAP</u>" means generally accepted accounting principles as are in effect from time to time, subject to the provisions of Section 1.3, and applied on a consistent basis both as to classification of items and amounts.

"<u>Governing Board</u>" means, with respect to any corporation, limited liability company or similar Person, the board of directors, board of governors or other body or entity that sets overall institutional direction for such Person.

"<u>Governmental Authority</u>" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guaranteed Liabilities</u>" means (a) the prompt Payment In Full, when due or declared due and at all such times, of all Obligations and all other amounts pursuant to the terms of this Agreement, the Notes, and all other Loan Documents heretofore, now or at any time or times hereafter owing, arising, due or payable from the Borrower or any other Loan Party to any one or more of the Lenders, including principal, interest, premiums and fees (including all reasonable

**Exhibit 1**
**22 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

fees and expenses of counsel); and (b) the prompt, full and faithful performance, observance and discharge of each and every agreement, undertaking, covenant and provision to be performed, observed or discharged by the Borrower and each other Loan Party under this Agreement, the Notes and all other Loan Documents to which it is a party.

"Guarantor" means each of the parties to this Agreement that is designated as a "Guarantor" on the signature page hereof and each other Person that joins this Agreement as a Guarantor after the date hereof.

"Guarantors' Obligations" means the obligations of the Guarantors to the Lenders under Article XII.

"Guaranty" or "Guarantee" means, with respect to any Person, without duplication, any obligation, contingent or otherwise, of such Person pursuant to which such Person has directly or indirectly guaranteed or had the economic effect of guaranteeing any Indebtedness or other obligation or liability of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of any such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or liability (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement condition or otherwise), (b) to purchase or lease property or services for the purpose of assuring another Person's payment or performance of any Indebtedness or other obligations or liabilities, (c) to maintain the working capital of such Person to permit such Person to pay such Indebtedness or other obligations or liabilities or (d) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness or other obligation or liability of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, that the term Guaranty/Guarantee shall not include endorsements for collection or deposit in the ordinary course of business. Unless otherwise specified, the amount of any Guaranty shall be deemed to be the lesser of the principal amount of the Indebtedness or other obligations or liabilities guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guaranty.

"Hazardous Materials" means (i) any explosive or radioactive substances, materials or wastes, and (ii) any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under, or that could reasonably be expected to give rise to liability under, any applicable Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

    (a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

**Exhibit 1**
**23 of 132**

(b)     all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)     all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than 30 days after the date on which such trade account payable was created);

(d)     obligations (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such obligations shall have been assumed by such Person or is limited in recourse;

(e)     all obligations of such Person under Capital Leases and all its Synthetic Lease Obligations;

(f)     all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)     all obligations of such Person to advance funds to, or purchase assets, property or services from, any other Person in order to maintain the financial condition of such Person; and

(h)     all Guarantees of such Person in respect of any of the foregoing.

"Indemnified Taxes" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers or any other Loan Party under any Loan Document and (ii) to the extent not otherwise described in the preceding clause (i), Other Taxes.

"Indemnitee" has the meaning specified in Section 11.3.

"Information" means all information received from the Loan Parties or any of their Subsidiaries relating to the Loan Parties or any of such Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or the Issuing Lender on a non-confidential basis prior to disclosure by the Loan Parties or any of their Subsidiaries, provided that, in the case of information received from the Loan Parties or any of their Subsidiaries after the date of this Agreement, such information is clearly identified at the time of delivery as confidential.

"Intellectual Property" means patents, trademarks, copyrights and any other assets of the Borrowers as to which filing with the United States Patent and Trademark Office or United States Copyright Office is necessary or advisable for the perfection of a Lien therein under applicable Law.

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement in substantially the form attached to the Security Agreement.

"Interest Expense" means, for any fiscal period and for any Person, the aggregate net amount of cash interest expense (excluding amortization of debt issuance costs) of such Person and its Subsidiaries accrued on a consolidated basis for such fiscal period, determined in accordance with GAAP. Computations of Interest Expense on a pro forma basis for Indebtedness having a variable interest rate shall be calculated at the rate in effect on the date of any determination.

"Interest Payment Date" means the last day of each fiscal quarter after the date hereof and the applicable Maturity Date.

"Interest Period" means the period of time selected by the Borrower in connection with (and to apply to) any election permitted hereunder by the Borrower to have Revolving Loans or Term Loan bear interest under the LIBOR Rate Option. Subject to the last sentence of this definition, such period shall be one, two, three or six months. Such Interest Period shall commence on the effective date of such LIBOR Rate Loan, which shall be (i) the Borrowing Date if the Borrower is requesting new Loans, or (ii) the date of renewal of or conversion to a LIBOR Rate Loan if the Borrower is renewing or converting an existing Loan. Notwithstanding the second sentence hereof: (a) any Interest Period that would otherwise end on a date that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) the Borrower shall not select, convert to or renew an Interest Period for any portion of the Loans that would end after the applicable Maturity Date and (c) if any Interest Period begins on the last Business Day of a month or on a day of a month for which there is no numerically corresponding day in the month in which such Interest Period is to end, such Interest Period shall be deemed to end on the last Business Day of the final month of such Interest Period.

"Interest Rate Option" means any (i) LIBOR Rate Option, (ii) Quoted Rate Option, or (iii) Floating Rate Option.

"Inventory" means all inventory of any Loan Party, as such term is defined in the UCC, whether now owned or hereafter acquired, whether consisting of whole goods, spare parts or components, supplies or materials, whether acquired, held or furnished for sale, for lease or under service contracts or for manufacture or processing, and wherever located.

"Investment" means, with respect to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant

**Exhibit 1**
**25 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Issuing Lender</u>" means CoBank, in its individual capacity as issuer of Letters of Credit hereunder.

"<u>Joint Venture</u>" means a corporation, partnership, limited liability company or other entity in which any Person other than the Loan Parties and their Subsidiaries holds, directly or indirectly, an equity interest.

"<u>Landlord Agreement</u>" means any landlord's waiver or other lien waiver or subordination agreement executed and delivered by a lessor, warehouse operator or other applicable Person with respect to a leased location of any Loan Party to the Administrative Agent for the benefit of the Lenders.

"<u>Law</u>" means any law (including common law and Environmental Laws), constitution, statute, treaty, regulation, rule, ordinance, opinion, release, ruling, order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award by or settlement agreement with any Governmental Authority.

"<u>Lenders</u>" means each of the Persons from time to time party hereto as a lender and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a Lender. Unless the context requires otherwise, the term "Lenders" includes the Swing Line Lender.

"<u>Letter of Credit</u>" has the meaning specified in Section 2.9(a).

"<u>Letter of Credit Borrowing</u>" has the meaning specified in Section 2.9(c)(iii).

"<u>Letter of Credit Expiration Date</u>" means the 30th day prior to the Maturity Date for Revolving Loans.

"<u>Letter of Credit Facility</u>" means the Letter of Credit facility established pursuant to Section 2.9.

"<u>Letter of Credit Fee</u>" has the meaning specified in Section 2.9(b).

"<u>Letter of Credit Obligations</u>" means, as of any date of determination, (i) the aggregate amount available to be drawn under all outstanding Letters of Credit on such date (if any Letter of Credit shall increase in amount automatically in the future, such aggregate amount available to be drawn shall currently give effect to any such future increase) <u>plus</u> (ii) the aggregate Reimbursement Obligations and Letter of Credit Borrowings on such date.

"<u>Letter of Credit Request</u>" has the meaning specified in Section 2.9(a).

"Letter of Credit Sublimit" means $10,000,000 (or, if less, the Aggregate Revolving Credit Commitment Amount).

"LIBOR Rate" means, with respect to any Interest Period, a rate of interest (rounded upward to the next whole multiple of 1/100th of one percent) reported by Bloomberg Information Services (or on any successor or substitute service providing rate quotations comparable to those currently provided by such service, as determined by the Administrative Agent from time to time, for the purpose of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period; provided that if such rate of interest is not ascertainable pursuant to the foregoing provisions of this definition (as determined by the Administrative Agent), then "LIBOR Rate" shall mean a comparable or successor rate designated by the Administrative Agent in its reasonable discretion. Notwithstanding the foregoing, if the LIBOR Rate (as determined without giving effect to this sentence) would be less than 0%, the LIBOR Rate shall be 0%.

"LIBOR Rate Loan" means a Loan bearing interest at the LIBOR Rate Option.

"LIBOR Rate Option" means the option of the Borrowers to have Loans bear interest at the rate and under the terms set forth in Section 2.4(b)(ii).

"Lien" means any mortgage, deed of trust, pledge, hypothecation, collateral assignment, lien (statutory or otherwise), security interest, charge or other encumbrance or security arrangement of any nature whatsoever, whether voluntarily or involuntarily given, including any conditional sale or title retention arrangement, and any assignment, deposit arrangement or lease intended as, or having the effect of, security and any filed financing statement or other notice of any of the foregoing (whether or not a lien or other encumbrance is created or exists at the time of the filing).

"Loan Documents" means this Agreement, the Fee Letter, the Environmental Indemnity, the Collateral Documents, the Perfection Certificate, the Landlord Agreements, the Notes and any other instruments, certificates or documents delivered in connection herewith or therewith, all as amended, restated, reaffirmed, reconfirmed, replaced, substituted or otherwise modified from time to time.

"Loan Parties" means the Borrowers and the other Guarantors.

"Loan Request" means a request for any of a Term Loan, a Revolving Loan or a Swing Line Loan, in each case substantially in the form of Exhibit E hereto.

"Loans" means collectively all Revolving Loans, Swing Line Loans and Term Loan or any Revolving Loan, Swing Line Loan and Term Loan, and "Loan" means the reference to any of the foregoing.

"Material Adverse Change" means any circumstance or event, or series of circumstances or events, that has or could reasonably be expected to have any material adverse effect whatsoever upon (i) the business, properties, assets, condition (financial or otherwise),

**Exhibit 1**
**27 of 132**

operations or liabilities (actual or contingent) of a Borrower individually or the Loan Parties, taken as a whole, (ii) the legality, binding effect, validity or enforceability of this Agreement or any other Loan Document, (iii) the ability of a Borrower individually or the Loan Parties, taken as a whole, to duly and punctually pay or perform any of the Obligations, or (iv) the ability of the Administrative Agent or any Lender to enforce their legal remedies pursuant to this Agreement or any other Loan Document.

"Material Agreement" means any (i) agreement, contract, note, bond, debenture or other instrument evidencing Material Indebtedness, or (ii) any agreement, contract or other instrument to which any Loan Party is a party or that is binding upon any Loan Party or its property the revocation, suspension or termination (prior to the stated termination date therefor) of which could reasonably be expected to result in a Material Adverse Change.

"Material Indebtedness" means Indebtedness (other than the Obligations) in an aggregate principal amount exceeding $1,000,000.

"Material Real Property" means any interest (including any fee simple or leasehold interest) of a Loan Party in real property or fixtures (a) having a value of $1,000,000 or more, (b) on or in which personal property constituting Collateral with a value of more than $1,000,000 is maintained at any time, or (c) otherwise determined by the Administrative Agent in its sole discretion to be material to the business, financial condition or operations of any Loan Party.

"Maturity Date" means (a) with respect to the Revolving Credit Facility (including the Swing Line Facility and Letter of Credit Facility), the Revolving Loan Maturity Date, and (b) with respect to the Term Loan Facility, the Term Loan Maturity Date.

"Maximum Rate" has the meaning specified in Section 11.14.

"Minimum Collateral Amount" means, at any time, (i) with respect to Cash Collateral consisting of cash or deposit account balances, an amount equal to 103% (or such lower percentage the Issuing Lender approves in its sole discretion) of the Fronting Exposure of the Issuing Lender with respect to Letters of Credit issued and outstanding at such time and (ii) otherwise, an amount determined by the Administrative Agent and the Issuing Lender in its sole discretion.

"Moody's" means Moody's Investors Service, Inc., or any successor or assignee thereof in the business of rating securities and debt.

"Mortgage" means each mortgage or deed of trust (as applicable) executed and delivered by a Loan Party to the Administrative Agent for the benefit of the Lenders with respect to the real estate owned by such Loan Party.

"Multiemployer Plan" means any employee benefit plan that is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA and to which the Borrower or any ERISA Affiliate is then making or accruing an obligation to make contributions or, within the preceding 5 plan years *of such Multiemployer Plan,* has made or had an obligation to make such contributions.

"<u>Net Cash Proceeds</u>" means:

       (a)     in the case of any Equity Issuance or Debt Incurrence, an amount equal to (i) the aggregate amount of all cash received by a Borrower or any of its Subsidiaries in respect of such Equity Issuance or Debt Incurrence, as applicable, <u>minus</u> (ii) customary, bona fide, out-of-pocket direct costs incurred by the Borrower and its Subsidiaries in connection such issuance;

       (b)     with respect to any Casualty Event, an amount equal to (i) cash payments received by a Borrower or any of its Subsidiaries from such Casualty Event, <u>minus</u> (ii) all customary, bona fide, out-of-pocket direct costs incurred by the Borrower and its Subsidiaries in connection with collecting such cash payments; and

       (c)     with respect to the Disposition, an amount equal to (i) cash payments received by a Borrower or any of its Subsidiaries from such Disposition, <u>minus</u> (ii) all income taxes and other taxes assessed by a Governmental Authority as a result of such transaction, minus (a) all customary, bona fide, out-of-pocket direct transaction costs incurred by the Borrower and its Subsidiaries in connection with such Disposition.

"<u>Non-Consenting Lender</u>" has the meaning specified in Section 11.1.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Notes</u>" means, collectively, the Revolving Notes, the Term Loan Notes and the Swing Line Notes.

"<u>Obligation</u>" means any obligation or liability of any of the Loan Parties, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due, under or in connection with this Agreement, the Notes, the Letters of Credit, the Fee Letter or any other Loan Document whether to the Administrative Agent, any of the Lenders or their Affiliates or other persons provided for under such Loan Documents, including interest and fees that accrue after the commencement of any Debtor Relief Proceedings with respect to any Loan Party.

"<u>Official Body</u>" means (i) any Governmental Authority and (ii) any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"<u>Organizational Documents</u>" means the certificate or articles of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate of formation, limited liability company agreement or other organizational documents of any Person.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered,

become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Information" has the meaning specified in Section 12.9.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.6).

"Overadvance" has the meaning specified in Section 2.13(a).

"PACA" means, collectively, (a) the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. § 499(e)(c)(2) *et. seq.*), together with all rules and regulations relating thereto or promulgated thereunder by any Governmental Authority (including 7 C.F.R. § 46.1 *et seq.*) and (b) every other Law of similar import, in each case as in effect from time to time.

"Participant" has the meaning specified in Section 11.8(d).

"Participant Register" has the meaning specified in Section 11.8(d).

"Participation Advance" has the meaning specified in Section 2.9(c)(ii).

"PASA" means, collectively, (a) the Packers and Stockyards Act, 1921 (7 U.S.C. § 181 *et. seq.*), together with all rules and regulations relating thereto or promulgated thereunder (including 9 C.F.R. § 200 *et seq.*), and (b) every other Law of similar import, in each case as in effect from time to time.

"Patron" means a member of any of the Borrowers.

"Payment In Full" means the payment in full in cash of the Loans and other Obligations hereunder, the termination of the Commitments and the expiration or termination of all Letters of Credit.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor entity performing similar functions.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code, and either (i) is sponsored or maintained by any Loan Party or any ERISA Affiliate for employees of such Loan Party or any ERISA Affiliate, (ii) has at any time within the preceding 5 years been sponsored or maintained by such Loan Party or any entity which was at such time an ERISA Affiliate for

**Exhibit 1**
**30 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

employees of such Loan Party or of any entity which was at such time an ERISA Affiliate, or (iii) to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding 5 plan years.

"Perfection Certificate" means a certificate in form reasonably satisfactory to the Administrative Agent signed by an Authorized Officer of each Loan Party setting forth certain information with respect to the Loan Parties and their assets.

"Permitted Liens" means:

(a)     Liens for taxes, assessments, or similar charges and levies of any Governmental Authority not yet due or which are being diligently contested in good faith by appropriate and lawful proceedings that suspend enforcement of such Liens and for which adequate reserves or other appropriate provisions in accordance with GAAP have been set aside on such Loan Party's books;

(b)     pledges or deposits made in the ordinary course of business to secure payment of workmen's compensation, or to participate in any fund in connection with workmen's compensation, unemployment insurance, old-age pensions or other social security programs, other than any Lien imposed by ERISA;

(c)     Liens of mechanics, materialmen, warehousemen, carriers, suppliers, landlords or other like Liens that are incurred in the ordinary course of business and either (i) secure obligations that are not overdue by more than 30 days or (ii) are being diligently contested in good faith by appropriate and lawful proceedings that suspend enforcement of such Liens and for which adequate reserves or other appropriate provisions in accordance with GAAP have been set aside on such Loan Party's books;

(d)     good-faith pledges or deposits made in the ordinary course of business to secure performance of bids, tenders, trade contracts (other than Indebtedness) or leases, not in excess of the aggregate amount due thereunder, or to secure statutory obligations, or surety, appeal, performance or other similar bonds required in the ordinary course of business;

(e)     encumbrances consisting of zoning restrictions, easements, right-of-way or other encumbrances, title defects and restrictions on the use of real property that in the aggregate are not substantial in amount and none of which materially impairs the use of such property or the value thereof, none of which is violated in any material respect by existing or proposed structures or land use and which do not interfere with the ordinary conduct of the business of the applicable Loan Party;

(f)     Liens, security interests and mortgages in favor of the Administrative Agent for the benefit of the Lenders;

(g)     Liens securing Indebtedness permitted under Section 7.1(f), provided, that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost

**Exhibit 1**
**31 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(h)     Liens arising from precautionary UCC financing statement filings with respect to operating leases or consignment arrangements entered into by a Loan Party in the ordinary course of business;

(i)     Liens in commodities that are the subject of commodity repurchase agreements so long as each such Lien secures only the applicable repurchase agreement and such agreement is not otherwise prohibited hereby;

(j)     CoBank's statutory Lien in the CoBank Equities; and

(k)     Liens resulting from judgments or orders not constituting an Event of Default under Section 9.1(e).

"<u>Person</u>" means any natural person, corporation, company, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, joint venture, Official Body, or any other entity.

"<u>Plan</u>" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including any Pension Plan), maintained for employees of any Loan Party or any ERISA Affiliate or any such Plan to which any Loan Party or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"<u>Plan Funding Rules</u>" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"<u>Planned Asset Sales</u>" means the Borrowers' anticipated sales of (i) canning operations machinery and equipment, (ii) real property and equipment located in Salem, Oregon known as "Plant 7," and (iii) real property and equipment located in Hermiston, Oregon.

"<u>Pricing Grid</u>" means the table and text set forth below:

The Applicable Margin for loans under the Revolving Credit Facility (including, without limitation, the Swing Line Loans and Letter of Credit Fees) and the Term Loan will be adjusted quarterly.  Adjustments will be made beginning 5 Business Days after the Administrative Agent receives the required financial statements from the Loan Parties.

**Exhibit 1**
**32 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

| Tier | Total Debt to Capitalization | Revolving Credit Facility LIBOR Rate Borrowings | Revolving Credit Facility Base Rate Borrowings | Term Loan LIBOR Rate Borrowings | Term Loan Base Rate Borrowings | Unused Commitment Fee |
|------|------------------------------|----------------------------------------------|-----------------------------------------------|--------------------------------|-------------------------------|----------------------|
| I | ≥ 0.70 to 1.0 | 450 bps | 350 bps | 450bps | 350 bps | 37.5 bps |
| II | ≥ 0.65 to 1.0 but < 0.70 to 1.0 | 400 bps | 300 bps | 400 bps | 300 bps | 32.5 bps |
| III | ≥ 0.60 to 1.0 but < 0.65 to 1.0 | 375 bps | 275 bps | 375 bps | 275 bps | 27.5 bps |
| IV | < 0.60 to 1.0 | 350 bps | 250 bps | 350 bps | 250 bps | 25.0 bps |

For purposes of determining the Applicable Margins and the Applicable Unused Commitment Fee Rate:

(a)     The Applicable Margin, the Applicable Unused Commitment Fee Rate and the Applicable Letter of Credit Fee Rate shall be set at Level I until September 30, 2018.

(b)     The Applicable Margin, the Applicable Unused Commitment Fee Rate and the Applicable Letter of Credit Fee Rate shall be recomputed as of the end of each quarter, commencing after September 30, 2018.   Any increase or decrease in the Applicable Margin or the Applicable Unused Commitment Fee Rate computed as of a year-end shall be effective no later than 5 Business Days following the date on which the financial statements for such computation are due to be delivered under Section 6.1(c).  If a Compliance Certificate is not delivered when due in accordance with such Section 6.1(c), then the rates in Level I shall apply as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered and shall remain in effect until the date on which such Compliance Certificate is delivered. Notwithstanding anything contained in this definition to the contrary, to the extent that the Applicable Margin shall change as a result of operation of this subsection (b), such change shall not apply to any existing LIBOR Rate Loan until such time as the current Interest Period with respect to such LIBOR Rate Loan expires.

(c)     If, as a result of any restatement of or other adjustment to the financial statements of the Borrowers or for any other reason, the Borrowers or the Lenders determine that (i) the Debt to Capitalization ratio as calculated by the Borrowers as of any applicable date was inaccurate and (ii) a proper calculation of the Debt to Capitalization ratio would have resulted in higher pricing for such period, the Borrowers shall immediately and retroactively be obligated to pay to the Administrative Agent for the account of the applicable Lenders, promptly on demand by the Administrative Agent (or, after the occurrence of an actual or deemed entry of an order for relief with respect to the Borrowers under the Bankruptcy Code of the United States, automatically and without further action by the Administrative Agent, any Lender or the Issuing Lender), an amount equal to the excess of the amount of interest and fees that should have been paid

**Exhibit 1**
**33 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

for such period over the amount of interest and fees actually paid for such period.  In addition, upon the occurrence of any Event of Default, the Applicable Margin, the Applicable Unused Commitment Fee Rate and the Applicable Letter of Credit Fee Rate shall automatically be set at Level I until such Event of Default has been cured or waived as set forth in this Agreement.  This paragraph shall not limit the rights of the Administrative Agent, any Lender or the Issuing Lender, as the case may be, under Section 2.10, Section 3.5, Article VIII, or any other provision of any Loan Agreement, other agreement or applicable law.

"<u>Prime Rate</u>" means, as of any day, a variable rate of interest per annum equal to the "U.S. prime rate" as reported on such day in the Money Rates Section of the Eastern Edition of *The Wall Street Journal*, or if the Eastern Edition of *The Wall Street Journal* is not published on such day, such rate as last published in the Eastern Edition of *The Wall Street Journal*.  In the event the Eastern Edition of *The Wall Street Journal* ceases to publish such rate or an equivalent on a regular basis, the term "*Prime Rate*" shall be determined on any day by reference to such other regularly published average prime rate for such date applicable to such commercial banks as is acceptable to the Administrative Agent in its reasonable discretion.  Any change in Prime Rate shall be automatic, without the necessity of notice provided to the Borrowers or any other Loan Party.

"<u>Principal Office</u>" means the main banking office of the Administrative Agent in Greenwood Village, Colorado, or such other banking office as may be designated by the Administrative Agent from time to time.

"<u>Prior Security Interest</u>" means a valid and enforceable perfected first-priority security interest in and to the Collateral that is subject only to Permitted Liens.

"<u>Pro Rata Share</u>" means (a) with respect to the Revolving Credit Facility as of any date of determination, the proportion that a Revolving Lender's Revolving Commitment as of such date bears to the aggregate amount of Revolving Commitments of all of the Revolving Lenders as of such date, <u>provided</u>, that if the Revolving Commitments have been terminated or have expired, Pro Rata Share under the Revolving Credit Facility shall be determined based upon the Revolving Commitments most recently in effect, giving effect to any assignments, and (b) with respect to the Term Loan Facility as of any date of determination, (i) if any Term Loan Commitments remain in effect, the proportion that a Term Lender's unused Term Loan Commitments bears to the aggregate amount of Term Loan Commitments of all of the Term Loan Lenders as of such date, or (ii) if the Term Loan Commitments have been terminated or have expired, the proportion that the outstanding principal amount of a Term Loan Lender's Term Loan as of such date bears to the aggregate principal amount of all outstanding Term Loans as of such date.

"<u>Producer</u>" means any producer, packer, processor, manufacturer, dealer, broker, agent, person engaged in farming operations, cooperative whose members consist of any such Persons or other seller of perishable agricultural products or other agricultural goods or farm products, including without limitation potatoes, corn, "Meat Food Products", "Livestock", "Livestock Products", "Poultry", "Poultry Products" (each as defined in PASA) and "Perishable Agricultural Commodities" (as defined in PACA).

"<u>Purchase Money Security Interest</u>" means Liens upon tangible personal property securing loans to any Loan Party or Subsidiary of a Loan Party or deferred payments by such Loan Party or Subsidiary for the purchase of such tangible personal property.

"<u>Quoted Rate</u>" means, for a Quoted Rate Period, the per annum rate quoted by 100% of the Revolving Lenders or the Term Lenders, as applicable, in their sole discretion, pursuant to Section 2.5.

"<u>Quoted Rate Loan</u>" means any Loan which bears interest at a rate determined by reference to a Quoted Rate.

"<u>Quoted Rate Option</u>" means the option of the Borrowers to have Loans bear interest at the rate and under the terms set forth in Section 2.4(b)(iii).

"<u>Quoted Rate Period</u>" means, relative to any Quoted Rate Loan, the period beginning on (and including) the date on which such Quoted Rate Loan is made, or continued as, or converted into, a Quoted Rate Loan and shall end on (but exclude) a day which is not less than one year from the beginning of such period.

"<u>Recipient</u>" means (i) the Administrative Agent, (ii) any Lender and (iii) the Issuing Lender, as applicable.

"<u>Register</u>" has the meaning specified in Section 11.8(c).

"<u>Reimbursement Obligation</u>" has the meaning specified in Section 2.9(c)(i).

"<u>Related Agreements</u>" has the meaning specified in Section 12.3(a).

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, Directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"<u>Request for Credit Extension</u>" means a Loan Request or Letter of Credit Request, as applicable.

"<u>Required Lenders</u>" means, at any time, Lenders (including Voting Participants) having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders and a minimum of three Lenders (including Voting Participants). The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrowers or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrowers' stockholders, partners or members (or the equivalent Person thereof).

"Revolving Commitment" means, with respect to any Revolving Lender, (a) the amount so designated for such Lender in the Register maintained by the Administrative Agent, plus or minus any such amount assumed or assigned pursuant to any Assignment and Assumption and any increases and decreases effected pursuant to Sections 2.12(c), 2.13(d) and 2.20 or (b) as the context may require, the obligation of such Revolving Lender to make Revolving Loans and participate in Swing Line Advances.

"Revolving Credit Exposure" means, as to any Revolving Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Loans and such Revolving Lender's participation in Letter of Credit Obligations and Swing Line Loans at such time.

"Revolving Credit Facility" means the Revolving Credit Facility established pursuant to Section 2.2.

"Revolving Credit Facility Usage" means at any time the sum of the outstanding Revolving Loans, the outstanding Swing Line Loans, and the Letter of Credit Obligations.

"Revolving Lender" means each Lender having a Revolving Commitment (or, after the Revolving Commitments have terminated, a Revolving Loan).

"Revolving Loans" means collectively and "Revolving Loan" means separately all Revolving Loans or any Revolving Loan made by the Lenders or one of the Lenders to the Borrowers pursuant to Section 2.2 or Section 2.9.

"Revolving Loan Maturity Date" means, with respect to the Revolving Credit Facility (including the Swing Line Facility and the Letter of Credit Facility), the earlier of (a) the date of acceleration of the Obligations in accordance with Section 9.2 and (b) November 15, 2019 or, if notice has been given and the requirements of Section 2.21 have been satisfied, November 15, 2020.

"Revolving Note" means the promissory notes of the Borrowers substantially in the form of Exhibit F-1.

"Sanction" means any sanction administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority.

"Sanctioned Country" means a country or territory that is, or whose government is, the subject of Sanctions, including as of the date hereof Crimea, Cuba, Iran, North Korea, Sudan and Syria.

"Sanctioned Person" means (a) any Person  listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or any other relevant authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any other Person that is the subject or target of any Sanctions, or (d) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a), (b) or (c) .

"Security Agreement" means the Security Agreement of even date herewith to which the Loan Parties and the Administrative Agent are parties.

"Solvent" means, with respect to any Person on any date of determination, taking into account such right of reimbursement, contribution or similar right available to such Person from other Persons, that on such date (i) the fair value of the property of such Person is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of such Person, (ii) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (iii) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (iv) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (v) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged.  In computing the amount of contingent liabilities at any time, it is intended that such liabilities will be computed at the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Standard & Poor's" means Standard & Poor's Ratings Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., or any successor or assignee of the business of such division in the business of rating securities and debt.

"Statutory Reserve Rate" means, for the Interest Period for any LIBOR Rate Loan, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the arithmetic mean, taken over each day in such Interest Period, of the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurocurrency Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" of any Person at any time means any corporation, trust, partnership, any limited liability company or other business entity (i) of which more than 50% of the outstanding voting securities or other interests normally entitled to vote for the election of one or more Directors or trustees (regardless of any contingency that does or may suspend or dilute the voting rights) is at such time owned, or the management of which is controlled, directly or indirectly through one or more intermediaries, or both, by such Person or one or more of such Person's Subsidiaries, or (ii) that is directly or indirectly controlled by such Person or one or more of such Person's Subsidiaries. Unless otherwise specified, "Subsidiary" means a Subsidiary of the Borrower.

**Exhibit 1**
**37 of 132**

"<u>Subsidiary Equity Interests</u>" has the meaning specified in Section 5.6.

"<u>Supplier Payable</u>" means, at any time of determination, any obligation of a Loan Party to a supplier that is secured by a purchase-money security interest in Eligible Inventory or proceeds thereof.

"<u>Swing Line Commitment</u>" means, with respect to the Swing Line Lender, (a) $10,000,000 or (b) as the context may require, the obligation of the Swing Line Lender to make Swing Line Advances to the Borrowers.  The Swing Line Commitment shall constitute a subcommitment of the Revolving Commitment of the Swing Line Lender.

"<u>Swing Line Facility</u>" means the swing line facility established pursuant to Section 2.3.

"<u>Swing Line Lender</u>" means CoBank, in its individual capacity as the provider of the Swing Line Commitment.

"<u>Swing Line Loans</u>" means collectively and "<u>Swing Line Loan</u>" means separately all Swing Line Loans or any Swing Line Loan made by any of the Lenders to the Borrowers pursuant to Section 2.3 hereof.

"<u>Swing Line Note</u>" means the promissory note of the Borrowers substantially in the form of Exhibit F-2.

"<u>Synthetic Lease Obligation</u>" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, for tax purposes or otherwise upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"<u>Tax Compliance Certificate</u>" means a tax certificate substantially in the form of Exhibit G hereto, prepared and delivered by any Lender in accordance with Section 3.2(g).

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Advance</u>" means a loan of funds by a Lender to the Borrowers under the Term Loan Facility.

"<u>Term Lender</u>" means any Lender with a Term Loan Commitment.

"<u>Term Loan</u>" means a Term Advance; and "<u>Term Loans</u>" means collectively all of the Term Loans.

"<u>Term Loan Commitment</u>" means, as to any Lender at any time, the amount initially set forth opposite its name on Schedule 1.1A, as such Commitment is thereafter assigned or

modified as provided herein and "Term Loan Commitments" means the aggregate Term Loan Commitments of all of the Lenders. As of the Closing Date, the aggregate amount of the Term Loan Commitments of the Lenders is $71,375,000.

"Term Loan Facility" means the loan facility established pursuant to Section 2.1.

"Term Loan Notes" means the promissory notes of the Borrowers substantially in the form of Exhibit F-3.

"Term Loan Maturity Date" means with respect to the Term Loan Facility the earlier of (a) the date of acceleration of the Obligations in accordance with Section 9.2 and (b) November 15, 2019 or, if notice has been given and the requirements of Section 2.21 have been satisfied, November 15, 2020.

"Termination Date" means the date as of which all of the following shall have occurred: (a) all Commitments under this Agreement have terminated, (b) all Obligations have been paid in full (other than contingent indemnification obligations), and (c) all Letters of Credit have terminated or expired (other than Letters of Credit as to which other arrangements with respect thereto satisfactory to the Administrative Agent and the Issuing Lender shall have been made).

"Threshold Amount" means $1,000,000.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments, Revolving Credit Exposure and outstanding Term Loan of such Lender at such time.

"Total Equity" means the Borrowers' Consolidated total assets less Consolidated total liabilities.

"UCC" means the Uniform Commercial Code as in effect in the State of Colorado.

"Unused Commitment Fee" has the meaning specified in Section 2.7.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"U.S. Borrower" means any Borrower that is a U.S. Person.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Voting Participant" has the meaning specified in Section 11.8(d).

"Voting Participant Notice" has the meaning specified in Section 11.8(d).

"Weekly Reset LIBOR Rate" means the rate per annum determined by the Administrative Agent as of the first Business Day of each calendar week to be the Adjusted LIBOR Rate that would be in effect for a LIBOR Rate Loan with a one-month Interest Period

commencing on such Business Day. The Weekly Reset LIBOR Rate shall be reset weekly on the first Business Day of each week.

"<u>Withholding Agent</u>" means (i) the Borrower or any other Loan Party and (ii) the Administrative Agent.

1.2 **Construction**. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the other Loan Documents: (a) references to the plural include the singular, the plural, the part and the whole; (b) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (c) the words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document as a whole; (d) article, section, subsection, clause, schedule and exhibit references are to this Agreement or other Loan Document, as the case may be, unless otherwise specified; (e) reference to any Person includes such Person's successors and assigns; (f) reference to any agreement, including this Agreement and any other Loan Document together with the schedules and exhibits hereto or thereto, document or instrument means such agreement, document or instrument as amended, modified, supplemented, replaced, substituted for, superseded or restated at any time and from time to time; (g) relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; (h) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; (i) section headings herein and in each other Loan Document are included for convenience and shall not affect the interpretation of this Agreement or such Loan Document; (j) any pronoun shall include the corresponding masculine, feminine and neuter terms; (k) reference to any Law or regulation herein shall refer to such Law or regulation as amended, modified or supplemented from time to time; (l) the word "will" shall be construed to have the same meaning and effect as the word "shall"; and (m) unless otherwise specified, all references herein to times of day shall be references to prevailing Denver, Colorado time.

