Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
    Direct Dial:  503.802.2013
    Facsimile:    503.972.3713
    E-Mail:       albert.kennedy@tonkon.com
Timothy J. Conway, OSB No. 851752
    Direct Dial:  (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:       tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3867
    E-Mail:       michael.fletcher@tonkon.com
Ava L. Schoen, OSB No. 044072
    Direct Dial:  (503) 802-2143
    Facsimile:    (503) 972-3843
    E-Mail:       ava.schoen@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

        Attorneys for Debtors

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc., Hermiston Foods, LLC, and Quincy Foods, LLC,<br><br>        Debtors. | Case No. 19-62584-pcm11<br>**LEAD CASE**<br><br>(Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11)<br><br>**DEBTORS' AMENDED[1] MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS** |

---

[1] Except for Exhibit B (proposed Bid Procedures Order) and Exhibit 1 to Exhibit B (proposed Bid Procedures), this Amended Motion is identical to the original Motion previously filed with the Court [ECF No. 56].

**Page 1 of 18** - DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Debtors and Debtors-in-Possession NORPAC Foods, Inc. ("NORPAC"), Hermiston Foods, LLC ("Hermiston Foods"), and Quincy Foods, LLC ("Quincy Foods") (together, "Debtors") hereby move this Court for entry of an order (A) establishing bid and sale procedures, including an expense reimbursement fee to Oregon Potato Company ("OPC") as the stalking horse bidder; (B) approving the sale of assets free and clear of all liens, claims, interests, and encumbrances to OPC or the bidder with the highest and best offer received at an auction (the "Successful Bidder"); (C) approving the assumption and assignment of executory contracts to the Successful Bidder, and (D) granting related relief. Debtors request an expedited hearing with respect to the bid and sale procedures.

## INTRODUCTION

1. On August 22, 2019 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code.

2. Debtors have continued in possession of their property and are continuing to operate and manage their business as debtors-in-possession pursuant to Sections 1107(a) and 1108 of Title 11 of the United States Code.

3. No request has been made for the appointment of a trustee or examiner, and no official committee of unsecured creditors has been appointed in Debtors' cases.

## JURISDICTION

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief sought herein include Sections 105(a), 363, 365, and, if applicable, 1146 and 1129 of the Bankruptcy Code, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and applicable local rules and administrative orders.

DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

6.    Since 2015, Debtors have experienced significant operating losses.  In May of 2018, Debtors engaged the investment banking firm of D.A. Davidson & Co. to render financial advisory and investment banking services in connection with Debtors' financial and strategic alternatives, including purchase, merger, consolidation, reorganization, or other transaction of a like nature.  D.A. Davidson has a mergers and acquisition platform with broad industry expertise and worldwide capabilities.  D.A. Davidson contacted 166 potential strategic and financial investors.  Seventy-two non-disclosure agreements were executed. Four letters of intent or indications of interest were executed.  Extensive negotiations were conducted with a highly qualified and motivated party.  However, D.A. Davidson was unable to conclude a transaction and its engagement was terminated in June of 2019.

7.    On August 12, 2019, with the assistance of SierraConstellation Partners, LLC ("Sierra"), after almost six weeks of negotiation, Debtors entered into an Asset Purchase Agreement with OPC, which was amended by that certain First Amendment to Asset Purchase Agreement (collectively, the "APA").  The APA requires that Debtors close the transaction contemplated by the APA pursuant to an order of the United States Bankruptcy Court authorizing the sale free and clear of liens, claims, encumbrances, and interests (except for Permitted Encumbrances described in the APA),  pursuant to 11 U.S.C. § 363(b) and related provisions.  A copy of the APA, excluding certain lengthy schedules, is attached hereto as **Exhibit A**.  A copy of the complete APA, including all schedules, may be obtained by contacting spencer.fisher@tonkon.com.

8.    All capitalized terms used in this Motion that are not otherwise defined in this Motion shall have the definitions given to them in the APA.

9.    Pursuant to the APA, Debtors agreed to sell substantially all of their assets, with the exception of their investment in CoBank, certain life insurance policies, and other nominal assets (the "Purchased Assets," as more particularly defined in the APA).  The purchase price for

**Page 3 of 18** -    DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

Case 19-62584-pcm11    Doc 83    Filed 09/03/19

the Purchased Assets is $155,500,000, plus an agreed value for accounts receivable, with an adjustment for any change in the value of Debtors' inventory, less the amount due to growers at the closing of the 2019 crop, which OPC will pay to the growers.[2] Debtors believe the sale will generate funds sufficient to pay all secured and priority claims and leave sufficient funds for a meaningful distribution to unsecured creditors. Debtors believe the APA and contemplated sale process will maximize the value of Debtors' assets for the benefit of Debtors' estates and all creditors.

10. The sale proposed to OPC under the APA is subject to the receipt of higher and better offers received through a court-approved auction process. If the auction yields a higher and better offer, Debtors seek authority to effect a sale with the winning bidder.

**REQUESTED RELIEF**

11. Debtors request that the Court enter a bid procedures order in substantially the form attached hereto as **Exhibit B** ("Bid Procedures Order") which order, among other things:

    (a) authorizes and approves bid procedures in connection with the receipt and analysis of competing bids substantially in the form attached as Exhibit 1 ("Bid Procedures") to the Bid Procedures Order;

    (b) authorizes and approves procedures (the "Assumption Procedures") for the assumption and assignment of those executory contracts and unexpired leases designated by the Successful Bidder to be assumed and assigned at Closing (the "Designated Contracts");

    (c) approves the form and manner of notice of (i) the sale and hearing thereon; and (ii) the assumption, assignment, and proposed cure costs of the Designated Contracts substantially in the form attached hereto as **Exhibit C** (the "Sale Notice"); and

    (d) establishes the following dates and deadlines, subject to modification as needed:

        (i) Objection Deadline: October 18, 2019 at 5:00 p.m. prevailing Pacific time as the deadline to object to the sale transactions and/or

---

[2] Any summary or description of the terms set forth in the APA are for the convenience of the Court and interested parties. To the extent there is any conflict, the APA governs in all respects.

DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

Case 19-62584-pcm11    Doc 83    Filed 09/03/19

the assumption and assignment of the Designated Contracts or cure costs related thereto.

(ii) Bid Deadline: October 18, 2019 at 5:00 p.m. prevailing Pacific time, as the deadline by which all binding bids must be actually received by Debtors' counsel pursuant to the Bid Procedures (the "Bid Deadline").

(iii) Auction: October 24, 2019 at 10:00 a.m. prevailing Pacific time, as the date and time for the auction, if one is needed (the "Auction"), to be held at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon 97204.

(iv) Sale Hearing: October 28, 2019 at 9:30 a.m. prevailing Pacific time, or such other time as is announced at the conclusion of the Auction (the "Sale Hearing"), which will be held before the Honorable Peter C. McKittrick, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, Courtroom No. 1, 1050 SW Fifth Avenue, Portland, Oregon.

(e) approves OPC as the Stalking Horse Bidder; and if OPC is not the Successful Purchaser, entitlement to a cash expense reimbursement payment in the amount of $2,000,000.

## THE PROPOSED SALE

12.     The principal terms of the APA are as follows[3].  Capitalized terms used below have the meanings given such terms in the APA:

| Purchaser: | OPC ("Buyer"). |
|---|---|
| Purchase Price: | An amount equal to (i) One Hundred Fifty-Five Million Five Hundred Thousand Dollars ($155,500,000), subject to withholding of the Indemnification Escrow Amount; plus (ii) the amount by which the Inventory Value is greater or less than the Target Inventory Value; plus (iii) the Accounts Receivable Collection Value (as more particularly set forth in the APA (the "Purchase Price"). |
| Assets to be Acquired: | Substantially all of Debtors' assets (as more particularly set forth in the APA, the "Purchased Assets"). |

---

[3] This summary is provided for the convenience of the Court and interested parties.  It is not intended to be a complete summary of the APA.  To the extent there is any conflict between this summary and the APA, the APA governs in all respects.

**Page 5 of 18** -     DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

| | |
|---|---|
| Excluded Assets | Cash, and certain other assets as specifically set forth on Schedule 2.03 of the APA. |
| Assumed Liabilities: | With certain limitations, Cure Costs and Liabilities of Sellers under the Designated Contracts that are assumed and assigned at Closing, solely to the extent arising out of and relating to the period after the Closing, Sellers' obligations to growers for 2019 crops and Assumed Grower Obligations (as more particularly set forth in the APA, the "Assumed Liabilities"), and no other Liabilities. |
| Excluded Liabilities: | All liabilities other than those expressly identified as Assumed Liabilities under the APA, including, without limitation, pension liabilities. |
| Assumption and Assignment of Executory` Contracts: | Buyer will assume those contracts specifically set forth in Schedule 2.01(d) of the APA, as such Schedule 2.01(d) may be modified prior to the Sale Hearing.  Buyer will not assume Debtors' collective bargaining agreements. |
| Closing Conditions: | Among others as set forth in the APA, Buyer shall have completed certain due diligence to its satisfaction by the last date that competing bids are due, the Bankruptcy Court shall have entered a sale order providing for a sale "free and clear," in form and substance reasonably acceptable to Buyer (as more particularly set forth in the APA, the "Sale Order"), the representations and warranties of the parties set forth in the APA shall remain true and correct, and both parties shall have performed in all material respects the covenants set forth in the APA. |
| Bid Protections: | If Buyer is not the successful purchaser and an alternate transaction is approved by the Bankruptcy Court, Buyer will be entitled to receive a cash payment in the amount of $2,000,000 directly from the proceeds of a sale to another purchaser (as more particularly set forth in the APA, the "Expense Reimbursement Fee").  Any competing bid must exceed the sum of the Purchase Price plus the Expense Reimbursement Fee plus $2,000,000, and otherwise meet the financing and other requirements set forth in the Bid Procedures (such bid, a "Qualified Competing Bid").  If there is a Qualified Competing Bid, Sellers will hold an auction for the Purchased Assets (the "Auction").  Buyer may participate in the Auction, and any subsequent bid must exceed the previous bid by at least $500,000.  In order to determine the winning bid at any such Auction, Sellers will evaluate the value to be provided to Debtors under the bids, including the net economic effect upon Debtors' estates, taking into account Buyer's right to the Expense Reimbursement Fee. |

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

13.     In addition to the above general sale provisions, the following sale provisions are disclosed in accordance with applicable local rules and guidelines:

| | |
|---|---|
| Sale to Insider: | Buyer is not an insider as defined in Bankruptcy Code Section 1101(31). |
| Sale Free and Clear: | The sale will be free and clear of liens, claims, encumbrances, and other interests. |
| Liens: | The Purchased Assets are encumbered by a lien or liens asserted by CoBank, ACB, as Agent and PNC Equipment Finance, LLC. |
| Releases and Insider Benefits: | None. |
| Closing Deadlines: | The Closing shall occur two business days after all conditions to Closing have been either satisfied or waived, or on such other date as Sellers and Buyer agree.  The outside Sale Order date is November 15, 2019.  Parties anticipate Closing to occur on October 31, 2019. |
| Good Faith Deposit: | None by Buyer.  Competing bidders required to submit with their bid a good-faith deposit in the amount of $2,000,000. |
| Interim Arrangement With Proposed Buyer: | None. |
| Use of Proceeds: | Proceeds from the sale will be utilized to pay secured creditors in full, with remaining proceeds to be distributed pursuant to the Sale Order or further order of the Court. |
| Record Retention: | After the sale, Debtors will retain or have access to the books and records as necessary to administer the Chapter 11 case and file final returns as appropriate. |
| Sale of Avoidance Actions: | The Purchased Assets include the sale of any and all claims of Sellers and/or their bankruptcy estates against the growers listed on Schedule 2.02 of the APA arising under Chapter 5 of the Bankruptcy Code or analogous state law. |
| Requested Findings as to Successor Liability: | Buyer shall not be a successor to Debtors and shall have no liability or responsibility for any liability or obligation of Debtors other than as expressly set forth in the APA.  The sale to Buyer will not subject Buyer or its affiliates, successors, or assigns, or their respective properties, to any liability for claims against Debtors or Debtors' Assets. |

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

| | |
|---|---|
| Credit Bidding: | The motion does not seek to limit credit bidding under Section 363. |
| Standard for Approval: | The motion seeks approval of the proposed sale pursuant to the business judgment standard. |
| Relief From Bankruptcy Rule 6004(h): | This motion requests relief from Bankruptcy Rule 6004(h). |
| Solicitation Process: | Notice of the proposed sale will be given to all parties and creditors in interest, and other parties identified by Debtors that have expressed an interest in purchasing Debtors' assets and that have executed a confidentiality agreement. |

## AUCTION AND BID PROCEDURES

14.     The proposed Bid Procedures are intended to permit a fair and efficient competitive sale and to promptly identify any alternative bid that is higher or otherwise better than the bid set forth in the APA.  Because the Bid Procedures are attached as Exhibit 1 to the proposed Bid Procedures Order, they are not restated herein.  Generally speaking, however, the Bid Procedures establish, among other things:

(a)     The deadlines and requirements for becoming a Potential Bidder, submitting competing bids, and the method and criteria by which such competing bids are to become entitled to be Qualified Bids sufficient to trigger an Auction, including the minimum consideration that must be provided and the terms and conditions that must be satisfied by any Bidder (other than OPC) to be entitled to be a Potential Bidder and a Qualified Bidder (see Bid. Proc. at ¶¶ B, D).

(b)     The manner in which Qualified Bids will be evaluated by Debtors to determine the starting bid for the Auction (see Bid. Proc. at ¶ E).

(c)     The procedures for conducting the Auction (see Bid. Proc. at ¶ G).

(d)     The criteria by which the "Successful Purchaser" will be selected by Debtors, in consultation with its advisors (see Bid. Proc. at ¶¶ H-I).

(e)     Various other matters relating to the sale process generally, including the Sale Hearing, designation of a Backup Bidder, payment of the bid protections, return of any Sale Deposits, and certain reservations of rights (see Bid. Proc. at ¶¶ J-M).

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

Case 19-62584-pcm11     Doc 83     Filed 09/03/19

15. The Bid Procedures recognize Debtors' fiduciary obligations to maximize sale value and, as such, do not impair Debtors' ability to consider all qualified bid proposals, and preserve Debtors' right to modify the Bid Procedures as necessary or appropriate to maximize value for Debtors' estates in consultation with key parties set forth therein.

16. The Bid Procedures contain the following provisions that are required to be highlighted pursuant to local rules and guidelines:

(a) <u>Provisions Governing Qualification of Bidders</u>. The provisions governing an entity's right to become a Qualified Bidder are set forth in paragraphs B and D of the Bid Procedures.

(b) <u>Provisions Governing Qualified Bids</u>. The provisions governing Qualified Bids are set forth in paragraphs D and E of the Bid Procedures. Such provisions include, among other things, the deadlines for submitting a bid, the requirements for submitting a bid, the assets to be included in the bid, the period the bid must remain open, and the requirement to provide the Sale Deposit. OPC is deemed to have satisfied all of the bidding conditions.

(c) <u>Provisions Providing Bid Protections to "Stalking Horse" Bidder</u>. Paragraph A of the Bid Procedures sets forth the "stalking horse" bidder protections. The APA does not include any limitations on Debtors' ability to solicit higher or better bids. It does provide for the provision of an Expense Reimbursement Fee in the amount of $2,000,000, which shall be paid in the event the Property is sold to a party other than OPC.

(d) <u>Bidding Increments</u>. Paragraphs D and G of the Bid Procedures set forth the amount of the initial bid and any successive bidding increments.

(e) <u>Due Diligence Period</u>. Interested parties shall have until the Bid Deadline to conduct due diligence. Paragraph C of the Bid Procedures sets forth the requirements for obtaining due diligence access.

(f) <u>Modification of Bidding and Auction Procedures</u>. Paragraph M of the Bid Procedures authorizes Debtors, without further order of the Court, to modify the Bid Procedures.

(g) <u>Closing With Alternative Backup Bidders</u>. Paragraph J of the Bid Procedures addresses the ability of Debtors to sell the Property to the Backup Bidder.

**Page 9 of 18** - DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

(h)  <u>Provisions Governing the Auction</u>.  Paragraph G of the Bid Procedures sets forth the provisions governing the auction, and this Motion specifies the date, time, and place at which the Auction will be conducted and the method for providing notice to parties of any changes thereto.  Further, Paragraph D(1) of the Bid Procedures requires each bidder to identify whether it is bidding for itself or for others and, if for others, the identities of such parties and whether the bidder is party to any agreement limiting the bidders at the auction.

## SUMMARY OF THE ASSUMPTION AND ASSIGNMENT PROCEDURES

17.  Debtor is also seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Designated Contracts in connection with the Sale.  The Assumption Procedures are as set forth below.

18.  On or before the date that is ten (10) Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, Debtors will file a notice of potential assumption (the "Assumption Notice") with the Bankruptcy Court and serve such notice on each counterparty to an executory contract or lease listed thereon.  The Assumption Notice will identify all executory contracts and leases that Debtors believe may be assumed and assigned in connection with the Transaction and set forth a good faith estimate of the amount of Cure Costs applicable to each such contract or lease (and. if no cure cost is estimated to be applicable, the amount of such Cure Cost designated shall be $0.00) (the "Cure Schedule").

19.  On or before the date that is four (4) Business Days before the Sale Hearing (the "Designation Deadline""), Buyer shall provide to Sellers an updated schedule listing the Designated Contracts, i.e., those executory contracts and Leases set forth on the Cure Schedule that it desires to have assumed and assigned to Buyer at the Closing (the "Designated Contracts").  Sellers shall promptly file such additional motions or pleadings as may be appropriate or necessary to inform the Court and interested parties of the Designated Contracts.

20.  Notwithstanding the foregoing, Buyer reserves the right to remove a contract or lease from the list of Designated Contracts at any time pending Closing of the Transaction, even

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

after entry of the Sale Order. Only those Designated Contracts that Buyer finally elects to assume as of the Closing will be assumed by Sellers and assigned to Buyer pursuant to the Sale Order at Closing. Buyer shall make provision for the payment of the Cure Costs of assigned contracts in cash at Closing, or for the provision of adequate assurance that the Cure Costs will be promptly paid on or after Closing in accordance with the Sale Order.

21.    Any objection to the assumption and assignment of the Designated Contracts identified on the Cure Schedule, including objections to the cure amount set forth on such schedule and to adequate assurance of future performance, must be filed with the Bankruptcy Court no later than October 18, 2019 at 5:00 p.m. prevailing Pacific time.

22.    If no objection is timely filed to the assumption and assignment of a Designated Contract, the counterparty to such contract will be barred from objecting thereto and shall be deemed to consent to the assumption and assignment of such contract. If no objection is timely filed to the proposed cure amount with respect to a Designated Contract, then the cure amount set forth in the Cure Schedule shall be binding upon the non-debtor party to such contract for all purposes in this Chapter 11 case and will constitute a final determination of the total cure amount required to be paid in connection with the assumption and assignment thereof.

23.    If a timely objection is filed and such objection cannot otherwise be resolved by the parties, the Bankruptcy Court may hear such objection at the Sale Hearing or any adjourned date thereof. In Buyer's discretion, the pendency of a dispute relating to a proposed cure amount will not delay the Closing of the sale, including the assumption and assignment of other Designated Contracts necessary to effectuate such Closing, provided that, for any dispute relating to a proposed cure amount that is unresolved by the date of the Closing of the sale, Buyer shall pay, and Debtors shall escrow, the claimed cure amount requested with respect to such contract pending such resolution.

**Page 11 of 18** - DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

Case 19-62584-pcm11    Doc 83    Filed 09/03/19

# BASIS FOR RELIEF REQUESTED

## A. SALE OF ASSETS

24. Section 363(b)(1) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." This provision generally allows a trustee (subject to court approval) to sell property of the estate outside the ordinary course of business where the proposed sale is a sound exercise of a debtor's business judgment and when the sale is proposed in good faith and for fair value. *Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Ernst Home Center, Inc.*, 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). When a trustee articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the [trustee's] conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

25. Debtors have determined that it is in the best interests of Debtors' estates to sell the Property under 11 U.S.C. § 363 to OPC or another buyer. The decision to sell the assets has been approved by Debtors' board of directors. The sale will generate funds sufficient to pay all secured and priority claims and leave sufficient funds for a meaningful distribution to unsecured creditors. Debtors believe the APA and contemplated sale process will maximize the value of Debtors' assets for the benefit of Debtors' estates and all creditors. A sale will provide creditors with a greater return than liquidation and with prompt payment. The proposed sale will also result in the continued employment of many of Debtors' employees, and preserve business relationships and sales for vendors, customers, and other parties who are presently doing business with Debtors. Debtors do not have sufficient resources to continue operating or to file a plan of reorganization prior to the proposed sale. Debtor has determined that it is in the best interests of Debtors' estates to sell the Assets under 11 U.S.C. § 363 to OPC or another buyer who can continue some or all of Debtors' operations.

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

26.     The APA was negotiated at arm's length, in good faith, and Debtors believe their terms are fair and reasonable.  OPC is not an "insider" of Debtors and neither Debtors nor their management have a financial interest in the transactions contemplated by the APA.

**B.     SALE FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

27.     Debtors request that the Court authorize the sale of the Purchased Assets free and clear of all liens, claims, and encumbrances that may be asserted against the Purchased Assets, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the sale. OPC, or the Successful Bidder, will have no successor liability to any creditor who holds a claim as of the closing date except as specifically stated in the APA, and all such creditors will be forever enjoined from seeking to enforce or collect any such claim from or against the successful bidder.

28.     OPC (and potential bidders in the auction process) will only buy the assets if they are "free and clear" of liens, claims, and encumbrances and successor liability.

29.     Holders of liens and interests in the assets will be adequately protected because they will be paid in full from the sale proceeds or their interests will attach to the proceeds of the sale, which will be sufficient to pay their secured claims in full.

30.     Even to the extent there are later determined to be junior secured claims that will not be paid in full, Debtor may sell property of the estate free and clear of liens or other interests under Section 363(f)(1) when applicable non-bankruptcy law permits a sale free of liens and interests.  3 Collier on Bankruptcy P 363.06 (16th 2018).  Such a sale is permissible where state foreclosure law would eliminate the junior interest. *See Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions* (*In re Spanish Peaks Holdings II, LLC*), 872 F.3d 892 (9th Cir. 2017).  The Ninth Circuit, in *Pinnacle,* recently addressed the issue of free and clear sales under 11 U.S.C. § 363(f)(1) in the context of a proposed sale free and clear of an unexpired lease.  In that case, the Court stated as follows:  "* * * We, on the other hand, focus on 11 U.S.C. §363(f)(1), which authorizes a sale if 'applicable nonbankruptcy law permits sale of such property free and clear of

DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

such interest.' 11 U.S.C. § 363(f)(1).  Under Montana law, a foreclosure sale to satisfy a mortgage terminates a subsequent lease on the mortgaged property. *See Ruby Valley Nat'l Bank v. Wells Fargo Delaware Trust Co.*, 2014 MT 16, 373 Mont. 374, 317 P.3d 174, 178 (Mont. 2014); *Williard v. Campbell*, 91 Mont. 493, 11 P.2d 782, 787 (Mont. 1932). [Debtor]'s bankruptcy proceeded, practically speaking, like a foreclosure sale—hardly surprising since its largest creditor was the holder of the note and mortgage on the property.  Indeed, had [Debtor] not declared bankruptcy, we can confidently say that there would have been an actual foreclosure sale.  Such a sale would have terminated the Pinnacle and Opticom leases.  Section 363(f)(1) does not require an actual or anticipated foreclosure sale.  It is satisfied if such a sale would be legally permissible." *Id.* at 899-900.

31.  In Oregon, there are numerous state law provisions that permit the sale free and clear of liens and interests, including a hypothetical foreclosure by a lienholder, or a receivership, which could be initiated at the behest of creditors or by the debtor itself.

## C.  ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

32.  As described above, as part of the sale contemplated by the APA, Debtors intend to assume and assign certain executory contracts.

33.  Under Section 365(a), a debtor may assume or reject an executory contract, subject to the court's approval.  In determining whether to approve a request for approval of assumption of an executory contact, the bankruptcy court applies the business judgment rule.

34.  In addition to passing the business judgment test, Section 365(b) of the Bankruptcy Code requires that a debtor meet certain additional requirements to assume an executory contract:

35.  If there has been a default in an executory contract or unexpired lease of the debtor, a debtor may not assume such contract or lease unless, at the time of assumption of such contract or lease, the debtor (a) cures, or provides adequate assurance that Debtor will promptly cure, such default;(b) compensates, or provides adequate assurance that Debtor will promptly

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (c) provides adequate assurance of future performance under such contract or lease.