1.3 **Accounting Principles**. Except as otherwise provided in this Agreement, all computations and determinations as to accounting or financial matters (including financial ratios and other financial covenants) and all financial statements to be delivered pursuant to this Agreement shall be made and prepared in accordance with GAAP (including principles of consolidation where appropriate), applied on a consistent basis and, except as expressly provided herein, in a manner consistent with that used in preparing audited financial statements in accordance with Section 6.1(b) and all accounting or financial terms has the meanings ascribed to such terms by GAAP; provided, however, that (i) all accounting terms used in Article VIII (and all defined terms used in the definition of any accounting term used in Article VIII) have the meaning given to such terms (and defined terms) under GAAP as in effect on the date hereof applied on a basis consistent with those used in preparing the financial statements referred to in Section 5.10, and (ii) except for purposes of the audited financial statements delivered hereunder, all references to GAAP in this Agreement shall mean GAAP as adjusted for intracompany transactions, rebate roll ups and other adjustments as reflected in the unaudited financial statements and projections provided in connection with the execution of this Agreement, applied on a consistent basis. In the event of any change after the date hereof in GAAP, and if such

**Exhibit 1**
**40 of 132**

change would affect the computation of any of the financial covenants set forth in Section VIII, then the parties hereto agree to endeavor, in good faith, to agree upon an amendment to this Agreement that would adjust such financial covenants in a manner that would preserve the original intent thereof, but would allow compliance therewith to be determined in accordance with the Borrowers' financial statements at that time, provided that until so amended such financial covenants shall continue to be computed in accordance with GAAP prior to such change therein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrowers and their Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

1.4  **UCC Terms**.  Terms defined in the UCC in effect on the Closing Date and not otherwise defined herein shall, unless the context otherwise indicates, have the meanings provided by those definitions.  Subject to the foregoing, the term "UCC" refers, as of any date of determination, to the UCC then in effect.

1.5  **Rounding**.  Any financial ratios required to be maintained pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio or percentage is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.6  **Letter of Credit Amounts**.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to mean the maximum face amount of such Letter of Credit after giving effect to all increases thereof contemplated by such Letter of Credit or the Letter of Credit Application therefor (at the time specified therefor in such applicable Letter of Credit or Letter of Credit Application and as such amount may be reduced by (a) any permanent reduction of such Letter of Credit or (b) any amount which is drawn, reimbursed and no longer available under such Letter of Credit).

1.7  **Covenant Compliance Generally**.  For purposes of determining compliance under Article VIII, any amount in a currency other than Dollars will be converted to Dollars in a manner consistent with that used in calculating Consolidated Net Income in the most recent annual financial statements of the Borrowers and their Subsidiaries delivered pursuant to Section 6.1(b).  Notwithstanding the foregoing, for purposes of determining compliance with Article VII, with respect to any covenant with respect to the amount of Indebtedness or investment in a currency other than Dollars, no breach of any basket contained therein shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or investment is incurred; provided, that for the avoidance of doubt, the result of any changes in rates of exchange occurring after the time such Indebtedness or investment is incurred shall otherwise apply in all other cases, including determining whether any additional Indebtedness or investment may be incurred at any time in accordance with Article VII and for purposes of calculating financial ratios in accordance with Article VIII.

1.8  **Administration of Rates**.  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the

administration, submission or any other matter related to the rates in the definition of "LIBOR Rate" or with respect to any comparable or successor rate thereto.

## II. CREDIT FACILITIES

2.1  **Term Loan**.

(a)  <u>Term Loan Commitments</u>.  Subject to the terms and conditions hereof, and relying upon the representations and warranties of the Loan Parties set forth herein and in the other Loan Documents, each Term Lender severally agrees to make a single Term Advance to the Borrowers on the Closing Date in an amount equal to such Lender's Term Loan Commitment.  The Term Loan Facility is not a revolving facility; any Term Advances that are repaid may not be re-advanced hereunder. To the extent that the Term Loans are not drawn on the Closing Date, the Term Loan Commitments shall automatically be cancelled.

(b)  <u>Loan Request for Term Borrowing</u>.  The Term Loan shall be funded by the Term Lenders on the Closing Date as a Floating Rate Loan unless, not later than 11:00 a.m. three Business Days prior to the expected Closing Date, the Borrowers deliver to the Administrative Agent a duly completed Loan Request in which the Borrowers request that the Term Loan be funded by the Term Lenders on the Closing Date as a LIBOR Rate Loan and requesting an Interest Period therefor or as a Quoted Rate Loan and requesting a Quoted Rate Period therefor.

(c)  <u>Nature of Lenders' Obligations with Respect to Term Loan</u>.  The failure of any Lender to make a Term Loan shall not relieve any other Lender of its obligations to make a Term Loan nor shall it impose any additional liability on any other Lender hereunder.  The Lenders shall have no obligation to make Term Loan hereunder after the Closing Date.  The Term Loan Commitments are not revolving commitments, and the Borrowers shall not have the right to repay and reborrow under Section 2.1.

(d)  <u>Repayment of Term Loan</u>.  In addition to any prepayments or repayments made pursuant to Sections 2.12 and 2.13, the Borrowers shall repay the aggregate outstanding principal balance of the Term Loan in installments on the dates and in the amounts set forth below:

| Date | Amount |
|------|--------|
| June 30, 2018 | $500,000 |
| December 31, 2018 | $1,000,000 |
| June 30, 2019 | $1,500,000 |
| December 31, 2019 | $2,000,000* |
| June 30, 2020 | $2,500,000* |

\* (if Borrowers exercise their option under Section 2.21)

Notwithstanding anything herein to the contrary, the entire outstanding principal balance of the Term Loan shall be due and payable in full in cash on the Term Loan Maturity.

2.2  **Revolving Loans**.

**Exhibit 1**
**42 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(a)     Revolving Loan Commitments.  Subject to the terms and conditions hereof and relying upon the representations and warranties of the Loan Parties set forth herein and in the other Loan Documents, each Lender severally agrees to make Revolving Loans to the Borrowers at any time or from time to time on or after the Closing Date to the Revolving Loan Maturity Date, provided, that after giving effect to each such Revolving Loan (i) the aggregate principal amount of such Lender's Revolving Loans shall not exceed its Available Revolving Commitments and (ii) the Revolving Credit Facility Usage shall not at any time exceed the lesser of the Aggregate Revolving Credit Commitment Amount or the Borrowing Base.  Each request by the Borrowers for a Revolving Loan shall be deemed to be a representation by the Borrowers that each of them shall be in compliance with the proviso at the end of the preceding sentence and with Article IV after giving effect to the requested Revolving Loan.  Within such limits of time and amount and subject to the other provisions of this Agreement, the Borrowers may borrow, repay and reborrow pursuant to this Section 2.2.

(b)     Revolving Loan Requests.  The Borrowers may from time to time prior to the Revolving Loan Maturity Date request the Revolving Lenders to effect a Borrowing under the Revolving Credit Facility by delivering to the Administrative Agent, not later than **11:00 a.m.**, three Business Days prior to the proposed Borrowing Date with respect to LIBOR Rate Loans or Quoted Rate Loans and one Business Day prior to the proposed Borrowing Date with respect to Floating Rate Loans, a duly completed Loan Request.  Each such Loan Request shall be irrevocable and shall specify the aggregate amount of the proposed Revolving Loans comprising each Borrowing, and, if applicable, the Interest Period or Quoted Rate Period. Unless otherwise approved by the Administrative Agent in its sole discretion, each shall be in an amount equal to $5,000,000 or an integral multiple of $1,000,000 in excess of $5,000,000 (or, if more, the minimum amount required for the applicable Interest Rate Option pursuant to Section 2.4(c)).

(c)     Nature of Lenders' Obligations with Respect to Revolving Loans.  Each Lender shall be obligated to participate in each request for Revolving Loans pursuant to this Section 2.2 in accordance with its Pro Rata Share.  The obligations of each Lender hereunder are several. The failure of any Lender to perform its obligations hereunder shall not affect the Obligations of the Borrowers to any other party nor shall any other party be liable for the failure of such Lender to perform its obligations hereunder.  Other than Revolving Loans in repayment of Swing Line Loans in accordance with Section 2.3(e) and/or Reimbursement Obligations in accordance with Section 2.9(c), the Lenders shall have no obligation to make Revolving Loans hereunder on or after the Revolving Loan Maturity Date.

(d)     Repayment of Revolving Loans.  Notwithstanding anything herein or in any other Loan Document to the contrary, the Borrowers shall repay the entire outstanding principal amount of Revolving Loans, together with all outstanding interest thereon and unpaid fees with respect thereto, on the Revolving Loan Maturity Date.

## 2.3   **Swing Line Loans**.

(a)     Swing Line Commitments.  Subject to the terms and conditions hereof and relying upon the agreements of the Lenders set forth in this Section 2.3, the Swing Line Lender shall make Swing Line Loans to the Borrowers at any time or from time to time after the date hereof to, but not including, the Revolving Loan Maturity Date; provided, that after giving effect to any

**Exhibit 1**
**43 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

such Swing Line Loan, (i) the aggregate amount of Swing Line Loans shall not exceed the Swing Line Commitment, and (ii) the Revolving Credit Facility Usage shall not exceed the lesser of the Aggregate Revolving Commitment Amount or the Borrowing Base. Each request by the Borrowers for a Swing Line Loan shall be deemed to be a representation by the Borrowers that each of them shall be in compliance with the proviso at the end of the preceding sentence and with Article IV after giving effect to the requested Swing Line Loan. Within such limits of time and amount and subject to the other provisions of this Agreement, the Borrowers may borrow, repay and reborrow Swing Line Loans in accordance with to this Section 2.3. The Borrowers shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan.

(b)      <u>Cash Management Arrangements</u>. The Borrowers and the Swing Line Lender may enter into a cash management agreement providing for the automatic advance by the Swing Line Lender of Swing Line Loans under the conditions set forth in such agreement, which conditions shall be in addition to the conditions set forth herein.

(c)      <u>Swing Line Loan Requests</u>. Except as otherwise provided herein, the Borrowers may from time to time prior to the Revolving Loan Maturity Date request that the Swing Line Lender make Swing Line Loans by delivery to the Swing Line Lender (with a copy to the Administrative Agent) not later than **12:00 noon** (or such later time as the applicable cash management agreement, if any, may permit or otherwise as the Swing Line Lender in its sole discretion may agree) on the proposed Borrowing Date of a duly completed Loan Request, or by telephonic request promptly followed by a duly executed Loan Request. Each telephonic request and related Loan Request shall be irrevocable and shall specify the proposed Borrowing Date and the principal amount of such Swing Line Loan. Promptly after receipt of any telephonic or written request for a Swing Line Loan, the Swing Line Lender will confirm with the Administrative Agent that the Administrative Agent received a copy of the same and, if not, provide the Administrative Agent with information regarding the requested Swing Line Loan.

(d)      <u>Making Swing Line Loans</u>. So long as the Swing Line Lender has not received timely telephonic or written notice from the Administrative Agent that one or more conditions precedent to the making of a Loan under Section 4.2 have not been satisfied, the Swing Line Lender, after receipt by it of a Loan Request in accordance with Section 2.3(c), shall fund such Swing Line Loan to the Borrower in U.S. Dollars and immediately available funds at the Principal Office prior to 2:00 p.m. or as otherwise agreed in any applicable cash management agreement on the Borrowing Date.

(e)      <u>Borrowings to Repay Swing Line Loans</u>. The Swing Line Lender may, at its option, exercisable at any time for any reason whatsoever, demand repayment of the Swing Line Loans, and each Revolving Lender shall make a Revolving Loan in an amount equal to such Lender's Pro Rata Share of the aggregate principal amount of the outstanding Swing Line Loans, <u>plus</u>, if the Swing Line Lender so requests, accrued interest thereon, <u>provided</u>, that no Revolving Lender shall be obligated in any event to make Revolving Loans in excess of its Available Revolving Commitment. Revolving Loans made pursuant to the preceding sentence shall bear interest at the Floating Rate Option and shall be deemed to have been properly requested in accordance with Section 2.2(b) without regard to any of the requirements of that provision. Each Lender acknowledges and agrees that its obligations to fund Swing Line Loans pursuant to this

**Exhibit 1**
**44 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

Section 2.3(e) and/or to acquire participations pursuant to Section 2.3(f) in respect of Swing Line Loans are absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default or any failure by the Borrowers to satisfy any of the conditions set forth in Section 4.2. The Swing Line Lender shall provide notice to the Lenders that such Revolving Loans are to be made under this Section 2.3 and of the apportionment among the Lenders, and the Lenders shall be unconditionally obligated to fund such Revolving Loans (whether or not the conditions specified in Section 2.2(b) are then satisfied) by the time the Swing Line Lender so requests, which shall not be earlier than 2:00 p.m. on the Business Day next after the date the Lenders receive such notice from the Swing Line Lender.

(f)     <u>Risk Participations in Swing Line Loans</u>.  Immediately upon the making of each Swing Line Loan, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Swing Line Lender, without recourse or warranty, an undivided interest and participation in such Swing Line Loan in an amount equal to such Lender's Pro Rata Share of the principal amount of such Swing Line Loan, and such interest and participation may be recovered from such Lender together with interest thereon at the Floating Rate for each day during the period commencing on the date of demand and ending on the date such amount is received (subject to the limitation in clause (e) above that no Revolving Lender shall be obligated in any event to make Revolving Loans in excess of its Available Revolving Commitment).

2.4     <u>**Interest Rate Provisions**</u>.

(a)     <u>Generally</u>.  The Borrowers shall pay interest in respect of the outstanding unpaid principal amount of the Floating Rate Loans and Fixed Rate Loans, it being understood that, subject to the provisions of this Agreement, the Borrowers may select different Interest Rate Options and different Interest Periods and Quoted Rate Periods to apply to different Borrowings at any time outstanding and may convert to or renew one or more Interest Rate Options with respect to all or any portion of any Borrowing (subject to the minimum amounts set forth in Section 2.4(c)); <u>provided</u> that there shall not be at any one time outstanding more than 10 Borrowings of LIBOR Rate Loans or more than 10 Borrowings of Quoted Rate Loans, and <u>provided</u>, <u>further</u>, that if a Default or an Event of Default or Default has occurred and is continuing, the Borrower may not request, convert to, or renew any Fixed Rate Loans.  If at any time the designated rate applicable to any Loan made by any Lender exceeds the Maximum Rate, the rate of interest on such Lender's Loan shall be limited to such Lender's Maximum Rate.

(b)     <u>Interest Rate Options</u>.  Swing Line Loans and all other Obligations not constituting Term Loan or Revolving Loans shall bear interest calculated based upon the Floating Rate Option.  Subject to the limitations set forth in Section 3.4, the Borrowers shall have the right to select from the following Interest Rate Options applicable to Term Loan and Revolving Loans:

(i)     Floating Rate Option:  An option to pay interest at a fluctuating rate per annum equal to the Floating Rate in effect as of any date of determination plus the Applicable Margin as of such date;

**Exhibit 1**
**45 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(ii)    LIBOR Rate Option:  An option to pay interest at a fluctuating rate per annum equal to the Adjusted LIBOR Rate with respect to the applicable Interest Period and as in effect as of any date of determination plus the Applicable Margin as of such date; or

(iii)    Quoted Rate Option:  An option to pay interest at a rate per annum equal to the Quoted Rate with respect to the applicable Quoted Rate Period.

(c)    <u>Minimum Amounts</u>.  Unless otherwise approved by the Administrative Agent in its sole discretion, each selection of a LIBOR Rate Option or Quoted Rate Option must be applicable to Loans of a single Class in an aggregate amount equal to $5,000,000 or an integral multiple of $1,000,000 in excess of $5,000,000.

(d)    <u>Day Count Basis</u>.  Interest and fees shall be calculated on the basis of a 360-day year for the actual number of days elapsed (which results in more interest or fees, as the case may be, being paid than if calculated on the basis of a 365-day year).  The date of funding or conversion of a LIBOR Rate Loan or a Quoted Rate Loan to a Floating Rate Loan and the first day of an Interest Period or Quoted Rate Period shall be included in the calculation of interest. The date of payment of any Loan and the last day of an Interest Period or a Quoted Rate Period shall be excluded from the calculation of interest; <u>provided</u>, if a Loan is repaid on the same day that it is made, 1 day's interest shall be charged.

(e)    <u>Default Rate</u>.    To the extent permitted by Law, (i) immediately upon the occurrence and during the continuation of an Event of Default under Section 9.1(a) or 9.1(k), or (ii) upon notice from the Administrative Agent following the occurrence and during the continuation of any other Event of Default, the principal amount of all Obligations shall bear interest at the Default Rate and the rates applicable to Letter of Credit Fees shall be increased to the Default Rate.  The Borrowers acknowledge that the increase in rates referred to in this Section 2.4(e) reflects, among other things, the fact that such Loans or other amounts have become a substantially greater risk given their default status and that the Lenders are entitled to additional compensation for such risk; and all such interest shall be payable by the Borrowers upon demand by the Administrative Agent.

2.5    **Interest Periods**.  In order to convert a Floating Rate Loan (other than Swing Line Loans), Quoted Rate Loan or LIBOR Rate Loan or continue a Quoted Rate Loan or LIBOR Rate Loan, the Borrower shall deliver to the Administrative Agent a duly completed, written request therefor substantially in the form of Exhibit H (each, a "<u>Conversion or Continuation Notice</u>") not later than 11:00 a.m. at least three Business Days prior to the proposed effective date of such conversion or continuation.  The Conversion or Continuation Notice shall specify (i) which Borrowings (including the principal amount thereof) are subject to such request, and, in the case of any LIBOR Rate Loan or Quoted Rate Loan to be converted or continued, the last day of the current Interest Period or Quoted Rate Period therefor, (ii) the proposed effective date of such conversion or continuation (which shall be a Business Day), (iii) whether the Borrower is requesting a continuation of LIBOR Rate Loans or Quoted Rate Loans or a conversion of Borrowings from one Interest Rate Option to another Interest Rate Option, and (iv) if a continuation of or conversion to LIBOR Rate Loans or Quoted Rate Loans is requested, the

requested Interest Period or Quoted Rate Period with respect thereto. In addition, the following provisions shall apply to any continuation of or conversion of any Borrowings:

(a)    <u>Amount of Loans</u>.  After giving effect to such conversion or continuation, each Borrowing of Revolving Loans shall be in an amount no less than the minimum amount for Revolving Loans as set forth in Section 2.2(b) and any applicable minimum amount set forth in Section 2.4(c)).

(b)    <u>Commencement of Interest Period or Quoted Rate Period</u>.  In the case of any borrowing of, conversion to or continuation of any LIBOR Rate Loan or Quoted Rate Loan, the Interest Period or Quoted Rate Period, as applicable, shall commence on the date of advance of or conversion to any LIBOR Rate Loan or Quoted Rate Loans and, in the case of immediately successive Interest Periods or Quoted Rate Periods, each successive Interest Period or Quoted Rate Period shall commence on the date on which the immediately preceding Interest Period or Quoted Rate Period expires.  Upon a conversion from a LIBOR Rate Loan to a Floating Rate Loan or a Quoted Rate Loan to a Floating Rate Loan, interest at the Floating Rate Option shall commence on the last day of the existing Interest Period or Quoted Rate Period.

(c)    <u>Selection of Interest Rate Options</u>.  If the Borrower elects to continue a LIBOR Rate Loan but fails to select a new Interest Period to apply thereto, then a one month Interest Period automatically shall apply.  If the Borrower fails to duly request the continuation of any Borrowing consisting of LIBOR Rate Loans or Quoted Rate Loans on or before the date specified and otherwise in accordance with the provisions of this Section 2.5, then such LIBOR Rate Loans or Quoted Rate Loans automatically shall be converted to Floating Rate Loans.

(d)    <u>Procedures for Determining Quoted Rate and Quoted Rate Periods</u>.  So long as no Default or Event of Default shall exist, the Borrowers may request all or any part of any Borrowing under the Revolving Credit Facility or the Term Loan Facility to bear interest at a Quoted Rate for an applicable Quoted Rate Period by notifying the Administrative Agent not later than 12:00 noon on a Business Day which is at least five Business Days prior to the first day of the new Quoted Rate Period.  Each such notice shall be effective when received by the Administrative Agent, shall be in writing or by telephone or telecopy transmission, to be confirmed in writing by the Borrower if so requested by the Administrative Agent, and shall specify the first day of the requested Quoted Rate Period, the amount of the requested Quoted Rate Loan and the specific Facility under which such Quoted Rate Loan is being made, continued or converted.  Upon receipt of such request for a Quoted Rate Loan from the Borrower, the Administrative Agent will promptly notify each Lender under such Facility of the request for a Quoted Rate Loan and request that such Lenders quote an applicable Quoted Rate and Quoted Rate Period for such requested Quoted Rate Loan.  If 100% of the applicable Lenders agree upon a proposed Quoted Rate and applicable Quoted Rate Period, as determined in each such Lender's sole discretion, and provide notice thereof to the Administrative Agent at least two Business Days prior to the first day of the requested Quoted Rate Period, the Administrative Agent shall notify the Borrower of the proposed Quoted Rate and applicable Quoted Rate Period to be applicable to the requested Quoted Rate Loan.  The Borrower may decline to accept a proposed Quoted Rate and applicable Quoted Rate Period quoted by the applicable Lenders by notifying the Administrative Agent not later than 12:00 noon on a Business Day which is at least one Business Day prior to the first day of the requested Quoted

**Exhibit 1**
**47 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

Rate Period. If the Borrower declines to accept a proposed Quoted Rate and the applicable Quoted Rate Period quoted by the applicable Lenders, or if less than 100% of the applicable Lenders provide notice to the Administrative Agent of their agreement to a proposed Quoted Rate and applicable Quoted Rate Period at least two Business Days prior to the first day of the requested Quoted Rate Period, the requested Quoted Rate Loan shall automatically and without further request of the Borrower be converted into a Floating Rate Loan on the first day of the requested Quoted Rate Period. Each Quoted Rate Period for a Quoted Rate Loan under a Facility shall begin on a Business Day and shall end on or before the Maturity Date for such Facility.

2.6 **Making of Loans**.

(a) <u>Notifications and Payments</u>. The Administrative Agent shall, promptly after receipt by it of a Loan Request pursuant to Section 2.1(b) or Section 2.2(b) notify the applicable Lenders of such Class of Loan of its receipt of such Loan Request specifying the information provided by the Borrower and the apportionment among the Lenders of the requested Loan as determined by the Administrative Agent in accordance with Section 2.1 or Section 2.2, as the case may be Each applicable Lender shall remit the principal amount of their Pro Rata Share of the Loan to the Administrative Agent such that the Administrative Agent is able to, and the Administrative Agent shall, to the extent the Lenders have made funds available to it for such purpose and subject to the terms and conditions of Section 2.1 or Section 2.2, as applicable, fund such Loan to the Borrower in U.S. Dollars and immediately available funds to the Borrower's account specified in the Loan Request prior to 2:00 p.m. on the Borrowing Date.

(b) <u>Pro Rata Treatment of Lenders</u>. The borrowing of any Class of Loan shall be allocated to each Lender of such Class of Loan according to its Pro Rata Share thereof, and each selection of, conversion to or renewal of any Interest Rate Option and each payment or prepayment by the Borrower with respect to principal and interest due from the Borrower hereunder to the Lenders with respect to the applicable Commitments and Loan, shall (except as otherwise may be provided with respect to a Defaulting Lender and except as provided in Section 2.4, 3.1 or 3.6) be payable ratably among the Lenders of such Class of Loan entitled to such payment in accordance with the amount of principal and interest then due or payable such Lenders as set forth in this Agreement.

(c) <u>Presumptions by the Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed Borrowing Date that such Lender will not make available to the Administrative Agent such Lender's share of any Loan, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with this Section 2.6 or Section 2.2, as the case may be, and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of such Loan available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case

of a payment to be made by the Borrower, the interest rate then applicable to Floating Rate Loans. If such Lender pays its share of the applicable Loan to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent. If the Borrower and such Lender pay such interest for the same period, the Administrative Agent promptly shall remit to the Borrower the amount of interest paid by Borrower for such overlapping period. Nothing in this Section 2.6(c) or elsewhere in this Agreement or the other Loan Documents, including the provisions of Section 2.14, shall be deemed to require the Administrative Agent (or any other Lender) to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

2.7    **Fees**.

(a)    Unused Commitment Fee. Accruing from the Closing Date until the Revolving Loan Maturity Date, the Borrowers agree to pay to the Administrative Agent for the account of each Revolving Lender according to its Pro Rata Share, a nonrefundable unused commitment fee (each an "Unused Commitment Fee") equal to the Applicable Unused Commitment Fee Rate (computed on the basis of a year of 360 days, as the case may be, and actual days elapsed) multiplied by the average daily difference between the amount of (i) the Aggregate Revolving Credit Commitment Amount  and (ii) the Revolving Credit Facility Usage (with the outstanding principal balance of all Swing Line Loans included in calculating the Revolving Credit Facility Usage with respect only to the portion of the Unused Commitment Fee payable to the Swing Line Lender); provided, however, that any Unused Commitment Fee accrued with respect to the Revolving Commitment of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Borrowers so long as such Lender shall be a Defaulting Lender except to the extent that such Unused Commitment Fee shall otherwise have been due and payable by the Borrowers prior to such time; and provided further that no Unused Commitment Fee shall accrue with respect to the Revolving Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Subject to the provisos in the directly preceding sentence, all Unused Commitment Fees shall be payable in arrears on each Interest Payment Date.

(b)    Other Fees. The Borrowers agree to pay to the Administrative Agent such other fees as agreed in the Fee Letter.

2.8    **Notes**. The obligation of the Borrowers to repay the aggregate unpaid principal amount of the Revolving Loans, Swing Line Loans and Term Loan made to them by each Lender, together with interest thereon, shall, at the request of the applicable Lender, be evidenced by a Revolving Note, a Swing Line Note and/or a Term Loan Note, as the case may be, payable to the order of such Lender in a face amount equal to the Revolving Commitment, Swing Line Commitment or Term Loan Commitment, as applicable, of such Lender. The Borrowers hereby unconditionally promise to pay, to the order of each of the Lenders, the Administrative Agent, the Issuing Lender and the Swing Line Lender, as applicable, the Loans and other Obligations as provided in this Agreement and the other Loan Documents.

2.9     **Letter of Credit Subfacility**.

(a)     Issuance of Letters of Credit.   Subject to the terms and conditions of this Agreement and the other Loan Documents, including, without limitation, Section 4.2, and in reliance upon the representations and warranties set forth in this Agreement and the other Loan Documents and in reliance on the agreements of the Revolving Lenders set forth in this Section 2.9, the Issuing Lender agrees to issue standby letters of credit (the "Letters of Credit") for the account of the Borrowers on any Business Day from the Closing Date through but not including 30 days before the Revolving Loan Maturity Date. The Borrowers may at any time prior to Letter of Credit Expiration Date request the issuance of a Letter of Credit, or an amendment or extension of a Letter of Credit, by delivering to the Issuing Lender (with a copy to the Administrative Agent) a completed application and agreement for letters of credit, or request for such amendment or extension, as applicable, in such form as the Issuing Lender may specify from time to time (each a "Letter of Credit Request") by no later than **11:00 a.m. at least 5 Business Days,** or such shorter period as may be agreed to by the Issuing Lender, in advance of the proposed date of issuance, amendment or extension.  Promptly after receipt of any Letter of Credit Request, the Issuing Lender shall confirm with the Administrative Agent (in writing) that the Administrative Agent has received a copy of such Letter of Credit Request and if not, the Issuing Lender will provide the Administrative Agent with a copy thereof.  Unless the Issuing Lender has received notice from any Lender, the Administrative Agent or any Loan Party, at least one day prior to the requested date of issuance, amendment or extension of the applicable Letter of Credit, that one or more applicable conditions in Article IV is not satisfied, then the Issuing Lender will issue a Letter of Credit or agree to such amendment or extension, provided that each Letter of Credit shall (A) have a maximum maturity of 12 months from the date of issuance (except that the foregoing shall not prohibit a Letter of Credit providing for automatic renewals for additional periods not exceeding 1 year each so long as the Issuing Lender may prevent such renewal by notice and no such additional period extends beyond the date set forth in the following clause (B)), and (B) in no event expire later than the Letter of Credit Expiration Date, and provided, further, that at no time shall (i) the Letter of Credit Obligations exceed the Letter of Credit Sublimit or (ii) the Revolving Credit Facility Usage exceed the lesser of the Aggregate Revolving Credit Commitment Amount or the Borrowing Base.  Each request by the Borrowers for the issuance, amendment or extension of a Letter of Credit shall be deemed to be a representation by the Borrowers that each of them shall be in compliance with the 2nd proviso to the preceding sentence and with Article IV after giving effect to the requested issuance, amendment or extension of such Letter of Credit.  Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to the beneficiary thereof, the applicable Issuing Lender will also deliver to the Borrowers and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(b)     Letter of Credit Fees.   The Borrowers shall pay to the Administrative Agent for the ratable account of the Revolving Lenders a fee (the "Letter of Credit Fee") equal to the Applicable Letter of Credit Fee Rate (computed on the basis of a year of 360 days and actual days elapsed), which fee shall be computed on the daily average Letter of Credit Obligations and shall be payable quarterly in arrears on the first day of each January, April, July and October, and on the Revolving Loan Maturity Date.  The Borrowers shall also pay to the Issuing Lender for the Issuing Lender's sole account a fronting fee in an amount equal to the greater of (i) .20% of the face amount of each Letter of Credit or (ii) $2,500, as well as the Issuing Lender's then in

effect customary fees and administrative expenses payable with respect to the Letters of Credit as the Issuing Lender may generally charge or incur from time to time in connection with the issuance, maintenance, amendment (if any), assignment or transfer (if any), negotiation, and administration of Letters of Credit.

(c)     <u>Disbursements, Reimbursement</u>.  Immediately upon the issuance of each Letter of Credit, each Revolving Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the Issuing Lender a participation in such Letter of Credit and each drawing thereunder, without recourse or warranty, in an amount equal to such Revolving Lender's Pro Rata Share of the maximum amount available to be drawn under such Letter of Credit and the amount of such drawing, respectively.

(i)     In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, the Issuing Lender will promptly notify the Borrowers and the Administrative Agent thereof.  Provided that they shall have received such notice, the Borrowers shall reimburse (such obligation to reimburse the Issuing Lender shall sometimes be referred to as a "<u>Reimbursement Obligation</u>") the Issuing Lender prior to 12:00 noon on each date that an amount is paid by the Issuing Lender under any Letter of Credit (each such date, a "<u>Drawing Date</u>"), or if such notice was received after 11:00 a.m. on a Drawing Date, then by 10:00 a.m. on the Business Day immediately following such Drawing Date, by paying to the Administrative Agent for the account of the Issuing Lender an amount equal to the amount so paid by the Issuing Lender.  In the event the Borrowers fail to reimburse the Issuing Lender (through the Administrative Agent) for the full amount of any drawing under any Letter of Credit by date and time required in accordance with the foregoing sentence, then the Administrative Agent will promptly notify each Revolving Lender thereof, and the Borrowers shall be deemed to have requested that Revolving Loans be made by the Revolving Lenders under the Floating Rate Option to be disbursed on the Business Day immediately following the Drawing Date, subject to the amount of the unutilized portion of the Revolving Commitment and subject to the conditions set forth in Section 4.2 other than any notice requirements.  Any notice given by the Administrative Agent or Issuing Lender pursuant to this Section 2.9(c)(i) may be by telephone if immediately confirmed in writing; <u>provided</u> that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     Each Revolving Lender shall upon the Business Day immediately following a Drawing Date with respect to which notice was delivered by the Administrative Agent in accordance with Section 2.9(c)(i) make funds available to the Administrative Agent for the account of the Issuing Lender in an amount equal to its Pro Rata Share of the amount of the drawing.  So long as the conditions set forth in Section 4.2 have been satisfied or waived in accordance with this Agreement, each Revolving Lender that makes such funds available shall be deemed to have made a Revolving Loan at the Floating Rate Option; <u>provided</u>, that if any conditions set forth in Section 4.2 have not been satisfied or waived in accordance with this Agreement, each Revolving Lender shall remain obligated to fund its Pro Rata Share of such unreimbursed amount and such amount (each a "<u>Participation Advance</u>") shall be deemed to be a payment in respect of its participation in the applicable Letter of Credit Borrowing

**Exhibit 1**
**51 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

resulting from such drawing in accordance with Section 2.9(c)(iii). If any Revolving Lender so notified fails to make available to the Administrative Agent for the account of the Issuing Lender the amount of such Revolving Lender's Pro Rata Share of such amount by no later than Noon on such date, then interest shall accrue on such Revolving Lender's obligation to make such payment, from such Business Day to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Effective Rate during the first 3 days following the date such amount was due and (ii) at a rate per annum equal to the rate applicable to Floating Rate Loans thereafter. The Administrative Agent and the Issuing Lender will promptly give notice (as described in Section 2.9(c)(i) above) of the occurrence of the Drawing Date, but failure of the Administrative Agent or the Issuing Lender to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this clause (ii).

(iii)     With respect to any unreimbursed drawing that is not fully reimbursed by the Borrowers and is not refinanced by Revolving Loans in accordance with Section 2.9(c)(i) because of the Borrowers' failure to satisfy the conditions set forth in Section 4.2, the Borrowers shall be deemed to have incurred from the Issuing Lender a borrowing (each, a "Letter of Credit Borrowing") in an amount equal to the unreimbursed portion of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, each Revolving Lender's payment to the Administrative Agent for the account of the Issuing Lender pursuant to Section 2.9(c)(i) shall be deemed payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a Participation Advance from such Revolving Lender in satisfaction of its participation obligation under this Section 2.9.

(d)     Repayment of Participation Advances.

(i)     Upon (and only upon) receipt by the Administrative Agent for the account of the Issuing Lender of immediately available funds from the Borrowers (A) in reimbursement of any payment made by the Issuing Lender under the Letter of Credit with respect to which any Lender has made a Participation Advance to the Administrative Agent, or (B) in payment of interest on such a payment made by the Issuing Lender under such a Letter of Credit, the Administrative Agent on behalf of the Issuing Lender will pay to each Revolving Lender, in the same funds as those received by the Administrative Agent, the amount of such Revolving Lender's Pro Rata Share of such funds, except the Administrative Agent shall retain for the account of the Issuing Lender the amount of the Pro Rata Share of such funds of any Revolving Lender that did not make a Participation Advance in respect of such payment by the Issuing Lender.