36.     Similarly, Section 365(f)(2) applies similar requirements to the assignment of an executory contract, stating that the contract may be assigned if the debtor assumes such contract or lease in accordance with the provisions of this section, and adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

37.     In this case, Debtors' proposed assumption and assignment of the executory contracts to OPC or another bidder would fulfill the "cure" and "adequate assurance" requirements for assumption and assignment set forth in the aforementioned statutes.  Any defaults under the contracts and leases would be cured by OPC at closing or as soon thereafter as the Court establishes the amount of the cure payment needed (or the parties agree on such amount).  If another entity is the successful purchaser, it will have had to satisfy Debtors and the Court of its financial strength and, therefore, similarly will fulfill the "adequate assurance" requirement.

38.     Some, if not all, of the executory contracts at issue may contain provisions purporting to prohibit or condition the assignment to third parties.  The Bankruptcy Code specifically prohibits the termination or modification of executory contracts based on such clauses that restrict assignment.  11 U.S.C. § 365(f)

**D.     BID PROTECTIONS**

39.     Debtors also request approval of an expense reimbursement fee of $2,000,000.  The expense reimbursement fee would be payable to OPC directly from the proceeds of a sale to another purchaser in the event another bidder prevails at the Auction and an alternate sale is ultimately approved.

**Page 15 of 18** - DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

40.     In evaluating expense reimbursement and similar fees, courts have applied three basic standards: (a) the business judgment test; (b) the best interests of creditors test; and (c) the "actual and necessary," or administrative expense, test.  It appears that the Ninth Circuit has not adopted (or rejected) any of the foregoing tests.  No matter which test it chooses to apply, however, it would be appropriate for the Court to approve the Breakup Fee.

41.     Although courts may apply different analytical standards, they generally reach the same conclusion:  expense reimbursement fees are appropriate when they encourage bidding and are in the best interest of the estate.  *See, e.g., In re Integrated Resources, Inc.,* 147 B.R. 650 (S.D.N.Y. 1992), *app. dismissed on jurisdictional grounds*, 3 F.3d 49 (2d Cir. 1993) (applying the business judgment standard to approve expense reimbursement fee that helped attract and retain a potentially successful bid and attract other bidders); *In re America West Airlines, Inc.,* 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (applying the best interest of creditors tests and focusing on "whether the transaction will further the diverse interests of Debtors, creditors, and equity holders alike"); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (applying the "actual and necessary" test and stating that the estate benefits if the expense reimbursement fee induced "a bid that otherwise would not have been made * * *"); *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").

42.     Here, the expense reimbursement fee was necessary to induce OPC to enter into the APA and to serve as the stalking horse bidder.  Debtors, in their business judgment, agreed to the expense reimbursement fee to induce OPC to enter into the APA and to serve as the stalking horse bidder.  As the expense reimbursement fee was critical in inducing OPC to enter into the APA, and the APA is in the best interests of creditors, it follows that the expense reimbursement fee is in the best interests of creditors.  Finally, the expense reimbursement fee approximates the

DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

1  expenses incurred by OPC, or that will be incurred by OPC, in negotiating and documenting the

2  APA.

3  **E.     NON-APPLICABILITY OF STAY**

4      43.     In addition to the other sale-related relief sought herein, Debtors request that the

5  Court specifically find inapplicable any stays that might otherwise inhibit Debtors' ability to

6  close the proposed transactions for the sale of the Property immediately after the Court enters an

7  order approving the transactions, including, without limitation, those arising under Bankruptcy

8  Rules 6004 or 6006.  Any delay in a closing of the sale would mean substantial potential harm to

9  Debtors, their creditors, and their estates.

10                                **NOTICE**

11      44.     Debtors propose to give notice of the Auction, this Motion, and the Sale Hearing

12  as follows:  serve a copy of this Motion and the Sale Notice upon (a) counsel for the unsecured

13  creditors committee appointed in this case; (b) all persons or entities required to be served

14  pursuant to orders of this Court; (c) all parties who have filed requests for notice under

15  Bankruptcy Rule 2002 as of the date of service; (d) all persons or entities who, to the knowledge

16  of Debtors, hold a lien upon the Purchased Assets; (e) the Office of the United States Trustee;

17  and (f) all persons who have expressed an interest in purchasing the Purchased Assets and who

18  have signed a non-disclosure agreement with Debtors.  In addition, Debtors shall serve the

19  Notice of Motion to Approve Sale to OPC or Higher and Better Bidder at Auction, Auction,

20  Bidding Procedures, Sale Hearing, and Objection Deadlines on all creditors and parties in

21  interest reflected in the mailing matrix on file with the Court.

22      45.     Debtors submit that such notice constitutes good and sufficient notice of the

23  competitive offer procedures, this Motion, and all proceedings to be held thereon, and that no

24  other or further notice need be given.

25          WHEREFORE, Debtors respectfully request that the Court (a) enter an order

26  approving the Bid Procedures; and (b) as soon as practicable after completion of the Auction,

Tonkon Torp LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440

1  enter an order (i) approving the sale of the Property to OPC or other successful purchaser;

2  (ii) approving such sale free and clear of all liens, claims, and encumbrances, with such interests

3  attaching to the sale proceeds; (iii) approving the assumption and assignment of executory

4  contracts and unexpired leases to OPC or other successful purchaser; (iv) declaring all stays,

5  including, without limitation, those arising under Bankruptcy Rules 6004 or 6006, inapplicable;

6  and (vi) granting such other and further relief as may be just and proper.

7        DATED this 3rd day of September, 2019.

8              TONKON TORP LLP

9

10             By */s/ Michael W. Fletcher*
                Albert N. Kennedy, OSB NO. 821429

11                 Timothy J. Conway, OSB No. 851752
                Michael W. Fletcher, OSB No. 010448

12                 Ava L. Schoen, OSB No. 044072
                Attorneys for Debtors

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Page 18 of 18** - DEBTORS' AMENDED MOTION FOR ORDER APPROVING (A) BID AND SALE PROCEDURES, INCLUDING EXPENSE REIMBURSEMENT FEE, TO OREGON POTATO COMPANY; (B) SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES; AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS

# EXHIBIT A

**Asset Purchase Agreement**

**FIRST AMENDMENT**
to
**ASSET PURCHASE AGREEMENT**

This First Amendment (this "**Amendment**") to the Asset Purchase Agreement, by and among NORPAC Foods, Inc., an Oregon corporation ("**NORPAC**") with its wholly-owned subsidiaries Quincy Foods, LLC, a Washington limited liability company ("**Quincy Foods**") and Hermiston Foods, LLC, an Oregon limited liability company ("**Hermiston Foods**" and collectively with NORPAC and Quincy Foods, the "**Sellers**" and each a "**Seller**") and Oregon Potato Company, a Washington corporation ("**Buyer**"), dated August 12, 2019 (the "**Purchase Agreement**"), is entered into by and between the Parties, effective as of August 26, 2019 (the "**Effective Date**"). Capitalized terms used but not defined in this Amendment have the meanings given in the Purchase Agreement.

**WHEREAS**, on August 22, 2019, Sellers commenced voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Oregon under Case Nos. 19-62584-pcm11, 19-33102-pcm11 and 19-33103-pcm11 and as a result, Sellers are debtors and debtors in possession;

**WHEREAS**, since the date of the Purchase Agreement, the parties thereto have engaged in and concluded negotiations regarding Buyer's additional purchase from Sellers of certain real property located in Stayton, Oregon and all tangible assets associated therewith (the "**Stayton Assets**"); and

**WHEREAS**, the Sellers and Buyer wish to amend the Purchase Agreement to reflect the purchase of the Stayton Assets, subject to the terms and conditions of the Purchase Agreement as amended by this Amendment.

**NOW, THEREFORE**, in accordance with Section 11.09 of the Purchase Agreement and in consideration of the mutual covenants, terms, and conditions set out herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Purchase Agreement shall be amended as follows:

       1.       **Amendments.** The sections of the Purchase Agreement identified herein shall be amended and restated as follows:

**ARTICLE II**
**PURCHASE AND SALE**

<u>Section 2.04(i)</u> shall be deleted in its entirety and replaced with the following:

       (i) One Hundred Fifty-Five Million Five Hundred Thousand Dollars ($155,500,000), subject to withholding of the Indemnification Escrow Amount, *plus*

<u>Section 2.05(a)(i)</u> shall be deleted in its entirety and replaced with the following:

       (i) One Hundred Fifty-Five Million Five Hundred Thousand Dollars ($155,500,000), *minus*

The following shall be added as the last sentence in <u>Section 2.09(a)</u>:

       Buyer is acquiring the Stayton Property, but does not intend to operate the facilities thereon. Buyer will not offer employment to current bargaining unit employees who are members of Teamsters Local 670, or who are members of Operating Engineers Local 701, at the Stayton Property and Sellers will terminate all employees at the Stayton Property prior to Closing after providing any required WARN notices.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

The following clause shall be added as new <u>Section 4.09(i)</u>:

1

(i)    With respect to the Stayton Property, easements, rights of way and other similar encumbrances of record affecting such Real Property that are disclosed in the commitments to title insurance delivered by Sellers to Buyer in connection with this Agreement and are reasonably acceptable to Buyer.

## ARTICLE VII
## CLOSING CONDITIONS

Section 7.02(m) shall be deleted in its entirety and replaced with the following:

(m)    Buyer shall have completed its due diligence investigation of title, environmental (other than environmental matters relating to Map and Tax Lot Number 091W10CB02400 of the Stayton Property, which is referred to as Parcel II in the Stayton Title Commitment), customer, supplier and operational matters of the Business by the last date on which Qualified Competing Bids are due under the Sale Procedures Order, and shall, in its sole discretion, be satisfied with the results of such due diligence investigation.  Buyer shall provide Sellers with written notice by such date if this condition has not been satisfied.

The following clause shall be added as new Section 7.02(t):

(t)    Sellers shall have taken all required actions to cease Business operations and close all facilities located at the Stayton Property.

## ARTICLE XI
## MISCELLANEOUS

Section 11.06 shall be deleted in its entirety and replaced with the following:

**Section 11.06 Entire Agreement.** This Agreement, the First Amendment to Asset Purchase Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement, including any amendment hereto, and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement, including any amendment hereto, will control.

## Schedule 1.01

## DEFINITIONS

The following shall be added as a new defined term:

"**Stayton Title Commitment**" means the preliminary commitment for title insurance issued by First American Title Insurance Company under Commitment No. NCS-973766-WA1 dated August 1, 2019.

## Schedule 2.01

## Purchased Assets

The following clause shall be added as new Schedule 2.01(a)(4):

4.    All interests of Sellers in and to the real property (including, without limitation, all buildings, structures, improvements and fixtures situated thereon, and all easements, rights-of-way and other rights and privileges appurtenant thereto) located at  930 W Washington St, Stayton, OR 97383 and associated with Map and Tax Lot Numbers 091W07C 01100, 91W10CB02400,

91W09DD00100, 091W15BB01700, 091W1600100, 091W1600100, 091W09DC10500, 091W09DD02500, 091W2000100, 091W2000200, 091W10CC01100, 091W10CC02000, 091W10CC00600, 091W1700100, 091W1701200, 091W1601000, 091W1600900, 09S01W2000100, 09S01W2000200 and 09S01W1600200 (collectively, the "**Stayton Property**").

### Schedule 2.03

**Excluded Assets**

Clause 3 of Schedule 2.03 shall be deleted in its entirety without replacement.

**2.**     **No Other Changes.** This Amendment supersedes any prior or contemporaneous oral or written discussions as to the subject matter hereof. Except as specifically set forth herein, all terms and conditions of the Purchase Agreement shall remain in full force and effect and are hereby reaffirmed by the Parties.

**3.**     **Term and Termination**. Unless otherwise amended or modified by the Parties in accordance with Section 11.09 of the Purchase Agreement, this Amendment shall commence on the Effective Date and remain effective for so long as the Purchase Agreement remains effective under the terms thereof.

**4.**     **Incorporation.** This Amendment shall be deemed incorporated into the Purchase Agreement and subject entirely to the terms and conditions thereof, including without limitation, the terms of Article XI.

*[**Signatures Page Follows**]*

**IN WITNESS WHEREOF**, the parties hereto have caused this First Amendment to Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

**NORPAC Foods, Inc.,**
an Oregon corporation

By _____
Name: _SHAWN CAMPBELL_
Title: _PRES + CEO_

**Quincy Foods, LLC,**
a Washington limited liability company
By: NORPAC Foods, Inc.
Its: Member

By _____
Name: _SHAWN CAMPBELL_
Title: _PRES + CEO_

**Hermiston Foods, LLC,**
an Oregon limited liability company
By: NORPAC Foods, Inc.
Its: Member

By _____
Name: _SHAWN CAMPBELL_
Title: _PRES + CEO_

**BUYER:**

**Oregon Potato Company,**
a Washington corporation

By _____
Name: _Steven Schlesberger_
Title: _Vice President_

[Signature Page to First Amendment to Asset Purchase Agreement]

**ASSET PURCHASE AGREEMENT**

BY AND AMONG

**NORPAC Foods, Inc.**

**Quincy Foods, LLC**

**Hermiston Foods, LLC**

AND

**Oregon Potato Company**

DATED AS OF

**August 12, 2019**

4823-4697-8715v.21 0055621-000009

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS .................................................................................................................1

ARTICLE II PURCHASE AND SALE ..............................................................................................1

    **Section 2.01 Purchase and Sale of Assets.** ...................................................................................1

    **Section 2.02 Assumed Liabilities.** ...............................................................................................2

    **Section 2.03 Excluded Assets.** ....................................................................................................2

    **Section 2.04 Purchase Price.** .......................................................................................................3

    **Section 2.05 Payment of Purchase Price.** ...................................................................................3

    **Section 2.06 Allocation of Purchase Price.** .................................................................................4

    **Section 2.07 Closing Costs.** .........................................................................................................4

    **Section 2.08 Prorations.** ..............................................................................................................4

    **Section 2.09 Employees.** .............................................................................................................4

    **Section 2.10 Withholding Tax.** ...................................................................................................6

    **Section 2.11 Third Party Consents.** ............................................................................................6

ARTICLE III CLOSING .....................................................................................................................6

    **Section 3.01 Closing.** ...................................................................................................................6

    **Section 3.02 Closing Deliverables.** .............................................................................................6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ......................................8

    **Section 4.01 Organization and Qualification of NORPAC.** ........................................................8

    **Section 4.02 Organization and Qualification of Quincy Foods and Hermiston Foods.** ...................8

    **Section 4.03 Authority of Sellers.** ...............................................................................................9

    **Section 4.04 No Conflicts; Consents.** ..........................................................................................9

    **Section 4.05 Financial Statements.** .............................................................................................9

    **Section 4.06 Undisclosed Liabilities.** .........................................................................................9

    **Section 4.07 Absence of Certain Changes, Events and Conditions.** ...........................................10

    **Section 4.08 Material Contracts.** ................................................................................................11

    **Section 4.09 Title to Purchased Assets.** ....................................................................................11

    **Section 4.10 Condition and Sufficiency of Assets.** ...................................................................12

    **Section 4.11 Real Property.** ........................................................................................................12

    **Section 4.12 Intellectual Property.** ............................................................................................13

    **Section 4.13 Customers and Suppliers.** .....................................................................................14

    **Section 4.14 Insurance.** ..............................................................................................................14

Section 4.15 Legal Proceedings; Governmental Orders. ..................................................15

Section 4.16 Compliance with Laws; Permits. ...............................................................15

Section 4.17 Environmental Matters. .............................................................................15

Section 4.18 Employee Benefit Matters. ........................................................................16

Section 4.19 Employment Matters. .................................................................................19

Section 4.20 Taxes. ........................................................................................................20

Section 4.21 Brokers. .....................................................................................................20

Section 4.22 Food Safety. ..............................................................................................21

Section 4.23 Inventory. ..................................................................................................22

Section 4.24 No Other Representations or Warranties. ...................................................23

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ..................................23

Section 5.01 Organization of Buyer. ..............................................................................23

Section 5.02 Authority of Buyer. ....................................................................................23

Section 5.03 No Conflicts; Consents. .............................................................................23

Section 5.04 Legal Proceedings. ....................................................................................23

Section 5.05 Source of Funds. ........................................................................................23

Section 5.06 Independent Investigation. .........................................................................23

ARTICLE VI COVENANTS .................................................................................................24

Section 6.01 Conduct of Business Prior to the Closing. .................................................24

Section 6.02 Access to Information. ................................................................................24

Section 6.03 No Solicitation of Other Bids. ...................................................................25

Section 6.04 Notice of Certain Events. ...........................................................................25

Section 6.05 Confidentiality. ..........................................................................................26

Section 6.06 Non-Competition; Non-Solicitation. .........................................................26

Section 6.07 Product Liability Matters. ..........................................................................27

Section 6.08 Governmental Approvals and Consents. ....................................................27

Section 6.09 Books and Records. ...................................................................................28

Section 6.10 Closing Conditions. ...................................................................................29

Section 6.11 Public Announcements. ..............................................................................29

Section 6.12 Transfer Taxes. ..........................................................................................29

Section 6.13 Tax Clearance Certificates. ........................................................................29

Section 6.14 Finished Goods. .........................................................................................29

ii

Section 6.15 Further Assurances. ...................................................................................29

ARTICLE VII CONDITIONS TO CLOSING ...........................................................................29

Section 7.01 Conditions to Obligations of All Parties. ....................................................29

Section 7.02 Conditions to Obligations of Buyer. ...........................................................30

Section 7.03 Conditions to Obligations of Seller. ...........................................................31

ARTICLE VIII INDEMNIFICATION .....................................................................................31

Section 8.01 Survival. ......................................................................................................31

Section 8.02 Indemnification by Seller. ..........................................................................32

Section 8.03 Indemnification by Buyer. ..........................................................................32

Section 8.04 Indemnification Procedures. .......................................................................33

Section 8.05 Limitations on Indemnification. ..................................................................34

Section 8.06 Payments; Indemnification Escrow Fund. ..................................................35

Section 8.07 Tax Treatment of Indemnification Payments. .............................................35

Section 8.08 Effect of Investigation. ...............................................................................35

Section 8.09 Exclusive Remedies. ...................................................................................35

ARTICLE IX TERMINATION ...............................................................................................36

Section 9.01 Termination. ................................................................................................36

Section 9.02 Effect of Termination. .................................................................................37

ARTICLE X BANKRUPTCY COURT MATTERS ....................................................................37

Section 10.01 Binding Effect; Entry of Sale Order. ........................................................37

Section 10.02 Bankruptcy Court Approval. .....................................................................37

ARTICLE XI MISCELLANEOUS ..........................................................................................39

Section 11.01 Expenses. ..................................................................................................39

Section 11.02 Notices. ......................................................................................................39

Section 11.03 Interpretation. ............................................................................................40

Section 11.04 Headings. ...................................................................................................40

Section 11.05 Severability. ...............................................................................................40

Section 11.06 Entire Agreement. ......................................................................................41

Section 11.07 Successors and Assigns. ............................................................................41

Section 11.08 No Third-party Beneficiaries. ...................................................................41

Section 11.09 Amendment and Modification; Waiver. ....................................................41

Section 11.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. .........41

4823-4697-8715v.21 0055621-000009

**Section 11.11 Specific Performance.**................................................................................................42

**Section 11.12 Counterparts.**................................................................................................42

**SCHEDULES AND EXHIBITS**

Disclosure Schedule

Schedule 1.01 - Definitions
Schedule 2.01 - Purchased Assets
Schedule 2.02 – Assumed Grower Obligations
Schedule 2.03 – Excluded Assets
Schedule 2.04 – Inventory Pricing and Specifications
Schedule 3.02(a)(xiii) – COA Testing Requirements


Exhibit A – Escrow Agreement

4823-4697-8715v.21 0055621-000009

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of August 12, 2019, is entered into by and among NORPAC Foods, Inc., an Oregon corporation ("**NORPAC**") with its wholly-owned subsidiaries Quincy Foods, LLC, a Washington limited liability company ("**Quincy Foods**") and Hermiston Foods, LLC, an Oregon limited liability company ("**Hermiston Foods**" and collectively with NORPAC and Quincy Foods, the "**Sellers**" and each a "**Seller**") and Oregon Potato Company, a Washington corporation ("**Buyer**").

## RECITALS

**WHEREAS**, the Sellers are engaged in the acquisition of agricultural products from growers located throughout the Pacific Northwest and the processing, repacking and sale of food products (as conducted by Sellers prior to the Closing Date, the "**Business**");

**WHEREAS**, Sellers intend to commence voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court, District of Oregon (the "**Bankruptcy Court**"). The Sellers will seek to have their bankruptcy cases jointly administered (the "**Bankruptcy Case**");

**WHEREAS**, the Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from the Sellers, certain specified assets owned by the Sellers, and assume certain liabilities of the Sellers relating to the Business, in each case as more specifically provided herein and upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code;

**WHEREAS**, the transactions contemplated by this Agreement are, as more specifically provided herein, subject to the approval by the Bankruptcy Court of this Agreement and will only be consummated pursuant to the Sale Order entered in the Bankruptcy Case; and

**WHEREAS**, a portion of the Purchase Price payable by Buyer to Sellers shall be placed in escrow by Buyer to secure the indemnification obligations of the Sellers, the release of which shall be contingent upon certain events and conditions, all as set forth in this Agreement and the Escrow Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01** **Definitions.** Capitalized terms used herein have the meanings set forth in this Agreement or Schedule 1.01 hereto.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01** **Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein and except for any Excluded Assets, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, free and clear of any Encumbrances to the maximum extent permitted by Section 363(f) of the Bankruptcy Code (other than Permitted Encumbrances), all of Sellers' right, title and interest in, to and under the following assets (collectively, the "**Purchased Assets**"):

(a) the real property interests set forth on **Schedule 2.01(a)** (the "**Real Property**");

(b) all tangible personal property, including all furniture, fixtures, equipment, parts, machinery, tools, vehicles, inventory, materials, office equipment, supplies, computers, telephones owned by any Seller, including but not limited to, those assets set forth on **Schedule 2.01(b)** (the "**Tangible Personal Property**");

1

(c)     all intangible property and assets, including those set forth on **Schedule 2.01(c)**;

(d)     the Contracts set forth on **Schedule 2.01(d)** (the "**Assigned Contracts**");

(e)     all Intellectual Property rights, including those set forth on **Schedule 2.01(e)** (the "**Intellectual Property Assets**");

(f)     all Permits, including Environmental Permits, which are held by a Seller and required for ownership and use of the Purchased Assets, including, without limitation, those set forth on **Schedule 2.01(f)** (the "**Assigned Permits**");

(g)     all accounts receivable owing to any Seller as of the Closing Date (the "**Accounts Receivable**");

(h)     all inventory, including without limitation, all raw materials, work in process, bulk product, finished goods and packaging materials (the "**Inventory**");

(i)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes) related to the Purchased Assets;

(j)     all of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(k)     all insurance benefits, including rights and proceeds, arising from or relating to the Acquired Business, the Purchased Assets or the Assumed Liabilities; and

(l)     copies of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating solely to the Purchased Assets ("**Books and Records**"); *provided, however,* that the Books and Records do not include any of the Attorney Records.

**Section 2.02     Assumed Liabilities**.  Subject to the terms and conditions set forth herein, Buyer agrees to (i) pay the Cure Costs, (ii) assume, pay, perform and discharge all other obligations and Liabilities of Sellers under the Assigned Contracts set forth on **Schedule 2.01(d),** solely to the extent arising out of and relating to the period after the Closing and not to the extent arising out of any actual or alleged breach, default or other failure to perform under any such Assigned Contract occurring prior to the Closing, and (iii) assume the Sellers' obligations to growers for 2019 crops as set forth on **Schedule 2.02** (the "**Assumed Grower Obligations**") and pay the Assumed Grower Obligations in accordance with the payment terms set forth on **Schedule 2.02** (collectively, the "**Assumed Liabilities**"), and no other Liabilities of Sellers. Without limitation of the foregoing, it is expressly agreed that Buyer shall not assume any Liabilities associated with, relating to or resulting from, any single or multi-employer pension plan of any Seller. For the avoidance of doubt, the Assumed Liabilities may be changed prior to Closing pursuant to Section 10.04(c).

**Section 2.03     Excluded Assets**.  Notwithstanding anything to the contrary contained in this Agreement, Buyer is not acquiring any of Sellers' assets other than the Purchased Assets (collectively, the "**Excluded Assets**"). The Excluded Assets are specifically excluded from the sale contemplated by this Agreement and include, without limitation, those assets of Sellers set forth on **Schedule 2.03**.

Section 2.04    **Purchase Price.** The aggregate purchase price for the Purchased Assets shall be an amount equal to (i) One Hundred Forty-Nine Million Five Hundred Thousand Dollars ($149,500,000), subject to withholding of the Indemnification Escrow Amount, *plus* (ii) the amount by which the Inventory Value is greater or less than the Target Inventory Value, *plus* (iii) the Accounts Receivable Collection Value (the "**Purchase Price**"). The Purchase Price shall be paid to Sellers less the Assumed Grower Obligations (the "**Purchase Price Payment**") and otherwise as set forth in <u>Section 2.05</u>.