(ii)     If the Administrative Agent is required at any time to return to any Loan Party, or to a trustee, receiver, liquidator, custodian, or any official in any Debtor Relief Proceeding, any portion of any payment made by any Loan Party to the Administrative Agent for the account of the Issuing Lender pursuant to this Section 2.9 in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each Revolving Lender shall, on demand of the Administrative Agent, forthwith return to the

**Exhibit 1**
**52 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

Administrative Agent for the account of the Issuing Lender the amount of its Pro Rata Share of any amounts so returned by the Administrative Agent plus interest thereon from the date such demand is made to the date such amounts are returned by such Revolving Lender to the Administrative Agent, at a rate per annum equal to the Federal Funds Effective Rate in effect from time to time.

(e)     <u>Documentation</u>.  Each Loan Party agrees to be bound by the terms of the Issuing Lender's application and agreement for letters of credit and the Issuing Lender's written regulations and customary practices relating to letters of credit, though such interpretation may be different from such Loan Party's own.  In the event of a conflict between such application or agreement and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of its gross negligence or willful misconduct as determined by a final decision by a court of competent jurisdiction, the Issuing Lender shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following any Loan Party's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

(f)     <u>Determinations to Honor Drawing Requests</u>.  In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, the Issuing Lender shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit.

(g)     <u>Nature of Participation and Reimbursement Obligations</u>.  Each Revolving Lender's obligation in accordance with this Agreement to make the Revolving Loans or Participation Advances, as contemplated by this Section 2.9, as a result of a drawing under a Letter of Credit, and the Obligations of the Borrower to reimburse the Issuing Lender upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.9 under all circumstances, including the following circumstances:

(i)     any set-off, counterclaim, recoupment, defense or other right that such Revolving Lender may have against the Issuing Lender or any of its Affiliates, the Borrowers or any other Person for any reason whatsoever, or that any Loan Party may have against the Issuing Lender or any of its Affiliates, any Lender or any other Person for any reason whatsoever;

(ii)     the failure of any Loan Party or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in Sections 2.2 or 4.2 or as otherwise set forth in this Agreement for the making of a Revolving Loan, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of the Revolving Lenders to make Participation Advances under this Section 2.9;

(iii)     any lack of validity or enforceability of any Letter of Credit;

**Exhibit 1**
**53 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(iv)     any claim of breach of warranty that might be made by any Loan Party or any Lender against any beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, crossclaim, defense or other right that any Loan Party or any Lender may have at any time against a beneficiary, successor beneficiary any transferee or assignee of any Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), the Issuing Lender or its Affiliates or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Loan Party or Subsidiaries of a Loan Party and the beneficiary for which any Letter of Credit was procured);

(v)     the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provision of services relating to a Letter of Credit, in each case even if the Issuing Lender or any of its Affiliates has been notified thereof;

(vi)     payment by the Issuing Lender or any of its Affiliates under any Letter of Credit against presentation of a demand, draft or certificate or other document that does not comply with the terms of such Letter of Credit;

(vii)     the Solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)     any failure by the Issuing Lender or any of its Affiliates to issue any Letter of Credit in the form requested by any Loan Party, unless the Issuing Lender has received written notice from such Loan Party of such failure within three Business Days after the Issuing Lender shall have furnished such Loan Party and the Administrative Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)     any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of any Loan Party or Subsidiaries of a Loan Party;

(x)     any breach of this Agreement or any other Loan Document by any party thereto;

(xi)     the occurrence or continuance of an Debtor Relief Proceeding with respect to any Loan Party;

(xii)     the fact that an Event of Default or a Default shall have occurred and be continuing;

**Exhibit 1**
**54 of 132**

(xiii)   the fact that the Revolving Loan Maturity Date shall have passed or this Agreement or the Commitments hereunder shall have been terminated; and

(xiv)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

(h)   <u>Indemnity</u>.  The Borrowers hereby agree to protect, indemnify, pay and save harmless the Issuing Lender from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel) that the Issuing Lender may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (i) the gross negligence or willful misconduct of the Issuing Lender as determined by a final, non-appealable judgment of a court of competent jurisdiction or (ii) a claim brought by the Borrowers against the Issuing Lender for breach in bad faith of its obligations under this Agreement.

(i)   <u>Liability for Acts and Omissions</u>.  As between any Loan Party and the Issuing Lender, such Loan Party assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, the Issuing Lender shall not be responsible for any of the following, including any losses or damages to any Loan Party or other Person or property relating thereto:   (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if the Issuing Lender or its Affiliates shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, that may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Loan Party against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Loan Party and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of the Issuing Lender or its Affiliates, as applicable, including any act or omission of any Governmental Authority, and none of the above shall affect or impair, or prevent the vesting of, any of the Issuing Lender's or its Affiliates rights or powers hereunder.  Nothing in the preceding sentence shall relieve the Issuing Lender from liability for the Issuing Lender's gross negligence or willful misconduct or breach in bad faith by the Issuing Lender of its obligations under this Agreement (as determined by a court of competent jurisdiction in a final, non-appealable judgment).  In no event shall the Issuing Lender or its Affiliates be liable to any Loan Party for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses

**Exhibit 1**
**55 of 132**
Case 19-62584-pcm11   Doc 16   Filed 08/22/19

(including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

Without limiting the generality of the foregoing, the Issuing Lender and each of its Affiliates (i) may rely on any oral or other communication believed in good faith by the Issuing Lender or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit, (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by the Issuing Lender or its Affiliate; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on the Issuing Lender or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by the Issuing Lender or its Affiliates under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not put the Issuing Lender or its Affiliates under any resulting liability to the Borrowers or any Lender.

(j)     Issuing Lender Reporting Requirements.  The Issuing Lender shall, on the first Business Day of each month, provide to the Administrative Agent and the Borrowers a schedule of the Letters of Credit issued by it, in form and substance satisfactory to the Administrative Agent, showing the date of issuance of each Letter of Credit, the account party, the original face amount (if any), and the maturity date of any Letter of Credit outstanding at any time during the preceding month, and any other information relating to such Letter of Credit that the Administrative Agent may request.

(k)     ISP.  Unless otherwise expressly agreed by the Issuing Lender, the Borrowers and the beneficiary of a Letter of Credit, the rules of the International Standby Practices as most recently published from time to time by the International Chamber of Commerce (the "ISP") shall apply to each Letter of Credit.

**Exhibit 1**
**56 of 132**

2.10    **Payments**.

(a)    Payments Generally.  All payments and prepayments to be made in respect of principal, interest, Unused Commitment Fees, Letter of Credit Fees, other fees referred to in Section 2.7 or other fees or amounts due from the Borrowers hereunder shall be payable prior to 11:00 a.m. on the date when due without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by the Borrowers, and without set-off, counterclaim or other deduction of any nature, and an action therefor shall immediately accrue.  Such payments shall be made to the Administrative Agent at the Principal Office for the account of Lenders or Issuing Lender to which they are owed, in each case in U.S. Dollars and in immediately available funds.  The Administrative Agent shall promptly distribute such amounts to the Issuing Lender, Swing Line Lender and/or applicable Lenders in immediately available funds.  The Administrative Agent's and each Lender's statement of account, ledger or other relevant record shall, in the absence of manifest error, be conclusive as the statement of the amount of principal of and interest on the Loans and other amounts owing under this Agreement and shall be deemed an "*account stated*."

(b)    Payments by the Borrowers; Presumptions by the Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Lender hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Lender, as the case may be, the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the Issuing Lender, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

2.11    **Interest Payment Dates**.  Interest on Floating Rate Loans and Quoted Rate Loans shall be due and payable in arrears on each Interest Payment Date.  Interest on LIBOR Rate Loans shall be due and payable on the last day of each Interest Period for those Loans and, if such Interest Period is longer than 3 months, on the last day of each 3-month interval during such Interest Period.  Interest on mandatory prepayments of principal under Section 2.13 shall be due on the date such mandatory prepayment is due.  Interest on the principal amount of each Loan or other monetary Obligation shall be due and payable on demand after such principal amount or other monetary Obligation becomes due and payable (whether on the stated Maturity Date, upon an accelerated Maturity Date or otherwise).

2.12    **Voluntary Prepayments and Reduction of Commitments**.

(a)    Right to Prepay.  The Borrowers shall have the right at their option from time to time to prepay the Loans in whole or part without premium or penalty (except as provided in Sections 3.1 and 3.5, 10.3,).  Whenever a Borrower desires to prepay any part of the Loans, it

**Exhibit 1**
**57 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

shall provide a prepayment notice to the Administrative Agent by 11:00 a.m. at least (A) 3 Business Days prior to the date of prepayment of LIBOR Rate Loans and Quoted Rate Loans, (B) 1 Business Day prior to the date of prepayment of Floating Rate Loans, or (C) no later than 1:00 p.m. on the date of prepayment of Swing Line Loans, setting forth the following information:

   (i) the date, which shall be a Business Day, on which the proposed prepayment is to be made;

   (ii) a statement indicating the application of the prepayment among Class of Loan and Borrowings; and

   (iii) the total principal amount of such prepayment, which shall not be less than the lesser of the following with respect to any Class of Loan: (A) the then outstanding principal amount of such Class of Loan, or (B) $5,000,000 (provided, that the amount of any prepayment to which this Section 2.12(a)(iii)(B) applies shall be in integral multiples of $1,000,000).

  (b) <u>All prepayment notices shall be irrevocable</u>. The principal amount of the Loans for which a prepayment notice is given, together with interest on such principal amount except with respect to Loans to which the Floating Rate Option applies, shall be due and payable on the date specified in such prepayment notice as the date on which the proposed prepayment is to be made. All Term Loan prepayments permitted pursuant to this Section 2.12 shall be applied to the unpaid installments of principal of the Term Loan in the inverse order of scheduled maturities. Except as provided in Section 2.4, if the Borrowers prepay a Loan but fail to specify the applicable Class and/or Borrowing that the Borrowers intend to prepay, then such prepayment shall be applied first, ratably to all outstanding Revolving Loans that are Floating Rate Loans, second, ratably to all outstanding Revolving Loans that are LIBOR Rate Loans, third, ratably to all outstanding Revolving Loans that are Quoted Rate Loans, fourth, to all outstanding Term Loans that are Floating Rate Loans, fifth, to all outstanding Term Loans that are LIBOR Rate Loans, and sixth, to all outstanding Term Loans that are Quoted Rate Loans. Any prepayment hereunder shall include all interest and fees due and payable with respect to the Loan being prepaid and shall be subject to the Borrowers' Obligation to indemnify the Lenders under Section 3.5.

  (c) <u>Reduction of Revolving Commitment</u>. The Borrowers shall have the right at any time after the Closing Date upon 5 days' prior written notice to the Administrative Agent to permanently reduce (ratably among the Revolving Lenders in proportion to their Pro Rata Shares) the Revolving Commitments, in a minimum amount of $10,000,000 and whole multiples of $5,000,000, or to terminate completely the Revolving Commitments, without penalty or premium except as hereinafter set forth; <u>provided</u> that any such reduction or termination shall be accompanied by prepayment of the Revolving Loans, together with outstanding Unused Commitment Fees, and the full amount of interest accrued on the principal sum to be prepaid (and all amounts referred to in Section 3.5 hereof) to the extent necessary to cause the aggregate Revolving Credit Facility Usage after giving effect to such prepayments to be equal to or less than the Revolving Commitments as so reduced or terminated. Any notice to reduce the Revolving Commitments under this Section 2.12 shall be irrevocable.

2.13    **Mandatory Prepayments**.

(a)    Overadvance.  If the Revolving Credit Facility Usage at any time exceeds the lesser of the Aggregate Revolving Commitment Amount or the Borrowing Base (each, an "Overadvance"), the Borrower shall prepay the Revolving Loans (or Cash Collateralize Letter of Credit Obligations, if prepayment in full of the Revolving Loans is not sufficient) in such amounts as shall be necessary so that Revolving Credit Facility Usage does not exceed the lesser of the Aggregate Revolving Credit Commitment Amount or the Borrowing Base.

(b)    Disposition of Assets.  Within 3 Business Days of any Disposition other than a Disposition expressly permitted under clause (a), (c), (d), (e), (f) or (g) of Section 7.7, the Borrowers shall prepay Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such Disposition to the extent the aggregate amount of such Net Cash Proceeds exceed $1,000,000 during any fiscal year.  Notwithstanding anything herein to the contrary, no such mandatory prepayment shall constitute or be deemed to constitute a cure of any Default or Event of Default arising as a result of the Disposition giving rise to such prepayment obligation.

(c)    Planned Asset Sales.  Upon the closing of any of the Planned Asset Sales, the Borrowers shall prepay the Term Loan in an amount equal to 100% of the Net Cash Proceeds.  If such Net Cash Proceeds paid to the Lenders equal or exceed $25,000,000 by April 30, 2018, then the Borrowers shall be entitled to retain 20% of the total of the Net Cash Proceeds from the Planned Asset Sales.

(d)    Casualty Events. Not later than 1 Business Day following the receipt by any Loan Party of the proceeds of insurance, condemnation award, or other compensation in respect of any Casualty Event or series of related Casualty Events affecting any property of any Loan Party, the Borrower shall prepay or cause such other Loan Party to prepay the Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such Casualty Event(s) to the extent that the aggregate amount of all amounts so received in any single fiscal year exceeds $2 million.  If such Casualty Event relates to Inventory or other current assets, such Net Cash Proceeds shall prepay the Revolving Loans first, and then the Term Loan.  If such Casualty Event relates to real property, fixtures, equipment or other assets, such Net Cash Proceeds shall prepay the Term Loan first, and then the Revolving Loans with a corresponding reduction in the Aggregate Revolving Commitment Amount.

(e)    Application to Productive Assets. Notwithstanding the foregoing, and provided no Default or Event of Default has occurred and is continuing, prepayment shall not be required under the foregoing clause (d) to the extent a Loan Party reinvests the Net Cash Proceeds of the applicable Casualty Event in productive assets (other than Inventory unless such Net Cash Proceeds result from a Casualty Event with respect to Inventory) of a kind then used or usable in the business of such Loan Party, within 12 months after the date of such Casualty Event (or enters into a binding commitment thereof within said 12-month period and subsequently makes such reinvestment within 90 days of the end of the initial 12-month period); provided that the Borrowers notify the Administrative Agent in writing of such Loan Party's  intent to reinvest and delivers such proceeds to the Administrative Agent to be placed into an escrow account until such assets are replaced or, if no asset replacement occurs within the 12-month period, then applied to the Obligations.

**Exhibit 1**
**59 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(f)     <u>Equity Issuances</u>.  Immediately upon any Equity Issuance other than Equity Issuances expressly permitted under clauses (a), (b) and (c) of Section 7.12, the Borrowers shall prepay the Obligations in an aggregate amount equal to 100% of the Net Cash Proceeds of such Equity Issuance.

(g)     <u>Debt Incurrence</u>.  Immediately upon the receipt of the Net Cash Proceeds of any Debt Incurrence, other than a Debt Incurrence permitted under Section 7.1, the Borrowers shall prepay the Obligations in an amount equal to 100% of the amount of such Net Cash Proceeds. Notwithstanding anything herein to the contrary, any such prepayment shall not constitute or be deemed to be a cure of any Default or Event of Default arising as a result of such Debt Incurrence.

(h)     <u>Application Among Obligations</u>.  All prepayments pursuant to this Section 2.13, other than under clauses (c) and (d), shall be applied, first to prepay any Overadvances that may be outstanding, pro rata, second to prepay the Term Loan (to be applied to installments of the principal of the Term Loan in inverse order of scheduled maturities) and third to prepay the Revolving Loans (including Swing Line Loans), with a corresponding reduction in the Revolving Loan Commitments, and to Cash Collateralize outstanding Letter of Credit Obligations.

(i)     <u>Interest Payments; Application Among Interest Rate Options</u>.  All prepayments pursuant to this Section 2.13 shall be accompanied by accrued and unpaid interest upon the principal amount of each such prepayment.  Subject to Section 2.13(h), all prepayments required pursuant to this Section 2.13 shall first be applied to Floating Rate Loans, then to LIBOR Rate Loans, and then to Quoted Rate Loans.  In accordance with Section 3.5, the Borrower shall indemnify the Lenders for any loss or expense, including loss of margin, incurred with respect to any such prepayments applied against LIBOR Rate Loans on any day other than the last day of the applicable Interest Period or against Quoted Rate Loans on any day other than the last day of the applicable Quoted Rate Period.

2.14    **<u>Sharing of Payments by Lenders</u>**.  If any Lender shall, by exercising any right of setoff, counterclaim or banker's lien, by receipt of voluntary payment, by realization upon security, or by any other non-pro rata source or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro-rata share of the amount such Lender is entitled hereunder, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, <u>provided</u> that:

(a)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest other than interest or other amounts, if

any, required by Law (including court order) to be paid by the Lender or the holder making such purchase; and

(b)     the provisions of this Section 2.14 shall not be construed to apply to (x) any payment (including the application of funds arising from the existence of a Defaulting Lender) made by the Loan Parties pursuant to and in accordance with the express terms of the Loan Documents or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Participation Advances to any assignee or participant, other than to the Borrowers or any Subsidiary thereof (as to which the provisions of this Section 2.14 shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.  This Section 2.14 shall not apply to any action taken by CoBank with respect to any CoBank Equities held by the Borrowers, including pursuant to Section 2.17(b) and Section 9.2(c).

## 2.15   **Defaulting Lenders**.

(a)     <u>Defaulting Lender Adjustments</u>.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)     <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)     <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article IX or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.2(c) shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the Issuing Lender or Swing Line Lender hereunder; third, to Cash Collateralize the Issuing Lender's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.16; fourth, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (y) Cash Collateralize the Issuing Lender's future Fronting Exposure with respect to such Defaulting Lender with respect to future Letters of Credit issued under this Agreement, in

**Exhibit 1**
**61 of 132**

accordance with Section 2.16; sixth, to the payment of any amounts owing to the Lenders, the Issuing Lender or the Swing Line Lender as a result of any judgment of a court of competent jurisdiction obtained by any Lender, the Issuing Lender or the Swing Line Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans or Letter of Credit Obligations in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made or the related Letters of Credit were issued at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and Letter of Credit Obligations owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or Letter of Credit Obligations owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in Letter of Credit Obligations and Swing Line Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Facility without giving effect to Section 2.15(a)(iv) below. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.15(a) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

      (iii)    <u>Certain Fees</u>.

      (A)    No Defaulting Lender shall be entitled to receive any Unused Commitment Fee for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

      (B)    Each Defaulting Lender shall be entitled to receive Letter of Credit Fees for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Pro Rata Share of the stated amount of Letters of Credit for which it has provided Cash Collateral pursuant to Section 2.16.

      (C)    With respect to any Unused Commitment Fee or Letter of Credit Fee not required to be paid to any Defaulting Lender pursuant to clause (A) or (B) above, the Borrowers shall (x) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Letter of Credit Obligations or Swing Line Loans that has been reallocated to such Non-Defaulting Lender pursuant to clause (iv) below, (y) pay to the Issuing Lender and Swing Line Lender, as applicable, the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to the Issuing Lender's or Swing Line Lender's Fronting

Exposure to such Defaulting Lender, and (z) not be required to pay the remaining amount of any such fee.

(iv)     <u>Reallocation of Participations to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in Letter of Credit Obligations and Swing Line Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (x) the conditions set forth in Section 4.2 are satisfied at the time of such reallocation (and, unless the Borrowers shall have otherwise notified the Administrative Agent at such time, the Borrowers shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (y) such reallocation does not cause any Non-Defaulting Lender's Pro Rata Share of the Revolving Credit Facility Usage to exceed such Non-Defaulting Lender's Revolving Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)     <u>Cash Collateral; Repayment of Swing Line Loans</u>.  If the reallocation described in clause (iv) above cannot, or can only partially, be effected, the Borrowers shall, without prejudice to any right or remedy available to it hereunder or under Law, (x) first, prepay Swing Line Loans in an amount equal to the Swing Line Lender's Fronting Exposure and (y) second, Cash Collateralize the Issuing Lender's Fronting Exposure in accordance with the procedures set forth in Section 2.16.

(b)     <u>Defaulting Lender Cure</u>.  If the Borrowers, the Administrative Agent and the Swing Line Lender and Issuing Lender agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit and Swing Line Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility (without giving effect to Section 2.15(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(c)     <u>New Swing Line Loans/Letters of Credit</u>.  So long as any Lender is a Defaulting Lender, (i) the Swing Line Lender shall not be required to fund any Swing Line Loans unless it is satisfied that it will have no Fronting Exposure after giving effect to such Swing Line Loan and (ii) no Issuing Lender shall be required to issue, extend, renew or increase any Letter of Credit unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

**Exhibit 1**
**63 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

2.16  **Cash Collateral**.  At any time that there shall exist a Defaulting Lender, within one Business Day following the written request of the Administrative Agent or the Issuing Lender (with a copy to the Administrative Agent) the Borrowers shall Cash Collateralize the Issuing Lender's Fronting Exposure with respect to such Defaulting Lender (determined after giving effect to Section 2.15(a)(iv) and any Cash Collateral provided by such Defaulting Lender) in an amount not less than the Minimum Collateral Amount.

(a)  Grant of Security Interest.  The Borrowers, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the Issuing Lender, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for the Defaulting Lenders' obligation to fund participations in respect of Letter of Credit Obligations, to be applied pursuant to clause (b) below.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and the Issuing Lender as herein provided, or that the total amount of such Cash Collateral is less than the Minimum Collateral Amount, the Borrowers will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(b)  Application.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section 2.16 or Section 2.15 in respect of Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of Letter of Credit Obligations (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(c)  Termination of Requirement.  Cash Collateral (or the appropriate portion thereof) provided to reduce the Issuing Lender's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section 2.16 following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (ii) the determination by the Administrative Agent and the Issuing Lender that there exists excess Cash Collateral; provided that, subject to Section 2.15, the Person providing Cash Collateral and the Issuing Lender may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations and provided further that to the extent that such Cash Collateral was provided by the Borrowers or any other Loan Party, such Cash Collateral shall remain subject to the Prior Security Interest granted pursuant to the Loan Documents.

## 2.17  **CoBank Capital Plan**.

(a)  Each party hereto acknowledges that CoBank's Bylaws and Capital Plan (as each may be amended from time to time) shall govern (i) the rights and obligations of the parties with respect to the CoBank Equities and any patronage refunds or other distributions made on account thereof or on account of the Borrowers' patronage with CoBank, (ii) the Borrowers' eligibility for patronage distributions from CoBank (in the form of CoBank Equities and cash) and (iii) patronage distributions, if any, in the event of a sale of a participation interest.  CoBank

reserves the right to assign or sell participations in all or any part of its Commitments or outstanding Loans hereunder on a non-patronage basis.

(b)     Each party hereto acknowledges that CoBank has a statutory first lien pursuant to the Farm Credit Act of 1971 (as amended from time to time) on all CoBank Equities that the Borrower may now own or hereafter acquire, which statutory lien shall be for CoBank's sole and exclusive benefit.  Notwithstanding anything herein or in any other Loan Document to the contrary, the CoBank Equities shall not constitute security for the Obligations due to any other Lender.  To the extent that any of the Loan Documents create a Lien on the CoBank Equities or on patronage accrued by CoBank for the account of the Borrowers (including, in each case, proceeds thereof), such Lien shall be for CoBank's sole and exclusive benefit and shall not be subject to pro rata sharing hereunder.  Neither the CoBank Equities nor any accrued patronage shall be offset against the Obligations except that, in the event of an Event of Default, CoBank may elect to apply the cash portion of any patronage distribution or retirement of equity to amounts owed to CoBank under this Agreement, whether or not such amounts are currently due and payable.  The Borrowers acknowledge that any corresponding tax liability associated with such application is the sole responsibility of the Borrowers.  CoBank shall have no obligation to retire the CoBank Equities upon any Event of Default, Default or any other default by the Borrowers or any other Loan Party, or at any other time, either for application to the Obligations or otherwise.

2.18    **Cash Management**.

(a)     Borrowers shall (i) establish and maintain cash management services of a type and on terms satisfactory to Administrative Agent at Wells Fargo Bank, N.A. ("Cash Management Bank"), and shall request in writing and otherwise take such reasonable steps to ensure that all of its Account Debtors forward payment of the amounts owed by them directly to such Cash Management Bank, and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all collections (including those sent directly by Account Debtors to a Cash Management Bank) into a bank account in a Borrower's name (a "Cash Management Account") at one of the Cash Management Banks.

(b)     Each Cash Management Bank shall establish and maintain deposit account control agreements with Administrative Agent and Borrowers, in form and substance acceptable to Administrative Agent ("Deposit Account Control Agreement"); provided, however, that unless and until the Administrative Agent shall otherwise require by written notice to Borrowers, no Deposit Account Control Agreement shall be required for Borrowers' Cash Management Account(s) with the Bank of Nova Scotia.  Each such Deposit Account Control Agreement shall provide, among other things, that (i) all items of payment deposited in such Cash Management Account and proceeds thereof are held by such Cash Management Bank as agent or bailee-in-possession for Administrative Agent, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account, other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) upon the Administrative Agent's request at any time after the occurrence and during the continuance of an

Event of Default, it immediately will forward by daily sweep all amounts in the applicable Cash Management Account to the Administrative Agent's Account.

(c)     So long as no Default or Event of Default has occurred and is continuing, the Borrowers may add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be satisfactory to Administrative Agent and Administrative Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, Borrowers and such prospective Cash Management Bank shall have executed and delivered to Administrative Agent a Deposit Account Control Agreement. Borrowers shall close any of their Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from Administrative Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in Administrative Agent's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Administrative Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Administrative Agent's liability under any Deposit Account Control Agreement with such Cash Management Bank is no longer acceptable in Administrative Agent's reasonable judgment.

(d)     The Cash Management Accounts shall be cash collateral accounts, with all cash, checks and similar items of payment in such accounts securing payment of the Obligations, and in which Borrowers are hereby deemed to have granted a Lien to Administrative Agent.

2.19    **Joint and Several Liability of Borrowers**.    The parties intend that each of the Borrowers shall be fully liable, jointly and severally, for the Obligations.  Nonetheless, in case a court finds that any Borrower is not such a primary obligor with respect to all or any part of the Obligations, each Borrower expressly waives the benefit of any and all defenses and discharges available to a guarantor, surety, endorser or accommodation party dependent on an obligor's character as such.  Without limiting the generality of the foregoing, each Borrower waives (a) any defense arising by reason of any disability or other defense of the other Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of the Lenders) of the liability of the other Borrowers or any other Loan Party; (b) any defense based on any claim that such Borrower's obligations exceed or are more burdensome than those of the other Borrowers or any other Loan Party; (c) the benefit of any statute of limitations affecting the Borrowers' liability hereunder; (d) any right to proceed against the other Borrowers or any other Loan Party, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of the Lenders whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by the Lender; and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by Law limiting the liability of or exonerating guarantors, sureties or other accommodation parties

2.20    **Protective Advances**.

(a)     Subject to the limitations set forth below, the Administrative Agent is authorized by the Borrowers and the Lenders, from time to time in the Administrative Agent's sole

discretion (but with absolutely no obligation), to make Revolving Loans to the Borrowers, on behalf of all the Lenders, which the Administrative Agent, in its reasonable discretion, deems necessary or desirable (i) to preserve or protect the Collateral; (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Revolving Loans and other Obligations; or (iii) to pay any other amount chargeable to or required to be paid by the Borrowers or the other Obligors pursuant to the terms of this Agreement or the other Loan Documents, including payment of costs, fees, and expenses described in Section 11.3 and other sums payable under the Loan Documents (any of such Revolving Loans are herein referred to as "Protective Advances"); provided that the aggregate amount of outstanding Protective Advances plus the Revolving Credit Facility Usage shall not exceed the Aggregate Revolving Credit Commitment Amount. Protective Advances may be made even if the conditions precedent set forth in Section 4.2 have not been satisfied, shall constitute Obligations, shall be secured by the Liens in favor of the Administrative Agent (for the benefit of the Lenders) in and to the Collateral and shall accrue interest at the same rate as the Floating Rate. The Administrative Agent's authorization to make Protective Advances may be revoked at any time by the Required Lenders. At any time the conditions precedent set forth in Section 4.2 have been satisfied, the Administrative Agent may request the Revolving Lenders to make Revolving Loans to repay outstanding Protective Advances. At any other time the Administrative Agent may require the Revolving Lenders to fund their risk participations described in clause (b) below.

(b)      Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Revolving Commitment. From and after the date, if any, on which any Revolving Lender funds its participation in any Protective Advance purchased hereunder by making Revolving Loans, the Administrative Agent shall promptly distribute to such Revolving Lender, such Revolving Lender's pro rata share of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

**2.21**    **Option to Extend Maturity Date**.

(a)      The Borrowers shall have the option to extend the Maturity Date beyond November 15, 2019 if the following conditions are met:

(i)      the Maturity Date has not occurred on or before September 15, 2019;

(ii)      no Event of Default has occurred and is continuing, and no default exists which, with the passage of time and/or giving of notice, would become an Event of Default;

(iii)      the maximum outstanding balance of the Term Loan does not exceed $52,000,000; and

(iv)      for the Borrowers' fiscal year ended March 31, 2019:

(A)      Total Net Sales are not less than $327,000,000;

**Exhibit 1**
**67 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(B) EBITDA is not less than $21,500,000; and

(C) Gross Margin is not less than 20%.

(b) If the conditions set forth in Section 2.21(a) have been satisfied and the Borrowers wish to extend the Maturity Date for a period of one year, then the Borrowers shall give written notice to the Administrative Agent of the exercise of the extension option by no later than October 15, 2019, but not earlier than September 15, 2019. Such written notice shall include a Compliance Certificate as of the date of the notice and a certification that the conditions set forth in Section 2.21(a) have been met. Upon verification by the Administrative Agent of the matters set forth in the Compliance Certificate, the Revolving Loan Maturity Date and the Term Loan Maturity Date each shall be the earlier of (i) the date of acceleration of the Obligations in accordance with Section 9.2 and (ii) November 15, 2020.

### III. INCREASED COSTS; TAXES; ILLEGALITY; INDEMNITY

3.1 **Increased Costs**.

(a) <u>Increased Costs Generally</u>. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Adjusted LIBOR Rate) or the Issuing Lender;

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (ii) through (iv) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or the Issuing Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, the Issuing Lender or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, Issuing Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Issuing Lender or other Recipient, the Borrower will pay to such Lender, Issuing Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, Issuing Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     <u>Capital Requirements</u>.  If any Lender or the Issuing Lender determines that any Change in Law affecting such Lender or the Issuing Lender or any lending office of such Lender or such Lender's or the Issuing Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or the Issuing Lender's capital or on the capital of such Lender's or the Issuing Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit or Swing Line Loans held by, such Lender, or the Letters of Credit issued by the Issuing Lender, to a level below that which such Lender or the Issuing Lender or such Lender's or the Issuing Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Lender's policies and the policies of such Lender's or the Issuing Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or the Issuing Lender, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Lender or such Lender's or the Issuing Lender's holding company for any such reduction suffered.

(c)     <u>Certificates for Reimbursement</u>.  A certificate of a Lender or the Issuing Lender setting forth the amount or amounts necessary to compensate such Lender or the Issuing Lender or its holding company, as the case may be, as specified in this Section 3.1 and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     <u>Delay in Requests</u>.  Failure or delay on the part of any Lender or the Issuing Lender to demand compensation pursuant to this Section 3.1 shall not constitute a waiver of such Lender's or the Issuing Lender's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a Lender or the Issuing Lender pursuant to this Section 3.1 for any increased costs incurred or reductions suffered more than 9 months prior to the date that such Lender or the Issuing Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 9 month period referred to above shall be extended to include the period of retroactive effect thereof).

3.2     **Taxes**.

(a)     <u>Issuing Lender</u>.  For purposes of this Section 3.2, the term "<u>Lender</u>" includes the Issuing Lender and the term "<u>applicable Law</u>" includes FATCA.

(b)     <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of a Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Law.  If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an

Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.2) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)      <u>Payment of Other Taxes by the Borrower</u>.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)      <u>Indemnification by the Borrower</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.2) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  Each of the Loan Parties shall, and does hereby agree to, jointly and severally indemnify the Administrative Agent, and shall make payment in respect thereof within 10 days after demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required pursuant to Section 3.2(e) below.

(e)      <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the applicable Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii)  any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.8 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (e).

(f)      <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.2, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

**Exhibit 1**
**70 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(g)    Status of Lenders.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.2(g)(ii)(A), (g)(ii)(B) and (g)(ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower:

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

**Exhibit 1**
**71 of 132**

(2)     executed originals of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a Tax Compliance Certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed originals of IRS Form W-8BEN; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a Tax Compliance Certificate on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     <u>Treatment of Certain Refunds</u>.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.2 (including by the payment of additional amounts pursuant to this Section 3.2), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.2 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This clause shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

3.3     **Illegality**.  If any Lender determines that any Change in Law has made it unlawful for such Lender to make, maintain or fund LIBOR Rate Loans, or to determine or charge interest rates based upon the LIBOR Rate Option, or if any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue LIBOR Rate Loans or to convert Floating Rate Loans to LIBOR Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBOR Rate Loans of such Lender to Floating Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued and unpaid interest and all other amounts payable by Borrower under this Agreement on the amount so prepaid or converted.

3.4     **LIBOR Rate Option Unavailable; Interest After Default**.  Adjusted LIBOR Rate Unavailable.  If at any time:

**Exhibit 1**
**73 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(a)     the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that either Dollar deposits are not being offered to banks in the London interbank LIBOR Rate market or that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

(b)     the Required Lenders determine (which determination shall be conclusive and binding absent manifest error) that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to the lenders of making or maintaining the Loans for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (x) any request to make, convert or continue any Loan at the LIBOR Rate Option shall be ineffective, and (y) all Loans (other than Quoted Rate Loans) shall bear interest at the Floating Rate Option (determined as set forth in the proviso of the definition of "Floating Rate") from the date of such notice until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist.