Section 2.05    **Payment of Purchase Price.**

(a)    The amount paid by Buyer to Sellers at Closing (the "**Closing Purchase Price Payment**") shall equal (i) One Hundred Forty-Nine Million Five Hundred Thousand Dollars ($149,500,000), *minus* (ii) the Indemnification Escrow Amount, *plus* (iii) the amount by which the Estimated Inventory Value is greater or less than the Target Inventory Value, *plus* (iv) the Accounts Receivable Closing Value, *minus* (v) the Estimated Assumed Grower Obligations.

(b)    No later than five (5) days before Closing, Sellers shall deliver to Buyer a spreadsheet setting forth the Estimated Inventory Value, Accounts Receivable Closing Value, Estimated Assumed Grower Obligations and its good faith calculation of the Closing Purchase Price Payment, in a form reasonably satisfactory to Buyer (the "**Closing Flow of Funds**").

(c)    During the ninety (90) days after the Closing Date (the "**Adjustment Period**"), Sellers and Buyer shall work together to reconcile the Estimated Inventory Value, Accounts Receivable Closing Value and the Estimated Assumed Grower Obligations with the actual Inventory Value, Accounts Receivable Collection Value and Assumed Grower Obligations, each as of the Closing Date (the "**Purchase Price Adjustment**") and at the end of the Adjustment Period, Sellers shall deliver to Buyer their good faith calculation of the Purchase Price Adjustment and Purchase Price Payment in form substantially similar to the Closing Flow of Funds (the "**Final Flow of Funds**").

(d)    No later than fifteen (15) days after delivery of the proposed Final Flow of Funds, Buyer will give notice that it either accepts or rejects the Purchase Price Adjustment set forth in the Final Flow of Funds.  If Buyer accepts the Purchase Price Adjustment, or if Buyer fails to give notice to Sellers of any objection within fifteen (15) days after delivery of the proposed Final Flow of Funds, the Purchase Price Payment set forth in the Final Flow of Funds shall be the final and binding calculation of the Purchase Price Payment and no further amounts will be due to either Buyer or Sellers pursuant to this <u>Section 2.05</u>.  If Buyer gives notice to Sellers of an objection to Purchase Price Adjustment within fifteen (15) days after delivery of the proposed Final Flow of Funds, Sellers and Buyer shall attempt in good faith to resolve their differences. If Sellers and Buyer are able to resolve their differences, the Purchase Price set forth in the Final Flow of Funds, as modified to reflect the resolution of the differences between Sellers and Buyer, shall be the final and binding calculation of the Purchase Price Payment.  If, however, Sellers and Buyer are unable to resolve their differences, Sellers and Buyer shall submit any disputed items to final and binding arbitration in Seattle, Washington by a mutually agreed upon single arbitrator with experience related to food product inventories in Washington.  Each party shall submit what it believes would be the accurate Purchase Price Adjustment together with its supporting evidence at a single arbitration hearing.  The parties shall use their good faith efforts to complete any such arbitration within thirty (30) days of the request for arbitration.   The determination of the Purchase Price Adjustment and Purchase Price Payment by the arbitrator shall be final and binding on Sellers and Buyer.  The fees and expenses of the arbitrator shall be paid when due 50% by Sellers and 50% by Buyer.

(e)    If the Closing Purchase Price Payment is greater than the Purchase Price Payment (a "**Purchase Price Shortfall**"), Sellers shall promptly pay the difference as directed by Buyer within three (3) Business Days of the final determination (or, in Buyer's sole discretion, such difference may be disbursed from the Indemnity Escrow Fund to Buyer).  If the Closing Purchase Price Payment is less than the Purchase Price Payment, Buyer shall promptly pay the difference as directed by Sellers within three (3) Business Days of the final determination.

**Section 2.06** **Allocation of Purchase Price.** Sellers and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets in accordance with Code Section 1060 and applicable Treasury Regulations as shown on the allocation schedule (the "**Allocation Schedule**"). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Sellers within sixty (60) days following the Closing Date. If Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule, Sellers and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within ninety (90) days following the Closing Date, such dispute shall be resolved by the determination of an independent accountant, to be appointed by the parties at such time. The fees and expenses of such accounting firm shall be borne equally by Sellers and Buyer. Buyer and Sellers shall file all Tax Returns (including, but not limited to IRS Form 8594), in a manner consistent with the Allocation Schedule, provided, however, that no discrepancy between the Allocation Schedule and any Tax Returns already filed with respect to transfer Taxes described in <u>Section 6.12</u> shall require the parties to amend such Tax Returns. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise, that is inconsistent with the Allocation Schedule unless required to do so by applicable Law.

**Section 2.07** **Closing Costs.** With regard to the transfer of each parcel of Real Property, Buyer, on the one hand, and Sellers on the other will each pay for one-half of (i) title coordination fees, (ii) real estate escrow fees, and (iii) any title cancellation fees. Sellers will pay title premiums for standard coverage title insurance policies and the costs of ALTA surveys necessary for Buyer to obtain extended coverage title insurance policies for such properties as Buyer may require, and Buyer will pay any excess premiums for extended coverage and/or any endorsements that Buyer chooses to obtain, *provided, however*, that Sellers shall pay for any title endorsements reasonably requested by Buyer to affirmatively insure over any title exceptions raised by the title company after reviewing the title surveys.

**Section 2.08** **Prorations.**

(a) The parties agree that the following prorations shall be made and satisfied in accordance with <u>Section 2.08(b)</u> below:

(i) The Sellers will be responsible for all ad valorem Taxes on the Purchased Assets, including real and personal property taxes and assessments, and installments of special assessments relating to the Purchased Assets (collectively "**Property Taxes**"), attributable to periods occurring on or before the Closing Date. Property Taxes attributable to a Tax period beginning before and ending after the Closing Date shall be prorated between Sellers and Buyer. Sellers shall be responsible for the portion of such Property Taxes determined by multiplying the Property Taxes for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of such period ending on the Closing Date, and the denominator of which is the number of calendar days in the entire period. If any Tax authority accelerates the collection of Property Taxes from a post-Closing Tax year to the Tax year in which the Closing occurs, such Taxes shall be considered Taxes due and payable in the Tax year in which the Closing occurs for purposes of this <u>Section 2.08(a)(i)</u>. The Buyer shall be responsible for all other Property Taxes attributable to the Purchased Assets.

(ii) Utilities and other services provided at or related to the Real Property shall be prorated between Sellers and Buyer with respect to their ownership of the Real Property before and after the Closing Date. Sellers shall be responsible for payments incurred or relating to any period prior to the Closing Date and Buyer shall be responsible for payments incurred or relating to any period beginning on or after the Closing Date.

(b) Any fees, Liabilities or charges subject to proration under this <u>Section 2.08</u> shall be paid by Buyer as they become due. In the event statements or bills are sent to a Seller by any Tax authority or Person demanding payment, Sellers shall forward such statements to Buyer. Buyer shall be entitled to recover Sellers' prorated portion of such payments by providing written notice to Sellers or, at its sole discretion, by demanding disbursement from the Indemnification Escrow Fund.

**Section 2.09** **Employees.**

(a)     Buyer has the right to offer employment to any of Sellers' employees who are employed in connection with the Purchased Assets (the "**Business Employees**") and whom Buyer determines, in its sole and absolute discretion, to be suitable to the operations of such businesses, on terms to be agreed between Buyer and each Business Employee; provided, however, that in no event shall Buyer have any obligation whatsoever to hire any employee of any Seller.  Buyer will offer employment to current bargaining unit employees from NORPAC Foods, Inc. who are members of Teamsters Local 670, affiliated with the International Brotherhood of Teamsters, under Buyer's initial terms and conditions of employment, which will be substantially similar to the terms and conditions of employment contained in the current Labor Agreement between NORPAC Foods, Inc., Plants 1, 5, 6, 7 & 8, and Teamsters Local 670, term of agreement April 1, 2017 – March 31, 2020 (the "**670 Agreement**"), including the recognition clause, which is only for the Brooks' Plant (Plant No. 5) and the Repack Plant (Plant No. 8).  Buyer is not assuming any of NORPAC's obligations or liabilities under the 670 Agreement, including any liability for any pension or other retiree benefit.  Buyer will offer employment to current bargaining unit employees from NORPAC Foods, Inc. who are members of Teamsters Local 324, affiliated with the International Brotherhood of Teamsters, under Buyer's initial terms and conditions of employment, which will be substantially similar to the terms and conditions of employment contained in the current Labor Agreement between NORPAC Foods, Inc., and Teamsters Local 324, effective March 2, 2017 through March 1, 2020 (the "**324 Agreement**"), including the recognition clause.  Buyer is not assuming any of NORPAC's obligations or liabilities under the 324 Agreement, including any liability for any pension or other retiree benefit.  Buyer will offer employment to current bargaining unit employees from Quincy Foods, LLC under Buyer's initial terms and conditions of employment, which will be substantially similar to the terms and conditions of employment contained in the current Collective Bargaining Agreement between Quincy Foods, LLC, and Teamsters Local 760 (the "**760 Agreement**"), except for Article 7, Vacation, Article 13, Group Insurance, and Article 14, Retirement.  Buyer will offer Vacation and Sick Leave, Group Insurance and Retirement through its own policies and/or plan(s), which will be determined by Buyer.  Buyer is not assuming any pension liability under the 760 Agreement.  The parties acknowledge that Article 1 of the 760 Agreement is not considered a "term or condition of employment" for purposes of this Agreement.

(b)     For the avoidance of doubt, Sellers shall be solely responsible and Buyer shall have no obligation whatsoever, for any Liabilities relating to the following: (i) payment of all compensation and wages (including salaries, commissions, and bonuses) and payroll Taxes through the Closing Date, (ii) payment of all benefits, including severance, accrued vacation, pension and profit sharing contributions, seniority rights, and other forms of benefits of any type or nature on account of said employees' or any former employees' employment by any Seller through the Closing Date, (iii) satisfying Sellers' obligations on account of employment or former employment by Seller, including obligations for providing COBRA health plan continuation coverage to former employees and their dependents (whether they are on COBRA health plan continuation coverage on the day before the Closing Date, are employees of a Seller who are not employed by Buyer on the Closing Date or their dependents, or otherwise), (iv) performing any obligations required by the Fair Labor Standards Act of 1938, the Equal Pay Act, applicable wage and hour laws, or any other applicable laws, (v) giving any required notices under the Warn Act, (vi) all Losses relating to or arising under NORPAC's single employer or multi-employer pension plans (including any withdrawal liability assessed against NORPAC), and (vii) any and all other liabilities and obligations to Sellers' employees, former employees, and their respective dependents and for compliance with all applicable employment laws.

(c)     Sellers shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims are incurred prior to the Closing Date. Sellers also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which are incurred prior to the Closing Date. For purposes of this Agreement, the following claims shall be deemed to be incurred as follows: (i) life, accidental death and dismemberment, short-term disability, and workers' compensation insurance benefits, on the event giving rise to such benefits; (ii) medical, vision, dental, and prescription drug benefits, on the date the applicable services, materials or supplies were provided; and (iii) long-term disability benefits, on the eligibility date determined by the long-term disability insurance carrier for the plan in which the applicable

employee participate. Sellers shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

**Section 2.10     Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law with respect to the transactions contemplated by this Agreement. All such withheld and remitted amounts shall be treated as delivered to Sellers hereunder.

**Section 2.11     Third Party Consents.** To the extent that any Seller's rights under any Purchased Asset may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by Law and the Purchased Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Purchased Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this Section 2.11 to the contrary, Buyer shall not be deemed to have waived its rights under Section 7.02(c) hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

**ARTICLE III**
**CLOSING**

**Section 3.01     Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Davis Wright Tremaine, LLP located in Seattle, Washington, at 12:01 AM, Pacific standard time, on the day that is two (2) Business Days after all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Sellers and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

**Section 3.02     Closing Deliverables.**

(a)     At the Closing, Sellers shall deliver to Buyer the following:

(i)      the Escrow Agreement duly executed by Seller;

(ii)     a bill of sale in form and substance satisfactory to Buyer (the "**Bill of Sale**") and duly executed by Sellers, transferring the Tangible Personal Property to Buyer;

(iii)    an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**") and duly executed by Sellers, effecting the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

(iv)     an intellectual property assignment in form and substance satisfactory to Buyer (the "**Intellectual Property Assignments**") and duly executed by Sellers, transferring all of Sellers' right, title and interest in and to the Intellectual Property Assets to Buyer;

6

(v) with respect to each parcel of Real Property, a general warranty deed subject only to the applicable Permitted Encumbrances and otherwise in form and substance satisfactory to Buyer (each, a "**Deed**") and duly executed and notarized by the appropriate Seller;

(vi) with respect to each Lease, an Assignment and Assumption of Lease in form and substance satisfactory to Buyer (each, an "**Assignment and Assumption of Lease**") and duly executed by the appropriate Seller;

(vii) an assignment of that certain Option to Purchase Agreement, dated April 1, 2007 by and between Lineage Logistics and NORPAC (the "**Brooks Option Assignment**");

(viii) the Seller Closing Certificate;

(ix) the Seller Secretary Certificate;

(x) the FIRPTA Certificates;

(xi) such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement;

(xii) a recordable memorandum of assignment with respect to (i) Exception Numbers 15, 19 and 21 of Schedule B, Part II of the Salem Title Commitment, and (ii) any recorded memorandum evidencing the Brooks Option Assignment, in each case in form and substance reasonably acceptable to Buyer (collectively, the "**Memorandums of Assignment**") and duly executed and acknowledged by NORPAC;

(xiii) a Certificate of Analysis for all Products that states the lot number for that batch of Products, provides test results showing the Products comply with the COA testing requirements specified on **Schedule 3.02(a)(xiii)**, and confirms the any certifications that are specifications;

(xiv) a Certificates of Origin for each Product;

(xv) a recordable agreement in form and substance satisfactory to Buyer and duly executed and acknowledged by Quincy Foods and Big Dog, LLC, terminating (i) the purchase right referenced in that certain Memorandum of Right to Purchase recorded in Grant County, Washington on June 20, 2012 under Recording No. 1301724, and (ii) any agreements relating to such purchase right; and

(xvi) an option agreement in form and substance satisfactory to Buyer (the "**Quincy Purchase Option Agreement**") granting to Buyer the right to purchase the real estate and building associated with the cold storage facilities operated by Lineage Logistics and located at 80 Columbia Way, Quincy, WA 98848, and a recordable memorandum with respect to such right to purchase in form and substance reasonably acceptable to Buyer and duly executed and acknowledged by Lineage Logistics.

(b) At the Closing, Buyer shall deliver to Sellers the following:

(i) the Closing Purchase Price Payment by wire transfer of immediately available funds to an account designated in writing by Sellers to Buyer;

(ii) the Escrow Agreement duly executed by Buyer;

(iii) the Assignment and Assumption Agreement duly executed by Buyer;

(iv)        the Intellectual Property Assignment duly executed by Buyer;

(v)        with respect to each Lease, an Assignment and Assumption of Lease duly executed by Buyer; and

(vi)        the Memorandums of Assignment duly executed and acknowledged by Buyer.

(c)        At the Closing, Buyer shall deliver to the Escrow Agent:

(i)        the Indemnification Escrow Amount (such amount, including any interest or other amounts earned thereon and less any disbursements therefrom in accordance with the Escrow Agreement, the "**Indemnification Escrow Fund**") by wire transfer of immediately available funds to accounts designated by the Escrow Agent, to be held for the purpose of securing the indemnification obligations of Sellers set forth in ARTICLE VIII and the obligations of Sellers in Section 2.05(e) and Section 2.08(b); and

(ii)        the Escrow Agreement.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered section of the Disclosure Schedules, each Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.  The Disclosure Schedules are arranged in paragraphs corresponding to the lettered and numbered sections contained in this Agreement and include sections not specifically referenced in the text of the section.  If an item is disclosed in one section of the Disclosure Schedules, it shall be deemed to have been disclosed in any other section of the Disclosure Schedules to the extent the content and context of such disclosure makes it readily apparent on its face that such disclosure is applicable to such other sections.  None of the disclosures contained in the Disclosure Schedules are intended to constitute, and shall not be construed as constituting, representations or warranties except as and to the extent specifically provided in this Agreement, nor shall any of the disclosures in the Disclosure Schedules be deemed to expand in any way the scope or effect of the representations and warranties made by Sellers in this ARTICLE IV.

**Section 4.01      Organization and Qualification of NORPAC.** NORPAC is a corporation duly organized, validly existing and in good standing under the Laws of the state of Oregon and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Acquired Business as currently conducted by it. NORPAC is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Acquired Business as currently conducted by it makes such licensing or qualification necessary.

**Section 4.02      Organization and Qualification of Quincy Foods and Hermiston Foods.**

(a)        Quincy Foods is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Washington and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Acquired Business as currently conducted by it. Quincy Foods is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Acquired Business as currently conducted by it makes such licensing or qualification necessary.

(b)        Hermiston Foods is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Oregon and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Acquired Business as currently conducted by it. Hermiston Foods is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Acquired Business as currently conducted by it makes such licensing or qualification necessary.

**Section 4.03     Authority of Sellers.** Each Seller has full corporate or limited liability company power and authority to enter into this Agreement and the Ancillary Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement by each Seller and any Ancillary Document to which such Seller is a party, the performance by each Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Seller. This Agreement has been duly executed and delivered by each Seller, and, (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of each Seller enforceable against such Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, fraudulent conveyance and other similar Laws affecting creditors' rights generally and by general principles of equity (the "**General Enforceability Exceptions**"). When each Ancillary Document to which each Seller is or will be a party has been duly executed and delivered by such Seller (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of such Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by the General Enforceability Exceptions.

**Section 4.04     No Conflicts; Consents.** The execution, delivery and performance of this Agreement by Sellers and the Ancillary Documents to which the Sellers are a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, operating agreement, by-laws or other organizational documents of either Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to any Seller, the Business or the Purchased Assets; (c) except as set forth in Section 4.04 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which any Seller is a party or by which any Seller or the Acquired Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required under the HSR Act.

**Section 4.05     Financial Statements.** Complete copies of the audited financial statements consisting of the consolidated balance sheet of the Sellers as at March 31 in each of the fiscal years 2018 and 2019 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Audited Financial Statements**"), and unaudited financial statements consisting of the consolidated balance sheet of the Sellers as at June 30, 2019 and the related statements of income and retained earnings, stockholders' equity and cash flow for the three-month period then ended (the "**Interim Financial Statements**" and together with the Audited Financial Statements, the "**Financial Statements**") have been delivered to Buyer. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Audited Financial Statements). The Financial Statements are based on the books and records of the Sellers, and fairly present the consolidated financial condition of the Sellers as of the respective dates they were prepared and the consolidated results of the operations of the Sellers for the periods indicated. The consolidated balance sheet of the Sellers as of March 31, 2019 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**." Sellers maintain a standard system of accounting for the Business established and administered in accordance with GAAP.

**Section 4.06     Undisclosed Liabilities.** Except as set forth in Section 4.06 of the Disclosure Schedules, Sellers have no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

4823-4697-8715v.21 0055621-000009

**Section 4.07    Absence of Certain Changes, Events and Conditions.** Since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been any:

(a)    event, occurrence or development that has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    declaration or payment of any dividends or distributions on or in respect of the capital stock or equity interests of either Seller or the redemption, purchase or acquisition of any  capital stock or equity interests of any Seller;

(c)    material change in any method of accounting or accounting practice for the Business, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(d)    entry into any Contract that would constitute a Material Contract;

(e)    incurrence, assumption or guarantee of any indebtedness for borrowed money in connection with the Business except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

(f)    transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the Balance Sheet, except for the sale of inventory in the ordinary course of business;

(g)    cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(h)    transfer or assignment of or grant of any license or sublicense under or with respect to any material Intellectual Property Assets or Intellectual Property Agreements (except non-exclusive licenses or sublicenses granted in the ordinary course of business consistent with past practice);

(i)    material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(j)    acceleration, termination, material modification to or cancellation of any Assigned Contract or Permit;

(k)    material capital expenditures which would constitute an Assumed Liability;

(l)    imposition of any Encumbrance upon any of the Purchased Assets;

(m)    grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of any current or former employees, officers, directors, independent contractors or consultants of the Business, other than as provided for in any written agreements or required by applicable Law;

(n)    adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant of the Business, (ii) Benefit Plan, or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(o)    any loan to (or forgiveness of any loan to), or entry into any other transaction with, any current or former directors, officers or employees of the Business;

(p)    adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law; or

4823-4697-8715v.21 0055621-000009

(q)     any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 4.08     Material Contracts.**

(a)     <u>Section 4.08(a) of the Disclosure Schedules</u> lists each of the following Contracts under which any of the Purchased Assets are bound or affected (such Contracts, together with all Contracts disclosed in <u>Section 4.11 of the Disclosure Schedules</u> (Real Property), <u>Section 4.12 of the Disclosure Schedules</u> (Intellectual Property Agreements) and <u>Section 4.13 of the Disclosure Schedules</u> (Material Customer and Material Supplier Contracts) being the "**Material Contracts**"):

(i)     all Contracts involving aggregate consideration in excess of $100,000 and which, in each case, cannot be cancelled without penalty or without more than 90 days' notice;

(ii)     all Contracts that require any Seller to purchase or sell a stated portion of the requirements or outputs of the Acquired Business or that contain "take or pay" provisions;

(iii)     all Contracts that provide for the indemnification of any Person;

(iv)     all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts;

(v)     all employment agreements and Contracts with independent contractors or consultants (or similar arrangements);

(vi)     all collective bargaining agreements or Contracts with any Union;

(vii)     all Contracts relating to indebtedness (including, without limitation, guarantees);

(viii)     all Contracts with any Governmental Authority;

(ix)     all Contracts that limit or purport to limit the ability of any Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(x)     all joint venture, partnership or similar Contracts; and

(xi)     all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets.

(b)     Each Material Contract is valid and binding on the applicable Seller in accordance with its terms and is in full force and effect. Neither any Seller nor, to Sellers' Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any written notice, or, to Sellers' Knowledge, any oral notice of any intention to terminate, any Material Contract. To Sellers' Knowledge, except as set forth in <u>Section 4.08(b) of the Disclosure Schedules</u>, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer. There are no material disputes pending or, to Sellers' Knowledge, threatened under any Contract included in the Purchased Assets.

**Section 4.09     Title to Purchased Assets.** Sellers have good and valid title to, or a valid leasehold interest in, all of the Purchased Assets. All such Purchased Assets (including leasehold interests) are free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

11

(a)       Encumbrances for Taxes not yet due and payable;

(b)       Encumbrances arising under original purchase price conditional sales contracts and equipment leases with third parties that were entered into in the ordinary course of business;

(c)       zoning or other governmentally established restrictions or encumbrances affecting real property which are not violated by any current use, occupancy or activity conducted by the Sellers;

(d)       pledges or deposits to secure obligations under workers or unemployment compensation Laws or similar legislation or to secure public or statutory obligations in each case (i) that relate to obligations that are not delinquent, and (ii) that are not, individually or in the aggregate, material to the Purchased Assets;

(e)       mechanics', warehousemens', materialmens', suppliers', vendors', Perishable Agricultural Commodities Act liens, or similar Encumbrances arising or incurred in the ordinary course of business securing amounts that are not overdue for a period of more than 60 days and that are not, individually or in the aggregate, material to the Purchased Assets;

(f)       with respect to the Salem Property, the following Exceptions set forth in Schedule B, Part II of the Salem Title Commitment (provided, however, that if such Exceptions are deleted from updated or supplemental versions of the Salem Title Commitment issued after the date of this Agreement, such Exceptions shall not be considered Permitted Encumbrances): (i) Special Exception 7, modified to reflect no general and special taxes and assessments are due and owing as of the policy date; (ii) Special Exceptions 11 through 21, inclusive; (iii) Special Exception 23; and (ii) Special Exception 24, modified to reference only the specific tenants identified in the applicable owner's affidavit delivered by NORPAC in advance of Closing;

(g)       with respect to the Quincy Property, the following Exceptions set forth in Schedule B, Part II of the Quincy Title Commitment (provided, however, that if such Exceptions are deleted from updated or supplemental versions of the Quincy Title Commitment issued after the date of this Agreement, such Exceptions shall not be considered Permitted Encumbrances): (i) Special Exceptions 4 and 5, modified to reflect no assessments are due and owing as of the policy date; (ii) Special Exception 16, modified to reference only the specific tenants identified in the applicable owner's affidavit delivered by Quincy Foods in advance of Closing; (iii) Special Exception 17; and (iv) Special Exceptions 19 through 63, inclusive; and

(h)       With respect to the Brooks Property, easements, rights of way and other similar encumbrances of record affecting such Real Property that are disclosed in the commitments to title insurance delivered by Sellers to Buyer in connection with this Agreement and are reasonably acceptable to Buyer.