3.5     **Indemnity**.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrowers shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Floating Rate Loan on a day other than the last day of the Interest Period or Quoted Rate Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrowers (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Floating Rate Loan on the date or in the amount notified by the Borrowers; or

(c)     any assignment of a LIBOR Rate Loan on a day other than the last day of the Interest Period therefor, or of a Quoted Rate Loan on a day other than the last day of the Quoted Rate Period therefor, in each case as a result of a request by the Borrowers pursuant to Section 3.6;

including any loss of anticipated profits and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrowers shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 3.5, each Lender shall be deemed to have funded each LIBOR Rate Loan made by it at the LIBOR Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such LIBOR Rate Loan was in fact so funded.

**Exhibit 1**
**74 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

3.6     **Mitigation Obligations; Replacement of Lenders**.

(a)     <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under Section 3.1, or requires any Loan Party to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.2, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or Section 3.2, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     <u>Replacement of Lenders</u>.  If any Lender requests compensation under Section 3.1, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.2 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.6(a) above or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.8), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.1 or 3.2) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that:

(i)     the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 11.8;

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in Letter of Credit drawings, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from a claim for compensation under Section 3.1 or payments required to be made pursuant to Section 3.2, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not conflict with applicable Law; and

(v)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

**Exhibit 1**
**75 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

3.7   **Survival**.  Each party's obligations under this Article III shall survive the resignation of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

## IV. CONDITIONS OF LENDING AND ISSUANCE OF LETTERS OF CREDIT

The obligation of each Lender to make Loans and of the Issuing Lender to issue Letters of Credit hereunder is subject to the performance by each of the Loan Parties of its Obligations to be performed hereunder at or prior to the making of any such Loans or issuance of such Letters of Credit and to the satisfaction of the following further conditions:

4.1   **First Loans and Letters of Credit**.

(a)   <u>Deliveries</u>.  On the Closing Date, the Administrative Agent shall have received each of the following in form and substance satisfactory to the Administrative Agent:

(i)   a certificate of each of the Loan Parties signed by a Compliance Officer of each such Loan Party, dated the Closing Date stating that (a) all representations and warranties of the Loan Parties set forth in this Agreement are true and correct in all material respects (including without limitation the representation as to solvency of the Loan Parties set forth in Section 5.19), (b) the Loan Parties are in compliance with each of the covenants and conditions hereunder, (c) no Event of Default or Default exists, and (d) no Material Adverse Change has occurred since the date of the last audited financial statements of the Borrower delivered to the Administrative Agent;

(ii)   a certificate dated the Closing Date and signed by the Secretary or an Assistant Secretary of each of the Loan Parties, certifying as appropriate as to: (a) all action taken by each Loan Party in connection with this Agreement and the other Loan Documents; (b) the names of the Authorized Officers authorized to sign the Loan Documents and their true signatures; and (c) copies of its Organizational Documents as in effect on the Closing Date certified by the appropriate state official where such documents are filed in a state office (if so filed or required to be so filed) together with certificates from the appropriate state officials as to the continued existence and good standing or existence (as applicable) of each Loan Party in each state where organized or qualified to do business;

(iii)   this Agreement and each of the other Loan Documents signed by an Authorized Officer and all appropriate financing statements required to be delivered pursuant to any of the Collateral Documents;

(iv)   customary written opinions of counsel for the Loan Parties, which shall include among other things a discussion of the potential impact of the Food Security Act, PACA, PASA and similar Laws on the first priority Lien of the Administrative Agent for

**Exhibit 1**
**76 of 132**

the benefit of the Lenders, duly executed (including any local counsel, if applicable), dated the Closing Date and in form and substance reasonably acceptable to the Administrative Agent;

(v)     evidence that adequate insurance required to be maintained under this Agreement is in full force and effect, with additional insured, mortgagee and lender loss payable special endorsements attached thereto in form and substance satisfactory to the Administrative Agent and its counsel naming the Administrative Agent as additional insured, mortgagee and lender loss payee, as applicable;

(vi)     a duly completed Compliance Certificate as of the last day of the calendar month most recently ended prior to the Closing Date, signed by a Compliance Officer of the Borrower;

(vii)     a Borrowing Base Report as of a date not more than 30 days prior to the Closing Date;

(viii)     a perfection certificate in form and substance satisfactory to the Administrative Agent;

(ix)     a duly completed, executed Request for Credit Extension for each Loan or Letter of Credit requested to be made on the Closing Date, including notice of election as to Interest Periods (if applicable);

(x)     all material governmental and third-party consents required to effectuate the transactions contemplated hereby;

(xi)     evidence that, concurrently with the closing hereof, all existing credit facilities between the Borrowers and Metropolitan Life Insurance Company will be terminated, all outstanding obligations thereunder will be paid in full, and all Liens securing such obligations will be released;

(xii)     a Lien search with respect to the Borrower and each other Loan Party, in scope satisfactory to the Administrative Agent and with results showing no Liens other than Permitted Liens and otherwise satisfactory to the Administrative Agent;

(xiii)     true, correct and complete copies of all Material Agreements not already delivered pursuant to clause (ii) above;

(xiv)     each of the following with respect to all real property owned by any Loan Party:

(A)     Mortgages;

(B)     a legal description of such real property constituting Collateral, sufficient for recording;

**Exhibit 1**
**77 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(C)     a commitment to issue an ALTA title insurance policy or policies insuring the Administrative Agent, for the benefit of the Lenders, in form acceptable to the Administrative Agent (including such endorsements as the Administrative Agent may require), insuring such Mortgage as a valid first priority Lien upon the property subject to such Mortgage subject only to such exceptions as are acceptable to the Administrative Agent;

(D)     to the extent available, an "as-built" survey or surveys complying with the Minimum Standard Detail requirements for ALTA/NSPS Land Title surveys, as most recently established and adopted, and meeting such minimum survey standards as the Administrative Agent may require, such survey or surveys to be certified in favor of the Administrative Agent for the benefit of the Lenders as to each of the real properties constituting Collateral;

(E)     Phase I environmental audits with respect to each of the real properties constituting Collateral, together with such other environmental information as the Administrative Agent may request;

(F)     evidence that the Loan Parties have taken all actions required under the Flood Laws and/or requested by the Administrative Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the real property constituting Collateral, including all real property to be subject to Mortgages required to be delivered pursuant to Section 6.13(ii), including, but not limited to:

(1)     providing the Administrative Agent with the address and/or GPS coordinates of each structure on any improved real property that will be subject to the Mortgage;

(2)     obtaining or providing the following documents:  (a) a completed standard "life-of-loan" flood hazard determination form, (b) if the improvement(s) to the improved real property is located in a special flood hazard area, a notification to the Borrower ("Borrower Notice") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community does not participate in the NFIP, and (c) documentation evidencing the Borrower's receipt of the Borrower Notice (*e.g.*, countersigned Borrower Notice, return receipt of certified U.S. Mail, or overnight delivery);

(3)     to the extent required under Section 6.4(b), obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral;

(xv)     an executed direction to pay proceeds letter with respect to any proceeds of the Loans being disbursed to third parties;

**Exhibit 1**
**78 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(xvi)   such financial statements, budgets, forecasts and other financial information as to the Loan Parties as the Administrative Agent or any other Lender may have required prior to the Closing Date;

(xvii)   at least 5 Business Days prior to the Closing Date, all documentation and other information requested by (or on behalf of) any Lender in order to comply with requirements of Anti-Terrorism Laws;

(xviii) by the Borrowers if the Borrowers have requested that any Fixed Rate Loans to be made on the Closing Date, a Funding Indemnity Letter duly executed; and

(xix)   such other documents in connection with such transactions as the Administrative Agent or said counsel may reasonably request.

(b)   <u>Payment of Fees</u>.  The Borrowers shall have paid all fees and expenses payable on or before the Closing Date as required by this Agreement, the Fee Letter or any other Loan Document.

4.2   **Each Loan or Letter of Credit**.  At the time of making or conversion of any Loans or issuing, extending, amending or increasing any Letters of Credit and after giving effect to the proposed extensions of credit: (i) the representations and warranties of the Loan Parties set forth in Article V of this Agreement shall then be true and correct, except such representations and warranties that are not qualified in this Agreement by reference to a Material Adverse Change shall then be true and correct in all material respects as of such date, (ii) no Event of Default or Default shall have occurred and be continuing, and (iii)  the Borrower shall have delivered a duly executed and completed Loan Request to the Administrative Agent for each Loan requested to be made pursuant to Sections 2.1(b), 2.2(b) and 2.3(c), or Letter of Credit Request to the Issuing Lender for each Letter of Credit to be issued pursuant to Section 2.9(a), as the case may be.

## V. REPRESENTATIONS AND WARRANTIES

The Loan Parties, jointly and severally, represent and warrant to the Administrative Agent and each of the Lenders as follows:

5.1   **Organization and Qualification**.  Each Loan Party and each Subsidiary of each Loan Party (a) is a corporation, partnership or limited liability company or other entity as identified on Schedule 5.6, in each case duly organized, validly existing and in good standing under the laws of its jurisdiction of organization specified on Schedule 5.6, (b) has the lawful power to own or lease its properties and to engage in the business it presently conducts or proposes to conduct, and (c) is duly licensed or qualified and in good standing in each jurisdiction listed on Schedule 5.1 and in all other jurisdictions where the property owned or leased by it or the nature of the business transacted by it or both makes such licensing or qualification necessary except where the failure to be so duly licensed or qualified could not reasonably be expected to result in a Material Adverse Change.

**Exhibit 1**
**79 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

5.2     **Compliance With Laws**.

(a)     Each Loan Party and each Subsidiary of each Loan Party is in compliance with all applicable Laws in all jurisdictions in which any Loan Party or Subsidiary of any Loan Party is presently or currently foresees that it will be doing business except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

(b)     Without limiting the foregoing clause (a), each Loan Party and each Subsidiary of each Loan Party is in compliance with (i) all Applicable Food and Feed Safety Laws and (ii) such Loan Party's or Subsidiary's own policies and procedures that it implemented to comply with Applicable Food and Feed Safety Laws, in each case, except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

(c)     None of the entry into and performance by any Loan Party of the Loan Documents to which it is a party, making of the Loans or any issuance, extension or increase of any Letter of Credit contravenes any Law applicable to such Loan Party or its Subsidiary of any of the Lenders.

5.3     **Title to Properties**.  Each Loan Party and each Subsidiary of each Loan Party (a) has good and marketable title to or valid leasehold interest in all properties, assets and other rights that it purports to own or lease or that are reflected as owned or leased on its books and records, and (b) owns or leases all of its properties free and clear of all Liens except Permitted Liens.

5.4     **Investment Company Act**.  None of the Loan Parties or Subsidiaries of any Loan Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940 or under the "control" of an "investment company" as such terms are defined in the Investment Company Act of 1940 and shall not become such an "investment company" or under such "control."

5.5     **Event of Default**.  No Event of Default or Default exists or is continuing.

5.6     **Subsidiaries and Owners**.  Schedule 5.6 states (a) the name of each of the Borrowers' Subsidiaries, its jurisdiction of organization and the amount, percentage and type of equity interests in such Subsidiary (the "Subsidiary Equity Interests"), and (b) any options, warrants or other rights outstanding to purchase any such equity interests referred to in clause (a) (collectively, the "Equity Interests").  Each Borrower has good and marketable title to all of the Subsidiary Equity Interests it purports to own, free and clear in each case of any Lien and all such Subsidiary Equity Interests have been validly issued, fully paid and nonassessable.

5.7     **Power and Authority; Validity and Binding Effect**.

(a)     Each Loan Party and each Subsidiary of each Loan Party has the full power to enter into, execute, deliver and carry out this Agreement and the other Loan Documents to which it is a party, to incur the Indebtedness contemplated by the Loan Documents and to perform its Obligations under the Loan Documents to which it is a party, and all such actions have been duly authorized by all necessary proceedings on its part.

**Exhibit 1**
**80 of 132**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(b)     This Agreement and each of the other Loan Documents (i) has been duly and validly executed and delivered by each Loan Party, and (ii) constitutes, or will constitute, legal, valid and binding obligations of each Loan Party that is or will be a party thereto, enforceable against such Loan Party in accordance with its terms, except to the extent that enforcement thereof may be limited by an applicable bankruptcy, insolvency or similar laws now or hereafter in effect affecting creditors' rights generally and by general principles of equity.

5.8     **No Conflict; Material Agreements; Consents**.  Neither the execution and delivery of this Agreement or the other Loan Documents by any Loan Party nor the consummation of the transactions herein or therein contemplated or compliance with the terms and provisions hereof or thereof by any of them will conflict with, constitute a default under or result in any breach of (i) the terms and conditions of the Organizational Documents of any Loan Party, (ii) any Material Agreement to which any Loan Party or any of its Subsidiaries is a party or by which it or any of its Subsidiaries is bound or to which it is subject, or (iii) any applicable Law or any order, writ, judgment, injunction or decree to which any Loan Party or any of its Subsidiaries is a party or by which it or any of its Subsidiaries is bound or to which it is subject, or result in the creation or enforcement of any Lien, charge or encumbrance whatsoever upon any property (now or hereafter acquired) of any Loan Party or any of its Subsidiaries (other than Liens granted under the Loan Documents).  There is no default under any Material Agreement or order, writ, judgment, injunction or decree of any Governmental Authority to which any Loan Party or any of its Subsidiaries is a party or by which it or any of its Subsidiaries is bound or to which it is subject that could reasonably be expected to result in a Material Adverse Change.  None of the Loan Parties or their Subsidiaries is bound by any contractual obligation (including without limitation pursuant to any Material Agreement), or subject to any restriction in any of its Organizational Documents, or any requirement of Law that could reasonably be expected to result in a Material Adverse Change.  Except as set forth in Schedule 5.8, no consent, approval, exemption, order or authorization of, or a registration or filing with, any Governmental Authority or any other Person is required by any Law or any agreement (including without limitation any Material Agreement) in connection with the execution, delivery and carrying out of this Agreement and the other Loan Documents.  Each of the Loan Parties' Material Agreements is in full force and effect, and no Loan Party has received any notice of termination, revocation or other cancellation (before any scheduled date for termination) in respect thereof.

5.9     **Litigation**.  There are no actions, suits, proceedings or investigations pending or, to the knowledge of any Loan Party, threatened against such Loan Party or any Subsidiary of such Loan Party at law or in equity before any Governmental Authority that individually or in the aggregate could reasonably be expected to result in a Material Adverse Change other than those set forth on Schedule 5.9.  None of the Loan Parties or any Subsidiaries of any Loan Party is in violation of any order, writ, injunction or any decree of any Governmental Authority that could reasonably be expected to result in a Material Adverse Change.

5.10   **Financial Statements**.

(a)     <u>Audited Financial Statements</u>.  The audited financial statements delivered on or before the Closing Date in accordance with Section 4.1(a) and thereafter most recently delivered in accordance with Section 6.1(b) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein;

**Exhibit 1**
**81 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(ii) fairly present the financial condition of the Borrowers and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Borrowers and their Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)     Unaudited Financial Statements. The unaudited financial statements delivered on or before the Closing Date in accordance with Section 4.1(a) and thereafter most recently delivered by the Borrowers in accordance with Section 6.1(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrowers and their Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

(c)     Material Adverse Change.  Since October 31, 2017, no Material Adverse Change has occurred.

5.11    **Margin Stock**.  None of the Loan Parties or any Subsidiaries of any Loan Party engages or intends to engage principally, or as one of its important activities, in the business of extending credit for the purpose, immediately, incidentally or ultimately, of purchasing or carrying margin stock (within the meaning of Regulation U, T or X as promulgated by the Board).  No part of the proceeds of any Loan has been or will be used, immediately, incidentally or ultimately, to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or that is inconsistent with the provisions of the regulations of the Board.  None of the Loan Parties or any Subsidiary of any Loan Party holds or intends to hold margin stock in such amounts that more than 25% of the reasonable value of the assets of any Loan Party or Subsidiary of any Loan Party are or will be represented by margin stock.

5.12    **Full Disclosure**.   Neither this Agreement nor any other Loan Document, nor any certificate, statement, agreement or other documents furnished to the Administrative Agent or any Lender in connection herewith or therewith, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading; provided that, with respect to any projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.13    **Taxes**.  All federal, state, local and other tax returns required to have been filed with respect to each Loan Party and each Subsidiary of each Loan Party have been filed, and payment or adequate provision has been made for the payment of all taxes, fees, assessments and other governmental charges that have or may become due pursuant to said returns or to assessments received, except to the extent that such taxes, fees, assessments and other charges are being contested in good faith by appropriate proceedings diligently conducted and for which such reserves or other appropriate provisions, if any, as shall be required by GAAP shall have been made.

**Exhibit 1**
**82 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

5.14 **Intellectual Property; Other Rights**. Each Loan Party and each Subsidiary of each Loan Party owns or possesses all the Intellectual Property and all services marks, trade names, domain names, licenses, registrations, franchises, permits and other rights necessary to own and operate its properties and to carry on its business as presently conducted and planned to be conducted by such Loan Party or Subsidiary, without known possible, alleged or actual conflict with the rights of others, except to the extent that the failure to so own or possess such Intellectual Property could not reasonably be expected to result in a Material Adverse Change.

5.15 **Liens in the Collateral**. The Liens in the Collateral granted to the Administrative Agent for the benefit of the Lenders pursuant to the Collateral Documents constitute and will continue to constitute Prior Security Interests in and to the Collateral. All filing fees and other expenses in connection with the perfection of such Liens have been or will be paid by the Borrowers.

5.16 **Insurance**.

(a)     The properties of each Loan Party and each of its Subsidiaries are insured pursuant to policies and other bonds that are valid and in full force and effect and that provide coverage satisfying or surpassing the requirements set forth in Section 6.4(a).

(b)     Each Loan Party, to the extent required under the Flood Laws, has obtained flood insurance for such structures and contents constituting Collateral located in a flood hazard zone pursuant to policies that are valid and in full force and effect and which provide coverage meeting the requirements of Section 6.4(b).

5.17 **ERISA Compliance**.

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Loan Parties, nothing has occurred that would prevent, or cause the loss of, such qualification. The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan and multiemployer Plan that are required by the Plan Funding Rules, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan or Multiemployer Plan.

(b)     There are no pending or, to the best knowledge of any Loan Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to result in a Material Adverse Change. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that could reasonably be expected to result in a Material Adverse Change.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Plan or, to the Borrowers' actual knowledge, multiemployer Plan has any unfunded pension liability (*i.e.*, excess of benefit liabilities over the current value of that Plan's or multiemployer Plan's assets, determined in accordance with the assumptions used for funding the Plan or multiemployer Plan for the applicable plan year); (iii) no Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect

**Exhibit 1**
**83 of 132**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

to any Plan or, to the Borrowers' actual knowledge, multiemployer Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred that, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a multiemployer Plan; (v) no Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA; (vi) as of the most recent valuation date for any Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and no Loan Party nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date; and (vii) no Plan or, to the Borrowers' actual knowledge, multiemployer Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan or multiemployer Plan.

5.18   **Environmental Matters**.  Except as disclosed on Schedule 5.18:

(a)   To the Borrower's knowledge the facilities and properties currently or formerly owned, leased or operated by any of the Loan Parties (the "Properties") do not contain any Hazardous Materials attributable to the Loan Parties' ownership, lease or operation of the Properties in amounts or concentrations or stored or utilized which (i) constitute or constituted a violation of Environmental Laws, or (ii) could reasonably be expected to give rise to any Environmental Liability, in each case to the extent that such violation or Environmental Liability, either individually or in the aggregate, could reasonably be expected to cause a Material Adverse Change.

(b)   None of the Loan Parties has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to their activities at any of the Properties or the business operated by the Loan Parties (the "Business"), or any prior business for which any Loan Party has retained liability under any Environmental Law; and

(c)   Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could reasonably be expected to give rise to any Environmental Liability for any Loan Parties in an aggregate amount in excess of the Threshold Amount, nor have any Hazardous Materials been generated, treated, stored or disposed of by or on behalf of any Loan Party at, on or under any of the Properties in violation of Environmental Laws, or in a manner that could reasonably be expected to give rise to, Environmental Liability in an aggregate amount in excess of the Threshold Amount.

5.19   **Solvency**.  Before and after giving effect to the initial Loans hereunder, each Borrower alone is, and the Loan Parties taken as a whole are, Solvent.

5.20   **Sanctions; Anti-Terrorism Laws; Anti-Corruption Laws**.  None of the Loan Parties and their Subsidiaries and Affiliates, nor (to the Borrower's knowledge) any Director, officer, employee or agent of any Loan Party or any Subsidiary, is (a) a Sanctioned Person, (b) engaged

**Exhibit 1**
**84 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

in any business involved in making or receiving any contribution of funds, goods or services to or for the benefit of such Person or in any transaction that evades or avoids, or has the purpose of evading or avoiding, the prohibitions set forth in any Anti-Terrorism Law or Anti-Corruption Law, or (c) otherwise in violation of any Anti-Terrorism Law or Anti-Corruption Law.

5.21 **Compliance with Food Security Act and Agricultural Lien Statutes**. Each Loan Party is in compliance with all applicable Agricultural Lien Statutes, except where the failure to comply could not reasonably be expected to result in a Material Adverse Change.

5.22 **Agricultural Licenses**. Except as set forth on Schedule 5.22, or the perfection certificate delivered at Closing, (a) no Loan Party is required to maintain any Agricultural Licenses or presently maintains any Agricultural Licenses and (b) no Loan Party is a "packer", "dealer" or a "broker" as defined in any Agricultural Lien Statute.

## VI. AFFIRMATIVE COVENANTS

The Loan Parties, jointly and severally, covenant and agree that until Payment In Full of the Obligations, the Loan Parties shall comply at all times with the following covenants:

6.1 **Reporting Requirements**. The Loan Parties will furnish or cause to be furnished to the Administrative Agent and each of the Lenders:

(a) _Monthly Financial Statements_. As soon as available and in any event within 30 calendar days after the end of each calendar month, financial statements of the Borrowers and their Subsidiaries, consisting of a consolidating and consolidated balance sheet as of the end of such calendar month and related consolidating and consolidated statements of income, stockholders equity and cash flows for the calendar month then ended and the fiscal year through that date, all in reasonable detail and certified (subject to normal year-end audit adjustments) by a Compliance Officer of the Borrowers as having been prepared in accordance with GAAP, consistently applied, and setting forth in comparative form the budget and the respective financial statements for the corresponding date and period in the previous fiscal year. Each such financial statement shall be accompanied by a management narrative explaining the results of operations and changes in financial condition, in form and substance acceptable to the Administrative Agent.

(b) _Annual Financial Statements_. As soon as available and in any event within 90 calendar days after the end of each fiscal year of the Borrowers, audited financial statements of the Borrowers and their Subsidiaries consisting of a consolidating and consolidated balance sheet as of the end of such fiscal year, and related consolidating and consolidated statements of income, stockholders' equity and cash flows for the fiscal year then ended, all in reasonable detail and setting forth in comparative form the financial statements as of the end of and for the preceding fiscal year, and certified by independent certified public accountants of nationally recognized standing reasonably satisfactory to the Administrative Agent. The certificate or report of accountants shall be free of qualifications and shall not indicate the occurrence or existence of any event, condition or contingency that would materially impair the prospect of payment or performance of any covenant, agreement or duty of any Loan Party under any of the Loan Documents. The Loan Parties shall deliver with such financial statements and certification

**Exhibit 1**
**85 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

by their accountants a letter of such accountants to the Administrative Agent and the Lenders substantially to the effect that, based upon their ordinary and customary examination of the affairs of the Borrowers, performed in connection with the preparation of such consolidated financial statements, and in accordance with GAAP, they are not aware of the existence of any condition or event that constitutes an Event of Default or Default or, if they are aware of such condition or event, stating the nature thereof. In addition, the Borrowers will deliver a management narrative explaining the results of operations and changes in financial condition over the past year, in form and substance acceptable to the Administrative Agent. The Borrowers shall deliver audited financial statements for the fiscal year ended March 31, 2017 within 30 days after the Closing Date.

(c)     <u>Compliance Certificates</u>**.**  Concurrently with the financial statements of the Borrowers furnished to the Administrative Agent and to the Lenders pursuant to Sections (a) and (b), a Compliance Certificate duly executed by a Compliance Officer of the Borrowers.

(d)     <u>Borrowing Base Reports</u>**.** Not later than the last day of each calendar month, a properly completed Borrowing Base Report as of the last day of the preceding calendar month, including Inventory, agings of the Accounts and accounts payable of the Loan Parties as of the end of such preceding calendar month and such other information as the Administrative Agent from time to time may reasonably request.

(e)     <u>Other Reports</u>.

(i)     <u>Annual Budget</u>.  The annual budget and any forecasts or projections of the Borrowers, to be supplied not later than 30 days prior to the commencement of each fiscal year to include monthly income statements, balance sheet and cash flow projections.

(ii)     <u>Management Letters</u>.  Promptly upon their becoming available to the Borrowers, any reports, including management letters submitted, to the Borrowers by independent accountants in connection with any annual, interim or special audit.

(iii)     <u>Cash Flow Forecasts</u>.  Within 15 days after the end of each month, a rolling 13-week cash flow forecast for the Borrowers.  After March 31, 2019, the Borrowers may request approval by the Required Lenders to cease providing such forecasts.

(iv)     <u>Planned Asset Sale Reports</u>.  Within 15 days after the end of each month, a written report detailing the Borrowers' activities and progress toward closing the Planned Asset Sales, until such time as all Planned Asset Sales have been completed.

(v)     <u>Crop and Pool Economic Values</u>.  Within 5 days after approval by the Borrowers' Board of Directors, copies of the Crop Economic Value Determination and the Pool Economic Value Determination (as such terms are used in the Borrowers' business), including an explanation of any adjustments.

(f)     <u>Notices</u>.

(i)     Default.  Promptly after any officer of any Loan Party has learned of the occurrence of an Event of Default or Default, a certificate signed by an Authorized Officer setting forth the details of such Event of Default or Default and the action that such Loan Party proposes to take with respect thereto.

(ii)    Litigation.  Promptly after the commencement thereof, notice of all actions, suits, proceedings or investigations before or by any Governmental Authority or any other Person against any Loan Party or Subsidiary of any Loan Party that relate to the Collateral, involve a claim or series of claims equal to or in excess of the Threshold Amount or that if adversely determined could reasonably be expected to result in a Material Adverse Change.

(iii)   Agricultural Lien Notices and Enforcement Actions.  Promptly following the receipt thereof, any notice (written or otherwise) from any Producer, unpaid seller, supplier, agent or secured party indicating such Person's intent to claim or preserve the benefits of any trust under any Agricultural Lien Statute or of any Lien in any "farm products" (as defined in the UCC) under applicable Law; and promptly following the Borrowers' knowledge thereof, notice of any action commenced against any Loan Party or any Subsidiary of any Loan Party by (A) any beneficiary of any such Lien to enforce such Lien or (B) any Governmental Authority or any beneficiary of a trust created under any Agricultural Lien Statute to enforce payment from such trust.

(iv)    Deficiency Notices.  Promptly following the receipt thereof by any Loan Party or Subsidiary, any warning letter from any Governmental Authority in connection with a Loan Party's or Subsidiary's failure to adequately address any Form 483 observations or any other Governmental Authority findings relating to the conditions, procedures or products in any Loan Party's or Subsidiary's facilities.

(v)     Organizational Documents.    Within the time limits set forth in Section 7.13, any amendment to the Organizational Documents.

(vi)    Material Agreements.  Any material amendment, supplement, waiver or other modification to any of the Material Agreements, or any notice of default or of termination, cancellation or revocation (prior to any scheduled date of termination) delivered thereunder.

(vii)   Erroneous Financial Information.  Immediately in the event that the Borrowers or their accountants conclude or advise that any previously issued financial statement, audit report or interim review should no longer be relied upon or that disclosure should be made or action should be taken to prevent future reliance.

(viii)  ERISA Event.  Immediately upon the occurrence of any ERISA Event or any event reasonably expected to result in an ERISA Event.

(g)     Other Information.  Such other reports and information as any of the Lenders may from time to time reasonably request.

**Exhibit 1**
**87 of 132**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

6.2 **Preservation of Existence, Etc.** Each Loan Party shall, and shall cause each of its Subsidiaries to, maintain (a) its legal existence as a corporation, limited partnership or limited liability company or other entity, as the case may be as of the Closing Date or the date of formation or acquisition thereof, except as otherwise expressly permitted in Section 7.6, (b) its license or qualification and good standing in each jurisdiction in which its ownership or lease of property or the nature of its business makes such license or qualification necessary and the failure to be so licensed or qualified could reasonably be expected to result in a Material Adverse Change, and (c) all licenses, franchises, permits and other authorizations and Intellectual Property, the loss, revocation, termination, suspension or adverse modification of which could reasonably be expected to result in a Material Adverse Change.

6.3 **Payment of Liabilities, Including Taxes, Etc.** Each Loan Party shall, and shall cause each of its Subsidiaries to, duly pay and discharge all Material Indebtedness and other material liabilities (including all lawful claims that, if unpaid, would by Law become a Lien on the assets of any Loan Party) to which it is subject or that are asserted against it, promptly as and when the same shall become due and payable, including all taxes, assessments and governmental charges upon it or any of its properties, assets, income, prior to the date on which penalties attach thereto, except to the extent that (i) such Material Indebtedness or other material liability is being diligently contested in good faith by appropriate actions, (ii) such reserves or other appropriate provisions, if any, as shall be required by GAAP have been made with respect thereto, and (iii) no foreclosure or similar proceedings have been commenced or notice of Liens filed with respect thereto.

6.4 **Maintenance of Insurance**.

(a) Each Loan Party shall, and shall cause each of its Subsidiaries to, insure its properties and assets against loss or damage by fire and such other insurable hazards as such assets are commonly insured (including fire, extended coverage, property damage, workers' compensation, public liability and business interruption insurance) and against other risks (including errors and omissions) in such amounts as similar properties and assets are insured by prudent companies in similar circumstances carrying on similar businesses, and with reputable and financially sound insurers, including self-insurance to the extent customary, all as reasonably determined by the Administrative Agent. Such insurance policies shall contain additional insured, mortgagee and lender loss payable special endorsements in form and substance satisfactory to the Administrative Agent naming the Administrative Agent as additional insured, mortgagee and lender loss payee, as applicable, and providing the Administrative Agent with notice of cancellation acceptable to the Administrative Agent.

(b) Each Loan Party shall, to the extent required under the Flood Laws, obtain and maintain flood insurance for such structures and contents constituting Collateral located in a flood hazard zone, in such amounts as similar structures and contents are insured by prudent companies in similar circumstances carrying on similar businesses and otherwise satisfactory to the Administrative Agent.

6.5 **Maintenance of Properties and Leases**. Each Loan Party shall, and shall cause each of its Subsidiaries to, maintain in good repair, working order and condition (ordinary wear and tear excepted) in accordance with the general practice of other businesses of similar character and

size, all of those properties useful or necessary to its business, and from time to time, such Loan Party will make or cause to be made all appropriate repairs, renewals or replacements thereof.

6.6    **Visitation Rights**.  Each Loan Party shall, and shall cause each of its Subsidiaries to, permit any of the officers or authorized employees or representatives of the Administrative Agent or any of the Lenders to visit and inspect during normal business hours any of its properties and to examine and make excerpts from its books and records and discuss its business affairs, finances and accounts with its officers and to conduct reviews of each Loan Party's assets (which reviews may occur on an annual basis or more frequently, as determined by the Administrative Agent, in its sole discretion), all in such detail and at such times and as often as the Required Lenders may reasonably request, all at the Borrowers' expense, <u>provided</u> that prior to the occurrence of an Event of Default the Administrative Agent shall provide the Borrowers with reasonable notice prior to any visit or inspection, and provided further that all actions of the Administrative Agent and any of its Related Parties with respect thereto comply with all applicable laws and Borrowers' reasonable safety requirements or procedures applicable to such assets and properties.  Prior to occurrence of an Event of Default, the Administrative Agent shall not request reimbursement from the Borrowers for more than 2 such Collateral audits in any calendar year.

6.7    **Keeping of Records and Books of Account**.  The Loan Parties shall, and shall cause each Subsidiary of the Borrower to, maintain and keep proper books of record and account that enable the Borrowers and their Subsidiaries to issue financial statements in accordance with GAAP and as otherwise required by applicable Laws of any Governmental Authority having jurisdiction over the Borrowers or any Subsidiary, and in which full, true and correct entries shall be made in all material respects of all its dealings and business and financial affairs.

6.8    **Compliance with Laws; Use of Proceeds**.

(a)    Each Loan Party shall, and shall cause each of its Subsidiaries to, comply with all applicable Laws (other than Environmental Laws, which are subject to Section 6.8(b)), in all respects; provided that it shall not be deemed to be a violation of this Section 6.8(a) if any failure to comply with any Law would not result in fines, penalties, remediation costs, other similar liabilities or injunctive relief that, in the aggregate, could reasonably be expected to result in a Material Adverse Change.

(b)    Each Loan Party shall (i) conduct its operations and keep and maintain its real property in material compliance with all Environmental Laws and environmental permits; (ii) obtain and renew all environmental permits necessary for its operations and properties; and (iii) implement any and all investigation, remediation, removal and response actions that are necessary to maintain the value and marketability of the real property or to otherwise comply with Environmental Laws pertaining to any of its real property (provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such investigation, remediation, removal, response or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP).

**Exhibit 1**
**89 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(c)     Each Loan Party shall, and shall cause each of its Subsidiaries to, comply with all Material Agreements to which it is a party in all respects.

(d)     Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by the Loan Parties, their Subsidiaries and their Directors, officers, employees and agents with Anti-Terrorism Laws and Anti-Corruption Laws.

(e)     The Loan Parties will use the Letters of Credit and the proceeds of the Loans only in accordance with Section 6.11 and as permitted by applicable Law.

(f)     Each Loan Party shall, and shall cause each of its Subsidiaries to, comply with the policies and procedures that it implemented to comply with Applicable Food and Feed Safety Laws; in each case except where the failure to do so could not reasonably be expected to result in a Material Adverse Change.

6.9     **Further Assurances**.

(a)     <u>Generally</u>.  Each Loan Party shall, from time to time, at its expense, preserve and protect the Administrative Agent's Lien on and Prior Security Interest in the Collateral and all other real and personal property of the Loan Parties whether now owned or hereafter acquired (excluding Excluded Property and any asset with respect to which the Administrative Agent affirmatively releases its Lien) as a continuing Prior Security Interest therein, subject only to Permitted Liens, and shall do such other acts and things as the Administrative Agent in its reasonable discretion may deem necessary or advisable from time to time in order to preserve, perfect and protect the Liens granted or purported to be granted under the Loan Documents and to exercise and enforce its rights and remedies thereunder with respect to the Collateral. The Administrative Agent may elect not to request any documents, instruments, filings or opinions as contemplated by this Section 6.9 or the Security Agreement if it determines in its sole discretion that the costs to the Borrowers of perfecting a security interest or Lien in such property exceeds the relative benefit of such property to the Lenders.