**Section 4.10       Condition and Sufficiency of Assets.** Except as set forth in <u>Section 4.10 of the Disclosure Schedules</u>, the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets are structurally sound, are in good operating condition and repair, reasonable wear and tear excepted, and are adequate for the uses to which they are being put by Sellers as of the date hereof, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

**Section 4.11       Real Property.**

(a)       For each parcel included in the Real Property, Sellers have delivered to Buyer copies of the deeds and other instruments (as recorded) by which a Seller acquired such parcel of Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Sellers with respect to such parcel. With respect to each parcel of Real Property:

(i)      Sellers have good and marketable fee simple title, free and clear of all Encumbrances, except (A) Permitted Encumbrances and (B) those Encumbrances set forth on Section 4.11(a)(i) of the Disclosure Schedules;

(ii)      except as set forth on Section 4.11(a)(ii) of the Disclosure Schedules, Sellers have not leased or otherwise granted to any Person the right to use or occupy such Real Property or any portion thereof; and

(iii)      there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Real Property or any portion thereof or interest therein.

(b)      Section 4.11(b) of the Disclosure Schedules sets forth for each parcel of Real Property a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, whether granted by or granted to a Seller (collectively, the "**Leases**"). Sellers have delivered to Buyer a true and complete copy of each Lease. With respect to each Lease:

(i)      such Lease is with respect to the Sellers party thereto and, to Sellers' Knowledge with respect to the lessors thereto, valid, binding, enforceable and in full force and effect, except as enforceability may be limited by the General Enforceability Exceptions;

(ii)      Sellers are not in breach or default under such Lease and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default under such Lease by any Seller and, to Sellers' knowledge, by any other party to such Lease; and

(iii)      Except as set forth in Section 4.11(b) of the Disclosure Schedules, Sellers have not subleased, assigned or otherwise granted to any Person the right to use or occupy such Real Property or any portion thereof.

(c)      Sellers have not, in the five (5) year period preceding the date hereof, received any written notice of (i) violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which would reasonably be expected to adversely affect the ability to operate the Real Property as currently operated. Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty, which damage or destruction has not been repaired or replaced.

**Section 4.12**      **Intellectual Property.**

(a)      Section 4.12(a) of the Disclosure Schedules contains a correct, current and complete list of: (i) all Intellectual Property Registrations, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered or filed; the patent, registration or application serial number; the issue, registration or filing date; and the current status; and (ii) all material unregistered Intellectual Property included in the Intellectual Property Assets.

(b)      Section 4.12(b) of the Disclosure Schedules contains a correct, current and complete list of all Intellectual Property Agreements (excluding shrink-wrap, click-wrap, or other similar agreements for commercially available off-the-shelf software), specifying for each the date, title, and parties thereto, and including the Intellectual Property Agreements: (i) under which any Seller is a licensor or otherwise grants to any Person any right or interest relating to any Intellectual Property Asset; (ii) under which any Seller is a licensee or otherwise granted any right or interest relating to the Intellectual Property of any Person; and (iii) which otherwise relate to the Sellers' ownership or use of any Intellectual Property Assets that are material in the conduct of the Acquired Business as currently conducted. Sellers have provided Buyer with true and

13

complete copies of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on the applicable Seller in accordance with its terms and is in full force and effect. Neither any Seller nor any other party thereto is, or, to Sellers' Knowledge, is alleged to be, in breach of default under, or has provided or received any written or, to Sellers' Knowledge, oral notice of breach of, default under, or intention to terminate (including by non-renewal), any Intellectual Property Agreement.

(c)     Sellers are the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, in each case, free and clear of Encumbrances other than Permitted Encumbrances.

(d)     All of the Intellectual Property Assets are valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect. Sellers have taken all necessary steps to maintain and enforce the Intellectual Property Assets. All required filings and fees related to the Intellectual Property Registrations have been timely submitted with and paid to the relevant Governmental Authorities and authorized registrars.

(e)     There are no Actions (including any opposition, cancellation, revocation, review, or other proceeding), whether settled, pending or threatened in writing or, to Sellers' Knowledge, orally (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by any Seller in the conduct of the Acquired Business; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property Assets; or (iii) by Sellers or, to Sellers' Knowledge, any other Person alleging any infringement, misappropriation, or other violation by any Person of any Intellectual Property Assets.

**Section 4.13     Customers and Suppliers.**

(a)     Section 4.13(a) of the Disclosure Schedules sets forth with respect to the Acquired Business: (i) each customer who has paid aggregate consideration to any Seller for goods or services rendered in an amount greater than or equal to $100,000 for each of the two most recent fiscal years (collectively, the "**Material Customers**"); (ii) the amount of consideration paid by each Material Customer during such periods; and (iii) a list of all Contracts between any Seller and a Material Customer. Sellers have not received any written or, to Sellers' Knowledge, oral notice that any of the Material Customers has ceased, or intends to cease after the Closing, to use the goods or services of the Acquired Business or to otherwise terminate or materially reduce its relationship with the Acquired Business.

(b)     Section 4.13(b) of the Disclosure Schedules sets forth with respect to the Acquired Business (i) each supplier to whom any Seller has paid consideration for goods or services rendered in an amount greater than or equal to $100,000 for each of the two most recent fiscal years (collectively, the "**Material Suppliers**"); (ii) the amount of purchases from each Material Supplier during such periods; and (iii) a list of all Contracts between any Seller and a Material Supplier. Sellers have not received any written or, to Sellers' Knowledge, oral notice that any of the Material Suppliers has ceased, or intends to cease, to supply goods or services to the Acquired Business or to otherwise terminate or materially reduce its relationship with the Acquired Business.

**Section 4.14     Insurance.** Section 4.14 of the Disclosure Schedules sets forth (a) a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by any Seller or its Affiliates and relating to the Acquired Business, the Purchased Assets or the Assumed Liabilities (collectively, the "**Insurance Policies**"); and (b) with respect to the Acquired Business, the Purchased Assets or the Assumed Liabilities, a list of all pending claims and the claims history for Sellers since December 31, 2015. There are no claims related to the Acquired Business, the Purchased Assets or the Assumed Liabilities pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights. Neither Sellers nor any of their Affiliates have received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if not yet due, accrued. All such Insurance Policies

14

(a) are in full force and effect and enforceable in accordance with their terms; (b) are provided by carriers who are, to Sellers' Knowledge, financially solvent; and (c) have not been subject to any lapse in coverage. Neither Sellers nor any of their respective Affiliates is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Acquired Business and are sufficient for compliance with all applicable Laws and Contracts to which either Seller is a party or by which it is bound.

**Section 4.15     Legal Proceedings; Governmental Orders.**

(a)     Except as set forth in Section 4.15(a) of the Disclosure Schedules, there are no Actions pending or, to Sellers' Knowledge, threatened against or by any Seller (a) relating to or affecting the Acquired Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To Seller's Knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)     There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Acquired Business. To Sellers' Knowledge, no event has occurred or circumstances exist that would reasonably be expected to constitute or result in (with or without notice or lapse of time) a violation of any such Governmental Order.

**Section 4.16     Compliance with Laws; Permits.** Except for past violations for which no Seller is subject to any current Liability and cannot become subject to any future Liability and except as set forth in Section 4.16 of the Disclosure Schedules, each Seller in respect of the Purchased Assets and the operations and practices of the Acquired Business is and has been, since January 1, 2015, in compliance with all applicable Laws and has received no written notice of any violation or alleged violation of any Laws with respect to the Acquired Business or the Purchased Assets which violation or alleged violation has not been cured. All reports, filings and returns associated with or related to the Acquired Business or the Purchased Assets that are material and are required to be filed by or on behalf of any Seller with any Governmental Authority have been filed and, when filed, were correct and complete in all material respects. Without limiting the generality of the foregoing:

(a)     All Permits required for Sellers to conduct the Acquired Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Sellers and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Section 4.16(a) of the Disclosure Schedules lists all current Permits issued to any Seller, which are related to the conduct of the Acquired Business as currently conducted or the ownership and use of the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration. To Seller's Knowledge, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Section 4.16(a) of the Disclosure Schedules.

(b)     The Sellers have received no written notice alleging a nuisance or other interference with the rights of any Person or entity in such a manner as to give rise to or constitute reasonable grounds for litigation by any such Person or entity seeking compensation or damages or seeking to restrain, enjoin or otherwise prohibit any aspect of the Purchased Assets, the Acquired Business or the manner in which the Acquired Business is currently conducted.

**Section 4.17     Environmental Matters.**

(a)     The operations of the Acquired Business and the Purchased Assets are currently, and have been for the five-year period preceding the date hereof, in all material respects in compliance with all Environmental Laws. Sellers have not received from any Person, with respect to the Acquired Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which remains pending or unresolved or is the source of ongoing obligations or requirements as of the Closing Date.

(b)     Sellers have obtained and are in material compliance with all Environmental Permits (each of which is disclosed in <u>Section 4.17(b) of the Disclosure Schedules</u>) necessary for the conduct of the Acquired Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Sellers through the Closing Date in accordance with Environmental Law, and Sellers are not aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the conduct of the Acquired Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets. With respect to any such Environmental Permits, Sellers have undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of the same, and to Sellers' Knowledge, no condition, event or circumstance exists that might prevent or impede the transferability of the same, and Sellers have not received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same.

(c)     None of the Real Property is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)     There has been no Release of Hazardous Materials in contravention of Environmental Law or the terms of an Environmental Permit with respect to the Acquired Business, the Purchased Assets or any real property currently or, to Sellers' Knowledge, formerly owned, leased or operated by any Seller in connection with the Acquired Business. Sellers have not received an Environmental Notice that any of the Acquired Business, the Purchased Assets or any real property currently owned, leased or operated by any Seller in connection with the Acquired Business (including soils, groundwater, surface water, buildings and other structure located thereon) has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim, or a violation of Environmental Law or term of any Environmental Permit.

(e)     <u>Section 4.17(e) of the Disclosure Schedules</u> contains a complete and accurate list of all active or abandoned aboveground or underground storage tanks owned or operated by any Seller in connection with the Purchased Assets or located on real property currently owned, leased or operated by any Seller in connection with the Acquired Business.

(f)     Sellers have not received any Environmental Notice regarding potential Liabilities with respect to off-site Hazardous Materials treatment, storage, or disposal facilities or locations used in connection with the Acquired Business.

(g)     Sellers have not retained or assumed, by contract or operation of Law, any Liabilities or obligations of third parties under Environmental Law.

(h)     Sellers have provided or otherwise made available to Buyer and listed in <u>Section 4.17(h) of the Disclosure Schedules:</u> (i) any and all environmental reports, studies, audits, surveys, records, sampling data, site assessments, risk assessments, economic models and other similar documents in either Seller's possession or control with respect to the Purchased Assets related to compliance with Environmental Laws or the Release, presence, investigation or remediation of, or exposure to, Hazardous Materials; (ii) any and all documents and correspondence in either Seller's possession or control related to Environmental Claims or Environmental Notices; and (iii)  any and all material documents in either Seller's possession or control concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current or future Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

(i)     Sellers are not aware of nor do they reasonably anticipate, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the Acquired Business or the Purchased Assets as currently carried out.

**Section 4.18     Employee Benefit Matters.**

16

(a)     Section 4.18(a) of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not Tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by any Seller for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which any Seller or any of its ERISA Affiliates has or may have any Liability with respect to any current or former employee, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual (as listed on Section 4.18(a) of the Disclosure Schedules, each, a "**Benefit Plan**").

(b)     With respect to each Benefit Plan other than a Multiemployer Plan, Sellers have made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, summaries of benefits and coverage; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service and any legal opinions issued thereafter with respect to such Benefit Plan's continued qualification; (vi) in the case of any Benefit Plan for which a Form 5500 must be filed, a copy of the two most recently filed Forms 5500, with all corresponding schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters or other correspondence from the Internal Revenue Service, Department of Labor, Department of Health and Human Services, Pension Benefit Guaranty Corporation or other Governmental Authority relating to the Benefit Plan.

(c)     Each Benefit Plan and any related trust (other than any multiemployer plan within the meaning of Section 3(37) of ERISA (each a "**Multiemployer Plan**")) has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA, the Code and any applicable local Laws). Each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified and received a favorable and current determination letter from the Internal Revenue Service with respect to the most recent five year filing cycle, or with respect to a prototype or volume submitter plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan or volume submitter plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Sellers' Knowledge, nothing has occurred that would reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. To Sellers' Knowledge, nothing has occurred with respect to any Benefit Plan that has subjected or would reasonably be expected to subject any Seller or any of its ERISA Affiliates or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to Tax or penalty under Sections 4975 or 4980H of the Code. No Benefit Plan which is a pension plan (other than a Multiemployer Plan) which is subject to minimum funding requirements, including any multiple employer plan (each a "**Single Employer Plan**"), has an "accumulated funding deficiency," whether or not waived, or is subject to a lien for unpaid contributions under Section 303(k) of ERISA or Section 430(k) of the Code. No Single Employer Plan covering employees of the Business which is a defined benefit plan has an "adjusted funding target attainment percentage," as defined in Section 436 of the Code, less than 80%. Except as set forth in Section 4.18(c) of the Disclosure Schedules, all benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all

4823-4697-8715v.21 0055621-000009

applicable Laws and accounting principles, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with GAAP.

(d)     Neither Sellers nor any of their ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA or related provisions of the Code or applicable local Law relating to employee benefit plans with respect to any Benefit Plan; (ii) failed to timely pay premiums to the Pension Benefit Guaranty Corporation; (iii) withdrawn from any Benefit Plan; (iv) engaged in any transaction which would give rise to Liability under Section 4069 or Section 4212(c) of ERISA with respect to any Benefit Plan; (v) incurred Taxes under Section 4971 of the Code with respect to any Single Employer Plan; or (vi) participated in a multiple employer welfare arrangements (MEWA) covering employees of the Business.

(e)     Except as set forth in Section 4.18(e) of the Disclosure Schedules, (i) no Benefit Plan is a Multiemployer Plan, and all contributions required to be paid by Sellers or their ERISA Affiliates have been timely paid to the applicable Multiemployer Plan, (ii) neither Sellers nor any ERISA Affiliate has incurred any withdrawal liability under Title IV of ERISA with respect to any Benefit Plan that is a Multiemployer Plan which remains unsatisfied, and (iii) a complete withdrawal from all such Multiemployer Plans at the Closing Date would not result in any material Liability to any Seller and no such Multiemployer Plan is in critical, endangered or seriously endangered status or has suffered a mass withdrawal.  Except as set forth in Section 4.18(e) of the Disclosure Schedules, (i) no such plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA); (ii) no Action has been initiated by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee for any such plan; (iii) no such plan or the plan of any ERISA Affiliate maintained or contributed to within the last six (6) years is a Single Employer Plan subject to Title IV of ERISA; and (iv) no "reportable event," as defined in Section 4043 of ERISA, with respect to which the reporting requirement has not been waived, has occurred with respect to any such plan.

(f)     Except as set forth in Section 4.18(f) of the Disclosure Schedules and other than as required under Sections 601 to 608 of ERISA or other applicable Law, no Benefit Plan or other arrangement covering employees of the Business provides post-termination or retiree health benefits to any individual for any reason.

(g)     Except as set forth in Section 4.18(g) of the Disclosure Schedules, there is no pending or, to Sellers' Knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the three (3) years prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under, or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(h)     There has been no amendment to, announcement by Sellers or their respective Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year (other than on a de minimis basis) with respect to any director, officer, employee, consultant or independent contractor of the Business, as applicable. Neither Sellers nor any of their respective Affiliates have any commitment or obligation or has made any representations to any director, officer, employee, consultant or independent contractor of the Business, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement.

(i)     Each Benefit Plan that is subject to Section 409A of the Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including, notices, rulings and proposed and final regulations) thereunder. Sellers do not have any obligation to gross up, indemnify or otherwise reimburse any individual for any excise Taxes, interest or penalties incurred pursuant to Section 409A of the Code.

4823-4697-8715v.21 0055621-000009

(j)     Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of the Business to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code; or (vi) cause a complete or partial withdrawal by Seller from any Multiemployer Plan.

**Section 4.19     Employment Matters.**

(a)     Section 4.19(a) of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Acquired Business as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) whether the individual is classified as an employee, independent contractor or consultant; (ii) title or position; (iv) whether the individual is classified as full-time, part-time or seasonal; (iii) hire or retention date; (iv) whether the individual is classified as exempt from state and federal overtime laws; and (vii) whether the individual is employed on an at-will basis; and (viii) the facilities to which such individual is assigned or provides services. Except as set forth in Section 4.19(a) of the Disclosure Schedules, as of the date hereof, all compensation, including wages, commissions, bonuses, fees and other compensation, payable to all employees, independent contractors or consultants of the Acquired Business for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Sellers with respect to any compensation, commissions, bonuses or fees.

(b)     Except as set forth in Section 4.19(b) of the Disclosure Schedules, Sellers are not, and have not been for the past five (5) years, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not been for the past five (5) years, any Union representing or purporting to represent any employee of any Seller, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. Except as set forth in Section 4.19(b) of the Disclosure Schedules, there has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Sellers or any employees of the Acquired Business.

(c)     Sellers are and have been in compliance with the terms of the Contracts listed on Section 4.19(b) of the Disclosure Schedules and all applicable Laws pertaining to employment and employment practices to the extent they relate to employees, consultants and independent contractors of the Acquired Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave and unemployment insurance. All individuals characterized and treated by Sellers as consultants or independent contractors of the Acquired Business are properly treated as independent contractors under all applicable Laws. All employees of the Acquired Business classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified.

(d)     Each Seller is in compliance with, and has complied, with the Immigration Reform and Control Act of 1986, as amended, with all applicable regulations related thereto with respect to the employment status of each Seller's employees and the preparation of the Employment Eligibility Verification Form (Form I-9) for each employee.

(e)     Except as set forth in Section 4.19(e) of the Disclosure Schedules, there are no Actions against any Seller pending, or to the Sellers' Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant,

4823-4697-8715v.21 0055621-000009

employee, consultant or independent contractor of the Acquired Business, including, without limitation, any charge, investigation or claim relating to unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, employee classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable Laws.

(f)     Sellers have complied with the WARN Act, and they have no plans to undertake any action that would trigger the WARN Act.

**Section 4.20     Taxes.** Except as set forth in <u>Section 4.20 of the Disclosure Schedules</u>:

(a)     All Tax Returns required to be filed by Sellers for any Pre-Closing Tax Period have been, or will be, timely filed. All such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by each Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)     Since December 31, 2009, no claim has been made by any Tax authority in a jurisdiction in which either Sellers do not file Tax Returns that either Seller is or may be subject to taxation by that jurisdiction.

(c)     Sellers have withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder, member or other party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(d)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(e)     All deficiencies asserted, or assessments made, against any Seller as a result of any examinations by any Tax authority have been fully paid or resolved.

(f)     Sellers are not a party to any Action by any Tax authority. There are no pending Actions or Actions threatened in writing by any Tax authority.

(g)     There are no Encumbrances for Taxes upon any of the Purchased Assets nor is any Tax authority in the process of imposing any Encumbrances for Taxes on any of the Purchased Assets (other than for current Taxes not yet due and payable).

(h)     No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(i)     Each of Quincy Foods and Hermiston Foods is, and has been at all times since its formation, disregarded as an entity separate from NORPAC for U.S. federal income and applicable state income Tax purposes.

(j)     Sellers are not, and have not been, a party to, or a promoter of, a "reportable transaction" or a "listed transaction" within the meaning of Sections 6707A(c)(1) or 6707A(c)(2) of the Code and Treasury Regulations Section 1.6011-4(b).

**Section 4.21     Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of any Seller.

**Section 4.22    Food Safety.**

(a)    **Warranties; Product Recalls; Etc.** Each product designed, manufactured, sold, delivered, distributed, used, installed or serviced by any Seller, since January 1, 2015, with respect to the Acquired Business or services rendered or performed by any Seller in connection therewith (a "**Business Product**"), has been in conformity in all material respects with all applicable Laws, Contracts with third parties and all express and implied warranties. No Seller has any material Liability for replacement, repair, alleged defect in, non-performance or deficiency of any Business Product that is not reserved against in the Balance Sheet. Each Seller and, to the Sellers' Knowledge, the suppliers and subcontractors of each Seller is, compliant with any Laws applicable to any Business Product and are not in breach of quality control, food safety, product integrity, facility certification or any similar obligations imposed in Contracts with customers for the supply of Business Products. No Business Product is subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale or lease. Since January 1, 2015, no customer of any Seller has asserted any material claims of breach of warranty with regard to a Business Product. Except as described in Section 4.22 of the Disclosure Schedules, since January 1, 2015 no Seller has conducted any product recalls or withdrawals for any reason whatsoever, whether voluntary, preventive or otherwise, and no Business Product has been found to be adulterated misbranded or labelled in a manner contrary to applicable Laws or that is, or would reasonably be construed to be false or misleading. To the Sellers' Knowledge, there is no reason to believe that a basis for a recall or withdrawal of any Business Products may be required under applicable Laws or any policy applicable to any Seller and, to the Sellers' Knowledge, no recall has been threatened by any Governmental Authority or Non-Governmental Authority or is being considered by any Seller.

(b)    **Compliance with Food Safety Laws**. All Business Products and the ingredients thereof grown, produced, manufactured, tested, packaged, labelled, stored, shipped, advertised, marketed, distributed, sold, imported and exported by any Seller and, to the Sellers' Knowledge, the respective suppliers and subcontractors of the Sellers, are in compliance with all applicable Laws, including the provisions of the Federal Food, Drug, and Cosmetic Act, the Food Safety Modernization Act, the Food Allergen Labeling and Consumer Protection Act of 2004, the National Labeling and Education Act of 1990, the Organic Food Production Act, the Perishable Agricultural Commodities Act, the Food Quality Protection Act, and all comparable state or local applicable Laws and each of their applicable Governmental Authorities implementing regulations by the U.S. Food and Drug Administration and United States Department of Agriculture and all other applicable Laws imposed or administered by any Governmental Authority and all material standards, guidelines and requirements imposed, recommended or administered by any Non-Governmental Authority, including all relevant industry standards specifications and binding contractual obligations.

(c)    **Claims.** No Seller and, to the Sellers' Knowledge, no supplier or subcontractor of any Seller has received any written notice, request for clarification, letter, demand, claim, Litigation, Non-Governmental Action or objection relating to the Business Products or the Acquired Business from any Governmental Authority, Non-Governmental Authority or Person or, to the Sellers' Knowledge, has any such action been asserted or threatened by any Governmental Authority, Non-Governmental Authority or Person, against any Seller, or, to the Sellers' Knowledge, has any such action been asserted or threatened by any Governmental Authority, Non-Governmental Authority or Person, against any such supplier or subcontractor. Without limiting the generality of the foregoing, no written notice, demand, claim, Litigation or Non-Governmental Action has been delivered or, to the Sellers' Knowledge, asserted or threatened by any Governmental Authority, Non-Governmental Authority or Person, against any Seller or, to the Sellers' Knowledge, asserted or threatened by any Governmental Authority, Non-Governmental Authority or Person, against a customer or supplier of any Seller relating to advertising, marketing, sales, distribution or other trade practices in connection with the Business Products.

(d)    **Permits**. No Seller and, to the Sellers' Knowledge, no supplier or subcontractor of any Seller has received any written notice from any Governmental Authority or Non-Governmental Authority relating to the withdrawal of any license, permit, approval, certification, consent or listing required by any Seller, any such supplier or any such subcontractor pursuant to the applicable Laws in any jurisdiction in which the Business Products are advertised, marketed, distributed, sold, imported or exported or requiring

21

any modification of any of the Business Products in order to preserve any license, permit, approval, certification, consent or listing or the right to produce or sell the Business Products in a jurisdiction pursuant to such applicable Laws.

**Section 4.23    Inventory.**

(a)      All Products and Packaging Materials were manufactured, processed, labelled and packaged in accordance with, as applicable, (i) the specifications set forth on <u>Schedule 2.04</u>, (ii) good manufacturing practices prevailing in the industry as of the date hereof, (iii) the applicable provisions of the HACCP and HARP-C food safety programs, and (iv) all applicable local, state and federal laws, statutes and regulations including, but not limited to, the U.S. Federal Food, Drug and Cosmetic Act, as modified, including the Food Safety Modernization Act and the Foreign Supplier Verification Program (the "**FDCA**") and the regulations and other requirements of the Food & Drug Administration ("**FDA**") and other state and federal authorities.

(b)      All manufacturing, processing, packaging and storage of the Products and Packaging Materials have been conducted in a clean and sanitary environment.