(b)     <u>Additional Subsidiaries</u>.  In furtherance, and not in limitation, of Section 6.9(a), each Loan Party agrees that, promptly after the creation or acquisition by such Loan Party of any Subsidiary (and in any event within 30 days after such creation or acquisition, as such time period may be extended by the Administrative Agent in its sole discretion) to cause such created or acquired Subsidiary Person to (i) become a Guarantor by delivering to the Administrative Agent a duly executed joinder in accordance with Section 12.10, (ii) grant a security interest in all Collateral owned by such Subsidiary by delivering to the Administrative Agent a duly executed supplement to each applicable Loan Document or such other document as the Administrative Agent shall deem appropriate for such purpose and comply with the terms of each applicable Loan Document, (iii) deliver to the Administrative Agent such opinions, documents and certificates as may be reasonably requested by the Administrative Agent, (iv) deliver to the Administrative Agent such original certificated Equity Interests or other certificates and stock or other transfer powers evidencing the Equity Interests of such Person, (v) deliver to the Administrative Agent such updated Schedules to the Loan Documents as requested by the Administrative Agent with respect to such Person, and (vi) deliver to the Administrative Agent such other documents as may be reasonably requested by the

Administrative Agent, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(c)     <u>Real Property</u>.  In furtherance, and not in limitation, of Section 6.9(a), the Loan Parties shall (i) within 30 days after the acquisition of any Material Real Property by any Loan Party that is not subject to an existing mortgage or deed of trust in favor of the Administrative Agent, for the benefit of the Lenders, notify the Administrative Agent, (ii) within 90 days after such acquisition (as such time period may be extended by the Administrative Agent, in its sole discretion), deliver such mortgages, deeds of trust, title insurance policies, environmental reports, surveys and other documents reasonably requested by the Administrative Agent in connection with granting and perfecting a first priority Lien, other than Permitted Liens, on such Material Real Property in favor of the Administrative Agent, for the ratable benefit of the Lenders, all in form and substance acceptable to the Administrative Agent, and (iii) within 90 days after notice from the Administrative Agent in its sole discretion at any time, deliver such mortgages, deeds of trust, title insurance policies, environmental reports, surveys and other documents reasonably requested by the Administrative Agent in connection with granting and perfecting a first priority Lien, other than Permitted Liens, on any real property owned or leased by any Loan Party in favor of the Administrative Agent, for the ratable benefit of the Lenders, all in form and substance acceptable to the Administrative Agent.

6.10     **CoBank Equity**.  So long as CoBank is a Lender hereunder, the Borrowers will (a) maintain their status as an entity eligible to borrow from CoBank and (b) acquire equity in CoBank in such amounts and at such times as CoBank may require in accordance with CoBank's Bylaws and Capital Plan (as each may be amended from time to time), except that the maximum amount of equity that the Borrowers may be required to purchase in CoBank in connection with the Loans made by CoBank may not exceed the maximum amount permitted by the Bylaws and the Capital Plan at the time this Agreement is entered into. The Borrowers acknowledge receipt of a copy of (i) CoBank's most recent annual report, and if more recent, CoBank's latest quarterly report, (ii) CoBank's Notice to Prospective Stockholders and (iii) CoBank's Bylaws and Capital Plan, which describe the nature of all of the Borrowers' cash patronage, stock and other equities in CoBank acquired in connection with its patronage loan from CoBank (the "CoBank Equities") as well as capitalization requirements, and agrees to be bound by the terms thereof.

6.11     **Use of Proceeds**.  The proceeds of the Term Loan and any Revolving Loans made on the Closing Date shall be used for the prepayment of the obligations described in Section 4.1(a)(xi), all obligations owed to the Lenders under that certain Third Amended and Restated Loan and Security Agreement, dated as of October 30, 2015, as amended and supplemented from time to time, and for general corporate purposes of the Borrowers and their Subsidiaries not in contravention of any Laws.  The proceeds of all other Revolving Loans and Swing Line Loans shall be used for working capital and general corporate purposes of the Borrowers and their Subsidiaries not in contravention of any Laws, including the payment of certain fees and expenses incurred in connection with the this Agreement.

6.12     **Updates to Schedules**.  Concurrently with the delivery of financial statements under Section 6.1 as of the end of the last month of any fiscal quarter, the Borrowers shall provide the Administrative Agent in writing with such revisions or updates to the Schedules referred to in

**Exhibit 1**
**91 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

this Agreement as may be necessary or appropriate to update or correct any information or disclosures provided therein that have become outdated or incorrect in any material respect. No such Schedule shall be deemed to have been amended, modified or superseded by any such correction or update, nor shall any breach of warranty or representation resulting from the inaccuracy or incompleteness of any such Schedule be deemed to have been cured thereby, unless and until the Administrative Agent, in its discretion, shall have accepted in writing such revisions or updates to such Schedule; provided, however, that the Borrower may update Schedule 5.6 without any Lender approval in connection with any transaction not prohibited under Sections 7.6, 7.7 and 7.9.

6.13 **Post-Closing Deliveries**. To the extent not delivered on the Closing Date, the Borrowers shall deliver to the Administrative Agent each of the following, each in form and substance satisfactory to the Administrative Agent, not later than 30 days after the Closing Date (or such later date as agreed by the Administrative Agent in its sole discretion):

(i) account control agreements with respect to all deposit accounts, securities accounts and commodities accounts maintained by any Loan Party, including ScotiaBank, Columbia Bank and Key Bank;

(ii) each of the following (in each case, to the extent not previously delivered pursuant to Section 4.1(a):

(A) Mortgages with respect to all Material Real Property owned or leased by any Loan Party;

(B) a legal description of each parcel of such Material Real Property, compatible with the survey described below and sufficient for recording;

(C) an ALTA title insurance policy or policies insuring the Administrative Agent, for the benefit of the Lenders, and in form acceptable to the Administrative Agent (including such endorsements as the Administrative Agent may require), insuring each Mortgage as a valid first priority Lien upon the property subject to such Mortgage subject only to such exceptions as are acceptable to the Administrative Agent;

(D) an "as-built" survey or surveys complying with the Minimum Standard Detail requirements for ALTA/ACSM Land Title surveys, as most recently established and adopted, and meeting such minimum survey standards as the Administrative Agent may require, such survey or surveys to be certified in favor of the Administrative Agent for the benefit of the Lenders as to each of the real properties constituting Collateral;

(E) Phase I environmental audits with respect to each of the real properties constituting Collateral, together with such other environmental information as the Administrative Agent may request;

(F) evidence that the Loan Parties have taken all actions required under the Flood Laws and/or requested by the Administrative Agent to assist in

ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to:

        (1)      providing the Administrative Agent with the address and/or GPS coordinates of each structure on any improved real property that will be subject to the Mortgage;

        (2)      obtaining or providing the following documents: (a) a completed standard "life-of-loan" flood hazard determination form, (b) if the improvement(s) to the improved real property is located in a special flood hazard area, a notification to the Borrower ("Borrower Notice") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community does not participate in the NFIP, and (c) documentation evidencing the Borrower's receipt of the Borrower Notice (*e.g.*, countersigned Borrower Notice, return receipt of certified U.S. Mail, or overnight delivery),

        (3)      to the extent required under Section 6.4(b), obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral; and

    (iii)    an executed Landlord Agreement from the lessor, warehouse operator or other applicable Person for each leased Collateral location;

    (iv)    title insurance policies with respect to each Mortgage;

    (v)    all appropriate stock powers and certificates evidencing the pledged Collateral and all other original items required to be delivered pursuant to any of the Collateral Documents;

    (vi)    subordination and nondisturbance agreements executed by any lessees of real property owned by the Borrowers, each in form and substance satisfactory to the Administrative Agent in its sole discretion;

    (vii)    copies of all Material Agreements not previously delivered, including ground leases, development agreements and operating agreements between the Borrowers and Henningsen Cold Storage Co.; and

    (viii)    a certificate signed by the Secretary or an Assistant Secretary of each of the Loan Parties, certifying as appropriate as to all action taken by each Loan Party in connection with this Agreement and the other Loan Documents, including corporate resolutions in form and substance satisfactory to the Administrative Agent.

Notwithstanding any other provision of this Agreement, the Administrative Agent may waive any of the foregoing requirements if the Administrative Agent determines in its sole discretion that the burden of requiring such compliance outweighs the benefits expected to be afforded thereby.

## VII. NEGATIVE COVENANTS

7.1    **Indebtedness**.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, at any time create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under this Agreement and the other Loan Documents;

(b)    Indebtedness under Demand Patron Notes and other promissory notes payable to members of the Borrower not exceeding (as to all such Demand Patron Notes and other promissory notes) $1,000,000 in outstanding amount at any one time;

(c)    Indebtedness consisting of Supplier Payables owing to the applicable Producers or other sellers that are either unsecured or secured only by Purchase Money Security Interests;

(d)    unsecured Indebtedness of a Loan Party to another Loan Party;

(e)    Guaranties by any Loan Parties of Indebtedness permitted hereunder;

(f)    other Indebtedness (including obligations under Capital Leases) that is either unsecured or secured only by Purchase Money Security Interests in fixed assets, so long as the aggregate amount of all such Indebtedness (whether secured or unsecured) does not exceed $1,000,000;

(g)    Indebtedness under performance bonds, surety bonds, release, appeal and similar bonds, statutory obligations or with respect to workers' compensation claims, health, disability or other employee benefits or property, casualty or liability insurance, in each case incurred in the ordinary course of business, and reimbursement obligations in respect of any of the foregoing; and

(h)    Indebtedness incurred in the ordinary course of business in respect of and ancillary to automatic clearinghouse arrangements, check endorsement guaranties and otherwise in connection with deposit accounts or cash management services.

7.2    **Liens**.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, at any time create, incur, assume or suffer to exist any Lien on any of its property or assets, tangible or intangible, now held or hereafter acquired, or agree or become liable to do so, except Permitted Liens.

7.3    **Affiliate Transactions**.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, enter into or carry out any transaction with any Affiliate of any Loan Party (including purchasing property or services from or selling property or services to any Affiliate of any Loan Party or other Person) unless such transaction is not otherwise prohibited by this Agreement, is in accordance with all applicable Law and (i) is entered into in the ordinary course of business upon fair and reasonable arm's-length terms and conditions that are fully disclosed to the Administrative Agent, or (ii) is an Investment permitted under Section 7.4(e) or a Restricted Payment permitted under Section 7.5.

**Exhibit 1**
**94 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

7.4     <u>**Loans and Investments**</u>.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, at any time make or suffer to remain outstanding any Investment or agree, become or remain liable to make any Investment, except:

(a)     Investments existing on the Closing Date and described in Schedule 7.4;

(b)     trade credit extended on usual and customary terms in the ordinary course of business;

(c)     Investments in the form of cash and Cash Equivalents;

(d)     loans and advances to, and other Investments in, other wholly-owned Loan Parties;

(e)     notes payable to, or equity interests issued by, account debtors to any Loan Party in good faith settlement of delinquent obligations and pursuant to any plan of reorganization or similar proceedings upon the bankruptcy or insolvency of any such account debtor;

(f)     the CoBank Equities and any other stock or securities of, or Investments in, CoBank or its investment services or programs;

(g)     Guaranties permitted by Section 7.1;

(h)     loans and advances to employees for business expenses incurred in the ordinary course of business; and

(i)     other Investments not exceeding $1,000,000 in the aggregate in any fiscal year of the Borrowers.

7.5     <u>**Dividends and Related Distributions**</u>.  The Borrowers will not declare or make any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, without the prior written consent of the Administrative Agent.

7.6     <u>**Liquidations, Mergers, Consolidations, Acquisitions**</u>.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, (i) dissolve, liquidate or wind-up its affairs, (ii) become a party to any merger or consolidation, or (iii) acquire by purchase, lease or otherwise all or substantially all of the assets or Equity Interests of any other Person or group of related Persons or any division, line of business or other business unit of any other Person, except:

(a)     any Subsidiary may merge with (i) the Parent, provided that the Parent shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, <u>provided</u> that when any Borrower or Guarantor is merging with another Subsidiary, a Borrower or Guarantor shall be the continuing or surviving Person; and

(b)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to a Borrower or to a another Subsidiary; <u>provided</u> that if the transferor

**Exhibit 1**
**95 of 132**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

in such a transaction is a Subsidiary, then the transferee must either be a Borrower or a Guarantor.

7.7     **Dispositions of Assets or Subsidiaries**.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, Dispose of, voluntarily or involuntarily, any of its properties or assets, tangible or intangible (including sale, assignment, discount or other disposition of accounts, contract rights, chattel paper, equipment or general intangibles with or without recourse or of Equity Interests, shares of beneficial interest, partnership interests or limited liability company interests or other equity interests of a Subsidiary of such Loan Party), except:

(a)     transactions involving the sale of inventory in the ordinary course of business;

(b)     any Disposition of obsolete or worn-out assets in the ordinary course of business that are no longer necessary or required in the conduct of such Loan Party's or such Subsidiary's business;

(c)     any Disposition of assets by any Loan Party or any wholly owned Subsidiary of such Loan Party to another Loan Party, so long as such sold or transferred assets are subject to the Administrative Agent's Prior Security Interest therein;

(d)     any Disposition of assets in the ordinary course of business that have been or are concurrently replaced by substitute assets acquired or leased as permitted in this Agreement, so long as such substitute assets are subject to the Administrative Agent's Prior Security Interest therein;

(e)     any Disposition of Cash Equivalents;

(f)     the Planned Asset Sales, provided that Net Cash Proceeds are delivered to the Administrative Agent as required in Section 2.13(c);

(g)     leases and licenses of real or personal property by any Loan Party or Subsidiary in the ordinary course of business in accordance with the Borrower's past practices; and

(h)     Dispositions by the Borrowers and their Subsidiaries not otherwise permitted under this Section 7.7; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition and (ii) the aggregate book value of all property Disposed of in reliance on this clause (h) in any fiscal year shall not exceed $1,000,000;

provided, however, that any Disposition pursuant to subsections (a) through (h) shall be for fair market value.

7.8     **Use of Proceeds**.  No Loan Party shall use the proceeds of any Loan or other extension of credit hereunder, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose. No Loan Party shall, directly or indirectly, use the proceeds of any Loan or other extension of credit hereunder, or lend, contribute or otherwise make available such proceeds or other extension of credit to any subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or

**Exhibit 1**
**96 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise).

7.9 **Subsidiaries, Partnerships and Joint Ventures**. No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, own or create directly or indirectly any Subsidiaries other than (a) any Subsidiary that has joined this Agreement as Guarantor on the Closing Date; and (b) any Subsidiary formed or acquired after the Closing Date that joins this Agreement as a Guarantor by delivering to the Administrative Agent (i) an executed joinder agreement in form and substance satisfactory to the Administrative Agent; (ii) documents in the forms described in Section 4.1 modified as appropriate; and (iii) documents necessary to grant and perfect Prior Security Interests to the Administrative Agent for the benefit of the Lenders in the Equity Interests of, and assets held by, such Subsidiary.

7.10 **Continuation of or Change in Business**. No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, engage in any line of business other than those lines of business conducted by the Loan Parties on the date hereof, substantially as conducted and operated by such Loan Party or Subsidiary during the present fiscal year, and such Loan Party or Subsidiary shall not permit any material change in such business.

7.11 **Fiscal Year**. The Borrowers shall not, and shall not permit any Subsidiary of the Borrowers to, change its fiscal year from the twelve-month period beginning April 1 and ending March 31.

7.12 **Issuance of Equity Interests**. No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, commence or consummate any Equity Issuance, except for (a) any such Equity Issuances by any Loan Party (other than the Borrowers) to and for the benefit of a Loan Party and that are subject to the Administrative Agent's Prior Security Interest therein and otherwise comply with the Security Agreement, (b) issuance of warrants or options to Directors, officers, or employees of the Borrowers pursuant to employee benefit plans established in the ordinary course of business and any such equity interests of the Borrowers issued upon the exercise of such warrants or options), (c) issuances of equity to new members of the Borrowers in accordance with the Borrowers' past practices; (d) to the extent not restricted by Section 7.5, the Borrowers may declare and make dividend payments and other distributions in the form of its own Equity Interests to members; and (e) the Borrowers may issue and sell common Equity Interests, so long as the Net Cash Proceeds thereof are applied to the prepayment of the Term Loan pursuant to Section 2.13(f).

7.13 **Changes in Organizational Documents**. No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, amend its Organizational Documents without providing at least 30 calendar days' prior written notice to the Administrative Agent and the Lenders and, in the event such change would be adverse to the Lenders as determined by the Administrative Agent in its sole discretion, obtaining the prior written consent of the Required Lenders.

7.14 **Negative Pledges**. No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, enter into any Agreement with any Person that, (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Borrowers or any Guarantor or to otherwise

transfer property to the Borrowers or any Guarantor, (ii) of any Subsidiary to Guarantee the Indebtedness of the Borrowers or (iii) of the Borrowers or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person.

7.15    **Anti-Terrorism Laws; Anti-Corruption Laws**. No Loan Party shall, or shall permit any of its Subsidiaries to, knowingly, directly or indirectly, (a) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person, (b) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to any Anti-Terrorism Law, or (c) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law or Anti-Corruption Law (and the Borrower shall deliver to the Administrative Agent any certification or other evidence requested from time to time by the Administrative Agent in its reasonable discretion, confirming Borrower's compliance with this Section 7.15).

7.16    **Material Agreements**.  No Loan Party shall, or shall permit any of its Subsidiaries to, amend, restate, supplement, waive or otherwise modify, or terminate, cancel or revoke (prior to any scheduled date of termination) any Material Agreement if such modification, termination, cancellation or revocation could reasonably be expected to result in a Material Adverse Change, Default or Event of Default.

7.17    **Member Marketing Contract**.  No Borrower shall use any form of Member Marketing Contract other than the form attached hereto as Exhibit I.

7.18    **Producer Payment Pool**.  The economic value of the Borrowers' Producer payment pool at the close of the fiscal year ending March 31, 2018 shall not exceed 90% of the Crop Economic Value without prior written consent of the Required Lenders.  The economic value of the Borrowers' Producer payment pool at the close of each fiscal year after March 31, 2018 shall not exceed 100% of the Crop Economic Value without prior written consent of the Required Lenders.

7.19    **Independence of Covenants**.  All covenants contained in Articles VI, VII and VIII of this Agreement shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that such action or condition would be permitted by another covenant shall not avoid the occurrence of a Default if such action is taken or condition exists.

## VIII. FINANCIAL COVENANTS

8.1    **Minimum EBITDA**.  The Loan Parties shall not permit their EBITDA, calculated as of the end of each fiscal quarter of the Borrowers for the 4 fiscal quarters then ended, to be less than the following amounts.

| December 31, 2017 | ($10,000,000) |
|---|---|
| March 31, 2018 | 10,000,000 |
| June 30, 2018 | 19,000,000 |
| September 30, 2018 | 21,000,000 |

| | |
|---|---|
| December 31, 2018 | 25,000,000 |
| March 31, 2019 | 19,500,000 |
| June 30, 2019 | 21,000,000 |
| September 30, 2019 | 24,000,000 |
| December 31, 2019 | 26,500,000* |
| March 31, 2020 | 28,500,000* |
| * If Borrowers exercise their option under Section 2.21 | |

8.2 **Minimum Cash Interest Coverage Ratio**. The Loan Parties shall not permit their Cash Interest Coverage Ratio, calculated as of the end of each fiscal quarter of the Borrowers for the 4 fiscal quarters then ended, to be less than the following:

| | |
|---|---|
| December 31, 2017 | (1.00):1.00 |
| March 31, 2018 | 1.00:1.00 |
| June 30, 2018 | 1.50:1.00 |
| September 30, 2018 | 1.50:1.00 |
| December 31, 2018 | 2.00:1.00 |
| March 31, 2019 | 2.00:1.00 |
| June 30, 2019 | 2.00:1.00 |
| September 30, 2019 | 2.00:1.00 |
| December 31, 2019 | 2.00:1.00* |
| March 31, 2020 | 3.00:1.00* |
| * If Borrowers exercise their option under Section 2.21 | |

8.3 **Minimum Total Equity**. The Loan Parties shall not permit the Borrowers' Total Equity, calculated as of the end of each fiscal quarter of Parent for such quarter, to be less than the following amounts:

| | |
|---|---|
| December 31, 2017 | $30,000,000 |
| March 31, 2018 | 32,000,000 |
| June 30, 2018 | 34,000,000 |
| September 30, 2018 | 36,000,000 |
| December 31, 2018 | 38,000,000 |
| March 31, 2019 | 40,000,000 |
| June 30, 2019 | 42,000,000 |
| September 30, 2019 | 44,000,000 |
| December 31, 2019 | 46,000,000* |
| March 31, 2020 | 48,000,000* |
| * If Borrowers exercise their option under Section 2.21 | |

8.4 **Maximum Debt to Capitalization** . The Loan Parties shall not permit their Debt to Capitalization Ratio, calculated as of the end of each fiscal quarter of the Borrowers for the 4 fiscal quarters then ended, to be greater than the following:

| | |
|---|---|
| December 31, 2017 | 0.90:1.00 |
| March 31, 2018 | 0.90:1.00 |

**Exhibit 1**
**99 of 132**

| | |
|---|---|
| June 30, 2018 | 0.85:1.00 |
| September 30, 2018 | 0.85:1.00 |
| December 31, 2018 | 0.80:1.00 |
| March 31, 2019 | 0.80:1.00 |
| June 30, 2019 | 0.80:1.00 |
| September 30, 2019 | 0.80:1.00 |
| December 31, 2019 | 0.75:1.00* |
| March 31, 2020 | 0.75:1.00* |
| * If Borrowers exercise their option under Section 2.21 | |

8.5 **Maximum Capital Expenditures**. The Loan Parties shall not permit their Capital Expenditures, calculated as of the end of each fiscal year of the Borrowers for such year, to be greater than the following amounts:

| | |
|---|---|
| March 31, 2018 | $13,500,000 |
| March 31, 2019 | 14,500,000 |
| March 31, 2020 | 14,000,000* |

## IX. EVENTS OF DEFAULT

9.1 **Events of Default**. An Event of Default means the occurrence or existence of any one or more of the following events or conditions (whatever the reason therefor and whether voluntary, involuntary or effected by operation of Law):

(a) Payments Under Loan Documents. (i) The Borrowers or any other Loan Party shall fail to pay any principal of any Loan (including scheduled installments, mandatory prepayments or the payment due at maturity), Reimbursement Obligation or Letter of Credit or Obligation; or (ii) the Borrowers or any other Loan Party shall fail to pay any interest on any Loan, Reimbursement Obligation or Letter of Credit Obligation or any other amount owing hereunder or under the other Loan Documents on the date on which such principal, interest or other amount becomes due in accordance with the terms hereof or thereof;

(b) Breach of Warranty. Any representation, warranty, certification or statement of fact made or deemed made at any time by any of the Loan Parties herein or in any other Loan Document, or in any certificate, other instrument or statement furnished pursuant to the provisions hereof or thereof, shall have been false or misleading in any material respect as of the time it was made or furnished;

(c) Breach of Other Covenants. Any of the Loan Parties shall default in the observance or performance of any other covenant, condition or provision hereof or of any other Loan Document, and such default shall continue unremedied for the expressly specified cure period with respect thereto or, if no such cure period is specified, for a period of 30 days after the earlier of (i) the Administrative Agent's delivery of written notice thereof to the Borrowers or (ii) an Authorized Officer of any Loan Party having obtained knowledge thereof;

(d) Defaults in Other Agreements or Indebtedness. A default or event of default shall occur at any time under the terms of any other agreement with respect to Indebtedness or any

**Exhibit 1**
**100 of 132**

Case 19-62584-pcm11   Doc 16   Filed 08/22/19

other credit extension in an aggregate principal amount (including undrawn committed or available amounts), of which is equal to or in excess of the Threshold Amount and such breach, default or event of default (i) arises from the failure to pay (beyond any period of grace permitted with respect thereto, whether waived or not) any related Indebtedness or other credit extensions when due (whether at stated maturity, by acceleration or otherwise) or (ii) the effect of which is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice and/or lapse of time, if required, the acceleration of any related Indebtedness or other credit extensions (whether or not such right shall have been waived) or the termination of any commitment to lend;

(e)     <u>Final Judgments or Orders</u>.  Any final judgments or orders for the payment of money in an aggregate amount in excess of the Threshold Amount shall be entered against any Loan Party by a court having jurisdiction in the premises, which judgment is not discharged, vacated, bonded or stayed pending appeal within a period of 30 days from the date of entry;

(f)     <u>Loan Document Unenforceable</u>.  Any of the Loan Documents shall cease to be legal, valid and binding agreements enforceable against the party executing the same or such party's successors and assigns (as permitted under the Loan Documents) in accordance with the respective terms thereof or shall in any way be terminated (except in accordance with its terms) or become or be declared ineffective or inoperative or shall in any way be challenged or contested by any party thereto (other than the Administrative Agent or any Lender) or cease to give or provide the respective Liens, security interests, rights, titles, interests, remedies, powers or privileges intended to be created thereby;

(g)     <u>Security Interests Unenforceable</u>.  Any Lien purported to be created under any Collateral Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid or perfected Lien on any portion of the Collateral, with the priority required by the applicable Collateral Document, except (i) pursuant to Section 11.1(f), (ii) as a result of the sale or other disposition of the applicable Collateral or the release of the applicable Loan Party in a transaction permitted under the Loan Documents, or (iii) as provided in any Loan Document;

(h)     <u>Uninsured Losses; Proceedings Against Assets</u>.  There shall occur any uninsured damage to or loss, theft or destruction of any portion of the Collateral with a fair market value in excess of the Threshold Amount or the Collateral or any other of the Loan Parties' or any of their Subsidiaries' assets with a fair market value in excess of the Threshold Amount are attached, seized, levied upon or subjected to a writ or distress warrant; or such come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not cured within 30 days thereafter;

(i)     <u>Events Relating to Pension Plans and Multiemployer Plans</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount;

**Exhibit 1**
**101 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(j)    <u>Change of Control</u>.  A Change of Control shall have occurred;

(k)    <u>Debtor Relief Proceedings</u>.  (i) A Debtor Relief Proceeding shall have been instituted against any Loan Party or Subsidiary of a Loan Party and such Debtor Relief Proceeding shall remain undismissed or unstayed and in effect for a period of 60 consecutive days or such court shall enter a decree or order granting any of the relief sought in such Debtor Relief Proceeding, (ii) any Loan Party or Subsidiary of a Loan Party institutes, or takes any action in furtherance of, a Debtor Relief Proceeding, (iii) an order granting the relief requested in any Debtor Relief Proceeding (including, but not limited to, an order for relief under federal bankruptcy laws) shall be entered, (iv) any Loan Party or Subsidiary thereof shall commence a voluntary case under, file a petition seeking to take advantage of, any bankruptcy, insolvency, reorganization or other similar law, domestic or foreign, (v) any Loan Party or Subsidiary thereof shall consent to or fail to contest in a timely and appropriate manner any petition filed against it in any Debtor Relief Proceeding, (vi) any Loan Party or Subsidiary thereof shall apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign, (vii) any Loan Party or Subsidiary thereof shall take any action to approve or authorize any of the foregoing, or (viii) any Loan Party or any Subsidiary of a Loan Party ceases to be Solvent or admits in writing its inability to pay its debts as they mature;

(l)    <u>Writ of Attachment</u>.  A writ of attachment, garnishment, levy or similar process shall be issued against or served on any Lender by a court of competent jurisdiction with respect to (i) any property of any Loan Party or any Subsidiary thereof in the possession of such Lender or (ii) any indebtedness of any Lender to any Loan Party or any Subsidiary of any Loan Party;

(m)    <u>Agricultural License</u>.  Any Agricultural License of any Loan Party shall be revoked or suspended if such revocation or suspension would cause a Material Adverse Change or is not being diligently contested by appropriate proceedings, or any surety company issuing Agricultural Bond to a Loan Party shall notify such Loan Party of such surety's decision not to renew such Agricultural Bond if such non-renewal would cause a Material Adverse Change or unless such bond is replaced prior to the expiration of the existing Agricultural Bond; or there is commenced any action against any Loan Party by (i) any beneficiary of a trust created under any Agricultural Lien Statute to enforce payment from such trust in an aggregate amount exceeding the Threshold Amount, or (ii) any Person (a) whose Lien was not extinguished by the applicable Loan Party's compliance with the Food Security Act or (b) that is entitled to protection under the UCC or any Agricultural Lien Statute, in each case which claim is in an aggregate amount exceeding the Threshold Amount, except in each case to the extent such action is being diligently contested in good faith by appropriate and lawful proceedings and for which adequate reserves in accordance with GAAP have been set aside on the Borrower's books or could not reasonably be expected to cause a Material Adverse Change; or

(n)    <u>Recall; Suspension</u>.  (i) Any inventory or products of any Loan Party or any Subsidiary of any Loan Party in an aggregate amount exceeding the Threshold Amount shall be subject to any seizure, administrative detention or mandatory recall by any Governmental Authority, (ii) any Loan Party or any Subsidiary of any Loan Party shall voluntarily recall any of its inventory or products in an aggregate amount exceeding the Threshold Amount, or (iii) any Governmental Authority suspends or revokes any operations, license or registration of any Loan

**Exhibit 1**
**102 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

Party, any Subsidiary of any Loan Party or any of their facilities, unless such suspension or revocation could not reasonably be expected to cause a Material Adverse Change.

9.2     **Consequences of Event of Default**.

(a)     <u>Events of Default Other Than Bankruptcy, Insolvency or Reorganization Proceedings</u>.  If an Event of Default specified under Section 9.1 (other than Section 9.1(k)) shall occur and be continuing, the Lenders and the Administrative Agent shall be under no further obligation to make Loans and the Issuing Lender shall be under no obligation to issue Letters of Credit and the Administrative Agent may, and upon the request of the Required Lenders, shall (i) by written notice to the Borrowers, declare the unpaid principal amount of the Loans then outstanding and all interest accrued thereon, any unpaid fees and all other Indebtedness of the Borrowers to the Lenders hereunder and thereunder to be forthwith due and payable, and the same shall thereupon become and be immediately due and payable to the Administrative Agent for the benefit of each Lender without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, and (ii) require the Borrowers to, and the Borrowers shall thereupon, Cash Collateralize the Letter of Credit Obligations in an amount not less than the Minimum Collateral Amount; and

(b)     <u>Bankruptcy, Insolvency or Reorganization Proceedings</u>.  If an Event of Default specified under Section 9.1(k) shall occur, the Lenders shall be under no further obligations to make Loans hereunder and the Issuing Lender shall be under no obligation to issue Letters of Credit and the unpaid principal amount of the Loans then outstanding and all interest accrued thereon, any unpaid fees and all other Indebtedness of the Borrowers to the Lenders hereunder and thereunder automatically shall be immediately due and payable, and the Borrowers shall be required to Cash Collateralize the Letter of Credit Obligations in an amount not less than the Minimum Collateral Amount, in each case without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived; and

(c)     <u>Set-off</u>.  If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, the Issuing Lender or any such Affiliate, to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrowers or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or the Issuing Lender or their respective Affiliates, irrespective of whether or not such Lender, Issuing Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrowers or such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender or the Issuing Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.17 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Lender, and the Lenders, and

**Exhibit 1**
**103 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, the Issuing Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Lender or their respective Affiliates may have. Each Lender and Issuing Lender agrees to notify the Borrowers and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application; and

(d) <u>Application of Proceeds</u>. After the exercise of remedies provided for in this Section 9.2 (or after the Loans have automatically become immediately due and payable and the Letter of Credit Obligations have automatically been required to be Cash Collateralized as set forth in Section 9.2(b)), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and the Issuing Lender (including fees, charges and disbursements of counsel to the respective Lenders and the Issuing Lender and amounts payable under Article X), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, Letter of Credit Borrowings and other Obligations, and fees (including Letter of Credit Fees), ratably among the Lenders and the Issuing Lender in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans and Letter of Credit Borrowings ratably among the Lenders and the Issuing Lender in proportion to the respective amounts described in this clause <u>Fourth</u> payable to them;

*Fifth*, to the Administrative Agent for the account of the Issuing Lender, to Cash Collateralize that portion of Letter of Credit Obligations comprised of the aggregate undrawn amount of Letters of Credit;

*Sixth*, to payment of all other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause *Sixth* held by them; and

*Last*, the balance, if any, after Payment In Full of all of the Obligations, to the Loan Parties or as otherwise required by Law.

**Exhibit 1**
**104 of 132**

# X. THE ADMINISTRATIVE AGENT

10.1 **Appointment and Authority**. Each of the Lenders and the Issuing Lender hereby irrevocably appoints CoBank to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article X are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Lender, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

10.2 **Rights as a Lender**. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

10.3 **No Fiduciary Duty**. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information

relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

10.4    **Exculpation**.

(a)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 9.2 and 11.1) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by the Borrowers, a Lender or the Issuing Lender.

(b)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

10.5    **Reliance by the Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender or the Issuing Lender unless the Administrative Agent shall have received notice to the contrary from such Lender or the Issuing Lender prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

10.6    **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers

**Exhibit 1**
**106 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

by or through their respective Related Parties. The exculpatory provisions of this Article X shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facilities as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

10.7  **Filing Proofs of Claim**.  In case of the pendency of any proceedings under any Debtor Relief Law or any other judicial proceeding relating to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand therefor) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)  to file and prove a claim for the whole amount of the owing and unpaid principal and interest in respect of the Obligations and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Lender and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Lender and the Administrative Agent under Sections 2.6, 2.9(b) and 3.5) allowed in such proceeding;

(b)  to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)  and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and Issuing Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Lender, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.6, 2.9(b) and 3.5.

10.8  **Resignation of the Administrative Agent**.  The Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Lender and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrowers, to appoint a successor Administrative Agent.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier date as the Required Lenders may approve, the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders and the Issuing Lender, appoint a successor Administrative Agent; provided, that if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then the Administrative Agent's resignation shall nonetheless become effective in

**Exhibit 1**
**107 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

accordance with such notice and (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders or the Issuing Lender under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the Issuing Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section 10.8. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article X and Section 11.3 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Any resignation by CoBank as Administrative Agent pursuant to this Section shall also automatically constitute its resignation as an Issuing Lender and a Swing Line Lender, with replacement of the Administrative Agent as the Issuing Lender and Swing Line Lender conducted in accordance with Section 10.9 below.