(c)      All Products and Packaging Materials (i) are merchantable and fit for their intended purpose including, as applicable, for human consumption, (ii) are free from defects, (iii) meet the specifications set forth on <u>Schedule 2.04</u>, (iv) meet any requirements or specifications set forth in applicable customer contracts pursuant to which the Products and/or Packaging Materials were manufactured, processed, packaged and/or stored; (v) are items that can be introduced into interstate commerce; (vi) are of marketable grade and quality; (vii) have not been adulterated or misbranded; and (viii) conform to the applicable customer agreement.

(d)      Sellers are not subject to, nor are they aware of any pending or threatened, order, injunction, enforcement action or other proceeding by any local, state or federal governmental agency regarding the manufacturing processes, storage conditions, or purity of any products produced by Sellers, including the Products and Packaging Materials.

(e)      Sellers are registered and comply with all applicable requirements under the Public Health Security and Bioterrorism Preparedness and Response Act, as amended and the implementing rules and regulations of the FDA and are in compliance with the HACCP food safety systems requirements of the FDA and their own HACCP plan and the HARP-C food safety program (as applicable).

(f)      Sellers have obtained all permits, licenses, and approvals necessary to process, package, store and/or supply the Products and Packaging Materials as required by this Agreement (including those required by FDA).

(g)      Sellers have good and marketable title to the Products and all Products, when delivered, will be free and clear of all liens and encumbrances.

(h)      No Product or Packaging Material contains any of the chemicals known to the State of California to cause cancer or reproductive toxicity (currently available at: https://oehha.ca.gov/proposition-65/proposition-65-list) unless a chemical is present at levels below the safe harbor levels established by Proposition 65 and is not required to have any warning or other disclosure in accordance with California's Safe Drinking Water and Toxic Enforcement Act of 1986, as amended.

(i)      In connection with the California Transparency in Supply Chain Act, no Product, Packaging Materials or component thereof is sourced, produced or manufactured by Sellers using human slavery, child labor or forced labor.

(j)      None of the Products contain any peanuts, soybeans, milk, fish, crustacean, tree nuts, wheat or any other allergenic ingredients recognized by applicable Law.

22

**Section 4.24     No Other Representations or Warranties**. Except for the representations and warranties contained in this ARTICLE IV and the representations and warranties contained in the Ancillary Documents, no Seller or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of any Seller, the Business, the Purchased Assets or the Assumed Liabilities.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01     Organization of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the state of Washington.

**Section 5.02     Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by the General Enforceability Exceptions.

**Section 5.03     No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required under the HSR Act and such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

**Section 5.04     Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 5.05     Source of Funds**. At the Closing, Buyer will have sufficient cash available (including funds available under any debt facility) to enable it to pay the full Purchase Price payable hereunder and to make all other necessary payments by it in connection with the transactions contemplated herein and in the Ancillary Documents.  The source of funds for payment of the Purchase Price shall not violate any Law, and Buyer shall not fund the Purchase Price in violation of any Law.

**Section 5.06     Independent Investigation**.  Buyer has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that (a) in making its decision to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated herein and therein, Buyer

has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in ARTICLE IV (including the related portions of the Disclosure Schedules) and in the Ancillary Documents, and (b) no Seller or any other Person has made any representation or warranty as to any Seller, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in ARTICLE IV (including the related portions of the Disclosure Schedules) and the Ancillary Documents. Notwithstanding the foregoing, nothing in this <u>Section 5.06</u> shall limit any liability or indemnification, reimbursement or other obligation of any Seller, or any Buyer Indemnitee's right to seek any remedy, under this Agreement.

**ARTICLE VI**
**COVENANTS**

**Section 6.01     Conduct of Business Prior to the Closing.** From the date hereof until the Closing or the earlier termination of this Agreement, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Sellers shall (x) conduct the Acquired Business in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Acquired Business. Without limiting the foregoing, from the date hereof until the Closing Date or the earlier termination of this Agreement, Sellers shall:

> (a)     preserve and maintain all Permits required for the conduct of the Acquired Business as currently conducted or the ownership and use of the Purchased Assets;

> (b)     pay the debts, Taxes and other obligations of the Acquired Business when due;

> (c)     maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

> (d)     continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

> (e)     defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

> (f)     perform all of its obligations under all Assigned Contracts;

> (g)     maintain the Books and Records in accordance with past practice;

> (h)     comply in all material respects with all Laws applicable to the conduct of the Acquired Business or the ownership and use of the Purchased Assets;

> (i)     produce Products in accordance with the specifications sets forth in <u>Schedule 2.04</u>; and

> (j)     not take or permit any action that would cause any of the changes, events or conditions described in <u>Section 4.07</u> to occur.

**Section 6.02     Access to Information.**

> (a)     From the date hereof until the Closing or the earlier termination of this Agreement, Sellers shall (a) afford Buyer and its Representatives full and free access to and the right to inspect all of the Purchased Assets, properties, premises, Books and Records, Contracts and other documents and data related to the Acquired Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Acquired Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Sellers to cooperate with Buyer in its investigation of the Acquired Business. Without limiting the foregoing, Sellers shall permit Buyer and its Representatives to

24

conduct environmental due diligence of the Real Property, including the collecting and analysis of samples of indoor or outdoor air, surface water, groundwater or surface or subsurface land on, at, in, under or from the Real Property. Any investigation pursuant to this Section 6.02(a) shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller. No investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by any Seller in this Agreement. Without limiting the foregoing, Sellers shall promptly provide Buyer with any information requested by Buyer in connection with its due diligence investigation of the Business in order to facilitate the satisfaction of the condition set forth in Section 7.02(m).

(b)     From the date hereof until the Closing or the earlier termination of this Agreement, at the request and discretion of Buyer, Sellers shall use commercially reasonable best efforts to facilitate communications between Buyer and each of Sellers' customers, suppliers, lessors and other third party contract partners for the purpose of conducting Buyer's due diligence review and acquiring assurances of continued business operations from and after the Closing.

**Section 6.03     No Solicitation of Other Bids.**

(a)     From the date hereof until the filing date of the Bankruptcy Case or the earlier termination of this Agreement, Sellers shall not, and shall not authorize or permit any of their respective Affiliates or Representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal. Sellers shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Acquisition Proposal. For purposes hereof, "**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) relating to the direct or indirect disposition, whether by sale, merger or otherwise, of all or any portion of the Acquired Business or the Purchased Assets.

(b)     In addition to the other obligations under this Section 6.03, Sellers shall promptly (and in any event within three (3) Business Days after receipt thereof by any Seller or its Representatives) advise Buyer orally and in writing of any Acquisition Proposal, any request for information with respect to any Acquisition Proposal, or any inquiry with respect to or which could reasonably be expected to result in an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)     Sellers agree that the rights and remedies for noncompliance with this Section 6.03 shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

**Section 6.04     Notice of Certain Events.**

(a)     From the date hereof until the Closing or the earlier termination of this Agreement, Sellers shall promptly notify Buyer in writing of:

(i)     any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or would reasonably be expected to result in, any representation or warranty made by any Seller hereunder not being true and correct or (C) has resulted in, or would reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.02 to be satisfied;

25

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or, to Sellers' Knowledge, threatened against, relating to or involving or otherwise affecting the Acquired Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.15 or that relates to the consummation of the transactions contemplated by this Agreement.

(b)     Buyer's receipt of information pursuant to this Section 6.04 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by any Seller in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 6.05      Confidentiality.** From and after the Closing, Sellers shall, and shall cause their Affiliates to, hold, and shall use reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Acquired Business, except to the extent that Sellers can show that such information (a) is generally available to and known by the public through no fault of any Seller, any of its Affiliates or their respective Representatives; (b) is lawfully acquired by any Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation; or (c) is independently developed by either Seller or any of their respective Affiliates or Representatives without reference to or use of any information concerning the Acquired Business. If Sellers or their respective Affiliates or Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Sellers shall promptly notify Buyer in writing and shall disclose only that portion of such information which the Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Sellers shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 6.06      Non-Competition; Non-Solicitation.**

(a)     For a period of five (5) years commencing on the Closing Date (the "**Restricted Period**"), each Seller agrees that it shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Acquired Business (including any existing or former client or customer of any Seller and any Person that becomes a client or customer of Buyer after the Closing), or any other Person who has a material business relationship with the Acquired Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, a Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if such Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)     During the Restricted Period, Sellers shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Buyer pursuant to Section 2.09(a) in connection with the Closing or is or was employed in the Acquired Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this Section 6.06(b) shall prevent Sellers or any of their Affiliates from hiring (i) any employee whose employment has been terminated by Buyer or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee. Except pursuant to Section 2.09(a), during the Restricted Period, Buyer shall not, and shall not permit any of

26

its Affiliates to, directly or indirectly, hire or solicit any person who is employed by a Seller at a manager level or higher during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this Section 6.06(b) shall prevent Buyer or any of its Affiliates from hiring (i) any employee whose employment has been terminated by a Seller or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)     Sellers acknowledge that a breach or threatened breach of this Section 6.06 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by any Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)     Sellers acknowledge and agree that the restrictions contained in this Section 6.06 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 6.06 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 6.06 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 6.07    Product Liability Matters.** At or prior to the Closing, the Sellers, at their expense, shall cause Buyer to be named as an additional insured under each of the Sellers' occurrence-type policy or policies of insurance insuring against claims for personal injury and property damage arising out of or resulting from any Business Products manufactured or services performed by any Seller prior to the Closing Date. Each Seller shall prepay such policy or policies of insurance in an amount of not less than Ten Million Dollars ($10,000,000) for a period of three (3) years after the Closing, with a deductible not exceeding Fifty Thousand Dollars ($50,000). At the Closing, the Sellers shall deliver to Buyer one or more certificates of insurance evidencing that the insurance to be obtained pursuant to this Section 6.07 is in effect and prepaid and, to the extent permitted under the terms of such insurance, providing for notification to Buyer at least forty-five (45) days prior to the effective date of any termination or cancellation of such insurance.

**Section 6.08    Governmental Approvals and Consents.**

(a)     Each party hereto shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions (including those under the HSR Act) required under any Law applicable to such party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the Ancillary Documents. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)     Sellers shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 4.04 of the Disclosure Schedules.

(c)     Without limiting the generality of the parties' undertakings pursuant to subsections (a) and (b) above, each of the parties hereto shall use reasonable best efforts to:

(i)     respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any Ancillary Document;

(ii)     avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any Ancillary Document; and

(iii)     in the event any Governmental Order adversely affecting the ability of the parties to consummate the transactions contemplated by this Agreement or any Ancillary Document has been issued, to have such Governmental Order vacated or lifted.

(d)     All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Sellers or Buyer with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

**Section 6.09     Books and Records.**

(a)     Buyer acknowledges that the Books and Records relating to Sellers' operations prior to Closing related to the Acquired Business shall be acquired by Buyer at Closing, and that Sellers may from time to time after the Closing request access to or copies of such Books and Records. Seller agrees that upon reasonable prior notice from any Seller, it shall, during normal business hours, provide or cause to be provided to such Seller and its Representatives reasonable access to or copies of such Books and Records for any reasonable purpose, in a manner so as not to interfere unreasonably with the operation of the business of Buyer. Buyer agrees that it shall not, and shall cause each of its Affiliates not to, for a period of six (6) years from and after the Closing Date, or if shorter, the applicable period specified in Buyer's general document retention policies, destroy any material Books and Records without first notifying Sellers and affording Sellers reasonable opportunity to remove or copy such records.

(b)     In order to facilitate the resolution of any claims made against or incurred by Sellers prior to Closing, or for any other reasonable purpose, Sellers agree that upon reasonable prior notice from Buyer, it shall, to the extent permitted by applicable Law, during normal business hours, provide or cause to be provided to Buyer and its Representatives reasonable access to or copies of Books and Records (including personnel files) of the Business for any reasonable purpose, in a manner so as not to interfere unreasonably with the operation of the business of the Sellers. Sellers agree that they shall not, and shall cause each of their Affiliates not to, for a period of six (6) years from and after the Closing Date, or if shorter, the applicable period specified in Sellers' general document retention policies, or such other period as required by the Bankruptcy Court, destroy any material Books and Records without first notifying Buyer and affording Buyer reasonable opportunity to remove or copy such records.

(c)     Notwithstanding Section 6.08(a), Buyer agrees that the Attorney Records shall belong solely to Sellers, and Buyer shall have no right to review, access or obtain copies of the Attorney Records. Any Attorney Records in the possession of Buyer following the Closing shall be promptly delivered to Sellers.

FINAL

Section 6.10	**Closing Conditions.** From the date hereof until the Closing or the earlier termination of this Agreement, each party hereto shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE VII hereof.

Section 6.11	**Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement, *provided however, that* Buyer may disclose non-confidential information related to Sellers and the transactions contemplated hereby in connection with its customer communications and targeted marketing efforts.

Section 6.12	**Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Sellers when due. The parties shall use reasonable best efforts to timely file any Tax Return or other document with respect to such Taxes or fees.

Section 6.13	**Tax Clearance Certificates.** If requested by Buyer, Sellers shall request a tax clearance certificate (a "**Tax Clearance Certificate**") from any Tax authority in the jurisdictions that impose Taxes on a Seller or where a Seller has a duty to file Tax Returns and, if requested by Buyer, Sellers shall notify any such Tax authority of the transactions contemplated by this Agreement in the form and manner required by such Tax authorities, if the making or failure to make such notification could affect the liability of Buyer for any Taxes of Seller. If any Tax authority asserts that a Seller is liable for any Tax attributable to periods occurring on or before the Closing Date, such Seller shall promptly give Buyer notice of the same, and if such Tax or any part of the same becomes due upon failure to appeal or upon a final determination of liability, or if such Tax must be paid by such Seller to permit an appeal, such Seller shall promptly pay any and all such amounts and shall provide evidence to Buyer that such Liabilities have been paid in full or otherwise satisfied.

Section 6.14	**Finished Goods.** From the date hereof until the Closing, Sellers shall at all times maintain an inventory of Finished Goods with a Net Realized Value equal to or greater than $25,000,000.

Section 6.15	**Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

Section 7.01	**Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)	The filings of Buyer and Sellers pursuant to the HSR Act, if any, shall have been made and the applicable waiting period and any extensions thereof shall have expired or been terminated.

(b)	No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(c)	No Action shall have been commenced against Buyer or Sellers, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

29

4823-4697-8715v.21 0055621-000009

Case 19-62584-pcm11   Doc 83   Filed 09/03/19

**Section 7.02    Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Sellers contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Sellers shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    All approvals, consents and waivers that are listed on <u>Section 4.04 of the Disclosure Schedules</u> shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(d)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect.

(e)    Sellers shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in <u>Section 3.02(a)</u>.

(f)    Quincy Foods shall have filed for and obtained a change of the registered name of the entity with the Washington Secretary of State's Office.

(g)    Buyer shall have received an owner's title insurance policy and accompanying certificates and affidavits (including, but not limited to, customary owner's and same as survey affidavits) with respect to each parcel of Real Property, issued by a nationally recognized title insurance company reasonably acceptable to Buyer, written as of the Closing Date, insuring Buyer in such amounts and together with such endorsements, and otherwise in such form, as Buyer shall reasonably require.

(h)    All Encumbrances other than Permitted Encumbrances relating to the Purchased Assets shall have been released in full and Sellers shall have delivered to Buyer written evidence, in form reasonably satisfactory to Buyer, of the release of such Encumbrances.

(i)    Buyer shall have received on behalf of each Seller, a certificate, dated the Closing Date and signed by a duly authorized officer of NORPAC, that each of the conditions set forth in <u>Section 7.02(a)</u> and <u>Section 7.02(b)</u> have been satisfied (the "**Seller Closing Certificate**").

(j)    Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of NORPAC certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of NORPAC authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby (the "**Seller Secretary Certificate**").

(k)    Buyer shall have received on behalf of each Seller a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (collectively, the "**FIRPTA Certificates**"), in form and substance reasonably satisfactory to Buyer, that such Seller is not a foreign person within the meaning of Section 1445 of the Code, duly executed by NORPAC.

(l)      Sellers shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(m)      Buyer shall have completed its due diligence investigation of title, environmental, customer, supplier and operational matters of the Business by the last date on which Qualified Competing Bids are due under the Sale Procedures Order, and shall, in its sole discretion, be satisfied with the results of such due diligence investigation.  Buyer shall provide Sellers with written notice by such date if this condition has not been satisfied.

(n)      Buyer shall be satisfied, in its reasonable discretion, by the terms of the Sale Order.

(o)      The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.

(p)      The objection deadline shall have passed for all counterparties to Assigned Contracts to object to the Cure Costs listed in the Assumption Notice, and any timely objection has been resolved.

(q)      Sellers shall have made the insurance prepayments pursuant to Section 6.07.

(r)      NORPAC shall have legally changed its name so that "NORPAC" is no longer included.

**Section 7.03      Conditions to Obligations of Sellers.** The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)      The representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)      Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)      Buyer shall have delivered to Sellers duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(b).

(d)      Buyer shall have delivered the Indemnification Escrow Amount to the Escrow Agent.

(e)      Buyer shall have delivered to Sellers such other documents or instruments as Sellers reasonably request and are reasonably necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01      Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date; *provided, however, that* the representations and warranties set forth in: (i) Section 4.01 (Organization of NORPAC), Section 4.02 (Organization of Quincy Foods and Hermiston Foods), Section 4.03 (Authority of Sellers), Section 4.04 (No Conflicts and Consents), Section 4.09 (Title to Purchased

Assets), Section 4.11 (Real Property), Section 4.17 (Environmental), Section 4.18 (Employee Benefit Matters), Section 4.20 (Taxes), and Section 4.21 (Brokers) (collectively, the "**Seller Special Representations**"), and (ii) Section 5.01 (Organization of Buyer), Section 5.02 (Authority of Buyer) and Section 5.03 (No Conflicts and Consents) shall survive indefinitely, in each case, shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus sixty (60) days. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. No Person shall be liable for any claim for indemnification regarding a breach of representation, warranty or covenant hereunder unless written notice of a claim for indemnification is delivered by the Person seeking indemnification to the Person from whom indemnification is sought with respect to any such breach before the date on which the representation, warranty or covenant on which such claim is based ceases to survive as set forth in this Section 8.01 (in which case such indemnification obligation shall survive the time at which it would otherwise terminate pursuant to this ARTICLE VIII regardless of when any Losses in respect thereof may actually be incurred and shall survive until finally resolved). All notices given pursuant hereto shall set forth with reasonable specificity (to the extent known at such time) the basis for such claim for indemnification.

       **Section 8.02**    **Indemnification by Seller.** Subject to the other terms and conditions of this ARTICLE VIII, Sellers shall, jointly and severally, indemnify and defend each of Buyer and its Affiliates and their respective Representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of:

       (a)    any inaccuracy in or breach of any of the representations or warranties of any Seller contained in this Agreement, the Ancillary Documents or in any certificate or instrument delivered by or on behalf of such Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

       (b)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by a Seller pursuant to this Agreement, the Ancillary Documents or any certificate or instrument delivered by or on behalf of such Seller pursuant to this Agreement;

       (c)    any Third Party Claim based upon, resulting from or arising out of the Acquired Business prior to the Closing Date;

       (d)    any Losses incurred as a result of or related to, any single employer or multi-employer pension plan maintained by any Seller or offered to any employee of the Acquired Business prior to the Closing Date, whether such Losses are incurred prior to or after the Closing Date;

       (e)    any assets or liabilities of the Business other than the Purchased Assets or Assumed Liabilities; or

       (f)    any mechanics', warehousemens', materialmens', suppliers', vendors', Perishable Agricultural Commodities Act liens, or similar Encumbrances with respect to the Purchased Assets, other than any such Encumbrances relating to the Assumed Liabilities.

       **Section 8.03**    **Indemnification by Buyer.** Subject to the other terms and conditions of this ARTICLE VIII, Buyer shall indemnify and defend each Seller and its respective Affiliates and Representatives (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnitees based upon, arising out of, with respect to or by reason of:

       (a)    any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement, the Ancillary Documents or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such

representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement , the Ancillary Documents or any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement; or

(c)      any Assumed Liability.

**Section 8.04      Indemnification Procedures.** The party making a claim under this <u>ARTICLE VIII</u> is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this <u>ARTICLE VIII</u> is referred to as the "**Indemnifying Party**."

(a)      **Third Party Claims.** If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; *provided, that* if the Indemnifying Party is a Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by or on behalf of a Person that is a supplier or customer of the Acquired Business, or (y) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to <u>Section 8.04(b)</u>, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, *provided, that* if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to <u>Section 8.04(b)</u>, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Sellers and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of <u>Section 6.05</u>) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)      **Settlement of Third Party Claims**. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this <u>Section 8.04(b)</u>. If a firm offer is made

33

to settle a Third Party Claim without leading to Liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all Liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum Liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to <u>Section 8.04(a)</u>, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)     **Direct Claims**. Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 8.05     Limitations on Indemnification.**

(a)     **Thresholds**.  Subject to the other provisions of this <u>Section 8.05</u>:

(i)     Except to the extent a claim arises from Fraud on the part of a breaching party, no claim for indemnification under <u>Section 8.02(a)</u> (other than with respect to the Seller Special Representations) shall be made by a Buyer Indemnitee with respect to any breach resulting in an individual item of Losses, or related items of Losses arising out of substantially similar facts and circumstances, unless and until the amount of the Losses suffered by the Buyer Indemnitee in connection with such breach exceeds Fifty Thousand Dollars ($50,000) (the "**Claim Threshold**").

(b)     **Caps**.

(i)     The maximum aggregate amount of all Losses payable with respect to all claims for indemnification hereunder pursuant to <u>Section 8.02(a)</u> (other than those with respect to breaches of the Seller Special Representations) shall not exceed Twenty Million Dollars ($20,000,000).

(ii)     Notwithstanding anything else in this Agreement to the contrary, the maximum aggregate amount of Losses payable with respect to all claims for indemnification hereunder pursuant to <u>Section 8.02(a)</u> shall not exceed the Purchase Price.

(c)     **Insurance Benefits**.  The amount of any Losses subject to indemnification by the Sellers hereunder shall be calculated net of any amounts that have been previously recovered or are recoverable by

a Buyer Indemnitee under insurance policies or other collateral sources (such as contractual indemnities of any Person that are contained outside this Agreement).

(d) **Mitigation**. Buyer Indemnitees shall take and shall cause their Affiliates to take all reasonable steps to mitigate any Losses upon becoming aware of any event that gives rise to, or that would reasonably be expected to give rise to, such Losses, including incurring costs only to the minimum extent reasonably necessary to remedy the breach that gives rise to such Losses.

(e) **No Multiple Recovery**. No Buyer Indemnitee shall be entitled to recover any Losses relating to any breach of a representation or warranty or otherwise arising under one provision of this Agreement to the extent that the Buyer Indemnitee has already recovered Losses with respect to such breach pursuant to another representation, warranty, or other provision of this Agreement.

**Section 8.06    Payments; Indemnification Escrow Fund.**

(a) Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this <u>ARTICLE VIII</u>, the Indemnifying Party shall satisfy its obligations within fifteen (15) Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such fifteen (15) Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to the date such payment has been made at a rate per annum equal to five percent (5%). Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

(b) Any Losses payable to a Buyer Indemnitee pursuant to this <u>ARTICLE VIII</u> shall be satisfied in the following priority: (i) first, from the Indemnification Escrow Fund, and once the Indemnification Escrow Fund is exhausted; (ii) second, by setting off the amount of such Loss against any amounts owed or owing to Sellers under any commercial agreement between Buyer and any Seller; and (iii) third, to the extent the amount of Losses exceeds the amounts available to the Buyer Indemnitee under clauses (i) and (ii), from the Sellers by wire transfer of immediately available funds.

**Section 8.07    Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 8.08    Effect of Investigation.** Notwithstanding any other provision of this Agreement, the representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in <u>Section 7.02</u> or <u>Section 7.03</u>, as the case may be.

**Section 8.09    Exclusive Remedies.** Subject to <u>Section 6.06</u> and <u>Section 11.11</u>, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from Fraud, criminal activity or intentional misconduct) on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this <u>ARTICLE VIII</u>. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this <u>ARTICLE VIII</u>. Nothing in this <u>Section 8.09</u> shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any party's Fraud or criminal or intentional misconduct.