10.9 **Resignation of Swing Line Lender or Issuing Lender**. The Swing Line Lender or the Issuing Lender may at any time give notice of its resignation to the Lenders, the Administrative Agent and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with approval from the Borrowers (so long as no Event of Default has occurred and is continuing) to appoint a successor Swing Line Lender or Issuing Lender, such approval not to be unreasonably withheld or delayed. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Swing Line Lender or Issuing Lender (as applicable) gives notice of its resignation, then the Administrative Agent may on behalf of the Lenders, appoint a successor Swing Line Lender or Issuing Lender (as applicable); provided that if the Administrative Agent shall notify the Borrowers and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and the retiring Swing Line Lender or Issuing Lender (as applicable) shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the retiring Swing Line Lender or Issuing Lender (as applicable) on behalf of the Lenders or the Swing Line Lender or Issuing Lender under any of the Loan Documents, the retiring Swing Line Lender or Issuing Lender (as applicable) shall continue to hold such collateral security until such time as a successor Swing Line Lender or Issuing Lender (as applicable) is appointed). Upon the acceptance of a successor's appointment

as a Swing Line Lender or Issuing Lender (as applicable) hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Swing Line Lender or Issuing Lender (as applicable), and the retiring Swing Line Lender or Issuing Lender (as applicable) shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrowers to a successor Swing Line Lender or Issuing Lender (as applicable) shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor.  After the retiring Swing Line Lender's or Issuing Lender's (as applicable) resignation hereunder and under the other Loan Documents as a Swing Line Lender or Issuing Lender, as applicable, the provisions of Section 11.3 (and Article X if the Administrative Agent is the resigning Issuing Lender and Swing Line Lender) shall continue in effect for the benefit of such retiring Swing Line Lender or Issuing Lender (as applicable), its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Swing Line Lender or Issuing Lender (as applicable) was acting as a Swing Line Lender or Issuing Lender (as applicable).In addition to the foregoing requirements, upon the acceptance of a successor's appointment as Issuing Lender hereunder, the successor Issuing Lender shall issue letters of credit in substitution for the Letters of Credit issued by the retiring Issuing Lender, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Lender to effectively assume the obligations of the retiring Issuing Lender with respect to such Letters of Credit.

10.10  **Non-Reliance on the Administrative Agent and Other Lenders**.  Each Lender and the Issuing Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the Issuing Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

10.11  **No Other Duties, etc.**  Anything herein to the contrary notwithstanding, none of the Lead Arranger or Bookrunner listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the Issuing Lender hereunder.

10.12  **Authorization to Release Collateral and Guarantors**.  (a) The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion,

      (i)      to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (x) upon termination of all Commitments and Payment In Full of all Obligations (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements satisfactory to the Administrative Agent and the Issuing Lender shall have been made), (y) that is Disposed

of or to be Disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents, or (z) subject to Section 11.1, if approved, authorized or ratified in writing by the Required Lenders;

(ii)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.1(c); and

(iii)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.12.

(b)    The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

10.13   **Compliance with Flood Laws**.  CoBank has adopted internal policies and procedures that address requirements placed on federally regulated lenders under the Flood Laws.  CoBank, as administrative agent or collateral agent on a syndicated facility, will post on the applicable electronic platform (or otherwise distribute to each lender in the syndicate) documents that it receives in connection with the Flood Laws.  However, CoBank reminds each Lender and participant in the facility that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or participant in the facility) is responsible for assuring its own compliance with the flood insurance requirements.

10.14   **No Reliance on the Administrative Agent's Customer Identification Program**.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such other Laws.

## XI. MISCELLANEOUS

**Exhibit 1**
**110 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

11.1 **Modifications, Amendments or Waivers**. With the written consent of the Required Lenders, the Administrative Agent, acting on behalf of all the Lenders, and the Borrowers, on behalf of the Loan Parties, may from time to time enter into written agreements amending or changing any provision of this Agreement or any other Loan Document or the rights of the Lenders or the Loan Parties hereunder or thereunder, or may grant written waivers or consents hereunder or thereunder. Any such agreement, waiver or consent made with such written consent shall be effective to bind all the Lenders and the Loan Parties; provided, that no such agreement, waiver or consent may be made that will:extend or increase the Commitment of any Lender (or reinstate any obligation to make Loans terminated pursuant to Section 9.2) without the written consent of such Lender whose Commitment is being extended or increased (it being understood and agreed that a waiver of any condition precedent set forth in Section 4.2 or of any Default, mandatory prepayment or a mandatory reduction in Commitments is not considered an extension or increase in Commitments of any Lender);

(b) postpone any date fixed by this Agreement or any other Loan Document for any payment (including mandatory prepayment of Overadvances but excluding other mandatory prepayments of principal, interest, fees or other amounts due to the Lenders (or any of them) or any scheduled or mandatory reduction of the Commitments hereunder or under any other Loan Document without the written consent of each Lender entitled to receive such payment or whose Commitments are to be reduced, it being understood that the waiver of any mandatory prepayment of Loans, other than a mandatory prepayment of Overadvances, shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c) reduce the principal of, or the rate of interest specified herein on, any Loan or Letter of Credit Borrowing or any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly affected thereby; provided, however, that only the consent of the Required Lenders shall be necessary (A) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest or Letter of Credit Fees at the Default Rate or (B) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(d) change Section 2.14 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(e) change any provision of this Section 11.1 or the definition of "Required Lenders" without the written consent of each Lender directly affected thereby;

(f) except in connection with a transaction permitted under Section 7.6 or 7.7 or as otherwise authorized by Section 10.12, release all or substantially all of the Collateral without the written consent of each Lender whose Obligations are secured by such Collateral; or

(g) release the Borrowers without the consent of each Lender, or, except in connection with a transaction permitted under Section 7.2, 7.6 or 7.7 or as otherwise authorized by Section 10.12, all or substantially all of the value of the Guaranty provided pursuant to Article XII of this Agreement without the written consent of each Lender whose Obligations are

guaranteed thereby, except to the extent such release is permitted pursuant to Section 10.12 (in which case such release may be made by the Administrative Agent acting alone);

provided that (i) no agreement, waiver or consent that would modify the interests, rights or obligations of the Administrative Agent, the Swing Line Lender or the Issuing Lender may be made without the written consent of such Administrative Agent, the Swing Line Lender or the Issuing Lender, as applicable, and (ii) only the consent of the Administrative Agent shall be required for any amendment to the Fee Letter; and provided, further that, if in connection with any proposed waiver, amendment or modification referred to in Sections 11.1(a) through 11.1(g) above, the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained (each a "Non-Consenting Lender"), then the Borrowers shall have the right to replace any such Non-Consenting Lender with one or more replacement Lenders pursuant to Section 3.6.

No Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of such Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects such Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

11.2 **No Implied Waivers; Cumulative Remedies**.  No course of dealing and no delay or failure of the Administrative Agent, the Issuing Lender or any Lender in exercising any right, power, remedy or privilege under this Agreement or any other Loan Document shall affect any other or future exercise thereof or operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any further exercise thereof or of any other right, power, remedy or privilege.  The rights and remedies of the Administrative Agent and the Lenders under this Agreement and any other Loan Documents are cumulative and not exclusive of any rights or remedies that they would otherwise have.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent for the benefit of the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) the Issuing Lender or the Swing Line Lender from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Lender or Swing Line Lender, as the case may be) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 9.2 (subject to the terms of Section 2.14), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party in any Debtor Relief Proceedings.

**11.3    Expenses; Indemnity; Damage Waiver**.

(a)    Costs and Expenses.  The Borrowers shall pay (i) all out of pocket expenses incurred by the Administrative Agent and its Affiliates (including fees, charges and disbursements of counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for the Administrative Agent) in connection with the syndication of the Facilities, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all out of pocket expenses incurred by the Issuing Lender in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, and (iii) all out of pocket expenses incurred by the Administrative Agent, any Lender or the Issuing Lender (including the fees, charges and disbursements of any counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for the Administrative Agent, any Lender or the Issuing Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

(b)    Indemnification by the Borrowers.  The Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and the Issuing Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of legal counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrowers or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrowers or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrowers or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrowers or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrowers or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan

**Exhibit 1**
**113 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

Document, if the Borrowers or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. This Section 11.3(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages and other similar amounts arising from any non-Tax claim.

(c)     <u>Reimbursement by Lenders</u>.  To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under clause (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Issuing Lender, the Swing Line Lender or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Issuing Lender, the Swing Line Lender or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Pro Rata Share at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); <u>provided</u>, that with respect to such unpaid amounts owed to the Issuing Lender or Swing Line Lender solely in its capacity as such, only the Revolving Lenders shall be required to pay such unpaid amounts, such payment to be made severally among them based on such Revolving Lenders' Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought); and provided, further, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Issuing Lender or the Swing Line Lender in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Issuing Lender or the Swing Line Lender in connection with such capacity.

(d)     <u>Waiver of Consequential Damages, Etc</u>.  To the fullest extent permitted by applicable Law, the Borrowers shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in Section 11.3 shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(e)     <u>Payments</u>.  All amounts due under this Section shall be payable not later than 10 days after demand therefor.

(f)     <u>Survival</u>.  Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

11.4     **Holidays**.  Whenever any payment to be made hereunder shall be due on a day that is not a Business Day such payment shall be due on the next Business Day (except as provided in the definition of "<u>Interest Period</u>") and such extension of time shall be included in computing

**Exhibit 1**
**114 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

interest and fees, except that the Loans shall be due on the Business Day preceding the Maturity Date if the Maturity Date is not a Business Day. Whenever any action to be taken hereunder (other than a payment) shall be stated to be due on a day that is not a Business Day, such action shall be taken on the next following Business Day.

11.5   **Notices; Effectiveness; Electronic Communication**.

(a)   <u>Notices Generally</u>.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile (i) if to a Lender, at its address (or facsimile number) set forth in its Administrative Questionnaire or (ii) if to any other Person, to it at its address (or facsimile number) set forth on Schedule 1.1A. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications, to the extent provided in clause (b) below, shall be effective as provided in said clause (b).

(b)   <u>Electronic Communications</u>.   Notices and other communications to the Lenders and the Issuing Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender or Issuing Lender pursuant to Article II if such Lender or Issuing Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrowers may, each in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; <u>provided</u> that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)   <u>Change of Address, etc.</u>   Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)   <u>Platform</u>.

**Exhibit 1**
**115 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(i)      Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Issuing Lender and the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

(ii)      The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent, any Lender or the Issuing Lender by means of electronic communications pursuant to this Section, including through the Platform.

(e)      Multiple Borrowers. Each Borrower agrees that (a) any notice or other communication given by the Lenders to any Borrower in accordance with this Section shall be deemed sufficient as to all Borrowers, regardless of whether each Borrower is sent separate copies of such notice or even identified in such notice, and (b) any notice given by any Borrower to the Lenders in accordance with this Section shall be deemed given by all Borrowers, regardless of whether each Borrower is identified in, or expressly a party to, such notice.

11.6    **Severability**. The provisions of this Agreement are intended to be severable. If any provision of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

11.7    **Duration; Survival**. All representations and warranties of the Loan Parties contained herein or made in connection herewith shall survive the execution and delivery of this Agreement, the completion of the transactions hereunder and Payment In Full. All covenants and agreements of the Borrowers contained herein relating to the payment of principal, interest, premiums, additional compensation or expenses and indemnification, including those set forth in the Notes, Sections 3.1, 3.2, 3.5 and 11.3 or any other provision of any Loan Document shall survive Payment In Full and shall protect the Administrative Agent, Lenders and any other Indemnitees against events arising after such termination as well as before. All other covenants

**Exhibit 1**
**116 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

and agreements of the Loan Parties shall continue in full force and effect from and after the date hereof and until Payment In Full.

11.8 **Successors and Assigns**.

(a) <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrowers nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of this Section, (ii) by way of participation in accordance with the provisions of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Issuing Lender and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, all participations in Letters of Credit and Swing Line Loans and the Loans at the time owing to it); <u>provided</u> that (in each case and with respect to any Facility) any such assignment shall be subject to the following conditions:

(i) <u>Minimum Amounts</u>.

(A) In the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it (in each case with respect to any Facility) or contemporaneous assignments to related Approved Funds that equal at least the amount specified in clause (B) below in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B) In any case not described in clause (i)(A) of this clause (b), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "<u>Trade Date</u>" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, in the case of any assignment in respect of the Revolving Credit Facility, or $1,000,000, in the case of the Term Loan Facility, unless each of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrowers otherwise consent (each such consent not to be unreasonably withheld or delayed).

(ii)     <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(iii)     <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by clause (b)(i)(B) and in addition:

(A)     the consent of the Borrowers (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; <u>provided</u> that the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof and <u>provided</u>, <u>further</u>, that the Borrowers' consent shall not be required during the primary syndication of the Facilities;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) the Revolving Credit Facility or any unfunded Commitments with respect to the Term Loan Facility if such assignment is to a Person that is not a Lender with a Commitment in respect of such Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender, or (ii) any Term Loan to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund; and

(C)     the consent of the Issuing Lender and Swing Line Lender shall be required for any assignment in respect of the Revolving Credit Facility.

(iv)     <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to (i) the Borrowers or any of the Borrowers' Affiliates or Subsidiaries or (ii) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (v).

(vi)     <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural Person.

(vii)     <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the

**Exhibit 1**
**118 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrowers and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the Issuing Lender, the Swing Line Lender and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit and Swing Line Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this clause, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.4, 3.1, 3.2 and 11.3 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 11.8(d) below.

(c)    Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices in Greenwood Village, Colorado a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations. Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural

113

**Exhibit 1**
**119 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

person or the Borrowers or any of the Borrowers' Affiliates or Subsidiaries) (each a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders, Issuing Lender shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.3(c) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to (i) any increase in the commitment of such Participant, (ii) any reduction of interest rates, principal or fees, (iii) any extension of scheduled maturities or times for payment, (iv) any reduction in voting percentages or (v) a release of all or substantially all of the Collateral, in each case to the extent that such amendment, modification or waiver described in Section 11.1 would directly affect such Participant and could not be effected by a vote of the Required Lenders. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.1, 3.2 and 3.5 (subject to the requirements and limitations therein, including the requirements under Section 3.2 (it being understood that the documentation required under Section 3.2 shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 11.8; provided that such Participant (A) agrees to be subject to the provisions of Section 3.6 as if it were an assignee under clause (b) of this Section 11.8; and (B) shall not be entitled to receive any greater payment under Section 3.1 or 3.2, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 3.6 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 9.2(c) as though it were a Lender; provided that such Participant agrees to be subject to Section 2.14 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such

**Exhibit 1**
**120 of 132**

participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. CoBank reserves the right to assign or sell participations in all or part of its Commitments or outstanding Loans hereunder on a non-patronage basis.

Notwithstanding the preceding clause, any Participant that is a Farm Credit Lender that (i) has purchased a participation in a minimum amount of $10,000,000, (ii) has been designated as a voting Participant (a "<u>Voting Participant</u>") in a notice (a "<u>Voting Participant Notice</u>") sent by the relevant Lender (including any existing Voting Participant) to the Administrative Agent and (iii) receives, prior to becoming a Voting Participant, the consent of the Administrative Agent (such consent to be required only to the extent and under the circumstances it would be required if such Voting Participant were to become a Lender pursuant to an assignment in accordance with Section 11.8(b), except that such consent is not required for an assignment to an existing Voting Participant), shall be entitled to vote as if such Voting Participant were a Lender on all matters subject to a vote by Lenders, and the voting rights of the selling Lender (including any existing Voting Participant) shall be correspondingly reduced, on a dollar-for-dollar basis. Each Voting Participant Notice shall include, with respect to each Voting Participant, the information that would be included by a prospective Lender in an Assignment and Assumption. Notwithstanding the foregoing, each Farm Credit Lender designated as a Voting Participant in Schedule 11.8 shall be a Voting Participant without delivery of a Voting Participant Notice and without the prior written consent of the Administrative Agent. The selling Lender (including any existing Voting Participant) and the purchasing Voting Participant shall notify the Administrative Agent within 3 Business Days of any termination, reduction or increase of the amount of, such participation. The Administrative Agent shall be entitled to conclusively rely on information contained in Voting Participant Notices and all other notices delivered pursuant hereto. The voting rights of each Voting Participant are solely for the benefit of such Voting Participant and shall not inure to any assignee or participant of such Voting Participant that is not a Farm Credit Lender.

(e)     <u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

11.9     **Confidentiality**.  Each of the Administrative Agent, the Lenders and the Issuing Lender agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights

**Exhibit 1**
**121 of 132**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrowers and their obligations, this Agreement or payments hereunder; (g) on a confidential basis to (i) any rating agency in connection with rating the Borrowers or their Subsidiaries or the Facilities or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Facilities; (h) with the consent of the Borrowers; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the Administrative Agent, any Lender, the Issuing Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrowers.

For purposes of this Section, "Information" means all information received from the Borrowers or any of their Subsidiaries relating to the Borrowers or any of their Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender or the Issuing Lender on a nonconfidential basis prior to disclosure by the Borrowers or any of their Subsidiaries; provided that, in the case of information received from the Borrowers or any of their Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

## 11.10 **Counterparts; Integration; Effectiveness**.

(a) This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Article IV, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (*i.e.*, "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b) Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce

**Exhibit 1**
**122 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

11.11 **CHOICE OF LAW; SUBMISSION TO JURISDICTION; WAIVER OF VENUE; SERVICE OF PROCESS; WAIVER OF JURY TRIAL**.

(a)      Governing Law.  This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of Colorado.

(b)      SUBMISSION TO JURISDICTION.   EACH BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF COLORADO SITTING IN DENVER COUNTY AND OF THE UNITED STATES DISTRICT COURT OF COLORADO, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COLORADO STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.   EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.   NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER OR THE ISSUING LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWERS OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)      WAIVER OF VENUE.  EACH BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 11.11. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT AND AGREES NOT ASSERT ANY SUCH DEFENSE.

**Exhibit 1**
**123 of 132**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(d)  <u>SERVICE OF PROCESS</u>.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.5.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, ADMINISTRATIVE AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

11.12  **USA Patriot Act Notice**.  Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Loan Parties that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of Loan Parties and other information that will allow such Lender or Administrative Agent, as applicable, to identify the Loan Parties in accordance with the USA Patriot Act.  The Borrowers shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

11.13  **Payments Set Aside**.  To the extent any Loan Party makes a payment or payments to the Administrative Agent for the ratable benefit of the Lenders or the Administrative Agent receives any payment or proceeds of the Collateral which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any Debtor Relief Proceeding, other applicable Law or equitable cause, then, to the extent of such payment or proceeds repaid, the Obligations or part thereof intended to be satisfied shall be revived and continued in full force and effect as if such payment or proceeds had not been received by the Administrative Agent.

11.14  **Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the

interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

## XII. GUARANTY

12.1  **Guaranty**.  Each Guarantor hereby jointly and severally, unconditionally, absolutely, continually and irrevocably guarantees to the Administrative Agent for the benefit of the Lenders the payment and performance in full of the Guaranteed Liabilities  For all purposes of this Guaranty Agreement, notwithstanding the foregoing, the liability of each Guarantor individually with respect to its Guarantor's Obligations shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provisions of any applicable state law.  Each Guarantor agrees that it is jointly and severally, directly and primarily liable (subject to the limitation in the immediately preceding sentence) for the Guaranteed Liabilities.  The Guarantors' Obligations are secured by various Collateral.

12.2  **Payment**.  If the Borrowers or any other Loan Party shall default in payment or performance of any of the Guaranteed Liabilities, whether principal, interest, premium, indemnification obligations, fees (including, but not limited to, attorney's fees and expenses), expenses or otherwise, when and as the same shall become due, and after expiration of any applicable grace period, whether according to the terms of this Agreement, by acceleration, or otherwise, or upon the occurrence and during the continuance of any Event of Default, then any or all of the Guarantors will, upon demand thereof by the Administrative Agent, (iv) fully pay to the Administrative Agent, for the benefit of the Lenders, an amount equal to all the Guaranteed Liabilities then due and owing or declared or deemed to be due and owing, including for this purpose, in the event of any Event of Default under Section 9.1(k) (and irrespective of the applicability of any restriction on acceleration or other action as against any other Loan Party in any Debtor Relief Proceeding), the entire outstanding or accrued amount of all Obligations or (v) perform such Guaranteed Liabilities, as applicable. For purposes of this Section 12.2, the Guarantors acknowledge and agree that "Guaranteed Liabilities" shall be deemed to include any amount (whether principal, interest, premium, fees, expenses, indemnification obligations and/or any other payment obligation of any kind or nature) which would have been accelerated in accordance with Section 9.2 but for the fact that such acceleration could be unenforceable or not allowable in any Debtor Relief Proceeding or otherwise under any applicable Law. Notwithstanding anything herein to the contrary, upon the occurrence and continuation of an Event of Default, then notwithstanding any collateral or other security or credit support for the Guaranteed Liabilities, at the Administrative Agent's election and without notice thereof or demand therefor, each of the Guaranteed Liabilities and the Guarantors' Obligations shall immediately be and become due and payable.

12.3  **Absolute Rights and Obligations**.  This is a guaranty of payment and not of collection. The Guarantors' Obligations under this Article XII shall be joint and several, absolute and unconditional irrespective of, and each Guarantor hereby expressly waives, to the extent

**Exhibit 1**
**125 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

permitted by law, any defense to its obligations under this Guaranty Agreement and all other Loan Documents to which it is a party by reason of:

(a)     any lack of legality, validity or enforceability of this Agreement, of any of the Notes, of any other Loan Document, or of any other agreement or instrument creating, providing security for, or otherwise relating to any of the Guarantors' Obligations, any of the Guaranteed Liabilities, or any other guaranty of any of the Guaranteed Liabilities (the Loan Documents, and all such other agreements and instruments being collectively referred to as the "Related Agreements");

(b)     any action taken under any of the Related Agreements, any exercise of any right or power therein conferred, any failure or omission to enforce any right conferred thereby, or any waiver of any covenant or condition therein provided;

(c)     any acceleration of the maturity of any of the Guaranteed Liabilities, of the Guarantor's Obligations of any other Guarantor, or of any other obligations or liabilities of any Person under any of the Related Agreements;

(d)     any release, exchange, non-perfection, lapse in perfection, disposal, deterioration in value, or impairment of any security for any of the Guaranteed Liabilities, for any of the Guarantor's Obligations of any Guarantor, or for any other obligations or liabilities of any Person under any of the Related Agreements;

(e)     any dissolution of any Borrower, any Guarantor, any other Loan Party or any other party to a Related Agreement, or the combination or consolidation of the Borrowers, any Guarantor, any other Loan Party or any other party to a Related Agreement into or with another entity or any transfer or disposition of any assets of the Borrowers, any Guarantor or any other Loan Party or any other party to a Related Agreement;

(f)     any extension (including without limitation extensions of time for payment), renewal, amendment, restructuring or restatement of, any acceptance of late or partial payments under, or any change in the amount of any borrowings or any credit facilities available under, this Agreement, any of the Notes or any other Loan Document or any other Related Agreement, in whole or in part;

(g)     the existence, addition, modification, termination, reduction or impairment of value, or release of any other guaranty (or security therefor) of the Guaranteed Liabilities (including without limitation the Guarantor's Obligations of any other Guarantor and obligations arising under any other Guaranty or any other Loan Document now or hereafter in effect);

(h)     any waiver of, forbearance or indulgence under, or other consent to any change in or departure from any term or provision contained in this Agreement, any other Loan Document or any other Related Agreement, including without limitation any term pertaining to the payment or performance of any of the Guaranteed Liabilities, any of the Guarantor's Obligations of any other Guarantor, or any of the obligations or liabilities of any party to any other Related Agreement; and

(i) any other circumstance whatsoever (with or without notice to or knowledge of any Guarantor or any other Loan Party) which might in any manner or to any extent vary the risks of such Loan Party, or might otherwise constitute a legal or equitable defense available to, or discharge of, a surety or a guarantor, including without limitation any right to require or claim that resort be had to the Borrower or any other Loan Party or to any collateral in respect of the Guaranteed Liabilities or Guarantors' Obligations;

except, in each case, the defense of payment of the Guaranteed Liabilities. It is the express purpose and intent of the parties hereto that this Guaranty and the Guarantors' Obligations hereunder and under each joinder agreement with respect hereto shall be absolute and unconditional under any and all circumstances and shall not be discharged except by payment and performance as herein provided.

12.4 **Currency and Funds of Payment**. All Guarantors' Obligations for payment will be paid in lawful currency of the United States of America and in immediately available funds, regardless of any law, regulation or decree now or hereafter in effect that might in any manner affect the Guaranteed Liabilities, or the rights of any Lender with respect thereto as against the Borrowers or any other Loan Party, or cause or permit to be invoked any alteration in the time, amount or manner of payment by the Borrowers or any other Loan Party of any or all of the Guaranteed Liabilities.

12.5 **Subordination**. For so long as this Agreement remains in effect, each Guarantor hereby unconditionally subordinates all present and future debts, liabilities or obligations now or hereafter owing to such Guarantor (a) of the Borrowers, to the Payment In Full of the Guaranteed Liabilities, (b) of every other Guarantor (an "obligated guarantor"), to the Payment In Full of the Guarantors' Obligations of such obligated guarantor, and (c) of each other Person now or hereafter constituting a Loan Party, to the Payment In Full of the obligations of such Loan Party owing to any Lender and arising under the Loan Documents. All amounts due under such subordinated debts, liabilities, or obligations shall, upon the occurrence and during the continuance of an Event of Default, be collected and, upon request by the Administrative Agent, paid over forthwith to the Administrative Agent for the benefit of the Lenders on account of the Guaranteed Liabilities, the Guarantors' Obligations, or such other obligations, as applicable, and, after such request and pending such payment, shall be held by such Guarantor as agent and bailee of the Lenders separate and apart from all other funds, property and accounts of such Guarantor.

12.6 **Enforcement**. Each Guarantor from time to time shall pay to the Administrative Agent for the benefit of the Lenders, on demand, at the Administrative Agent's Principal Office or such other address as the Administrative Agent shall give notice of to such Guarantor, the Guarantors' Obligations as they become or are declared due, and in the event such payment is not made forthwith, the Administrative Agent may proceed to suit against any one or more or all of the Guarantors. At the Administrative Agent's election, one or more and successive or concurrent suits may be brought hereon by the Administrative Agent against any one or more or all of the Guarantors, whether or not suit has been commenced against the Borrower, any other Guarantor, or any other Person and whether or not the Lenders have taken or failed to take any other action to collect all or any portion of the Guaranteed Liabilities or have taken or failed to take any actions against any collateral securing payment or performance of all or any portion of the

Guaranteed Liabilities, and irrespective of any event, occurrence, or condition described in Section 12.3.

12.7 **Set-Off and Waiver**. Each Guarantor waives any right to assert against any Lender as a defense, counterclaim, set-off, recoupment or cross claim in respect of its Guarantor's Obligations (other than the defense of payment of the Guaranteed Liabilities), any defense (legal or equitable) or other claim which such Guarantor may now or at any time hereafter have against the Borrowers or any other Loan Party or any or all of the Lenders without waiving any additional defenses, set-offs, counterclaims or other claims otherwise available to such Guarantor. Each Guarantor agrees that each Lender shall have a lien for all the Guarantor's Obligations upon all deposits or deposit accounts, of any kind, or any interest in any deposits or deposit accounts, now or hereafter pledged, mortgaged, transferred or assigned to such Lender or otherwise in the possession or control of such Lender for any purpose (other than solely for safekeeping) for the account or benefit of such Guarantor, including any balance of any deposit account or of any credit of such Guarantor with the Lender, whether now existing or hereafter established, and hereby authorizes each Lender following the occurrence and during the continuance of an Event of Default at any time or times with or without prior notice to apply such balances or any part thereof to such of the Guarantor's Obligations to the Lenders then due and in such amounts as provided for in this Agreement or otherwise as they may elect.

12.8 **Waiver of Notice; Subrogation**.

(a) Each Guarantor hereby waives to the extent permitted by law notice of the following events or occurrences: (i) acceptance of this Guaranty Agreement; (ii) the Lenders' heretofore, now or from time to time hereafter making Loans and issuing Letters of Credit and otherwise loaning monies or giving or extending credit to or for the benefit of the Borrower or any other Loan Party, or otherwise entering into arrangements with any Loan Party giving rise to Guaranteed Liabilities, whether pursuant to this Agreement or the Notes or any other Loan Document or Related Agreement or any amendments, modifications, or supplements thereto, or replacements or extensions thereof; (iii) presentment, demand, default, non-payment, partial payment and protest; and (iv) any other event, condition, or occurrence described in Section 12.3. Each Guarantor agrees that each Lender may heretofore, now or at any time hereafter do any or all of the foregoing in such manner, upon such terms and at such times as each Lender, in its sole and absolute discretion, deems advisable, without in any way or respect impairing, affecting, reducing or releasing such Guarantor from its Guarantor's Obligations, and each Guarantor hereby consents to each and all of the foregoing events or occurrences.

(b) Each Guarantor hereby agrees that payment or performance by such Guarantor of its Guarantor's Obligations under this Guaranty Agreement may be enforced by the Administrative Agent on behalf of the Lenders upon demand by the Administrative Agent to such Guarantor without the Administrative Agent being required, such Guarantor expressly waiving to the extent permitted by law any right it may have to require the Administrative Agent, to (i) prosecute collection or seek to enforce or resort to any remedies against the Borrowers or any other Guarantor or any other guarantor of the Guaranteed Liabilities, or (ii) seek to enforce or resort to any remedies with respect to any security interests, Liens or encumbrances granted to the Administrative Agent or any Lender or other party to a Related Agreement by the Borrowers, any other Guarantor or any other Person on account of the Guaranteed Liabilities or any guaranty

**Exhibit 1**
**128 of 132**
Case 19-62584-pcm11    Doc 16    Filed 08/22/19

thereof, IT BEING EXPRESSLY UNDERSTOOD, ACKNOWLEDGED AND AGREED BY SUCH GUARANTOR THAT DEMAND UNDER THIS GUARANTY MAY BE MADE BY THE ADMINISTRATIVE AGENT, AND THE PROVISIONS HEREOF ENFORCED BY THE ADMINISTRATIVE AGENT, EFFECTIVE AS OF THE FIRST DATE ANY EVENT OF DEFAULT OCCURS AND IS CONTINUING.

(c)      Each Guarantor further agrees that such Guarantor shall not exercise any of its rights of subrogation, reimbursement, contribution, indemnity or recourse to security for the Guaranteed Liabilities until at least 95 days immediately following the Termination Date shall have elapsed without the filing or commencement, by or against any Loan Party, of any state or federal action, suit, petition or proceeding seeking any reorganization, liquidation or other relief or arrangement in respect of creditors of, or the appointment of a receiver, liquidator, trustee or conservator in respect to, such Loan Party or its assets.  If an amount shall be paid to any Guarantor on account of such rights at any time prior to Termination Date, such amount shall be held in trust for the benefit of the Lenders and shall forthwith be paid to the Administrative Agent, for the benefit of the Lenders, to be credited and applied upon the Guarantors' Obligations, whether matured or unmatured, in accordance with the terms of this Agreement or otherwise as the Lenders may elect.  The agreements in this subsection shall survive repayment of all of the Guarantors' Obligations, the termination or expiration of this Guaranty Agreement in any manner and occurrence of the Termination Date.

12.9    **Reliance**.  Each Guarantor represents and warrants to the Administrative Agent, for the benefit of the Lenders, that:  (a) such Guarantor has adequate means to obtain on a continuing basis (i) from the Borrowers, information concerning the Loan Parties and the Loan Parties' financial condition and affairs and (ii) from other reliable sources, such other information as it deems material in deciding to provide this Article XII and any joinder agreement ("Other Information"), and has full and complete access to the Loan Parties' books and records and to such Other Information; (b) such Guarantor is not relying on any Lender or its or their employees, Directors, agents or other representatives or Affiliates, to provide any such information, now or in the future; (c) such Guarantor has been furnished with and reviewed the terms of such Loan Documents and Related Agreements as it has requested, is executing this Agreement (or the joinder agreement to which it is a party, as applicable) freely and deliberately, and understands the obligations and financial risk undertaken by providing this Agreement; (d) such Guarantor has relied solely on the Guarantor's own independent investigation, appraisal and analysis of the Borrowers and the other Loan Parties, such Persons' financial condition and affairs, the Other Information, and such other matters as it deems material in deciding to provide this Guaranty and is fully aware of the same; and (e) such Guarantor has not depended or relied on any Lender or its or their employees, Directors, agents or other representatives or Affiliates, for any information whatsoever concerning the Borrowers or the Borrowers' financial condition and affairs or any other matters material to such Guarantor's decision to provide this Guaranty, or for any counseling, guidance, or special consideration or any promise therefor with respect to such decision.  Each Guarantor agrees that no Lender has any duty or responsibility whatsoever, now or in the future, to provide to such Guarantor any information concerning the Borrowers or any other Loan Party or such Persons' financial condition and affairs, or any Other Information, other than as expressly provided herein, and that, if such Guarantor receives any such information from any Lender or its or their employees, Directors, agents or other representatives or Affiliates, such Guarantor will independently verify the information and will not rely on any

**Exhibit 1**
**129 of 132**

Lender or its or their employees, Directors, agents or other representatives or Affiliates, with respect to such information.

12.10 **Joinder**.  Each Person that shall at any time execute and deliver to the Administrative Agent a joinder agreement with respect to this Article XII in form and substance acceptable to the Administrative Agent shall thereupon irrevocably, absolutely and unconditionally become a party hereto and obligated hereunder as a Guarantor, and all references herein and in the other Loan Documents to the Guarantors or to the parties to this Guaranty shall be deemed to include such Person as a Guarantor hereunder.

*Signature page follows.*

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, have executed this Agreement as of the day and year first above written.