4823-4697-8715v.21 0055621-000009

## ARTICLE IX
## TERMINATION

**Section 9.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by Buyer by written notice to Sellers if:

(i)    Sellers fail to commence the Bankruptcy Case on or before August 22, 2019;

(ii)    Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by any Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by such Seller within five (5) days of Sellers' receipt of written notice of such breach from Buyer;

(iii)    any of the conditions set forth in Section 7.01 or Section 7.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by November 30, 2019, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(iv)    if the Bankruptcy Court issues an Order (i) converting the Bankruptcy Case into cases under chapter 7 of the Bankruptcy Code, or (ii) dismissing the Bankruptcy Case;

(c)    by Sellers by written notice to Buyer if:

(i)    Sellers are not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Buyer within five (5) days of Buyer's receipt of written notice of such breach from Seller; or

(ii)    any of the conditions set forth in Section 7.01 or Section 7.03 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by November 30, 2019, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)    by Buyer or Sellers in the event that:

(i)    the Sale Procedures Order has not been entered by the Bankruptcy Court on or before October 4, 2019; provided that the party exercising such termination right is in compliance with Section 10.02;

(ii)    the Sale Order has not been entered by the Bankruptcy Court on or before November 15, 2019, 2019; provided that the party exercising such termination right is in compliance with Section 10.02;

(iii)    the Sale Order has not become a Final Order on or before November 30, 2019; provided that the party exercising such termination right is in compliance with Section 10.02;

4823-4697-8715v.21 0055621-000009

(iv)    the Bankruptcy Court shall enter an order approving a Qualified Competing Bid or any sale or other disposition of all or substantially all of the Purchased Assets to a Person other than Buyer, or Seller publicly announces the selection of a Person other than Buyer as the successful bidder for all or substantially all of the Transferred Assets in the Auction (each, an "**Alternate Transaction**") and Buyer is not the back-up bidder in accordance with the Sale Procedures;

(v)    there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited,

(vi)    any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become a Final Order.

**Section 9.02    Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article IX, this Agreement shall forthwith become void and there shall be no Liability on the part of any party hereto except:

(a)    as set forth in this ARTICLE IX and Section 6.05 and ARTICLE XI hereof; and

(b)    that nothing herein shall relieve any party hereto from Liability for any willful breach of any provision hereof.

# ARTICLE X
# BANKRUPTCY COURT MATTERS

**Section 10.01    Binding Effect; Entry of Sale Order.** Sellers and Buyer acknowledge and agree that their obligations to close the transactions contemplated by this Agreement (collectively, the "**Transaction**") are conditioned upon the entry by the Bankruptcy Court of the Sale Order (a) approving this Agreement and the sale of the Purchased Assets to Buyer pursuant to this Agreement, free and clear of all Encumbrances (except Permitted Encumbrances), and free from all successor or transferee liability to the fullest extent permitted by Section 363 of the Bankruptcy Code, and (b) approving the assumption by the Sellers and assignment to Buyer of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code.

**Section 10.02    Bankruptcy Court Approval.**

(a)    *Filing of Sale Motion*. Sellers shall promptly file and diligently pursue the Sale Motion. Sellers shall promptly confer with Buyer regarding any written objections filed with the Bankruptcy Court with respect to the Sale Motion.

(b)    *Obligation to Seek Sale Order*. To the extent Buyer is declared the Successful Bidder (as defined in the Sale Procedures Order), Sellers shall use reasonable best efforts to obtain entry of the Sale Order promptly and to perform such other acts as may be necessary to permit Sellers to consummate the Transaction. The Sale Order shall contain findings of fact and conclusions of law establishing, among other things, that: (a) Sellers are authorized to transfer to Buyer all interests of Sellers in the Purchased Assets free and clear of Encumbrances (except Permitted Encumbrances), to the fullest extent allowable under the Bankruptcy Code; (b) Sellers are authorized to assume and assign the Assigned Contracts to Buyer; (c) Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; and (d) the fourteen-day stay provision of Bankruptcy Rule 6004 is waived. In the event an Appeal is filed, Sellers shall each use their respective commercially reasonable efforts to defend the order or orders that are being appealed and, upon Buyer's election to proceed with the Transaction, may close the Transaction unless such closing is subject to a Stay. Sellers shall keep Buyer reasonably informed of the status of efforts to obtain the entry of the Sale Order. Sellers shall give Buyer reasonable advance written notice of any hearings regarding motions respecting the Sale Order, and Buyer shall have the right to appear and be heard at any such hearings.

**Section 10.03    Cooperation in Bankruptcy Court Matters.** Sellers shall use commercially reasonable efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of Sellers (including forms of orders and notices to interested parties) directly relating to the Purchased Assets or this Agreement that are filed after the date hereof at least three Business Days prior to the filing thereof in the Bankruptcy Court so as to allow Buyer to provide reasonable comments for incorporation into same, unless the exigencies of time that are outside of Sellers' control prevent the period from being that long. Upon and subject to the conditions of this Agreement, each of the parties shall use commercially reasonable efforts to take or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective in the most expeditious manner practicable the Transaction, including without limitation the assurance of future performance by Buyer under the Assigned Contracts as required by section 365(b)(1)(C) of the Bankruptcy Code. Without limiting the generality of the foregoing, prior to Closing, no Seller shall voluntarily dismiss the Bankruptcy Case or voluntarily convert the Bankruptcy Case to a Chapter 7 case.

**Section 10.04    Sale Procedures.** Sellers will use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Procedures Order, approving the bidding and sale procedures described in this Section ("**Sale Procedures**") as soon as practicable after the filing of the Sale Motion. If the Bankruptcy Court does not approve the Sale Procedures in their entirety, or if the Buyer does not accept any modified terms approved by the Bankruptcy Court, then the Buyer shall have the right to terminate this Agreement and neither party shall have any further obligation under this Agreement.

(a)    **Expense Reimbursement Fee**. In consideration of the Buyer conducting its due diligence and entering into this Agreement subject to higher and better offers pursuant to the Auction, the Sale Procedures Order will include, without limitation, (i) authorization and direction for the Sellers to pay the Buyer without the necessity of any further notice or hearing, directly from the proceeds of a sale to another purchaser, a fee of $2,000,000 to compensate the Buyer for its legal, accounting, and other professional costs and expenses, as well as Buyer's internal management time, incurred in connection with the proposed sale (the "**Expense Reimbursement Fee**").

(b)    **Competing Bid Requirements**.

(i)    The Sale Procedures Order shall provide that a competing bid must exceed the sum of the Purchase Price and the Expense Reimbursement Fee plus $2,000,000, and otherwise meet the financing and other requirements set forth in below (such bid, a "**Qualified Competing Bid**"). If there is a Qualified Competing Bid, Sellers shall hold an auction for the Purchased Assets (the "**Auction**"). Buyer may participate in such Auction, and any subsequent bid must exceed the previous bid by at least $500,000. In order to determine the winning bid at any such Auction, Sellers shall evaluate the value to be provided to the Debtors under the bids, including the net economic effect upon the Debtors' estates, taking into account Buyer's right to the Expense Reimbursement Fee. For example, if a third-party bids $155,000,000 at auction and Buyer bids $154,000,000 million, Buyer's bid would have a higher net value to the estates, because by accepting Buyer's bid, the estates would receive $154,000,000, whereas under the competing bid the estates would net only $153,000,000 after paying the Expense Reimbursement Fee.

(ii)    To be deemed a Qualified Competing Bid, a bidder must: (a) submit its bid using an asset purchase agreement substantially in the form of this Agreement, with a copy marked to indicate all changes from this Agreement; (b) submit its bid by a deadline to be established in the Sale Procedures Order; (c) not include a financing contingency in its bid; (d) provide at the time of its bid (i) a representation that the bidder has the financial ability to perform, plus supporting documents (*e.g.*, bank statements that show available cash) that are satisfactory to the Sellers in their reasonable discretion, and (ii) a representation that the bidder is duly authorized to submit the bid and close the transaction and has already obtained all necessary approvals (*e.g.*, board approvals), plus supporting documents satisfactory to the Sellers in their reasonable discretion; and (e) submit with its bid a good-faith deposit in the amount of $2,000,000 via certified check.

(c)    **Assumption and Assignment of Contracts.** The Sale Procedures Order shall include a procedure acceptable to the Buyer that provides for assumption and assignment of the Assigned Contracts,

4823-4697-8715v.21 0055621-000009

including the Leases, to the Buyer, and all the Cure Costs associated therewith will be paid as described in this Section.

(i)　　　On or before the date that is ten (10) Business Days following the date on which the Sale Procedures Order is entered by the Bankruptcy Court, Sellers shall file a notice of assumption (the "**Assumption Notice**") with the Bankruptcy Court and serve such notice on each counterparty to an executory contract or lease listed thereon. The Assumption Notice shall identify all executory contracts and leases that Sellers believe may be assumed and assigned in connection with the Transaction and set forth a good faith estimate of the amount of Cure Costs applicable to each such contract or lease (and if no cure cost is estimated to be applicable, the amount of such Cure Cost designated shall be "$0.00"). In accordance with the Sale Procedures Order, Buyer reserves the right to require Sellers to supplement such list and provide additional notice of assumption, up to five (5) Business Days prior to the date of the Sale Hearing.

(ii)　　　On or before the date that is four (4) Business Days before the Sale Hearing (the "**Designation Deadline**"), Buyer shall provide to Sellers an updated **Schedule 2.01(d)** listing those executory contracts and Leases that it elects to have assumed and assigned to Buyer at the Closing (the "**Designated Contracts**"). Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Designated Contracts and to determine the amount of the associated Cure Costs. Buyer shall make provision for the payment of the Cure Costs in cash at Closing, or the provision of adequate assurance that the Cure Costs will be promptly paid on or after Closing, in accordance with the Sale Order. Notwithstanding the foregoing, Buyer reserves the right to remove a contract or lease from the list of Designated Contracts at any time pending Closing of the Transaction, even after entry of the Sale Order. For the avoidance of doubt, notwithstanding the designation of contracts and leases as Designated Contracts, only those executory contracts and Leases that Buyer finally elects to assume as of the Closing will constitute Assigned Contracts and will be assumed by Sellers and assigned to Buyer pursuant to the Sale Order at Closing.

(iii)　　　Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing, Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, withdraw, repudiate or disclaim any executory contract or lease without the prior written consent of Buyer.

(iv)　　　Sellers shall cooperate with Buyer to resolve any disputes with the non-debtor party to any of the Designated Contracts regarding the amount of the Cure Costs. All Cure Costs shall be paid by Buyer directly to the contract counterparty. Buyer may elect to Close the Transaction pending resolution of a dispute about Cure Costs or other issues regarding assumption and assignment of a particular contract, and in such case, Buyer may elect to take assignment of the subject contract or not, in Buyer's discretion, upon resolution of such dispute.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.01　　Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred; *provided, however,* that Buyer and Sellers shall be equally responsible for all filing and other similar fees payable in connection with any filings or submissions under the HSR Act.

**Section 11.02　　Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours

of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 11.02</u>):

|  |  |
|---|---|
| **If to Sellers:** | NORPAC Foods, Inc.<br>PO Box 14444<br>Salem, OR 97309-5012<br><u>E-mail</u>: Winston Mar<br><u>Attention</u>: wmar@scpllc.com |
| *with a copy to:* | Tonkon Torp LLP<br>888 SW Fifth Avenue, Suite 1600<br>Portland, OR 97204<br><u>E-mail</u>: Michael.fletcher@tonkon.com<br><u>Attention</u>: Michael Fletcher |
| **If to Buyer:** | Oregon Potato Company<br>P.O. Box 3110<br>Pasco, WA 99302<br><u>E-mail</u>: sschossberger@oregonpotato.com<br><u>Attention</u>: Steven Schossberger, General Counsel |
| *with a copy to:* | Davis Wright Tremaine, LLP<br>920 Fifth Avenue, Suite 3300<br>Seattle, WA 98104<br><u>E-mail</u>: billweigand@dwt.com<br><u>Attention</u>: Bill Weigand |

**Section 11.03      Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 11.04      Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 11.05      Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in <u>Section 6.06(d)</u>, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

4823-4697-8715v.21 0055621-000009

**Section 11.06    Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 11.07    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however,* that prior to the Closing Date, Buyer may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 11.08    No Third Party Beneficiaries.** Except as provided in ARTICLE VIII, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 11.09    Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 11.10    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Washington without giving effect to any choice or conflict of law provision or rule (whether of the State of Washington or any other jurisdiction).

(b)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder or thereunder, or the Transaction contemplated hereunder or thereunder, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(e).

**Section 11.11** **Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 11.12** **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The parties agree that electronic signatures shall be accepted and deemed effective in all respects through use of a reputable electronic signature services such as DocuSign.

*[Signature Page Follows]*

4823-4697-8715v.21 0055621-000009

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS:

**NORPAC Foods, Inc.,**
an Oregon corporation

By _____
Name: Thomas R. Fessler
Title: Board Chairman

**Quincy Foods, LLC,**
a Washington limited liability company
    By: NORPAC Foods, Inc.
    Its: Member

By _____
Name: Thomas R. Fessler
Title: Board Chairman

**Hermiston Foods, LLC,**
an Oregon limited liability company
    By: NORPAC Foods, Inc.
    Its: Member

By _____
Name: Thomas R. Fessler
Title: Board Chairman

BUYER:

**Oregon Potato Company,**
a Washington corporation

By _____
Name: Frank Tiegs
Title: President

[Signature Page to Asset Purchase Agreement]

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SELLERS:

**NORPAC Foods, Inc.,**
an Oregon corporation

By_____
Name: Thomas R. Fessler
Title: Board Chairman

**Quincy Foods, LLC,**
a Washington limited liability company
   By: NORPAC Foods, Inc.
   Its: Member

By_____
Name: Thomas R. Fessler
Title: Board Chairman

**Hermiston Foods, LLC,**
an Oregon limited liability company
   By: NORPAC Foods, Inc.
   Its: Member

By_____
Name: Thomas R. Fessler
Title: Board Chairman

BUYER:

**Oregon Potato Company,**
a Washington corporation

By\_\_\_*Frank Tiegs*_____
Name: Frank Tiegs
Title: President

[Signature Page to Asset Purchase Agreement]

## Schedule 1.01

## DEFINITIONS

The following terms used in the Agreement have the meanings specified or referred to in this **Schedule 1.01**:

"**Accounts Receivable Collection Value**" shall mean ninety percent (90%) of the total value of all Accounts Receivable actually collected during the Adjustment Period.

"**Accounts Receivable Closing Value**" shall mean fifty percent (50%) of the Book Value of all accounts receivable as of the Closing Date, less any reserve for doubtful accounts.

"**Acquired Business**" means that portion of the Business to which the Purchased Assets and Assumed Liabilities relate.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" means the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Intellectual Property Assignment, Deeds, Assignment and Assumption of Leases, Brooks Purchase Option Agreement, Brooks Option Assignment, Quincy Purchase Option Agreement and the other agreements, instruments and documents required hereunder to be delivered at the Closing.

"**Attorney Records**" means with respect to the Sellers, all of the books, files, documents and records of attorneys relating to their respective representations of the Sellers in connection with the negotiation, execution and delivery of this Agreement, the Ancillary Documents and the transactions contemplated herein and therein.

"**Book Value**" means the balance sheet account balance of such assets as of the Closing Date calculated in accordance with GAAP.

"**Brooks Title Commitment**" means the preliminary commitment for title insurance issued by First American Title Insurance Company under Commitment No. NCS-972570-WA1 dated July 29, 2019.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Seattle, Washington are authorized or required by Law to be closed for business.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Cure Costs**" means the amounts required to be paid to satisfy 11 USC Sec. 365(b)(1) A with respect to the Assigned Contracts.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers concurrently with the execution and delivery of this Agreement.

"**Dollars or $**" means the lawful currency of the United States.

"**Encumbrance**" means any interest, charge, claim (including but not limited to claim for successor liability), community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, Labor Obligation, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, approval, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with any Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**Escrow Agent**" means Bank of America, National Association.

"**Escrow Agreement**" means the Escrow Agreement to be entered into by Buyer, Sellers and the Escrow Agent at the Closing, substantially in the form of **Exhibit A**.

"**Estimated Accounts Receivable Value**" means Sellers' good faith estimate of the Accounts Receivable Value at Closing.

"**Estimated Assumed Grower Obligations**" means Sellers' good faith estimate of the value of the Assumed Grower Obligations at Closing.

"**Estimated Inventory Value**" means Sellers' good faith estimate of the Inventory Value at Closing.

"**Final Order**" means an order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect and is no longer subject to appeal; provided, the if an appeal of the Sale Order is timely filed pursuant to Bankruptcy Rule 8002, but no stay of the execution of such order is issued by the court pending resolution of the appeal, then Buyer may elect to treat such order as a Final Order in its sole discretion.

"**Fraud**" means common law fraud under the laws of the State of Washington.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Indemnification Escrow Amount**" means Ten Million Dollars ($10,000,000).

"**Intellectual Property**" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); or (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**").

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property that is used or held for use in the conduct of the Acquired Business as currently conducted to which a Seller is a party, beneficiary or otherwise bound.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

"**Inventory Value**" means the value of all Inventory as determined using the calculation set forth on <u>Schedule 2.04</u>.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of either Seller, after due inquiry.

"**Labor Obligations**" means (a) legal and/or contractual obligations relating to the employment of labor including, without limitation, any provisions relating to wages, hours, equal employment, occupational safety and health, workers' compensation, unemployment insurance, collective bargaining, immigration, affirmative action, and the payment and withholding of social security and other taxes; (b) terms of all collective bargaining agreements, and any and all other agreements and understandings that are in place with any labor unions, trade associations, or other employee organizations that represent or have written a demand for recognition with respect to any Business Employees; (c) retirement, pension, employee, or welfare-benefits obligations with respect to any Business Employees; and (d) any obligations to fund or contribute to any Benefit Plans ever maintained or contributed to by any Seller or any related entities, whether or not covering Business Employees including but not limited to withdrawal liability or successor liability under ERISA.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, Taxes, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however,* that "Losses" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or other third party that is not an Affiliate of the Person claiming Losses.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Acquired Business, (b) the value of the Purchased Assets, or (c) the ability of Sellers to consummate the transactions contemplated hereby on a timely basis; *provided, however,* that none of the following shall be deemed to constitute a Material Adverse Effect: any effect arising from or relating to (i) changes after the date hereof in general business or economic conditions, (ii) changes after the date hereof in national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions or diplomatic or consular offices, or upon any military installation, equipment or personnel of the United States, (iii) changes after the date hereof in conditions in any financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (iv) changes after the date hereof in GAAP, (v) changes after the date hereof in Laws, (vi) compliance by any Seller with any express requirement of this Agreement or any of the Ancillary Documents, or (vii) any announcement or the pendency of the transactions contemplated by this Agreement; except in the case of clauses (i)-(v) to the extent any such effect has a materially disproportionate effect on the Acquired Business, the Purchased Assets or the Sellers.

"**Non-Governmental Authority**" means any certification authority of any nature, or any industry group or private body which establishes widely accepted standards or guidelines.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any Taxable period ending on or before the Closing Date and, with respect to any Taxable period beginning before and ending after the Closing Date, the portion of such Taxable period ending on and including the Closing Date.

"**Products**" means, collectively, the Finished Goods and Bulk Product.

"**Quincy Title Commitment**" means the preliminary commitment for title insurance issued by First American Title Insurance Company under Commitment No. NCS-969352-WA1 dated July 9, 2019.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Business**" means the processing, repacking and/or sale of food products other than food products processed and sold to Buyer or as otherwise agreed to in writing by Buyer.

"**Sale Hearing**" means the hearing by the Bankruptcy Court with respect to the Sale Motion.

"**Sale Motion**" means the motion of Seller seeking approval and entry of the Sale Procedures Order and the Sale Order in the Chapter 11 Cases.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably acceptable to Buyer and Seller, meeting the requirements of Section 10.02, approving this Agreement and all of the terms and conditions hereof, approving and authorizing Seller to consummate the Transaction contemplated hereby free and clear of all Encumbrances, and containing a finding that Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"**Sale Procedures Order**" means a Final Order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Seller, meeting the requirements of Section 10.04, and which, among other things establishes a date by which Qualified Competing Bids must be submitted, as requested under the Sale Motion.

"**Salem Title Commitment**" means the preliminary commitment for title insurance issued by First American Title Insurance Company under Commitment No. NCS-969365-WA1 dated July 1, 2019.

"**Target Inventory Value**" means Sixty Four Million Dollars ($64,000,000).

"**Tax**" or "**Taxes**" means all federal, state, local, non-U.S. income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, value added, alternative or add-on minimum, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental (including taxes under Code Section 59A), stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever imposed by any federal, state, local or non-U.S. taxing authority, together with any interest, additions or penalties with respect thereto, whether or not disputed, including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Territory**" means anywhere in the continental United States of America and Canada.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

**Schedule 2.01**

**Purchased Assets**

**Schedule 2.01(a) – Real Property**

1. All interests of Sellers in and to the real property (including, without limitation, all buildings, structures, improvements and fixtures situated thereon, and all easements, rights-of-way and other rights and privileges appurtenant thereto) located at 222 Columbia Way and 2374 NW Road J, Quincy, Washington and associated with Tax Parcel Numbers R040410312 and R151772000 (collectively, the "**Quincy Property**").

2. All interests of Sellers in and to the real property (including, without limitation, all buildings, structures, improvements and fixtures situated thereon, and all easements, rights-of-way and other rights and privileges appurtenant thereto) located at 2210 Madrona Avenue SE, Salem, Oregon; 3225 25th Street SE, Salem Oregon; 2525 Ewald Ave SE, Salem, Oregon, and associated with Map and Tax Lot Number 083W02A 00700, including the Madrona, Repack, Corporate Office and Henningsen facilities (collectively, the "**Salem Property**").

3. All interests of Sellers in and to the real property (including, without limitation, all buildings, structures, improvements and fixtures situated thereon, and all easements, rights-of-way and other rights and privileges appurtenant thereto) located at 4745 and 4755 Brooklake Road NE, Salem, Oregon and associated with Map and Tax Lot Number 062W04C 00700, 062W09 01200, 062W08 01500, 062W17 00600, 062W08 00100, 062W08 01600, 062W09 01400, 062W08 00200, 062W08 01800, 062W17C 00500, 062W08 01400, 062W09 01300, 062W08DD01100, 062W08DD01200, 062W08DD01300, 062W08 01700 and 062W17 00500 (collectively, the "**Brooks Property**").

**Schedule 2.01(b) – Tangible Property**

1. All tangible personal property, including all furniture, fixtures, equipment, parts, machinery, tools, vehicles, inventory, materials, office equipment, supplies, computers, telephones owned by any Sellers, unless specifically listed in <u>Schedule 2.03 – Excluded Assets</u>, including but not limited to, the assets described in <u>**ANNEX A – Tangible Property**</u>.

2. All Inventory of any Seller, including but not limited to, the Inventory described in <u>**ANNEX B – Inventory**</u>.

**Schedule 2.01(c) – Intangible Assets**

1. All Accounts Receivable.

2. All lists, information, communications and data concerning any past, present or potential customer relations.

3. All lists, information, communications and data concerning any past, present or potential supplier or third-party contractor relations.

4. All information technology data, backups and system information associated with the Purchased Assets.

5. Goodwill of the Business associated with the Purchased Assets.

6. All rights to and associated with the trade name "Quincy Foods".

7. All formulas, trade secrets, know how, concepts, methods, processes, recipes and other proprietary information relating to the Acquired Business.

8. Any and all claims of Sellers and/or their bankruptcy estates against the growers listed on **Schedule 2.02** arising under Chapter 5 of the Bankruptcy Code or analogous state law.

**Schedule 2.01(d) – Assigned Contracts**

1. All rights and entitlements of Sellers under the following customer Contracts:

   - Master Supply Agreement by and between J.R. Simplot Company and NORPAC Foods, Inc., dated July 1, 2017.

   - Contract by and between NORPAC Foods, Inc. and FMP SA Management Group, LLC & Food Management Partner, Inc. dated February 13, 2018.

   - Contract by and between NORPAC Foods, Inc. and Freshly, Inc. dated June 11, 2018.

   - Contract by and between NORPAC Foods, Inc. and Eat Fit Go, dated April 6, 2018.

   - Contract by and between NORPAC Foods, Inc. and B&G Foods, dated June 6, 2018.

   - Contract by and between NORPAC Foods, Inc. and Nestle USA, dated May 2, 2019.

   - Contract by and between NORPAC Foods, Inc. and Nestle USA, dated July 19, 2019.

   - Contract by and between NORPAC Foods, Inc. and Nestle Canada Inc., dated July 19, 2019.

2. Master Purchasing Agreement by and between Gordon Food Service, Inc. and Norpac Foods, dated September 1, 2019. All rights and entitlements of Sellers under the following Contracts with Lineage Logistics:

   - Quincy Property:

     o Lease Agreement by and between Lineage Logistics, LLC and Quincy Foods, LLC, dated August 7, 2018.

     o First Amendment to Amended and Restated Storage and Freezing Services Agreement by and between Lineage Logistics, LLC and Quincy Foods, LLC, dated July 10, 2019.

     o Amended and Restated Storage and Freezing Services Agreement by and between Lineage Columbia, LLC and Quincy Foods, LLC, dated August 3, 2016.