NORPAC FOODS, INC., as a Borrower

By: _~signature~_
Name: _Richard M. Munekiyo_
Title: ~~CEO & Secretary~~
    CFO

HERMISTON FOODS, LLC, as a Borrower

By: _~signature~_
Name: _Richard M. Munekiyo_
Title: ~~CEO & Secretary~~
    CFO

QUINCY FOODS, LLC, as a Borrower

By: _~signature~_
Name: _Richard M. Munekiyo_
Title: ~~CEO & Secretary~~
    CFO

COBANK, ACB, as Administrative Agent and as a Lender

By: _____
Name: _____
Title: _____

*Signature Page to Norpac Foods, Inc. Credit Agreement*

IN WITNESS WHEREOF, the parties hereto, by their officers thereunto duly authorized, have executed this Agreement as of the day and year first above written.

NORPAC FOODS, INC., as a Borrower

By: _____
Name: _____
Title: _____


HERMISTON FOODS, LLC, as a Borrower

By: _____
Name: _____
Title: _____


QUINCY FOODS, LLC, as a Borrower

By: _____
Name: _____
Title: _____


COBANK, ACB, as Administrative Agent and as a Lender

By: _____
Name: _Justin A. Barr_____
Title: _Vice President_____

*Signature Page to Norpac Foods, Inc. Credit Agreement*

# EXHIBIT 2

## FIRST AMENDMENT

## TO CREDIT AGREEMENT

# FIRST AMENDMENT TO CREDIT AGREEMENT

THIS FIRST AMENDMENT TO CREDIT AGREEMENT (this "Amendment") is dated as of December 20, 2017 and is made with respect to the Credit Agreement dated as of November 15, 2017 (the "Credit Agreement") by and among Norpac Foods, Inc., an Oregon cooperative corporation (the "Parent"), each of the Parent's Subsidiaries identified on the signature pages hereof (together with the Parent, collectively, the "Borrowers"), the Guarantors from time to time party thereto, the Lenders from time to time party thereto, and CoBank, ACB, in its capacity as Administrative Agent.

The Borrowers, the Lenders and the Administrative Agent wish to amend the Credit Agreement to change certain definitions and covenants, as more fully set forth below.

Now, therefore, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1. **Definitions**. As used herein, capitalized terms defined in the Credit Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

2. **Amendments to the Credit Agreement**. The Credit Agreement is hereby amended as follows:

(a) <u>References to Floating Rate</u>. The Credit Agreement is amended by deleting each reference to "Floating Rate", "Floating Rate Loan" and "Floating Rate Option" set forth therein and inserting "Base Rate", "Base Rate Loan" and "Base Rate Option", respectively, in substitution therefor.

(b) <u>Amendments to Section 1.1 of the Credit Agreement (Definitions)</u>. Section 1.1 of the Credit Agreement is hereby amended as follows:

(i) The following new definition is inserted therein in appropriate alphabetical order to read in its entirety as follows:

"<u>Base Rate</u>" means, for any day, a fluctuating rate per annum equal to the highest of (i) the Prime Rate, (ii) fifty basis points (0.50%) plus the Federal Funds Effective Rate, and (iii) except during any period in which a notice given pursuant to Section 3.3 is in effect, one hundred basis points (1.00%) plus the Adjusted LIBOR Rate for an Interest Period of one month commencing on such day. Any change in the Base Rate as of any day due to a change in the calculation or the components thereof shall be effective at the opening of such day of business on such day and without necessity of notice being provided to any Borrower or any other Person.

(ii) The definition of Business Day is amended and restated in its entirety to read as follows:

"<u>Business Day</u>" means any day other than a Saturday or Sunday or a legal holiday on which banks are authorized or required to be closed for business in Denver, Colorado or New York, New York and if the applicable Business Day relates to any LIBOR Rate Loan or Quoted Rate Loan, or to the setting of the Base Rate determined by reference to the Adjusted LIBOR Rate, such day must

also be a day on which dealings in Dollar deposits by and between banks are carried on in the London interbank market.

(iii)     Subsection (i) of the definition of Eligible Accounts is amended and restated in its entirety to read as follows:

(i)     Accounts with respect to the following Account Debtors, in each case, solely to the extent in excess of the percentages set forth below:

(1)     Accounts owing by CostCo Wholesale Corporation to the extent the amount of all obligations owing by such Account Debtor exceeds 30% of all Eligible Accounts;

(2)     Accounts owing by Sam's West, Inc. d/b/a Sam's Club and Wal-Mart Stores, Inc. to the extent amount of all obligations owing by such Account Debtors (collectively) exceeds 30% of all Eligible Accounts;

(3)     Accounts owing by each of the top ten Account Debtors (other than any Account Debtors referenced in the foregoing subsections (1) and (2)) to the extent the amount of all obligations owing by such Account Debtor exceeds 20% of all Eligible Accounts; and

(4)     Accounts owing by any Account Debtor (other than any Account Debtors referenced in the foregoing subsections (1), (2) and (3)) to the extent the amount of all obligations owing by such Account Debtor exceeds 10% of all Eligible Accounts;

(provided, however, that any of the foregoing percentages in excess of 10% shall be subject to adjustment down to 10% at any time in the sole discretion of Administrative Agent);

(iv)     The definitions of Floating Rate and Weekly Reset LIBOR Rate are deleted in their entirety therefrom.

(c)     Amendment to Section 2.2(b) of the Credit Agreement (Revolving Loan Requests). Section 2.2(b) of the Credit Agreement is amended and restated in its entirety to read as follows:

(b)     Revolving Loan Requests. The Borrowers may from time to time prior to the Revolving Loan Maturity Date request the Revolving Lenders to effect a Borrowing under the Revolving Credit Facility by delivering to the Administrative Agent, not later than 11:00 a.m., three Business Days prior to the proposed Borrowing Date with respect to LIBOR Rate Loans or Quoted Rate Loans and one Business Day prior to the proposed Borrowing Date with respect to Base Rate Loans, a duly completed Loan Request. Each such Loan Request shall be irrevocable and shall specify the aggregate amount of the proposed Revolving Loans comprising each Borrowing, and, if applicable, the Interest Period or Quoted Rate Period. Unless otherwise approved by the Administrative Agent in its sole discretion, each shall be in an amount equal to $5,000,000 or an integral multiple of $1,000,000 in excess of $5,000,000 (or, if more, the

2

minimum amount required for the applicable Interest Rate Option pursuant to Section 2.4(c)).

(d) <u>Amendment to Section 2.4(d) of the Credit Agreement (Day Count Basis)</u>. Section 2.4(d) of the Credit Agreement is amended and restated in its entirety to read as follows:

  (d) <u>Day Count Basis</u>. Interest and fees shall be calculated on the basis of a 360-day year for the actual number of days elapsed (which results in more interest or fees, as the case may be, being paid than if calculated on the basis of a 365-day year); <u>provided</u>, however, that interest accruing from time to time on Base Rate Loans and based on the Prime Rate shall be computed on the basis of the actual number of days elapsed in a year of 365 or 366 days, as the case may be. The date of funding or conversion of a LIBOR Rate Loan or a Quoted Rate Loan to a Base Rate Loan and the first day of an Interest Period or Quoted Rate Period shall be included in the calculation of interest. The date of payment of any Loan and the last day of an Interest Period or a Quoted Rate Period shall be excluded from the calculation of interest; <u>provided</u>, if a Loan is repaid on the same day that it is made, 1 day's interest shall be charged.

(e) <u>Amendment to Section 2.12(a) of the Credit Agreement (Right to Prepay)</u>. Section 2.12(a) of the Credit Agreement is amended and restated in its entirety to read as follows:

  (a) <u>Right to Prepay</u>. The Borrowers shall have the right at their option from time to time to prepay the Loans in whole or part without premium or penalty (except as provided in Sections 3.1 and 3.5, 10.3,). Whenever a Borrower desires to prepay any part of the Loans, it shall provide a prepayment notice to the Administrative Agent (A) by 11:00 a.m. at least 3 Business Days prior to the date of prepayment of LIBOR Rate Loans and Quoted Rate Loans, (B) no later than 1:00 p.m. on the date of prepayment of Base Rate Loans, or (C) no later than 1:00 p.m. on the date of prepayment of Swing Line Loans, setting forth the following information:

   (i) the date, which shall be a Business Day, on which the proposed prepayment is to be made;

   (ii) a statement indicating the application of the prepayment among Class of Loan and Borrowings; and

   (iii) the total principal amount of such prepayment, which shall not be less than the lesser of the following with respect to any Class of Loan: (A) the then outstanding principal amount of such Class of Loan, or (B) $5,000,000 (provided, that the amount of any prepayment to which this Section 2.12(a)(iii)(B) applies shall be in integral multiples of $1,000,000).

(f) <u>Amendment to Section 3.3 of the Credit Agreement (Illegality)</u>. Section 3.3 of the Credit Agreement is amended and restated in its entirety to read as follows:

  3.3 **Illegality**. If any Lender determines that any Change in Law has made it unlawful for such Lender to make, maintain or fund LIBOR Rate Loans or Base Rate Loans, or to determine or charge interest rates based upon any Interest Rate Option, or if any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on written notice thereof by such Lender to the Borrower through the

US.115545203.09

Administrative Agent, any obligation of such Lender to make, continue or convert any LIBOR Rate Loan shall be suspended and each Base Rate Loan made by such Lender shall be calculated without giving effect to clause (iii) in the definition thereof, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all LIBOR Rate Loans of such Lender to Base Rate Loans (without giving effect to clause (iii) in the definition thereof), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Rate Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued and unpaid interest and all other amounts payable by Borrower under this Agreement on the amount so prepaid or converted.

(g)    Amendment to Section 3.4 of the Credit Agreement (LIBOR Rate Option Unavailable; Interest After Default).    Section 3.4 of the Credit Agreement is amended and restated in its entirety to read as follows:

3.4    **LIBOR Rate Option Unavailable; Interest After Default**.  If at any time:

(a)    the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that either Dollar deposits are not being offered to banks in the London interbank LIBOR Rate market or that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

(b)    the Required Lenders determine (which determination shall be conclusive and binding absent manifest error) that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to the lenders of making or maintaining the Loans for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (x) any request to make, convert or continue any Loan at the LIBOR Rate Option shall be ineffective, and (y) all Loans (other than Quoted Rate Loans) shall bear interest at the Base Rate Option (without giving effect to clause (iii) in the definition thereof) from the date of such notice until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist.

(h)    Amendments to Section 6.1(e) of the Credit Agreement (Other Reports).  Section 6.1(e) of the Credit Agreement is amended by deleting each instance of "15 days" from subsections (iii) and (iv) thereof and inserting "30 days" in substitution therefor.

(i)    Amendments to Section 6.13 of the Credit Agreement (Post-Closing Deliveries). Section 6.13 of the Credit Agreement is amended by (i) deleting "30 days after the Closing Date" therefrom and inserting "February 15, 2018" in substitution therefor, and (ii) deleting "including" from subsection (i) thereof and inserting "other than existing deposit accounts maintained at" in substitution therefor.

4

(j)     Amendment to Exhibits to the Credit Agreement (Borrowing Base Report). Exhibit B to the Credit Agreement is hereby amended and restated in its entirety in the form of Exhibit B attached hereto.

3.     **No Other Changes**.  Except as expressly set forth herein, all terms, provisions, and conditions of the Credit Agreement and the other Loan Documents, and all documents executed in connection therewith, shall continue in full force and effect and shall remain enforceable and binding in accordance with their respective terms.

4.     **Representations and Warranties**.  Each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a)     Each Borrower has all requisite power and authority, corporate or otherwise, to execute and deliver this Amendment and any other documents delivered hereunder and to perform its obligations under this Amendment, the Credit Agreement as amended hereby, and the other Loan Documents.  This Amendment and the other Loan Documents have been duly and validly executed and delivered to the Administrative Agent by the applicable Borrower, and constitute such Borrower's legal, valid and binding obligations, enforceable in accordance with their terms.

(b)     The execution, delivery and performance by each Borrower of this Amendment, the Credit Agreement as amended hereby, and the other Loan Documents to which such Borrower is a party have been duly authorized by all necessary corporate or other action of such Borrower and do not and will not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate such Borrower's Governing Documents or any provision of any law, rule, regulation or order presently in effect having applicability to such Borrower, or (iii) result in a breach of, or constitute a default under, any indenture or agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected.

(c)     The representations and warranties of each Borrower in the Credit Agreement which are not otherwise qualified by materiality shall be true, correct and complete in all material respects on and as of the Effective Date of this Amendment as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all material respects as of the applicable earlier date(s); and (ii) the representations and warranties of each Borrower in the Credit Agreement which are qualified by materiality shall be true, correct and complete in all respects on and as of the Effective Date of this Amendment as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all respects as of the applicable earlier date(s).

5.     **Conditions to Effectiveness**. The effectiveness of this Amendment is subject to the satisfaction, in the Administrative Agent's sole discretion, of each of the following conditions precedent (the date on which all such conditions precedent are so satisfied shall be the "Effective Date"):

(a)     No Default, Event of Default or event that, with notice or the passage of time or both, would constitute an Event of Default, shall have occurred and be continuing.

(b)     The Administrative Agent shall have received each of the following, each in form and substance acceptable to the Administrative Agent in its sole discretion:

(i)     this Amendment, duly executed and delivered by each Borrower;

US.115545203.09

(ii)     a certificate of the secretary or assistant secretary of each Borrower, certifying (i) a true, correct and complete copy of the resolutions of such Borrower authorizing the execution, delivery and performance of this Amendment, (ii) true, correct and complete copies of such Borrower's Governing Documents (or, if true, certifying that, except as attached to such certificate, there has been no change to the same since they were certified to the Administrative Agent in connection with the Credit Agreement) and (iii) certifying the officers of such Borrower that are presently authorized to execute and deliver this Amendment and the other Loan Documents, together with true signatures of each such officer (or, if true, certifying that, such officers certified to the Administrative Agent in connection with the Credit Agreement remain authorized to execute and deliver this Amendment and the other Loan Documents);

(iii)     all fees and expenses of the Administrative Agent (including the fees and expenses of Administrative Agent and its counsel, advisors and consultants) to the extent invoiced prior to the date hereof; and

(iv)     such other assurances, certificates, documents, consents, reports or opinions as the Administrative Agent may require.

6.     **General Provisions**.

(a)     <u>Release</u>.  Each Borrower hereby absolutely and unconditionally releases and forever discharges each of the Administrative Agent and Lenders, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns, together with all of the present and former directors, officers and employees, agents, attorneys and consultants of any of such released parties, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which such Borrower, has had, now has or has made claim to have against any such Person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

(b)     <u>Expenses</u>.  The Borrowers agree to pay the expenses and costs of the Administrative Agent (including the fees and expenses of the Administrative Agent and its counsel, advisors and consultants) accrued and incurred in connection with the negotiation and documentation of this Amendment.

(c)     <u>Continuing Effect of Other Documents</u>.  The parties hereto hereby acknowledge and agree that this Amendment shall constitute a Loan Document for all purposes of the Credit Agreement and the other Loan Documents. This Amendment shall not constitute an amendment or waiver of any provision of the Credit Agreement or any other Loan Document except as expressly set forth herein, and shall not be construed as a waiver or consent to any further or future action on the part of any Borrower that would require a waiver or consent of the Lenders or the Administrative Agent. Except as expressly amended, modified and supplemented hereby, the provisions of the Credit Agreement and the other Loan Documents are and shall remain in full force and effect.

(d)     <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors and assigns, except that none of the Borrowers may assign or transfer its respective rights or obligations hereunder.

6

(e)     <u>Severability</u>. Should any provision of this Amendment be deemed unlawful or unenforceable, said provision shall be deemed several and apart from all other provisions of this Amendment, and all remaining provisions of this Amendment shall be fully enforceable.

(f)     <u>Governing Law</u>. THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF COLORADO.

(g)     <u>Headings</u>. The captions or headings in this Amendment are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Amendment.

(h)     <u>Counterparts</u>. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Amendment, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile or by e-mail transmission of a PDF or similar copy shall be equally as effective as delivery of an original executed counterpart of this Amendment. Any party delivering an executed counterpart signature page to this Amendment by facsimile or by e-mail transmission shall also deliver an original executed counterpart of this Amendment but the failure to deliver an original executed counterpart shall not affect the validity, enforceability or binding effect of this Amendment.

*Signature page follows.*

7

US.115545203.09

Exhibit 2
7 of 12

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers as of the day and year first above written.

**NORPAC FOODS, INC.,** as Borrower

By: _____
Name:   Richard M. Munekiyo
Title:    Secretary and Chief Financial Officer

**HERMISTON FOODS, LLC,** as Borrower

By: _____
Name:   Richard M. Munekiyo
Title:    Secretary and Chief Financial Officer

**QUINCY FOODS, LLC,** as Borrower

By: _____
Name:   Richard M. Munekiyo
Title:    Secretary and Chief Financial Officer

**COBANK, ACB,** as Administrative Agent and as Lender

By: _____
Name:   Justin A. Barr
Title:    Vice President

*Signature Page to First Amendment to Credit Agreement*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed by their duly authorized officers as of the day and year first above written.

NORPAC FOODS, INC., as Borrower

By: _____
Name:    Richard J. Munekiyo
Title:     Secretary and Chief Financial Officer


HERMISTON FOODS, LLC, as Borrower

By: _____
Name:    Richard J. Munekiyo
Title:     Secretary and Chief Financial Officer


QUINCY FOODS, LLC, as Borrower

By: _____
Name:    Richard J. Munekiyo
Title:     Secretary and Chief Financial Officer


COBANK, ACB, as Administrative Agent and as Lender

By: _____
Name:    Justin A. Barr
Title:     Vice President


*Signature Page to First Amendment to Credit Agreement*

### BORROWING BASE REPORT

*See attached.*

**Exhibit 2**
**10 of 12**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

**BORROWING BASE CERTIFICATE**
**COBANK, ACB**

| Name of Borrower: | City, State | Effective Date of Calculation |
|---|---|---|
| **NORPAC FOODS, INC.** | **Salem, OR** | |

In accordance with the Credit Agreement dated as of November 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and between the Borrower and CoBank, ACB, as administrative agent, set forth below is the calculation of the Borrowing Base as of the date set forth above in "Effective Date of Calculation". All capitalized terms used in this certificate have the meanings given them in the Credit Agreement; any additional terms are provided for reference only. In the event of any inconsistency between this Certificate and the Credit Agreement, the Credit Agreement's definitions and other terms shall control.

**PART A--ELIGIBLE INVENTORY**

| | TYPES OF INVENTORY | | VALUE | ADVANCE RATE | | MAXIMUM ADVANCE ALLOWABLE |
|---|---|---|---|---|---|---|
| 1. | Frozen Retail Fruit & Vegetables | | | | | |
| 2. | Frozen Bulk Fruit and Vegetables (<= 3 years old) | | | | | |
| 3. | Product Purchased for Resale | | | | | |
| 4. | Grower Supplies held for resale, including seed | | | | | |
| 5. | Less: Inventory not located at Eligible Inventory Locations | | | | | |
| 6. | Less: Inventory subject to liens other than in favor of the Administrative Agent and Permitted Liens | | | | | |
| 7. | Less: Returned or Rejected Goods | | | | | |
| 8. | Less: Other Excluded Inventory | | | | | |
| 9. | Less: absorption | | | | | |
| 10. | Less: Payables to Outside Warehouses | | | | | |
| 11. | TOTAL PART A: Eligible Inventory | | $0 | 65% | = | $0 |

**PART B--ELIGIBLE ACCOUNTS**

| Account Aging | 0-30 Days | |
|---|---|---|
| | 31-60 Days | |
| | Over 60 Days | |
| | Over 90 Days | |
| Total Receivables | | $0 |

Less: (see definitions in the Credit Agreement for full definition) due > 60 days from invoice date (or if for seed or chemicals due after current crop year)

a) non-trade accounts receivable
b) liens - other
c) rebates/allowances
d) foreign
e) US Govt. (includes agencies)
f) intercompany/affiliate
g) 50% cross aged over 90 days past due/in default
h) counterclaim/unresolved disputes
j) legal/bankruptcy/receivership/reorganization/debtor relief proceeding
k) conditional sales
l) accounts in states with no legal recourse
m) contra
n) bill and hold
o) other accounts receivable financing (discounting/factoring)
p) other ineligible accounts

Total Eligible Accounts before Concentration $0

**Exhibit 2**
**11 of 12**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

| Name of Borrower:<br>**NORPAC FOODS, INC.** | City,  State<br>**Salem,  OR** | Effective Date of Calculation<br>**January 0, 1900** |
|---|---|---|

Total Eligible Accounts before Concentration                    $0   from page 1

i) Excess Receivable Concentration calculation:

| | | | | |
|---|---|---|---|---|
| **30%** | $ | - | accounts of Sam's Club and Walmart (combined) and Costco as specified in the Credit Agreement in excess of this balance | |
| **20%** | $ | - | accounts of a top ten Account Debtor as specified in the Credit Agreement in excess of this balance | |
| **10%** | $ | - | accounts specified in the Credit Agreement in excess of this balance | |

| | Concentration<br>Calculation | % | Deduction Amount |
|---|---|---|---|
| Sam's / Wal-Mart | | 30% | 0 |
| Costco | | 30% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 20% | 0 |
| | | 10% | 0 |
| | | 10% | 0 |
| | | 10% | 0 |
| | | 10% | 0 |
| | | 10% | 0 |
| | | 10% | 0 |
| Total Concentration Deductions | | | $0 |

| | | **AMOUNT** | **ADVANCE<br>RATE** | | **MAXIMUM ADVANCE<br>ALLOWABLE** |
|---|---|---|---|---|---|
| TOTAL PART B: | Eligible Accounts | $0 | 85% | = | $0 |

**PART C--BORROWING BASE CALCULATION**

| | | | |
|---|---|---|---|
| 1. | SUBTOTAL (Add totals from Parts A & B) | | $0 |
| 2. | Less: aggregate amount of non-member Producer Payables | | |
| 3. | Less: amounts secured by other involuntary liens. | | |
| 4. | Less: aggregate amount of reserves, if any | | |
| 5. | Less: Book overdrafts | | |
| 6. | Less:  Demand Patron Notes | | |
| 7. | Subtotal of Lines 2 through 6 | | $0 |
| 8. | **BORROWING BASE** (Line 1 minus Line 7) | | **$0** |
| 9. | Less: Revolving Credit Facility Usage* | | |
| | * sum of outstanding Revolving Loans plus outstanding Swing Line Loans plus Letter of Credit Obligations | | |
| 10 | Excess or (Deficit) on Period End Date<br>(Line 8 minus Line 9) | | **$0** |

**NOTE:  IF LINE 8 IS A DEFICIT, REMIT THE DEFICIT TO THE ADMINISTRATIVE AGENT.**

In accordance with the terms of the Credit Agreement, I hereby certify that the information contained in this Borrowing Base Certificate is correct and presents fairly, in all material aspects, the financial position of the Borrower.

| **AUTHORIZED SIGNATURE** | **TITLE** | **DATE** |
|---|---|---|
| | | |

Email to:          CIServices@cobank.com

**Exhibit 2**
**12 of 12**

# EXHIBIT 3

## TENTH AMENDMENT

## TO CREDIT AGREEMENT

**SEVENTH AMENDMENT TO FORBEARANCE AGREEMENT
AND TENTH AMENDMENT TO CREDIT AGREEMENT**

This Amendment is dated as of June 5, 2019 by and among Norpac Foods, Inc., an Oregon cooperative corporation (the "Parent"), each of the Parent's Subsidiaries identified on the signature pages hereof (together with the Parent, collectively, the "Borrowers"), the Lenders signatories hereto, and CoBank, ACB, a federally chartered instrumentality of the United States, in its capacity as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

The Borrowers, the Guarantors from time to time party thereto, the Lenders from time to time party thereto and the Administrative Agent are parties to a Credit Agreement dated as of November 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Credit Agreement"). As used in these recitals, capitalized terms defined in the Credit Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

The Borrowers, the Lenders signatory thereto and the Administrative Agent are parties to a Forbearance Agreement and Second Amendment to Credit Agreement dated as of July 23, 2018 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Forbearance Agreement").

The Borrowers have requested that the Administrative Agent and the Lenders agree to certain amendments to the Credit Agreement and the Forbearance Agreement, and the Administrative Agent and the Lenders are willing to grant such requests on the terms and subject to the conditions set forth herein.

Now, therefore, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.     **Definitions**. As used herein, capitalized terms defined in the Credit Agreement or the Forbearance Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement or the Forbearance Agreement, respectively.

2.     **Acknowledgments and Agreements**. Each Borrower hereby reaffirms, acknowledges and agrees as follows:

(a)     *Recitals*. The Recitals to this Amendment are true and correct.

(b)     *Loan Documents*. Each Loan Document to which such Borrower is a party is the valid and binding agreement of such Borrower, enforceable in accordance with its terms, and as to each of which there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(c)     *Indebtedness*. The Obligations are not subject to any restriction, setoff, deduction, claim, counterclaim or defense of any Borrower of any kind or character whatsoever.

(d)     *Collateral*. The Administrative Agent, for itself and on behalf of the Lenders, has a valid, enforceable and first-priority perfected security interest in and Lien on all assets and property of each Borrower to secure the payment and performance of the Obligations, as to which collateral there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(e)     *Outstanding Loans.* As of June 3, 2019, (i) the outstanding principal balance of all

**Exhibit 3**
**1 of 14**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

Revolving Loans made under the Loan Documents was $82,500,000.00 together with accrued and unpaid interest thereon of $773,938.41 and an Unused Commitment Fee of $4,758.36; (ii) the Letter of Credit Obligations was $800,000.00 together with the accrued and unpaid Letter of Credit Fees in the aggregate amount of $6,844.45; (iii) the outstanding principal balance of all Swing Line Loans made under the Loan Documents was $1,015,023.67 together with accrued and unpaid interest thereon of $35,069.91; and (iv) the outstanding principal balance of the Term Loan made under the Loan Documents was $36,621,623.99 together with accrued and unpaid interest thereon of $209,696.43.

(f) *Specified Defaults.* The Specified Defaults (as defined in the Forbearance Agreement as amended hereby) have occurred and are continuing as of the date hereof. As a result of the Specified Defaults, (i) the Lenders do not have any obligation to make any Loan, (ii) the Issuing Lender does not have any obligation to issue any Letter of Credit, and (iii) the Administrative Agent and the Lenders are entitled to exercise rights and remedies under the Loan Documents and all other rights and remedies otherwise available to them, including, without limitation, the right to demand immediate payment of the entire outstanding principal balance of the Loans, all unpaid accrued interest thereon and all other Obligations.

(g) *No Waiver of Specified Defaults or Rights and Remedies.* Neither this Amendment, nor any action taken in accordance with this Amendment or any other Loan Document, nor any correspondence, any oral or written communications, nor any making of any Loan or issuing of any Letter of Credit, nor any acceptance of repayment of any Loan or other amount, nor any forbearance, amendment or consent or any other action or omission on the part of the Administrative Agent or any Lender shall be, or shall construed to be, a waiver, modification or release of any Specified Default or any other existing or future Default or Event of Default, as to which all rights and remedies of the Administrative Agent and each Lender are and shall continue at all times to be expressly reserved by the Administrative Agent and the Lenders.

(h) *Conduct.* The Administrative Agent and the Lenders have fully and timely performed all of their obligations and duties in compliance with the Loan Documents and applicable law, and have acted reasonably, in good faith and appropriately under the circumstances.

(i) *Communications with Consultants.* The Borrowers have engaged Davidson (as defined in the Credit Agreement) to provide financial and strategic assistance to the Borrowers. The Borrowers have also engaged and may in the future engage other consultants to provide financial and strategic assistance to the Borrowers. Each Borrower irrevocably authorizes Davidson, and each other consultant of a Borrower, to communicate directly with the Administrative Agent at any and all times to discuss or to review any aspect of the business of the Borrowers and any other matter regarding the engagement between any Borrower and such consultants, and to transmit any information relating to the Borrowers to the Administrative Agent, all without any further authorization from or notice to any Borrower.

(j) *Engagement of Consultants by Administrative Agent.* Without limiting any provision of the Credit Agreement, including but not limited to Sections 6.6 and 11.3(a) thereof, the Borrowers (x) acknowledge that the Administrative Agent may from time to time engage financial advisors or other consultants on terms and conditions acceptable to the Administrative Agent, in each case at the Borrowers' expense, (y) agree that the Borrowers shall, and shall cause their officers, employees and advisors to, cooperate with any such advisors and consultants and provide all information reasonably requested by any such advisor or consultant, which information shall be true, correct and complete, and (z) agree that the Borrowers shall, promptly after demand therefor, reimburse the Administrative Agent for all costs, fees, charges and disbursements of each such advisor or consultant. The Borrowers hereby acknowledge and agree that no Loan Party may rely on any statements made by, or any analysis, reports or

**Exhibit 3**
**2 of 14**

other documents (if any) prepared and/or provided by, a financial advisor or other consultant of the Administrative Agent or any Lender.

(k)     *Forbearance Fee*. The Borrowers shall pay to the Administrative Agent in immediately available funds a forbearance fee of $50,000 for the ratable account of the Lenders and Voting Participants consenting to this Amendment (the "Forbearance Fee").  The Forbearance Fee shall be due and payable on the date hereof and be deemed fully earned by the execution and delivery of this Agreement.

3.     **Amendments to the Forbearance Agreement**.  The Forbearance Agreement is hereby amended as follows:

(a)     Amendments to Section 1 of the Forbearance Agreement (Definitions).  Section 1 of the Forbearance Agreement is amended by amending and restating the following definitions to read in their entirety as follows:

"'Forbearance Termination Event' means any of the following:

(a)     the occurrence of the Stated Forbearance Termination Date; or

(b)     the occurrence of any of the following, but only if the Administrative Agent, in its sole discretion, has designated such occurrence as a Forbearance Termination Event effective as of the date specified in such notice:

(i)     any Default or Event of Default (other than the Specified Defaults) under any Loan Document;

(ii)     the Administrative Agent or any Lender becomes aware of or determines that any Default or Event of Default (other than the Specified Defaults) had occurred and was continuing under any Loan Document as of the date of this Agreement; or

(ii)     any Borrower or any other Loan Party fails to comply in any respect with any term, condition or provision of this Agreement."

"'Stated Forbearance Termination Date' means June 15, 2019."

(b)     Amendments to Section 3(f) of the Forbearance Agreement (Credit Extensions During the Forbearance Period).  Section 3(f) of the Forbearance Agreement is amended and restated in its entirety to read as follows:

"(f)     *Credit Extensions During the Forbearance Period*.  Section 4.2 of the Credit Agreement provides that no Lender (including the Issuing Lender) has any obligation to make any Loan or Letter of Credit (each a "Credit Extension") so long as any Default or Event of Default is continuing.  Notwithstanding the foregoing, the Lenders and the Issuing Lender hereby agree to make Loans and issue Letters of Credit to the Borrowers during the Forbearance Period under the terms and conditions of this Agreement and the other Loan Documents, provided that (1) no Forbearance Termination Event has occurred before or after giving pro forma effect to such requested Credit Extension, (2) each of the conditions precedent to such Credit Extension as set forth herein and in the other Loan Documents have been satisfied (other than those that cannot be satisfied solely as a result of the existence of the Specified Defaults or any other Default or Event of Default that has

**Exhibit 3**
**3 of 14**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

not been designated by the Administrative Agent in its sole discretion as a Forbearance Termination Event), and (3) each such requested Credit Extension is in compliance with all of the other requirements of the Loan Documents. In addition, so long as any Default or Event of Default has occurred and is continuing, Section 2.4(a) of the Credit Agreement provides that no Borrower may request, convert to, or renew any Fixed Rate Loans and Section 4.2 of the Credit Agreement provides that no Lender has any obligation to make or convert any Loan. Notwithstanding the foregoing, so long as no Forbearance Termination Event has occurred before or after giving pro forma effect thereto, Base Rate Loans, LIBOR Rate Loans and Quoted Rate Loans may be requested, converted and renewed in accordance with the terms and conditions of the Credit Agreement."

4. **Amendments to the Credit Agreement**. The Credit Agreement is hereby amended as follows:

(a) <u>Amendments to Section 1.1 of the Credit Agreement (Certain Definitions)</u>. Section 1.1 of the Credit Agreement is amended by adding or amending and restating, as the case may be, the following definitions to read in their entirety as follows:

"'<u>Aggregate Revolving Credit Commitment Amount</u>' means $87,500,000, constituting the sum of the Revolving Commitments of the Revolving Lenders, subject to adjustment in accordance with Sections 2.12 and 2.13."

"'<u>Forbearance Agreement</u>' means the Forbearance Agreement and Second Amendment to Credit Agreement dated as of July 23, 2018 among the Borrowers, the Lenders signatory thereto and the Administrative Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time."

"'<u>Revolving Loan Maturity Date</u>' means, with respect to the Revolving Credit Facility (including the Swing Line Facility and the Letter of Credit Facility), the earlier of (a) the date of acceleration of the Obligations in accordance with Section 9.2 and (b) June 15, 2019."

"'<u>Term Loan Maturity Date</u>' means, with respect to the Term Loan Facility, the earlier of (a) the date of acceleration of the Obligations in accordance with Section 9.2 and (b) June 15, 2019."

(b) <u>Amendment to Section 6.1(e)(iii) of the Credit Agreement (Cash Flow Forecasts)</u>. Section 6.1(e)(iii) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(iii) <u>Cash Flow Forecasts</u>. By Wednesday of each week, a rolling 13-week cash flow forecast for the Borrowers calculated with true, correct and complete data as of the immediately preceding Friday as certified by a Compliance Officer of the Borrowers and reviewed by the financial consultant of the Administrative Agent, together with a report setting forth actual Net Cash Flow for the three-week period ending on such Friday and identifying and explaining any material variances of actual Net Cash Flow for such three-week period compared to Net Cash Flow forecasted for such period as set forth the Borrower's 13-week cash flow forecast delivered by the Borrower to the Administrative Agent on May 8, 2019."

**Exhibit 3**
**4 of 14**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(c)      <u>Amendment to Section 6.1(e)(iv)(C) of the Credit Agreement (Weekly Telephonic Conference)</u>.  Section 6.1(e)(iv)(C) of the Credit Agreement is amended and restated in its entirety to read as follows:

> "(C)      On a weekly basis on a day and time to be mutually agreed upon, one or more Compliance Officers of the Borrowers shall hold a telephonic conference (1) with the Administrative Agent and any financial advisor or other consultant of the Administrative Agent (if applicable), to provide updates relative to the Borrowers' operating performance, including but not limited to variances between actual cash flow of the Borrowers and the cash flow forecasted by the Borrowers with respect to the immediately preceding week as set forth in the cash flow forecast delivered pursuant to Section 6.1(e)(iii) above, and (2) with Davidson and any other consultant of a Borrower, the Administrative Agent and any financial advisor or other consultant of the Administrative Agent (if applicable), to provide updates regarding potential Dispositions of assets and progress relative to the exploration of strategic alternatives and any other Joint Ventures or potential sale of the Borrowers or their assets, as well as other relevant matters."