   - Salem Property:

     o Operating Lease by and between NORPAC Foods, Inc. and Terminal Freezers, Inc. (Lineage Logistics), dated March 1, 2005.

     o Operating Lease Extension by and between NORPAC Foods, Inc. and Terminal Freezers, Inc. (Lineage Logistics), dated February 28, 2010.

     o Extension Restated Agreement for Frozen Food Storage by and between Terminal Freezers, Inc. (Lineage Logistics) and NORPAC Foods, Inc., dated February 28, 2010.

   - Brooks Property:

     o Lease by and between NORPAC Foods, Inc. and Terminal Freezers, Inc. (Lineage Logistics), dated April 1, 2007.

3. All rights and entitlements of Sellers under the following Contracts with Henningsen Cold Storage:

- Salem Property:

  o Ground Lease by and between Henningsen Cold Storage and NORPAC Foods, Inc. dated March 25, 2013.

  o Joint Development Agreement (Frozen Storage and Distribution Facility) by and between Henningsen Cold Storage and NORPAC Foods, Inc. dated March 25, 2013.

  o First Amended and Restated Operating Agreement (Frozen Storage and Distribution Facility) by and between Henningsen Cold Storage and NORPAC Foods, Inc. dated July 1, 2018 (amends Agreement dated March 25, 2013.

  o Option Agreement by and between Henningsen Cold Storage and NORPAC Foods, Inc. dated March 25, 2013.

  o Office Lease by and between Henningsen Cold Storage and NORPAC Foods, Inc. dated March 25, 2013.

4. All rights and entitlements of Sellers under the following supplier contracts:

- Supplier and Co-Packer Contracts Supply Agreement by and between NORPAC and Ampac, dated May 28, 2015.

- Fixed Price Agreement by and between Connell Oil, Inc. and Quincy Foods, LLC, dated February 15, 2018.

- Product and Services Supply Agreement by and between Ecolab Inc. and NorPac Foods, Inc., dated March 1, 2014.

- Co-Packer Agreement by and between Seneca Foods Corporation and NORPAC Foods, Inc., dated June 30, 2017.

- Co-Packer Agreement by and between Norsun Food Group, Inc. and NORPAC Foods, Inc. dated 2001.

- Co-Packer Agreement by and between NORPAC Foods, Inc., Roca Food Sales, Inc. and Expor San Antonio, Inc. and Robert Arneson Sales Agent, Inc. dated June 1, 1997.

- Co-Packer Agreement by and between NORPAC Foods, Inc., Townsend Farms, Inc, and Robert Arneson Sales Agent, Inc., dated July 21, 2000.

- Co-Packer Agreement by and between NORPAC Foods, Inc., Wawona Frozen Foods, and Robert Arneson Sales Agent, Inc., dated June 1, 1998.

- National Rental Agreement by and between Cintas Corporation No 2 and NORPAC Foods, Inc., dated June 1, 2019.

- Irrigation Contractor Agreement by and between Scott Brault dba Brault Irrigation and NORPAC Foods, Inc., dated January 1, 2012.

- Electricity Sales and Purchase Agreement by and between Calpine Energy Solutions, LLC and Norpac Foods, Inc., dated June 25, 2013.

- Seed Contract by and between Brotherton Seed Co., Inc. and NORPAC Foods, Inc., dated February 20, 2018.

- Seed Contract by and between Crites Seed, Inc. and NORPAC Foods, Inc., dated January 16, 2019.

- Seed Agreement by and between Seminis and NORPAC Foods, Inc., dated February 19, 2019
- Services Agreement by and between Diagraph Marking & Coding and Quincy Foods, LLC, dated June 20, 2019.

**Schedule 2.01(e) – Intellectual Property Assets**

1. All rights and interests in all Intellectual Property (registered and unregistered) held by any Seller, including but not limited to, the following:

   - "Flav-R-Pac"
   - See **ANNEX C – Trademarks**

**Schedule 2.01(f) – Assigned Permits**

1. All business permits held by any Seller, including but not limited to, the following:

   - See **ANNEX D – Permits**\*

2. Environmental Permits:

   Salem

   - Air Containment Discharge Permit, expires October 1, 2027
   - Industrial Stormwater Permit, expires July 31, 2022
   - Wastewater Discharge Permit, expires December 31, 2021

   Quincy

   - Air Containment Discharge Permit, no expiration, applying for renewal biannually
   - Industrial Stormwater Permit, expires December 31, 2019
   - State Waste Discharge Permit, apply for renewal annually
   - Dangerous Waste Report, no expiration but need to do annual reporting
   - Wastewater Discharge Permit, Expires April 30, 2023

   Brooks

   - Air Containment Discharge Permit, expires October 1, 2027
   - National Pollutant Discharge Elimination System Waste Discharge Permit
   - Industrial Stormwater Permit, expires June 30, 2019, reapplied for Permit
   - National Pollutant Discharge Elimination System Stormwater Discharge Permit, expires July 31, 2022

\*To be updated immediately prior to Closing to reflect permits held as of the Closing Date

**Schedule 2.02**

**Assumed Grower Obligations**

Assumed Grower Obligations

See **ANNEX E1 – NORPAC Grower Payables as of 7/31/2019\* and ANNEX E2 – Quincy Grower Payables as of 7/31/2019\***


Payment Terms*

*To be updated immediately prior to Closing to reflect projected grower payables as of the Closing Date.

## Schedule 2.03

**Excluded Assets**

1. Any insurance benefits related to insurance policies maintained by NORPAC up to and including the Closing.

2. Any prepaid expenses or deposits from NORPAC to third parties other than to the growers listed on **Schedule 2.02** up to and including Closing.

3. The Stayton Plant, Real Property, Water Management System, Land, Irrigation Assets, and all related personal property and Equipment, including IT Equipment, located at the Stayton Plant, other than Inventory.

4. 1955 Kenworth; NORPAC Wrapped Tractor Manufacturer's Serial Number 64417 (parade puller).

5. Any membership rights, cash surrender value, equity, or other rights associated with Co-Ops, Civic or governmental organizations, or trade organizations.

6. All Cash and cash equivalents at closing date.

**Schedule 2.04**

**Inventory Value**

<u>Inventory Pricing</u>

Inventory Value shall equal the product of (i) the sum of (A) 90% of the Net Realized Value of the Finished Goods *plus* (B) the Calculated Value of the Bulk Product *plus* (C) the Book Value of the Packaging Materials *multiplied by* (ii) 80%. See attached excel spreadsheet for the detailed application of the Inventory Value to the Inventory (the "**Spreadsheet**").

<u>Definitions</u>

The following terms shall have the meaning assigned herein for the purpose of this **<u>Schedule 2.04</u>**:

"**Book Value**" means the balance sheet account balance of such assets as of the Closing Date calculated in accordance with GAAP.

"**Bulk Product**" means the bulk product inventory of the Business as of the Closing Date meeting the specifications set forth below, excluding (i) hold inventory from packaging years 2017 and before; (ii) micro hold inventory from packaging year 2018 and 2019; and (iii) soup-related inventory such as soup #2 meats, soup ingredients, dry soup-cheese frozen and dry #2 base/flav.

"**Calculated Value**" means the value of Bulk Product as follows:

(i) for Bulk Product produced during packing years 2017 and before, the value as calculated per the Spreadsheet;

(ii) for Bulk Product produced during packing year 2018, Book Value with the following exceptions:

(a) for products on quality hold, deductions of 20% of Book Value and $0.11 / lb. for rework cost; and

(b) for any of the following products not on quality hold, but with less than grade A, a deduction equal to:

1. $0.10/lb. for green beans and cauliflower;

2. 25% of Book Value for B-grade sugar snaps;

3. 70% of Book Value for C and D grade sugar snaps and cob sort-outs; and

(iii) for Bulk Product produced during packing year 2019, the lesser of 2018 cost or Book Value less $0.0628/lb. for storage.

"**Customer Marks**" means the customers' trademarks under the customer agreements set forth in <u>Schedule 2.01(d)</u>.

"**Finished Goods**" means the finished goods of the Business that are fully packaged, labeled products held in inventory as of the Closing Date meeting the specifications set forth below, excluding (i) all finished goods inventory from packaging years 2017 and before and (ii) all micro hold finished goods inventory for packaging years 2018 and 2019.

"**Net Realized Value**" means the net realized value of such assets as determined in accordance with Randy Berning's memo dated April 18, 2019.

"**Packaging Materials**" means the packaging materials of the Business existing as of the Closing Date bearing either the Customer Marks or the Purchased Marks and meeting the specifications set forth below.

"**Purchased Marks**" means the trademarks of the Assigned Business set forth on <u>Schedule 2.01(e)</u>.

## INVENTORY SPECIFICATIONS

### *Bulk Product\**

**SUMMARY**
*As of June 30, 2019 [TO BE UPDATED FOR CLOSING DATE]*

<u>Gross Bulk Inventory (See Detailed Schedules):</u>

| Year | | Total USD |
|------|---|---|
| 2019 | $ | 15,094,923 |
| 2018 | | 39,185,562 |
| 2017 | | 5,112,740 |
| 2016 | | 1,994,030 |
| 2015 | | 155,060 |
| **Gross Bulk Inventory** | $ | **61,542,314** |

<u>Exclusions (See Detailed Schedules):</u>

| | | Total USD | % Excluded | | Excluded | Notes |
|---|---|---|---|---|---|---|
| 2018 | Hold Inventory | $ 369,297 | 100% | $ | 369,297 | All lbs on hard hold for micro excluded |
| 2017 | Hold Inventory | $ 1,157,640 | 100% | $ | 1,157,640 | All lbs on hold excluded |
| 2016 | Hold Inventory | $ 205,541 | 100% | $ | 205,541 | All lbs on hold excluded |
| 2015 | Hold Inventory | $ 52,936 | 100% | $ | 52,936 | All lbs on hold excluded |
| Soup | | $ 645,056 | 100% | $ | 645,056 | See "Soup Schedule" |
| **Total Excluded Inventory** | | | | $ | **2,430,469** | |

| **Net Bulk Inventory Available for Purchase** | $ | **59,111,845** |
|---|---|---|

<u>Discounts (See Detailed Schedules):</u>

| | Total USD | % Discount | | Discounted | Notes |
|---|---|---|---|---|---|
| Devalued Inventory | $ 6,182,535 | 81% | $ | 4,992,948 | See "2015-17 Devalued" |
| Sub Grade A Discounts | $ 1,909,434 | Variable % | $ | 508,815 | See "2018 - Sub Grade A Schedule" |
| Other Quality Discounts | $ 3,212,991 | $0.11 + 20% | $ | 1,357,371 | See "2018 - Other Quality Discounts" |
| 2019 Bulk | $ 15,094,923 | $0.0628 / lb | $ | 1,833,897 | Discount for $0.0628/lb storage cost |
| **Total Discounts** | | | $ | **8,693,031** | |

| **Discounted Purchase Price** | $ | **50,418,814** |
|---|---|---|

## *Packaging Materials Specifications**

**SUMMARY**

*As of June 30, 2019 [TO BE UPDATED FOR CLOSING DATE]*

**Packaging Inventory:**

| Type | Value |
|------|-------|
| Packaging (at Norpac) | $4,790,271 |
| Packaging (at Suppliers) | $247,239 |
| Totes (See Below) | $402,560 |
| Cornerposts (See Below) | $190,274 |
| Pallets (See Below) | $26,769 |
| **Gross Packaging Inventory** | **$5,657,113** |

**Exclusions:**

| | |
|------|-------|
| Stayton Packaging | $829,329 |
| Brooks Packaging | $175,688 |
| Kettle / Soup Packaging (at Norpac) | $85,696 |
| Kettle / Soup Packaging (at Suppliers) | $27,966 |
| Obsolete (at Norpac) | $309,719 |
| Obsolete (at Suppliers) | $121,102 |
| **Total Excluded Inventory** | **$1,549,499** |

| | |
|------|-------|
| **Net Packaging Inventory** | **$4,107,613** |

**Other Packaging Materials:**

| Location | Totes | Posts | Pallets |
|----------|-------|-------|---------|
| Repack | 788 | 4,440 | 4,810 |
| Quincy | 19,340 | 64,500 | 57 |
| Total Units | 20,128 | 68,940 | 4,867 |
| Price | $20.00 | $2.76 | $5.50 |
| **Total Other Packaging Inventory** | **$402,560** | **$190,274** | **$26,769** |

## *Finished Goods Specifications**

*To be updated prior to Closing

**Schedule 3.02(a)(xiii)**

**COA Testing Requirements**

[See Attached]

For a complete copy of the Asset Purchase Agreement, including all remaining Schedules and Exhibits, please contact Michael Fletcher, counsel for Debtors, at michael.fletcher@tonkon.com.

# EXHIBIT B

## Bid Procedures Order

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc., Hermiston Foods, LLC, and Quincy Foods, LLC,<br><br>    Debtors. | Case No. 19-62584-pcm11<br>**LEAD CASE**<br><br>(Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11)<br><br>**ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE OF DEBTORS' REAL PROPERTY, AND (C) ESTABLISHING DEADLINES** |

This matter came before this Court on Debtors' Amended Motion for Order Approving

(A) Bid and Sale Procedures, Including Expense Reimbursement Fee to Oregon Potato Company

("OPC"); (B) Sale of Assets Free and Clear of Liens, Claims, and Encumbrances; and

(C) Assumption and Assignment of Executory Contracts (the "Motion") filed by Debtors [ECF

No. _____]. Capitalized terms used herein and not otherwise defined shall have the meanings

assigned to such terms in the Motion. The Court having held an initial hearing on the Motion on

_____, 2019, and having considered the submissions and arguments of counsel and the

**Page 1 of 5** -  ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE OF DEBTOR'S ASSETS, AND (C) ESTABLISHING OBJECTION DEADLINES

files and records herein, and being now fully advised of the premises; now, therefore,

THE COURT FINDS as follows:

A.      This Court has core jurisdiction over the Chapter 11 cases of Debtors (the "Bankruptcy Case"), this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The notice provided regarding the Motion constitutes sufficient and adequate notice.  No other or further notice in connection with the entry of this Order is or shall be required.

C.      The Bid Procedures (attached as **Exhibit 1**) were proposed by Debtors in good faith, with the goal of maximizing the value of the Purchased Assets for the benefit of all creditors of the estates and other parties-in-interest.  Debtors have articulated good and sufficient reasons for authorizing and approving the Bid Procedures, which are reasonable and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Property.

D.      Debtors' proposed sale notice (attached as <u>Exhibit C</u> to the Motion) is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of this Order, the sale, the auction, and the assumption procedures.

E.      Approval of the $2,000,000 Expense Reimbursement Fee is necessary and appropriate to compensate OPC for (1) making the initial offer that serves as the floor for further bidding, and (2) negotiating and entering into the Asset Purchase Agreement ("APA").

F.      The Bid Procedures (including the Expense Reimbursement Fee) are fair and reasonable.  The Bid Procedures represent an exercise of Debtors' sound business judgment, will facilitate an orderly sale process, and are in the best interests of Debtors' estates.

G.  Entry of this Order is in the best interests of Debtors, their estates, and creditors and other parties-in-interest.

Now, therefore,

IT IS HEREBY ORDERED as follows:

1.  The Motion is granted.

2.  The Bid Procedures attached as **Exhibit 1** are hereby approved and shall be used in connection with the proposed sale of the Property.

3.  All responses or objections to the relief requested in the Motion that have not been withdrawn, waived, or settled are overruled.

4.  Any objections to the proposed sale or the assumption and assignment of the Designated Contracts or cure costs related thereto shall be in writing and filed with this Court no later than October 18, 2019 at 5:00 p.m. prevailing Pacific time.  Any party filing such an objection must attend the Sale Hearing and advocate its objection at such hearing.  Any objection not filed, served, and/or advocated in accordance with this paragraph may be deemed waived and may be forever barred.

5.  October 18, 2019 at 5:00 p.m. prevailing Pacific time is the deadline by which all binding bids must be actually received by Debtors' counsel pursuant to the Bid Procedures.

6.  The Auction, if one is needed, will be held on October 24, 2019 at 10:00 a.m. prevailing Pacific time, at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon 97204.

7.  The Sale Hearing will be conducted on October 28, 2019 at 9:30 a.m. before the Honorable Peter C. McKittrick United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, Courtroom No. 1, 1050 SW Fifth Avenue, Portland, Oregon 97204.

**Page 3 of 5** -  ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE OF DEBTOR'S ASSETS, AND (C) ESTABLISHING OBJECTION DEADLINES

8.      OPC is approved as the stalking horse bidder and the $2,000,000 Expense Reimbursement Fee, if payable, is approved.  The Expense Reimbursement Fee shall be treated as an administrative expense claim in the Bankruptcy Case payable solely from, and secured by a second priority lien on, the sale proceeds and any sale deposit under Section 364(d) of the Bankruptcy Code.  As applicable, the Expense Reimbursement Fee, if payable, shall be paid to OPC at the closing of the sale immediately after payment of the sale proceeds to CoBank, ACB, and prior to payment of the sale proceeds to any other third party asserting a lien on the Purchased Assets, and shall be free and clear of any such lien.

9.      The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.

10.      The failure of any third party to file and serve an objection as ordered and directed herein shall be deemed the consent of such a party to the sale and transfer of the Purchased Assets to OPC, or the Successful Purchaser if OPC is not the buyer, including the assumption and assignment of the Designated Contracts and the fixing of any applicable Cure Costs.

11.      Pursuant to the Guidelines Regarding Motions for Sale of All or Substantially All Assets and Sale Procedures Motions adopted by the Bankruptcy Court on March 8, 2010 (LBF 363), Debtors are hereby excused from the requirement of using Local Bankruptcy Form 760.5 [Notice of Intent to Sell Real or Personal Property, Compensate Real Estate Broker, and/or Pay any Secured Creditor's Fees and Costs; Motion for Authority to Sell Property Free and Clear of Liens; and Notice of Hearing].

12.      As provided by Bankruptcy Rule 6004(h), this Order shall not be stayed for 14 days after the entry thereof and shall be effective and enforceable immediately on its entry on the docket.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

13.     Unless otherwise specified, all time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

# # #

I certify that I have complied with the requirements of LBR 9021-1(a).

Presented by:

TONKON TORP LLP

By _____
      Albert N. Kennedy, OSB No. 821429
      Michael W. Fletcher, OSB No. 010448
      888 S.W. Fifth Avenue, Suite 1600
      Portland, OR 97204-2099
      Telephone:   503-221-1440
      Facsimile:    503-274-8779
      E-mail:       al.kennedy@tonkon.com
                       michael.fletcher@tonkon.com
      Attorneys for Debtors

cc:     List of Interested Parties

009684/00004/10288833v5

**Page 5 of 5** -   ORDER (A) APPROVING BID PROCEDURES, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER SALE OF DEBTOR'S ASSETS, AND (C) ESTABLISHING OBJECTION DEADLINES

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 19-62584-pcm11    Doc 83    Filed 09/03/19

# EXHIBIT 1

## BID PROCEDURES

Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
   Direct Dial:  503.802.2013
   Facsimile:    503.972.3713
   E-Mail:       albert.kennedy@tonkon.com
Timothy J. Conway, OSB No. 851752
   Direct Dial:  (503) 802-2027
   Facsimile:    (503) 972-3727
   E-Mail:       tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
   Direct Dial:  (503) 802-2169
   Facsimile:    (503) 972-3867
   E-Mail:       michael.fletcher@tonkon.com
Ava L. Schoen, OSB No. 044072
   Direct Dial:  (503) 802-2143
   Facsimile:    (503) 972-3843
   E-Mail:       ava.schoen@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

       Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc., Hermiston Foods, LLC, and Quincy Foods, LLC,<br><br>Debtors. | Case No. 19-62584-pcm11<br>**LEAD CASE**<br><br>(Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11)<br><br>**BID PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF ASSETS** |

       These Bid Procedures have been approved by order of the United States Bankruptcy Court for the District of Oregon (the "Court") in connection with the above-captioned bankruptcy cases of Debtors and Debtors-in-Possession NORPAC Foods, Inc., Hermiston Foods, LLC and Quincy Foods, LLC (together, "Debtors"), which order was entered on _____, 2019 [ECF No. ___] (the "Bid Procedures Order").

**Page 1 of 7** - BID PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF ASSETS

These Bid Procedures set forth the process by which Debtors are authorized to conduct the sale (the "Sale") by auction ("Auction") of certain of Debtors' assets. These Bid Procedures also set forth the terms by which prospective bidders may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for such assets.

## A.    STALKING HORSE BIDDER

On August 12, 2019, Debtors entered into an Asset Purchase Agreement (the "APA") with Oregon Potato Company ("OPC"), which was amended by that certain First Amendment to Asset Purchase Agreement (collectively, the "APA"). All capitalized terms used herein that are not otherwise defined shall have the definitions given to them in the APA.

Pursuant to the APA, Debtors agreed to sell to OPC substantially all of their assets, with the exception of their investment in CoBank, certain life insurance policies, and other nominal assets (the "Purchased Assets," as more particularly defined in the APA). The purchase price for the Purchased Assets is $155,500,000, plus an agreed value for accounts receivable, with an adjustment for any change in the value of Debtors' inventory, less the amount due to growers at the closing of the 2019 crop, which OPC will pay to the growers.[1] Pursuant to the APA Debtors agreed to pay to OPC an Expense Reimbursement Fee of $2,000,000 in the event the Court approves, and Debtors consummate, the sale of the Purchased Assets to a purchaser other than OPC. A copy of the APA has been filed with the Court, and a complete copy may be obtained by contacting Spencer Fisher at spencer.fisher@tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods.

## B.    PARTICIPATION REQUIREMENTS

To participate in the bidding process and to obtain access to due diligence materials, a person (other than OPC) interested in purchasing the Purchased Assets (a "Potential Bidder") must deliver (unless previously delivered) to counsel for Debtors the following (the "Preliminary Bid Documents"):

(1)    an executed confidentiality agreement in form and substance acceptable to Debtors and their counsel; and

(2)    preliminary written proof by the Potential Bidder of its financial capacity to close the proposed transaction, the adequacy of which must be deemed satisfactory to Debtors in their business judgment.

As soon as practicable, and in any event within two business days after a Potential Bidder delivers the Preliminary Bid Documents, Debtors shall determine and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents. Debtors shall work with Potential Bidders during the two business-day period (as it may be extended by Debtors) to attempt to correct or cure any deficiencies in any

---

[1] Any summary or description of the terms set forth in the APA are for the convenience of the Court and interested parties. To the extent there is any conflict, the APA governs in all respects.

**Page 2 of 7** -    BID PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF ASSETS

Preliminary Bid Documents.  Only those Potential Bidders whose Preliminary Bid Documents have been deemed acceptable at the end of such two business-day period (as it may be extended by Debtors) (each, an "Acceptable Bidder") may conduct a due diligence review with respect to the Purchased Assets or submit bids to acquire the Purchased Assets.  OPC is deemed an Acceptable Bidder.

## C.    OBTAINING DUE DILIGENCE ACCESS

After receipt of an executed confidentiality agreement and notification of Acceptable Bidder status, Debtors will provide each Acceptable Bidder reasonable due diligence information, as requested, including access to an electronic data room, as soon as reasonably practicable after such request.  Debtors shall be entitled to use their business judgment in determining the extent to which a Potential Bidder is entitled to receive confidential competitive information.

## D.    BID REQUIREMENTS

Any Acceptable Bidder that is interested in being a participant in the Auction and acquiring the Property (each a "Bidder") must submit a "Bid" as provided herein prior to 5:00 p.m. prevailing Pacific time on October 18, 2019 (the "Bid Deadline").  Any such Bid must:

(1)    Identify the bidder, i.e., including any party for whom it may be bidding with or on behalf of, whether the bidder is a party to any agreement limiting the bidders at the Auction, and any relation of such parties to Debtors.

(2)    Contain (x) a signed definitive asset purchase agreement in substantially the form of the APA (a "Competing APA") and (y) a comparison of such Competing APA to the APA, showing all of the differences between the two. A Competing APA must:

(a)    Be in form and substance satisfactory to Debtors;

(b)    Provide for a purchase price with respect to such assets in an amount that is at least equal to the Purchase Price, plus the Expense Reimbursement Fee, plus $2,000,000 (the "Initial Overbid Amount."), and such purchase price must have a cash component that is not less that that provided for in the APA;

(c)    Provide that the Bidder will forfeit the Sale Deposit (defined below), as liquidated damages if such purchaser defaults under the Competing APA;

(d)    Not provide for the payment to the Bidder of any breakup fee, topping fee, expense reimbursement, or other similar fee or arrangement; and

(e)    Not be subject to any (i) financing contingency, (ii) contingency relating to the completion of unperformed due diligence, (iii) contingency relating to the approval of the Bidder's board of

**Page 3 of 7** -  BID PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF ASSETS

directors or other internal approvals or consents, or (iv) any conditions precedent to the Bidder's obligation to purchase the Assets, other than any applicable conditions included in the APA; and

(f) Not be conditioned upon obtaining any regulatory approvals. Potential bidders are advised that the sale transaction may be subject to approval by the Federal Trade Commission and the Antitrust Division of the U.S. Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder ("HSR Act").