(d)      <u>Amendment to Section 6.1(e)(iv)(E) of the Credit Agreement (Sale Transaction)</u>. Section 6.1(e)(iv)(E) of the Credit Agreement is amended and restated in its entirety to read as follows:

> "(E)      The Borrowers shall deliver to the Administrative Agent, not later than June 15, 2019, a letter of intent or offer letter with respect to a potential sale of the Borrowers or their assets (the "<u>Sale Transaction</u>"), countersigned by the Parent, in form and substance acceptable to the Administrative Agent in its sole discretion."

(e)      <u>Amendment to Section 8.6 of the Credit Agreement (Maximum Cumulative Cash Flow Variance)</u>.  Section 8.6 of the Credit Agreement is amended and restated in its entirety to read as follows:

> "8.6      **Maximum Cumulative Cash Flow Variance**.  The Loan Parties shall not permit <u>actual</u> Net Cash Flow as reported by Wednesday of each week and calculated as of Friday of the immediately preceding week (in each case, in accordance with Section 6.1(e)(iii)) for the three-week period then ending, to be less than 90% of Net Cash Flow <u>forecasted</u> for such three-week period as set forth in the Borrowers' 13-week cash flow forecast delivered by the Borrowers to the Administrative Agent on May 8, 2019; provided that, if such variance is less than $500,000 for such three-week period, such variance shall not constitute a default hereunder and provided further that the Loan Parties shall not be required to comply with this Section 8.6 from and after May 31, 2019."

(f)      <u>Amendment to Section 9.1(c)(i) of the Credit Agreement (Breach of Other Covenants)</u>.  Section 9.1(c)(i) of the Credit Agreement is amended and restated in its entirety to read as follows:

> "(i)      Any of the Loan Parties shall default in the due observance or performance of any covenant, obligation, condition or provision under Sections 6.1(b), 6.1(e), 6.1(f)(i), 6.2(a), 6.4, 6.6, 6.8, 6.9(b), 6.9(c), 6.10, 6.11, 6.13, 9.2(f), 9.2(g), Article VII or Article VIII;"

(g)      <u>Amendment to Section 9.1(p) of the Credit Agreement (Sale Transaction)</u>.  Section 9.1(p) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(p)    Sale Transaction. (i) All potential purchasers with respect to the Sale Transaction withdraw from or otherwise notify the Borrowers that they do not intend to proceed with the Sale Transaction, or (ii) closing of the Sale Transaction does not occur by June 15, 2019."

(h)    Amendment to Section 9.1 to the Credit Agreement (Events of Default).  Section 9.1 of the Credit Agreement is amended by adding the following new subsection (q) immediately following subsection (p) therein to read as follows:

"(q)    Chief Restructuring Officer.  Following the engagement of a CRO pursuant to Section 9.2(f), (i) the CRO resigns or is terminated and the Borrowers have not retained a replacement CRO acceptable to the Administrative Agent in its sole discretion on terms and conditions acceptable to the Administrative Agent in its sole discretion within 5 Business Days following such resignation or termination, or (ii) the CRO no longer has all of the authorities and responsibilities set forth in the Loan Documents."

(i)    Amendment to Section 9.2(b) of the Credit Agreement (Events of Default Other Than Bankruptcy, Insolvency or Reorganization Proceedings).  Section 9.2(b) of the Credit Agreement is amended and restated in its entirety to read as follows:

"(b)    Events of Default Other Than Bankruptcy, Insolvency or Reorganization Proceedings. If an Event of Default specified under Section 9.1 (other than Section 9.1(k)) shall occur and be continuing, the Administrative Agent may, and upon the request of the Required Lenders, shall, (i) by written notice to the Borrowers, declare the unpaid principal amount of the Loans then outstanding and all interest accrued thereon, any unpaid fees and all other Indebtedness of the Borrowers to the Lenders hereunder and thereunder to be forthwith due and payable, and the same shall thereupon become and be immediately due and payable to the Administrative Agent for the benefit of each Lender without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived, (ii) require the Borrowers to, and the Borrowers shall thereupon, Cash Collateralize the Letter of Credit Obligations in an amount not less than the Minimum Collateral Amount, (iii) apply for the appointment of, or taking possession by, a trustee, receiver, liquidator or other similar official of the Borrowers to hold or liquidate all or any substantial part of the properties or assets of the Borrowers (and each Borrower hereby consents to such appointment and agrees to execute and deliver any and all documents requested by the Administrative Agent relating to the appointment of such trustee, receiver, liquidator or other similar official, whether by joining in a petition for the appointment of such an official, by entering no contest to a petition for the appointment of such an official, or otherwise, as appropriate under applicable law, and (iv) exercise and enforce any other rights and remedies available to any Lender by law or agreement; and"

(j)    Amendment to Section 9.2 of the Credit Agreement (Consequences of Event of Default).  Section 9.2 of the Credit Agreement is amended by inserting the following new subsections (f) and (g) immediately following subsection (e) therein to read as follows:

"(f)    Engagement of a Chief Restructuring Officer.

(i)    Following the occurrence of a Forbearance Termination Event (as defined in the Forbearance Agreement), the Borrowers shall, within five Business Days following written notice from the Administrative Agent, which notice may be given at any time at the option of the Administrative Agent in its sole discretion,

**Exhibit 3**
**6 of 14**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

appoint a Chief Restructuring Officer of each of the Borrowers ("CRO") that is acceptable to the Administrative Agent in its sole discretion and on terms and conditions acceptable to the Administrative Agent in its sole discretion.

(ii)     Without limiting the foregoing or any other provision of this Agreement or any other Loan Document, each Borrower agrees to authorize, empower and direct the CRO, in the name of and on behalf of such Borrower, by all necessary corporate action of such Borrower to take all action that the CRO deems necessary and appropriate, in the exercise of the CRO's business judgment and subject to applicable Law of the state in which such Borrower is organized and the Organizational Documents of such Borrower, including, without limitation, the following:

(A)     the use, sale, lease or other Disposition of assets of the Borrower in the ordinary course of business;

(B)     the use, sale, lease or other Disposition of all, or substantially all, of the assets of the Borrowers;

(C)     development and implementation of a strategic plan setting forth the Borrowers' planned repayment efforts, which may include refinancing, seeking additional financing (subject to the terms and conditions of this Agreement and the other Loan Documents), restructuring, reorganization, sale of assets, additional equity, bankruptcy or otherwise;

(D)     negotiation with creditors and other constituencies of the Borrowers regarding modification, settlement, restructuring or other consensual arrangements, including credit or forbearance agreements, a plan of reorganization or liquidation, and implementation thereof;

(E)     retention and termination of officers, employees, independent contractors, affiliate relationships, suppliers and other trade partners;

(F)     retention and termination of financial advisors and consultants, accountants, claims noticing agents, and other agents of the Borrowers;

(G)     control the Borrowers' cash, credit facilities, checking accounts, deposit accounts and other financial assets, and control ability to incur future liabilities;

(H)     provide advisory oversight and consultation for cash and liquidity to ensure the preservation or enhancement of the Borrowers' financial condition;

(I)     supervise preparation of financial statements, borrowing base certificates, 13-week cash flow reports and financial models;

**Exhibit 3**
**7 of 14**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(J)     implement coordination of and participate in significant correspondence, discussion and negotiation by and between the Borrowers' lenders, creditors, suppliers, vendors, customers and other constituencies;

(K)     initiate frequent discussions with the Administrative Agent and provide weekly updates to the Administrative Agent regarding all aspects of the Borrowers' operational or financial matters and provide timely, accurate and candid responses to the Administrative Agent's inquiries into various matters affecting the Borrowers;

(L)     attend and participate in all meetings of, and receive copies of all communications to, the Governing Board of the Borrowers;

(M)     exercise all of the Borrowers' rights and remedies with respect to proceedings brought to collect any Accounts;

(N)     investigate, pursue, sue for and collect debts, demands and receivables of the Borrower and to compromise and settle such as are of doubtful value, including but not limited to processing, submitting and collecting on insurance claims;

(O)     perform such other tasks as are reasonably necessary to perform the CRO's responsibilities; and

(P)     sign on behalf of the Borrowers all documents, instruments and/or agreements relating to any or all of the CRO's tasks and responsibilities.

(iii)     The Borrowers shall not terminate, amend or otherwise change the terms of employment of the CRO without the prior written consent of the Administrative Agent. Any termination of or amendment or other change to the terms of employment of the CRO without the prior written consent shall constitute or be deemed to constitute a Forbearance Termination Event with respect to the Forbearance Agreement.

(iv)     Each Borrower irrevocably authorizes the CRO to communicate directly with the Administrative Agent and the Lenders at any and all times to discuss or to review any aspect of the Borrowers' business and any other matter regarding the engagement between the Borrowers and the CRO, or to transmit any information relating to the Borrowers' business to the Administrative Agent and the Lenders, all without any further authorization from or notice to any Borrower."

"(g)     Appointment of a Receiver. Following the occurrence of a Forbearance Termination Event (as defined in the Forbearance Agreement), the Administrative Agent may at any time (and, upon written request of the Required Lenders, shall) apply for the appointment of a receiver over the Borrowers and all assets of the Borrowers on terms and conditions acceptable to the Administrative Agent in its sole discretion, which terms and conditions may be as set forth in the form of motion for the appointment of receiver, complaint, affirmation by the Borrowers and form of order attached hereto as Exhibit J; provided, however, that the Administrative Agent may complete, modify or supplement

**Exhibit 3**
**8 of 14**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

such documents prior to filing to incorporate additional factual information and to seek such other relief as may be appropriate under the circumstances. Each Borrower hereby authorizes and agrees that, following the occurrence of a Forbearance Termination Event, the Administrative Agent may file such motion, complaint, affirmation by the Borrowers, form of order and other related pleadings, documents, agreements and instruments with a court of competent jurisdiction, all without further approval from any Borrower, its Governing Board, officers or owners, and each Borrower hereby agrees that it will not oppose such motion for the appointment of a receiver. Each Borrower further waives any and all rights it may have to object to or contest the appointment of a receiver or to seek to interfere with the receiver's operation or disposition of the receivership estate (including without limitation by instituting a Debtor Relief Proceeding). For the avoidance of doubt, the right to apply for the appointment of a receiver set forth herein is in addition to, and not in limitation of, the rights and remedies set forth in in Section 9.2(f) or any other provision hereof or in any other Loan Document."

(k)     Amendment to Exhibit C to the Credit Agreement (Compliance Certificate). Exhibit C attached to the Credit Agreement is deleted and replaced in its entirety with Exhibit C to this Amendment.

(l)     Amendment to Exhibits to the Credit Agreement (Receiver Documents). The Credit Agreement is amended by inserting a new Exhibit J in the form of Exhibit J attached hereto immediately following Exhibit I to the Credit Agreement.

5.     **References**. All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby, and any and all references in any other Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby. All references in the Forbearance Agreement to "this Agreement" shall be deemed to refer to the Forbearance Agreement as amended hereby, and any and all references in any other Loan Documents to the Forbearance Agreement shall be deemed to refer to the Forbearance Agreement as amended hereby.

6.     **No Other Changes**. In the event of a conflict or inconsistency between (x) any of this Amendment, the Forbearance Agreement as amended hereby, or the Credit Agreement as amended hereby (each, an "**Amendment Document**") and (y) any other Loan Document, the applicable Amendment Document shall govern and such other Loan Document shall be deemed amended to the extent of such inconsistency or conflict. Except as amended by this Amendment, all terms, provisions, and conditions of the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and all documents executed in connection therewith, shall continue in full force and effect and shall remain enforceable and binding in accordance with their respective terms.

7.     **Representations and Warranties**. Each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a)     Each Borrower has all requisite power and authority, corporate or otherwise, to execute and deliver this Amendment and any other documents delivered hereunder and to perform its obligations under this Amendment, the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents. This Amendment and the other Loan Documents have been duly and validly executed and delivered to the Administrative Agent by the applicable Borrower, and this Amendment, the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents constitute such Borrower's legal, valid and binding obligations, enforceable in accordance with their terms.

**Exhibit 3**
**9 of 14**
Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(b)     The execution, delivery and performance by each Borrower of this Amendment, and the performance of the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents to which such Borrower is a party, have been duly authorized by all necessary corporate or other action of such Borrower and do not and will not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate such Borrower's Organizational Documents or any provision of any law, rule, regulation or order presently in effect having applicability to such Borrower, (iii) result in a breach of, or constitute a default under, any indenture or agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien of any nature upon or with respect to any of the properties now owned or hereafter acquired by any Borrower (other than as required under the Loan Documents or as otherwise permitted by the Loan Documents).

(c)     (i) The representations and warranties of each Borrower in the Credit Agreement, the Forbearance Agreement and the other Loan Documents which are not otherwise qualified by materiality shall be true, correct and complete in all material respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all material respects as of the applicable earlier date(s); and (ii) the representations and warranties of each Borrower in the Credit Agreement, the Forbearance Agreement and the other Loan Documents which are qualified by materiality shall be true, correct and complete in all respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all respects as of the applicable earlier date(s).

(d)     No event has occurred and is continuing, or would result from the execution and delivery of this Amendment, which constitutes a Default or an Event of Default (other than the Specified Defaults, as defined in the Forbearance Agreement).

8.     **Conditions to Effectiveness**.  Sections 3 and 4 of this Amendment shall be effective only if the Administrative Agent has received, on or before the date of this Amendment (or such later date as the Administrative Agent may agree in writing), each of the following, each in form and substance acceptable to the Administrative Agent in its sole discretion:

(a)     this Amendment, duly executed and delivered by each Borrower and the Required Lenders;

(b)     a certificate of the secretary or assistant secretary of each Borrower, certifying (i) a true, correct and complete copy of the resolutions of such Borrower authorizing the execution, delivery and performance of this Amendment, (ii) true, correct and complete copies of such Borrower's Organizational Documents (or, if true, certifying that, except as attached to such certificate, there has been no change to the same since they were certified to the Administrative Agent in connection with the Credit Agreement) and (iii) certifying the officers of such Borrower that are presently authorized to execute and deliver this Amendment and the other Loan Documents, together with true signatures of each such officer (or, if true, certifying that, such officers certified to the Administrative Agent in connection with the First Amendment to Credit Agreement remain authorized to execute and deliver this Amendment and the other Loan Documents);

(c)     payment of the Forbearance Fee;

**Exhibit 3**
**10 of 14**

(d)     payment of all other fees and expenses of the Administrative Agent (including the fees and expenses of the Administrative Agent and its counsel, advisors and consultants) to the extent invoiced prior to the date hereof; and

(e)     such other assurances, certificates, documents, consents, reports or opinions as the Administrative Agent may require.

9.     **General Provisions**.

(a)     <u>Release</u>.  Each Borrower hereby absolutely and unconditionally releases and forever discharges each of the Administrative Agent and Lenders, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns, together with all of the present and former Directors, officers and employees, agents, attorneys and consultants of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which such Borrower has had, now has or has made claim to have against any such Person for or by reason of any act, omission, matter, cause or thing whatsoever occurring or arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

(b)     <u>Costs and Expenses</u>.  Each Borrower hereby reaffirms its agreement under Section 11.3 of the Credit Agreement, among other things, to pay or reimburse the Administrative Agent on demand for all out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the fees, charges and disbursements of counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for the Administrative Agent), in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the other documents, agreements and certificates contemplated hereunder (whether or not the transactions contemplated hereby or thereby shall be consummated).

(c)     <u>No Waiver</u>.  The execution of this Amendment or any documents, agreements and certificates contemplated hereunder shall not be deemed to be a waiver of any Default or Event of Default or any other breach, default or event of default under any Loan Document or other document held by the Administrative Agent or any Lender, whether or not known to the Administrative Agent or any Lender and whether or not existing on the date of this Amendment.

(d)     <u>Loan Document</u>.  The parties hereto hereby acknowledge and agree that this Amendment shall constitute a Loan Document for all purposes of the Credit Agreement and the other Loan Documents.  This Amendment, together with the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents, comprise the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

(e)     <u>Successors and Assigns</u>.  This Amendment shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors and assigns, except that none of the Borrowers may assign or transfer its respective rights or obligations hereunder.

(f)     <u>Severability</u>.  Should any provision of this Amendment be deemed unlawful or unenforceable, said provision shall be deemed several and apart from all other provisions of this Amendment, and all remaining provisions of this Amendment shall be fully enforceable.

**Exhibit 3**
**11 of 14**

(g)    <u>Governing Law</u>.    THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF COLORADO.

(h)    <u>Headings</u>.    The captions or headings in this Amendment are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Amendment.

(i)    <u>Counterparts</u>.    This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Amendment, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile or by e-mail transmission of a PDF or similar copy shall be equally as effective as delivery of a manually executed counterpart of this Amendment.  Any party delivering an executed counterpart signature page to this Amendment by facsimile or by e-mail transmission shall also deliver a manually executed counterpart of this Amendment but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect of this Amendment.

*Signature pages follow.*

**Exhibit 3**
**12 of 14**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**NORPAC FOODS, INC.**, as Borrower

By: _____

Name:    Richard M. Munekiyo
Title:     Secretary, Treasurer and Chief Financial
           Officer

**HERMISTON FOODS, LLC**, as Borrower

By: _____

Name:    Richard M. Munekiyo
Title:     Secretary, Treasurer and Chief Financial
           Officer

**QUINCY FOODS, LLC,** as Borrower

By: _____

Name:    Richard M. Munekiyo
Title:     Secretary, Treasurer and Chief Financial
           Officer

*Signature Page to Seventh Amendment to Forbearance Agreement*
*and Tenth Amendment to Credit Agreement*

**Exhibit 3**
**13 of 14**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

**COBANK, ACB,** as Administrative Agent and as Lender

By: _____

Name: Jeff Hanson

Title: UP-Special Assets

# EXHIBIT 4

## THIRTEENTH AMENDMENT

## TO CREDIT AGREEMENT

# TENTH AMENDMENT TO FORBEARANCE AGREEMENT
# AND THIRTEENTH AMENDMENT TO CREDIT AGREEMENT

This Amendment is dated as of July 31, 2019 by and among Norpac Foods, Inc., an Oregon cooperative corporation (the "Parent"), each of the Parent's Subsidiaries identified on the signature pages hereof (together with the Parent, collectively, the "Borrowers"), the Lenders signatories hereto, and CoBank, ACB, a federally chartered instrumentality of the United States, in its capacity as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

The Borrowers, the Guarantors from time to time party thereto, the Lenders from time to time party thereto and the Administrative Agent are parties to a Credit Agreement dated as of November 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Credit Agreement").  As used in these recitals, capitalized terms defined in the Credit Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

The Borrowers, the Lenders signatory thereto and the Administrative Agent are parties to a Forbearance Agreement and Second Amendment to Credit Agreement dated as of July 23, 2018 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Forbearance Agreement").

The Borrowers have requested that the Administrative Agent and the Lenders agree to certain amendments to the Credit Agreement and the Forbearance Agreement, and the Administrative Agent and the Lenders are willing to grant such requests on the terms and subject to the conditions set forth herein.

Now, therefore, in consideration of the mutual covenants and agreements herein contained, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.     **Definitions**. As used herein, capitalized terms defined in the Credit Agreement or the Forbearance Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement or the Forbearance Agreement, respectively.

2.     **Acknowledgments and Agreements**. Each Borrower hereby reaffirms, acknowledges and agrees as follows:

(a)     *Recitals*.  The Recitals to this Amendment are true and correct.

(b)     *Loan Documents*.  Each Loan Document to which such Borrower is a party is the valid and binding agreement of such Borrower, enforceable in accordance with its terms, and as to each of which there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(c)     *Indebtedness*.  The Obligations are not subject to any restriction, setoff, deduction, claim, counterclaim or defense of any Borrower of any kind or character whatsoever.

(d)     *Collateral*.  The Administrative Agent, for itself and on behalf of the Lenders, has a valid, enforceable and first-priority perfected security interest in and Lien on all assets and property of each Borrower to secure the payment and performance of the Obligations, as to which collateral there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(e)     *Outstanding Loans.*  As of July 31, 2019, (i) the outstanding principal balance of

all Revolving Loans made under the Loan Documents was $82,500,000.00 together with accrued and unpaid interest thereon of $721,027.40 and an Unused Commitment Fee of $71.58; (ii) the Letter of Credit Obligations were $800,000.00 together with the accrued and unpaid Letter of Credit Fees in the aggregate amount of $0.00; (iii) the outstanding principal balance of all Swing Line Loans made under the Loan Documents was $3,963,035.30 together with accrued and unpaid interest thereon of $34,635.84; and (iv) the outstanding principal balance of the Term Loan made under the Loan Documents was $36,621,623.99 together with accrued and unpaid interest thereon of $320,062.96.

(f)     *Specified Defaults.* The Specified Defaults (as defined in the Forbearance Agreement as amended hereby) have occurred and are continuing as of the date hereof.  As a result of the Specified Defaults, (i) the Lenders do not have any obligation to make any Loan, (ii) the Issuing Lender does not have any obligation to issue any Letter of Credit, and (iii) the Administrative Agent and the Lenders are entitled to exercise rights and remedies under the Loan Documents and all other rights and remedies otherwise available to them, including, without limitation, the right to demand immediate payment of the entire outstanding principal balance of the Loans, all unpaid accrued interest thereon and all other Obligations.

(g)     *No Waiver of Specified Defaults or Rights and Remedies.* Neither this Amendment, nor any action taken in accordance with this Amendment or any other Loan Document, nor any correspondence, any oral or written communications, nor any making of any Loan or issuing of any Letter of Credit, nor any acceptance of repayment of any Loan or other amount, nor any forbearance, amendment or consent or any other action or omission on the part of the Administrative Agent or any Lender shall be, or shall be construed to be, a waiver, modification or release of any Specified Default or any other existing or future Default or Event of Default, as to which all rights and remedies of the Administrative Agent and each Lender are and shall continue at all times to be expressly reserved by the Administrative Agent and the Lenders.

(h)     *Conduct.* The Administrative Agent and the Lenders have fully and timely performed all of their obligations and duties in compliance with the Loan Documents and applicable law, and have acted reasonably, in good faith and appropriately under the circumstances.

(i)     *Communications with Consultants.* The Borrowers have engaged Davidson (as defined in the Credit Agreement) to provide financial and strategic assistance to the Borrowers.  The Borrowers have also engaged and may in the future engage other consultants to provide financial and strategic assistance to the Borrowers.  Each Borrower irrevocably authorizes Davidson, and each other consultant of a Borrower, to communicate directly with the Administrative Agent at any and all times to discuss or to review any aspect of the business of the Borrowers and any other matter regarding the engagement between any Borrower and such consultants, and to transmit any information relating to the Borrowers to the Administrative Agent, all without any further authorization from or notice to any Borrower.

(j)     *Engagement of Consultants by Administrative Agent.* Without limiting any provision of the Credit Agreement, including but not limited to Sections 6.6 and 11.3(a) thereof, the Borrowers (x) acknowledge that the Administrative Agent may from time to time engage financial advisors or other consultants on terms and conditions acceptable to the Administrative Agent, in each case at the Borrowers' expense, (y) agree that the Borrowers shall, and shall cause their officers, employees and advisors to, cooperate with any such advisors and consultants and provide all information reasonably requested by any such advisor or consultant, which information shall be true, correct and complete, and (z) agree that the Borrowers shall, promptly after demand therefor, reimburse the Administrative Agent for all costs, fees, charges and disbursements of each such advisor or consultant.  The Borrowers hereby acknowledge and agree that no Loan Party may rely on any statements made by, or any analysis, reports or

US.123899187.04

**Exhibit 4**
**2 of 9**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

other documents (if any) prepared and/or provided by, a financial advisor or other consultant of the Administrative Agent or any Lender.

3. **Amendments to the Forbearance Agreement**. Section 1 of the Forbearance Agreement is hereby amended as follows:

(a) The definition of "Specified Defaults" contained in Section 1 of the Forbearance Agreement is amended by (i) deleting "and" at the end of subsection (o) thereof, (ii) renumbering the existing subsection (p) thereof as subsection (r), and (iii) inserting the following new subsections (p) and (q) to read as follows:

"(p) the Borrowers' failure to deliver by June 15, 2019 a letter of intent or offer letter with respect to a potential sale of the Borrowers or their assets, countersigned by the Parent, in form and substance acceptable to the Administrative Agent in its sole discretion, as required by Section 6.1(e)(iv)(E) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c)(ii) of the Credit Agreement;

(q) the Borrowers' failure to deliver audited financial statements for the fiscal year ended March 31, 2019 that are free of qualifications, as required by Section 6.1(b) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c)(i) of the Credit Agreement; and"

(b) The following definitions contained in Section 1 of the Forbearance Agreement are amended and restated in their entirety to read as follows:

"'<u>Forbearance Termination Event</u>' means any of the following:

(a) the occurrence of the Stated Forbearance Termination Date;

(b) the occurrence of an Event of Default under Section 9.1(k) of the Credit Agreement; or

(c) the occurrence of any of the following, but only if the Administrative Agent, in its sole discretion, has designated such occurrence as a Forbearance Termination Event effective as of the date specified in such notice:

(i) any Default or Event of Default under any Loan Document (other than the Specified Defaults or an Event of Default described in the foregoing clause (b));

(ii) the Administrative Agent or any Lender becomes aware of or determines that any Default or Event of Default (other than the Specified Defaults or an Event of Default described in the foregoing clause (b)) had occurred and was continuing under any Loan Document as of the date of this Agreement; or

(ii) any Borrower or any other Loan Party fails to comply in any respect with any term, condition or provision of this Agreement."

"'<u>Stated Forbearance Termination Date</u>' means August 31, 2019."

US.123899187.04

**Exhibit 4**
**3 of 9**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

4.     **Amendments to the Credit Agreement**.  Section 1.1 of the Credit Agreement is hereby amended by adding or amending and restating, as the case may be, the following definitions to read in their entirety as follows:

"'<u>Revolving Loan Maturity Date</u>' means, with respect to the Revolving Credit Facility (including the Swing Line Facility and the Letter of Credit Facility), the earlier of (a) the date of acceleration of the Obligations in accordance with Section 9.2 and (b) August 31, 2019."

"'<u>Term Loan Maturity Date</u>' means, with respect to the Term Loan Facility, the earlier of (a) the date of acceleration of the Obligations in accordance with Section 9.2 and (b) August 31, 2019."

5.     **References**.  All references in the Credit Agreement to "this Agreement" shall be deemed to refer to the Credit Agreement as amended hereby, and any and all references in any other Loan Documents to the Credit Agreement shall be deemed to refer to the Credit Agreement as amended hereby. All references in the Forbearance Agreement to "this Agreement" shall be deemed to refer to the Forbearance Agreement as amended hereby, and any and all references in any other Loan Documents to the Forbearance Agreement shall be deemed to refer to the Forbearance Agreement as amended hereby.

6.     **No Other Changes**.  In the event of a conflict or inconsistency between (x) any of this Amendment, the Forbearance Agreement as amended hereby, or the Credit Agreement as amended hereby (each, an "**Amendment Document**") and (y) any other Loan Document, the applicable Amendment Document shall govern and such other Loan Document shall be deemed amended to the extent of such inconsistency or conflict.  Except as amended by this Amendment, all terms, provisions, and conditions of the Credit Agreement, the Forbearance Agreement and the other Loan Documents, and all documents executed in connection therewith, shall continue in full force and effect and shall remain enforceable and binding in accordance with their respective terms.

7.     **Representations and Warranties**.  Each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a)     Each Borrower has all requisite power and authority, corporate or otherwise, to execute and deliver this Amendment and any other documents delivered hereunder and to perform its obligations under this Amendment, the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents.  This Amendment and the other Loan Documents have been duly and validly executed and delivered to the Administrative Agent by the applicable Borrower, and this Amendment, the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents constitute such Borrower's legal, valid and binding obligations, enforceable in accordance with their terms.

(b)     The execution, delivery and performance by each Borrower of this Amendment, and the performance of the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents to which such Borrower is a party, have been duly authorized by all necessary corporate or other action of such Borrower and do not and will not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate such Borrower's Organizational Documents or any provision of any law, rule, regulation or order presently in effect having applicability to such Borrower, (iii) result in a breach of, or constitute a default under, any indenture or agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien of any nature upon or with respect to any of the properties now owned or

US.123899187.04

**Exhibit 4**
**4 of 9**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

hereafter acquired by any Borrower (other than as required under the Loan Documents or as otherwise permitted by the Loan Documents).

(c)        (i) The representations and warranties of each Borrower in the Credit Agreement, the Forbearance Agreement and the other Loan Documents which are not otherwise qualified by materiality shall be true, correct and complete in all material respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all material respects as of the applicable earlier date(s); and (ii) the representations and warranties of each Borrower in the Credit Agreement, the Forbearance Agreement and the other Loan Documents which are qualified by materiality shall be true, correct and complete in all respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all respects as of the applicable earlier date(s).

(d)        No event has occurred and is continuing, or would result from the execution and delivery of this Amendment, which constitutes a Default or an Event of Default (other than the Specified Defaults, as defined in the Forbearance Agreement).

8.        **Conditions to Effectiveness**.  Sections 3 and 4 of this Amendment shall be effective only if the Administrative Agent has received, on or before the date of this Amendment (or such later date as the Administrative Agent may agree in writing), each of the following, each in form and substance acceptable to the Administrative Agent in its sole discretion:

(a)        this Amendment, duly executed and delivered by each Borrower and the Required Lenders;

(b)        a certificate of the secretary or assistant secretary of each Borrower, certifying (i) a true, correct and complete copy of the resolutions of such Borrower authorizing the execution, delivery and performance of this Amendment, (ii) true, correct and complete copies of such Borrower's Organizational Documents (or, if true, certifying that, except as attached to such certificate, there has been no change to the same since they were certified to the Administrative Agent in connection with the Credit Agreement) and (iii) certifying the officers of such Borrower that are presently authorized to execute and deliver this Amendment and the other Loan Documents, together with true signatures of each such officer (or, if true, certifying that, such officers certified to the Administrative Agent in connection with the First Amendment to Credit Agreement remain authorized to execute and deliver this Amendment and the other Loan Documents);

(c)        a true, correct and complete certification regarding beneficial ownership of legal entity customers;

(d)        payment of all other fees and expenses of the Administrative Agent (including the fees and expenses of the Administrative Agent and its counsel, advisors and consultants) to the extent invoiced prior to the date hereof; and

(e)        such other assurances, certificates, documents, consents, reports or opinions as the Administrative Agent may require.

9.        **General Provisions**.

US.123899187.04

**Exhibit 4**
**5 of 9**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19

(a)     Release. Each Borrower hereby absolutely and unconditionally releases and forever discharges each of the Administrative Agent and Lenders, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns, together with all of the present and former Directors, officers and employees, agents, attorneys and consultants of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which such Borrower has had, now has or has made claim to have against any such Person for or by reason of any act, omission, matter, cause or thing whatsoever occurring or arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

(b)     Costs and Expenses. Each Borrower hereby reaffirms its agreement under Section 11.3 of the Credit Agreement, among other things, to pay or reimburse the Administrative Agent on demand for all out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the fees, charges and disbursements of counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for the Administrative Agent), in connection with the preparation, negotiation, execution, delivery and administration of this Amendment and the other documents, agreements and certificates contemplated hereunder (whether or not the transactions contemplated hereby or thereby shall be consummated).

(c)     No Waiver. The execution of this Amendment or any documents, agreements and certificates contemplated hereunder shall not be deemed to be a waiver of any Default or Event of Default or any other breach, default or event of default under any Loan Document or other document held by the Administrative Agent or any Lender, whether or not known to the Administrative Agent or any Lender and whether or not existing on the date of this Amendment.

(d)     Loan Document. The parties hereto hereby acknowledge and agree that this Amendment shall constitute a Loan Document for all purposes of the Credit Agreement and the other Loan Documents. This Amendment, together with the Credit Agreement as amended hereby, the Forbearance Agreement as amended hereby and the other Loan Documents, comprise the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

(e)     Successors and Assigns. This Amendment shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors and assigns, except that none of the Borrowers may assign or transfer its respective rights or obligations hereunder.

(f)     Severability. Should any provision of this Amendment be deemed unlawful or unenforceable, said provision shall be deemed several and apart from all other provisions of this Amendment, and all remaining provisions of this Amendment shall be fully enforceable.

(g)     Governing Law. THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF COLORADO.

(h)     Headings. The captions or headings in this Amendment are for convenience only and in no way define, limit or describe the scope or intent of any provision of this Amendment.

6

US.123899187.04

**Exhibit 4**
**6 of 9**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

(i)     <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Amendment, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Amendment by facsimile or by e-mail transmission of a PDF or similar copy shall be equally as effective as delivery of a manually executed counterpart of this Amendment.  Any party delivering an executed counterpart signature page to this Amendment by facsimile or by e-mail transmission shall also deliver a manually executed counterpart of this Amendment but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect of this Amendment.

*Signature pages follow.*

US.123899187.04

**Exhibit 4**
**7 of 9**

Case 19-62584-pcm11     Doc 16     Filed 08/22/19

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first above written.

**NORPAC FOODS, INC.**, as Borrower

By: _____

Name: Richard M. Munekiyo
Title: Secretary, Treasurer and Chief Financial Officer

**HERMISTON FOODS, LLC**, as Borrower

By: _____

Name: Richard M. Munekiyo
Title: Secretary, Treasurer and Chief Financial Officer

**QUINCY FOODS, LLC,** as Borrower

By: _____

Name: Richard M. Munekiyo
Title: Secretary, Treasurer and Chief Financial Officer

*Signature Page to Tenth Amendment to Forbearance Agreement
and Thirteenth Amendment to Credit Agreement*

**Exhibit 4**
**8 of 9**

**COBANK, ACB,** as Administrative Agent and as Lender

By: _____
Name:    Justin A. Barr
Title:    Vice President

*Signature Page to Tenth Amendment to Forbearance Agreement*
*and Thirteenth Amendment to Credit Agreement*

**Exhibit 4**
**9 of 9**

Case 19-62584-pcm11    Doc 16    Filed 08/22/19