(3) Include a deposit of $2,000,000 (the "Sale Deposit") in the form of either a wire transfer to an account specified by Debtors or by certified check. The Sale Deposit shall be held in escrow by Debtors or their counsel in a segregated account or trust account pending closing of the sale. The full amount of the Sale Deposit shall be forfeited as liquidated damages if such Bidder is the Successful Purchaser (defined below) and fails to close the transaction because of a breach or failure to perform on the part of the Successful Purchaser.

(4) To the extent not previously provided to Debtors, be accompanied by evidence satisfactory to Debtors, in their business judgment, that the Bidder: is willing, authorized, capable, and qualified financially, legally, and otherwise, of performing all obligations under its proposed Competing APA in the event it submits the Successful Bid (as hereinafter defined) at the Auction.

(5) Be submitted to counsel for Debtors so as to be received not later than the Bid Deadline. Any Bid that meets all of the foregoing requirements, as determined by Debtors, shall be considered a "Qualified Bid." Counsel for Debtors shall, as soon as practicable, send a copy of each Qualified Bid received, if any, to the following parties: (i) counsel to OPC, and (ii) counsel to each Bidder submitting a Qualified Bid (or, if a Bidder does not have counsel, to the Bidder).

## E.    EVALUATION OF QUALIFIED BIDS

Prior to the Auction, Debtors shall evaluate the Qualified Bids and identify the Qualified Bid that is, in Debtors' business judgment, the highest or otherwise best bid (the "Starting Bid"). No later than 5:00 p.m. prevailing Pacific time on October 23, 2019, Debtors shall notify OPC and all parties who have submitted Qualified Bids as to whether there will be an Auction and, if so, which Qualified Bid is the Starting Bid.

## F.    NO QUALIFIED BIDS

If no Qualified Bids are received by the Bid Deadline, then the Auction will not occur and OPC will be deemed the Successful Purchaser. Subject to the termination rights under the APA, Debtors will immediately pursue entry of a Sale Order by the Court approving the APA and authorizing the sale of the Property to OPC.

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

## G.    AUCTION

In the event Debtors determine that one or more Bids are Qualified Bids, then Debtors will conduct the Auction on October 24, 2019 at 10:00 a.m. prevailing Pacific time (the "Auction") with respect to the sale of the Assets at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon 97204, or at such other location as may be designated by Debtors.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

(1)    The Qualified Bidders, including OPC, shall appear in person or through duly-authorized representatives at the Auction.

(2)    Only Qualified Bidders, including OPC and CoBank ACB, shall be entitled to participate in and bid at the Auction.  Debtors may, in their sole discretion, permit others to attend the Auction.

(3)    Bidding at the Auction shall begin at the Starting Bid.

(4)    Subsequent bids at the Auction, including any bids by OPC, shall be made in minimum increments of $500,000.

(5)    For purposes of determining OPC's bid amounts, OPC shall receive a credit equal to the Expense Reimbursement Fee in each round of bidding.

(6)    All bidding will be open and transparent to all persons permitted to attend the Auction.

(7)    Each Qualified Bidder will be required to confirm on the record at the Auction that it has not colluded with any other person with respect to the bidding or the Sale.

(8)    Absent irregularities in the implementation of these Bid Procedures or in the conduct of the Auction, neither Debtors nor the Court will consider bids made after the Auction is closed.

(9)    The Auction shall be governed by such other procedures as may be announced by Debtors or their counsel from time to time at the Auction.

## H.    ACCEPTANCE OF THE SUCCESSFUL BID

Upon the conclusion of the Auction (if such Auction is conducted), Debtors, in the exercise of their reasonable, good-faith business judgment, and after consultation with CoBank, ACB, shall identify the highest or otherwise best bid (the "Successful Bid").  The Qualified Bidder having submitted the Successful Bid will be deemed the "Successful Purchaser."  The Successful Purchaser and Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which the Successful Bid was made.

Debtors will present the results of the Auction to the Court at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (i) the Auction was conducted, and the Successful Purchaser was selected, in accordance with these Bid Procedures; (ii) the Auction was fair in substance and procedure; (iii) the Successful Bid was a Qualified Bid; and (iv) consummation of the Sale contemplated by the Successful Bid is in the best interests of Debtors and their estates.

If an Auction is held, Debtors shall be deemed to have accepted a Qualified Bid only when (i) such bid is declared the Successful Bid at the Auction or by the Court, and (ii) definitive documentation acceptable to Debtors has been executed in respect thereof. Such acceptance is conditioned on approval by the Court of the Successful Bid and the entry of an Order approving such Successful Bid.

## I.    DESIGNATION OF CONTRACTS

On or before the date that is four (4) business days before the Sale Hearing (the "Designation Deadline"), the Successful Purchaser shall provide to Sellers a schedule of those executory contracts and leases set forth on the Cure Schedule that it desires to have assumed and assigned to the Successful Purchaser at Closing (the "Designated Contracts").

## J.    BANKRUPTCY COURT APPROVAL OF SALE

A hearing to consider approval of the sale to the Successful Purchaser (or to approve the APA if no Auction is held) (the "Sale Hearing") and seek entry of a Sale Order is presently scheduled to take place on October 28, 2019 at 9:30 a.m. prevailing Pacific Time. The Sale Hearing will be held before the Honorable Peter C. McKittrick, United States Bankruptcy Judge for the United States Bankruptcy Court for the District of Oregon, Courtroom No. 1, 1050 SW Fifth Avenue, Portland, Oregon 97204. Debtors and the Successful Purchaser, once the Successful Purchaser has been determined, shall each use their commercially reasonable efforts, and shall cooperate, assist, and consult with each other to secure the entry of a Sale Order in a form reasonably acceptable to Debtors and the Successful Purchaser.

The Sale Hearing may be continued to a later date by Debtors by sending notice to all prospective bidders prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

## K.    DESIGNATION OF BACKUP BIDDER

Upon conclusion of the Auction and selection of the Successful Purchaser, Debtors shall select the person submitting the highest or otherwise best bid (the "Backup Bidder"). The bid of the Backup Bidder shall remain open until the second business day following the closing of a sale to the Successful Purchaser. If for any reason the Successful Purchaser is unable or unwilling to consummate an approved sale because of a breach or failure to perform on the part of the Successful Purchaser, (a) it will forfeit its Sale Deposit to Debtors as liquidated damages in lieu of any other damages with respect to such breach, and (b) the Backup Bidder shall be deemed to be the Successful Purchaser. The purchase price shall be the amount of such Backup Bidder's last bid, and Debtors shall be authorized to effectuate the sale to the Backup Bidder without further order of the Bankruptcy Court.

**Page 6 of 7** -   BID PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF ASSETS

**L.      EXPENSE REIMBURSEMENT FEE**

At the closing of the sale to the Successful Purchaser, if the Successful Purchaser is not OPC, Debtors shall from the sale proceeds pay the Expense Reimbursement Fee to OPC by wire transfer in immediately available funds to an account designated by OPC.

**M.      RETURN OF SALE DEPOSIT**

The Sale Deposit of the Successful Purchaser shall, upon consummation of the sale, be credited to the purchase price paid by the Successful Purchaser.  If the Successful Purchaser fails to consummate the sale, then the full amount of the Sale Deposit shall be forfeited to, and be retained irrevocably by, Debtors.

The Sale Deposit of any unsuccessful Qualified Bidder will be returned to such unsuccessful Qualified Bidder within five business days after (i) the conclusion of the Auction (if the Bidder does not submit the Successful Bid and is not designated the Backup Bidder), or (ii) consummation of the sale (if the Bidder is designated the Backup Bidder).

**N.      RESERVATION OF RIGHTS TO MODIFY BID PROCEDURES**

Debtors reserve the right to modify these Bid Procedures in any manner that will best promote the goals of the bidding process and may impose, at or prior to the Auction, additional customary terms and conditions on the sale, including, without limitation, extending the deadlines set forth in these Bid Procedures, adjourning the Auction at the Auction, and/or adjourning the Sale Hearing in open court without further notice.

DATED this _____ day of September, 2019.

TONKON TORP LLP


By_____
        Albert N. Kennedy, OSB NO. 821429
        Timothy J. Conway, OSB No. 851752
        Michael W. Fletcher, OSB No. 010448
        Ava L. Schoen, OSB No. 044072
        Attorneys for Debtors

009684/00004/10288853v11

**Page 7 of 7 -**   BID PROCEDURES FOR THE SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS IN CONNECTION WITH THE SALE OF ASSETS

# EXHIBIT 2

## SALE NOTICE

Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
    Direct Dial:  503.802.2013
    Facsimile:    503.972.3713
    E-Mail:       albert.kennedy@tonkon.com
Timothy J. Conway, OSB No. 851752
    Direct Dial:  (503) 802-2027
    Facsimile:    (503) 972-3727
    E-Mail:       tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
    Direct Dial:  (503) 802-2169
    Facsimile:    (503) 972-3867
    E-Mail:       michael.fletcher@tonkon.com
Ava L. Schoen, OSB No. 044072
    Direct Dial:  (503) 802-2143
    Facsimile:    (503) 972-3843
    E-Mail:       ava.schoen@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

    Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc., Hermiston Foods, LLC, and Quincy Foods, LLC,<br><br>                 Debtors. | Case No. 19-62584-pcm11<br>**LEAD CASE**<br><br>(Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11)<br><br>**NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES** |

      **PLEASE TAKE NOTICE** that Debtors and Debtors-in-Possession NORPAC Foods, Inc. ("NORPAC"), Hermiston Foods, LLC ("Hermiston Foods"), and Quincy Foods, LLC ("Quincy Foods") (together, "Debtors") moved for approval of the sale of substantially all of Debtors' assets to Oregon Potato Company ("OPC"), free and clear of all liens, claims, and encumbrances, if there are no higher and better offers from qualified bidders at an auction scheduled for October 24, 2019 commencing at 10:00 a.m. prevailing Pacific time.

      The sale to OPC would be pursuant to the Asset Purchase Agreement ("APA") entered into with OPC, a copy of which was filed with the Court and may also be obtained by contacting

**Page 1 of 4 -**  NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

Spencer Fisher at spencer.fisher@ tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods. Capitalized terms used but not otherwise defined in this notice shall have the meanings assigned to such terms in the APA.

 **PLEASE TAKE FURTHER NOTICE** that, pursuant to 11 U.S.C. §§ 105 and 363, Debtors propose to sell the Purchased Assets to OPC or the Successful Bidder at auction (the "Purchaser"), and obtain an order providing and authorizing, *inter alia*, the following: (1) that the sale of the Purchased Assets to Purchaser is free and clear of all liens, claims, interests, obligations, and encumbrances; (2) that Purchaser has not assumed any of Debtors' liabilities or obligations (except as specifically assumed under the APA); (3) that Purchaser is not a successor to Debtors; (4) that all persons that have been served with this Notice are bound by the order and are enjoined from pursuing Purchaser to recover on any claims they may have against Debtors; and (5) that the APA and related agreements were entered into in good faith, without collusion, and from arms' length bargaining positions.

 **PLEASE TAKE FURTHER NOTICE** that the Court entered an order authorizing Debtors to hold an auction to sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, as provided in the APA, if an overbid is received. The auction, if one occurs, is scheduled for **October 24, 2019 at 10:00 a.m. prevailing Pacific time** at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon 97204.

 **PLEASE TAKE FURTHER NOTICE** that the Court entered an order approving bid procedures in connection with the sale and the auction. A copy of the Bid Procedures was filed with the court and can be obtained by contacting Spencer Fisher at spencer.fisher@ tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods.

 **PLEASE TAKE FURTHER NOTICE** that competing bidders are required to submit competing bids in the minimum amount of $2,000,000 in excess of the Purchase Price set forth in the APA, and otherwise qualify as bidders in accordance with the approved bidding procedures prior to **5:00 p.m. prevailing Pacific time on October 18, 2019**. The Purchase Price, as more particularly set forth in the APA, is an amount equal to (i) One Hundred Fifty-Five Million Five Hundred Thousand Dollars ($155,500,000), subject to withholding of the Indemnification Escrow Amount; plus (ii) the amount by which the Inventory Value is greater or less than the Target Inventory Value; plus (iii) the Accounts Receivable Collection Value, as those terms are defined in the APA.

 **PLEASE TAKE FURTHER NOTICE** that a hearing on the proposed sale to OPC, or any higher and better bidder at the auction (the "Sale Hearing"), is scheduled to be held on **October 28, at 9:30 a.m.** prevailing Pacific Time, or at such later time as may be announced at the auction by Debtors at the United States Bankruptcy Court for the District of Oregon, Courtroom 1, 1001 SW Fifth Avenue, Portland, Oregon 97204.

 **PLEASE TAKE FURTHER NOTICE** that in connection with the sale, Debtors intend to assume and assign certain of Debtors' executory contracts and leases to the purchaser. On or before the date that is ten (10) Business Days following the date on which the Bid Procedures Order is entered, Debtors will file a notice of potential assumption (the "Assumption Notice") with the Bankruptcy Court and serve such notice on each counterparty to an executory contract or lease listed thereon. The Assumption Notice will include a schedule (the "Cure Schedule") identifying all executory contracts and leases that Debtors believe may be assumed and assigned in connection with the Transaction and setting forth a good faith estimate of the amount, if any, required to cure any

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

monetary default under each such executory contract or lease (the "Cure Cost"). If no cure cost is estimated to be applicable, the amount of such Cure Cost designated shall be $0.00.

      **PLEASE TAKE FURTHER NOTICE** that any objection to the Assumption Notice or Cure schedule must be filed with the Bankruptcy Court on or before **October 18, 2019 at 5:00 p.m.** prevailing Pacific time stating the specific facts upon which the objection is based.

      **PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Cost scheduled by Debtors, the Cure Cost scheduled by Debtors on the Assumption Notice shall be binding upon the nondebtor party for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Cost required to be paid in connection with the potential assumption and assignment of such executory contract or unexpired lease. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by OPC or other qualified purchaser, and the nondebtor party to such executory contract or unexpired lease shall be barred from objecting to the assumption and assignment of such executory contract or unexpired lease, and shall be deemed to consent to the assumption and assignment of such executory contract or unexpired lease.

      On or before the date that is four (4) business days before the Sale Hearing (the "Designation Deadline""), Buyer shall provide to Sellers an updated schedule listing the Designated Contracts, i.e., those executory contracts and Leases set forth on the Cure Schedule that it desires to have assumed and assigned to Buyer at Closing (the "Designated Contracts"). Sellers shall promptly inform the Court and interested parties of the Designated Contracts. Notwithstanding the foregoing, Buyer reserves the right to remove a contract or lease from the list of Designated Contracts at any time pending Closing of the Transaction, even after entry of the Sale Order. Only those Designated Contracts that Buyer finally elects to assume as of Closing will be assumed by Sellers and assigned to Buyer pursuant to the Sale Order at Closing.

      **PLEASE TAKE FURTHER NOTICE** that a hearing on the Cure Amounts and Debtors' proposed assumption and assignment of the Designated Contracts is scheduled to be held on **October 28, at 9:30 a.m.** prevailing Pacific Time at the United States Bankruptcy Court for the District of Oregon, Courtroom 1, 1001 SW Fifth Avenue, Portland, Oregon 97204.

      **PLEASE TAKE FURTHER NOTICE** that if you wish to object to the sale of the Purchased Assets, and/or the potential assumption and assignment of an executory contract or unexpired lease in connection with the sale, or the Cure Costs related thereto, you must, on or before **October 18, 2019 at 5:00 p.m.** prevailing Pacific time, file a written objection with the United States Bankruptcy Court for the District of Oregon.

**Page 3 of 4 -** NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 19-62584-pcm11    Doc 83    Filed 09/03/19

Copies of any of the pleadings or documents referenced herein may be obtained by contacting Spencer Fisher at spencer.fisher@ tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods.

DATED this _____ day of September, 2019.

TONKON TORP LLP


By_____
      Albert N. Kennedy, OSB NO. 821429
      Timothy J. Conway, OSB No. 851752
      Michael W. Fletcher, OSB No. 010448
      Ava L. Schoen, OSB No. 044072
      Attorneys for Debtors

009684/00004/10288864v7

**Page 4 of 4 -** NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

# EXHIBIT C

## Sale Notice

Albert N. Kennedy, OSB No. 821429 (Lead Attorney)
    Direct Dial: 503.802.2013
    Facsimile:    503.972.3713
    E-Mail:       albert.kennedy@tonkon.com
Timothy J. Conway, OSB No. 851752
    Direct Dial: (503) 802-2027
    Facsimile:   (503) 972-3727
    E-Mail:      tim.conway@tonkon.com
Michael W. Fletcher, OSB No. 010448
    Direct Dial: (503) 802-2169
    Facsimile:   (503) 972-3867
    E-Mail:      michael.fletcher@tonkon.com
Ava L. Schoen, OSB No. 044072
    Direct Dial: (503) 802-2143
    Facsimile:   (503) 972-3843
    E-Mail:      ava.schoen@tonkon.com
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204-2099

    Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc., Hermiston Foods, LLC, and Quincy Foods, LLC,<br><br>             Debtors. | Case No. 19-62584-pcm11<br>**LEAD CASE**<br><br>(Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11)<br><br>**NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES** |

      **PLEASE TAKE NOTICE** that Debtors and Debtors-in-Possession NORPAC Foods, Inc. ("NORPAC"), Hermiston Foods, LLC ("Hermiston Foods"), and Quincy Foods, LLC ("Quincy Foods") (together, "Debtors") moved for approval of the sale of substantially all of Debtors' assets to Oregon Potato Company ("OPC"), free and clear of all liens, claims, and encumbrances, if there are no higher and better offers from qualified bidders at an auction scheduled for October 24, 2019 commencing at 10:00 a.m. prevailing Pacific time.

      The sale to OPC would be pursuant to the Asset Purchase Agreement ("APA") entered into with OPC, a copy of which was filed with the Court and may also be obtained by contacting

**Page 1 of 4 -**   NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

Spencer Fisher at spencer.fisher@ tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods. Capitalized terms used but not otherwise defined in this notice shall have the meanings assigned to such terms in the APA.

PLEASE TAKE FURTHER NOTICE that, pursuant to 11 U.S.C. §§ 105 and 363, Debtors propose to sell the Purchased Assets to OPC or the Successful Bidder at auction (the "Purchaser"), and obtain an order providing and authorizing, *inter alia*, the following: (1) that the sale of the Purchased Assets to Purchaser is free and clear of all liens, claims, interests, obligations, and encumbrances; (2) that Purchaser has not assumed any of Debtors' liabilities or obligations (except as specifically assumed under the APA); (3) that Purchaser is not a successor to Debtors; (4) that all persons that have been served with this Notice are bound by the order and are enjoined from pursuing Purchaser to recover on any claims they may have against Debtors; and (5) that the APA and related agreements were entered into in good faith, without collusion, and from arms' length bargaining positions.

PLEASE TAKE FURTHER NOTICE that the Court entered an order authorizing Debtors to hold an auction to sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, as provided in the APA, if an overbid is received. The auction, if one occurs, is scheduled for **October 24, 2019 at 10:00 a.m. prevailing Pacific time** at the offices of Tonkon Torp LLP, 888 SW Fifth Avenue, Suite 1600, Portland, Oregon 97204.

PLEASE TAKE FURTHER NOTICE that the Court entered an order approving bid procedures in connection with the sale and the auction. A copy of the Bid Procedures was filed with the court and can be obtained by contacting Spencer Fisher at spencer.fisher@ tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods.

PLEASE TAKE FURTHER NOTICE that competing bidders are required to submit competing bids in the minimum amount of $2,000,000 in excess of the Purchase Price set forth in the APA, and otherwise qualify as bidders in accordance with the approved bidding procedures prior to **5:00 p.m. prevailing Pacific time on October 18, 2019**. The Purchase Price, as more particularly set forth in the APA, is an amount equal to (i) One Hundred Fifty-Five Million Five Hundred Thousand Dollars ($155,500,000), subject to withholding of the Indemnification Escrow Amount; plus (ii) the amount by which the Inventory Value is greater or less than the Target Inventory Value; plus (iii) the Accounts Receivable Collection Value, as those terms are defined in the APA.

PLEASE TAKE FURTHER NOTICE that a hearing on the proposed sale to OPC, or any higher and better bidder at the auction (the "Sale Hearing"), is scheduled to be held on **October 28, at 9:30 a.m.** prevailing Pacific Time, or at such later time as may be announced at the auction by Debtors at the United States Bankruptcy Court for the District of Oregon, Courtroom 1, 1001 SW Fifth Avenue, Portland, Oregon 97204.

PLEASE TAKE FURTHER NOTICE that in connection with the sale, Debtors intend to assume and assign certain of Debtors' executory contracts and leases to the purchaser. On or before the date that is ten (10) Business Days following the date on which the Bid Procedures Order is entered, Debtors will file a notice of potential assumption (the "Assumption Notice") with the Bankruptcy Court and serve such notice on each counterparty to an executory contract or lease listed thereon. The Assumption Notice will include a schedule (the "Cure Schedule") identifying all executory contracts and leases that Debtors believe may be assumed and assigned in connection with the Transaction and setting forth a good faith estimate of the amount, if any, required to cure any

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

monetary default under each such executory contract or lease (the "Cure Cost"). If no cure cost is estimated to be applicable, the amount of such Cure Cost designated shall be $0.00.

      **PLEASE TAKE FURTHER NOTICE** that any objection to the Assumption Notice or Cure schedule must be filed with the Bankruptcy Court on or before **October 18, 2019 at 5:00 p.m.** prevailing Pacific time stating the specific facts upon which the objection is based.

      **PLEASE TAKE FURTHER NOTICE** that unless a timely objection is filed as to a Cure Cost scheduled by Debtors, the Cure Cost scheduled by Debtors on the Assumption Notice shall be binding upon the nondebtor party for all purposes in this Chapter 11 case and will constitute a final determination of the total Cure Cost required to be paid in connection with the potential assumption and assignment of such executory contract or unexpired lease. Further, unless a timely objection is filed, no further evidence shall be required to satisfy the requirements for assumption and assignment, including, without limitation, any further evidence of adequate assurance of performance by OPC or other qualified purchaser, and the nondebtor party to such executory contract or unexpired lease shall be barred from objecting to the assumption and assignment of such executory contract or unexpired lease, and shall be deemed to consent to the assumption and assignment of such executory contract or unexpired lease.

      On or before the date that is four (4) business days before the Sale Hearing (the "Designation Deadline""), Buyer shall provide to Sellers an updated schedule listing the Designated Contracts, i.e., those executory contracts and Leases set forth on the Cure Schedule that it desires to have assumed and assigned to Buyer at Closing (the "Designated Contracts"). Sellers shall promptly inform the Court and interested parties of the Designated Contracts. Notwithstanding the foregoing, Buyer reserves the right to remove a contract or lease from the list of Designated Contracts at any time pending Closing of the Transaction, even after entry of the Sale Order. Only those Designated Contracts that Buyer finally elects to assume as of Closing will be assumed by Sellers and assigned to Buyer pursuant to the Sale Order at Closing.

      **PLEASE TAKE FURTHER NOTICE** that a hearing on the Cure Amounts and Debtors' proposed assumption and assignment of the Designated Contracts is scheduled to be held on **October 28, at 9:30 a.m.** prevailing Pacific Time at the United States Bankruptcy Court for the District of Oregon, Courtroom 1, 1001 SW Fifth Avenue, Portland, Oregon 97204.

      **PLEASE TAKE FURTHER NOTICE** that if you wish to object to the sale of the Purchased Assets, and/or the potential assumption and assignment of an executory contract or unexpired lease in connection with the sale, or the Cure Costs related thereto, you must, on or before **October 18, 2019 at 5:00 p.m.** prevailing Pacific time, file a written objection with the United States Bankruptcy Court for the District of Oregon.

**Page 3 of 4 -** NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES

**Tonkon Torp** LLP
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
503-221-1440

Case 19-62584-pcm11    Doc 83    Filed 09/03/19

Copies of any of the pleadings or documents referenced herein may be obtained by contacting Spencer Fisher at spencer.fisher@ tonkon.com or from the website of Kurtzman Carson Consultants LLC at http://www.kccllc.net/norpacfoods.

DATED this _____ day of September, 2019.

TONKON TORP LLP

By_____
   Albert N. Kennedy, OSB NO. 821429
   Timothy J. Conway, OSB No. 851752
   Michael W. Fletcher, OSB No. 010448
   Ava L. Schoen, OSB No. 044072
   Attorneys for Debtors

009684/00004/10288864v7

**Page 4 of 4 -** NOTICE OF MOTION TO APPROVE SALE OF ASSETS TO OPC OR
HIGHER AND BETTER BIDDER AT AUCTION, AUCTION, BIDDING
PROCEDURES, SALE HEARING, AND OBJECTION DEADLINES