Below is an order of the court.

_____
PETER C. McKITTRICK
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>NORPAC Foods, Inc., Hermiston Foods, LLC, and Quincy Foods, LLC,<br><br>Debtors. | Case No. 19-62584-pcm11<br>**LEAD CASE**<br><br>(Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11)<br><br>ORDER APPROVING FORBEARANCE AGREEMENT |

This matter came before the Court on the Motion to Approve Forbearance Agreement (ECF 328, the "Motion") filed by CoBank, ACB ("CoBank"). Based upon the arguments of counsel in the Motion and the record of this case, and good cause appearing therefor,

IT IS HEREBY ORDERED

1. The Forbearance Agreement is approved. A copy of the Forbearance Agreement is attached to this Order as Exhibit 1. A copy of the Budget referenced in the Forbearance Agreement is attached to this Order as Exhibit 2.

Page 1 of 2 - Order Approving Forbearance Agreement

060870-0022/4826-3617-9115.4

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

Case 19-62584-pcm11    Doc 340    Filed 11/06/19

2. The terms of the Final Order Granting Debtors' Motion for Authorization to Obtain Secured Credit (ECF 147) and the Amended Final Order Granting Debtors' Motion for Authorization to Obtain Secured Credit (Amended Only for the Purpose of Attaching Budget) (ECF 202; as amended, the "DIP Financing Order") remain in full force and effect with respect to the Debtors' use of cash collateral pursuant to the Forbearance Agreement. CoBank is provided with and retains all of the protections set forth in the DIP Financing Order for Debtor's use of cash collateral pursuant to the Forbearance Agreement, and any advances made by CoBank under the Forbearance Agreement will be treated as Postpetition Indebtedness under the DIP Financing Order. For the avoidance of doubt, and without limitation, any advances made by CoBank under the Forbearance Agreement will be entitled to the treatment and priority described in paragraph 8 of the DIP Financing Order. For the further avoidance of doubt, all of the rights and protections of other creditors under the DIP Financing Order are preserved.

3. Nothing herein modifies the Stipulated Order re Limited Extension of Deadline for Challenges (ECF 254).

# # #

Presented by:

MILLER NASH GRAHAM & DUNN LLP

*/s/ Teresa H. Pearson*
Teresa H. Pearson, OSB No. 953750
teresa.pearson@millernash.com
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
Telephone: (503) 224-5858
Fax: (503) 224-0155

Attorneys for Creditor CoBank, ACB,
as Administrative Agent and Lender

Page 2 of 2 -   Order Approving Forbearance Agreement

060870-0022/4826-3617-9115.4

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
TELEPHONE: 503.224.5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

Case 19-62584-pcm11    Doc 340    Filed 11/06/19

# FORBEARANCE AGREEMENT

This Agreement is entered into as of November __, 2019 by and among NORPAC Foods, Inc., an Oregon cooperative corporation ("<u>NORPAC</u>"), Hermiston Foods, LLC, an Oregon limited liability company ("<u>Hermiston</u>"), and Quincy Foods, LLC, a Washington limited liability company ("<u>Quincy</u>"; together with NORPAC and Hermiston, the "<u>Borrowers</u>"), the Lenders (as defined in the Credit Agreement described below) signatory hereto, and CoBank, ACB, a federally chartered instrumentality of the United States, as administrative agent (in such capacity, the "<u>Administrative Agent</u>") under the Credit Agreement described below.

The Borrowers, the Lenders and the Administrative Agent are parties to a Credit Agreement dated as of November 15, 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>").

The Borrowers have requested that the Administrative Agent and the Lenders forbear for a limited period of time from exercising certain remedies available to them on account of certain existing defaults under the Loan Documents. The Administrative Agent and the Lenders are willing to grant the Borrowers' request on the terms and subject to the conditions set forth herein.

ACCORDINGLY, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Section 1. <u>Definitions</u>. As used herein, capitalized terms defined in the Credit Agreement but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement. In addition, as used in this Agreement:

"<u>Forbearance Period</u>" means the period of time commencing on the date hereof and ending upon the occurrence of a Forbearance Termination Event.

"<u>Forbearance Termination Event</u>" means the occurrence of any of the following:

(a) the occurrence of the Stated Forbearance Termination Date; or

(b) the occurrence of any of the following, but only if the Administrative Agent, in its sole discretion, has designated such occurrence as a Forbearance Termination Event effective as of the date specified in such notice:

(i) any Default or Event of Default under any Loan Document (other than the Specified Defaults);

(ii) the Administrative Agent or any Lender becomes aware of or determines that any Default or Event of Default (other than the Specified Defaults) had occurred and was continuing under any Loan Document as of the date of this Agreement; or

(iii) any Borrower or any other Loan Party fails to comply in any respect with any term, condition or provision of this Agreement.

"<u>Specified Defaults</u>" means:

(a) the Loan Parties' failure to maintain their EBITDA, as of March 31,

2018 for the four fiscal quarters of the Borrowers then ended, in an amount not less than $10,000,000 as required by Section 8.1 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual EBITDA of the Loan Parties for such period was ($6,482,926), resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(b) the Loan Parties' failure to maintain their Cash Interest Coverage Ratio, as of March 31, 2018 for the four fiscal quarters of the Borrowers then ended, of not less than 1.00:1.00 as required by Section 8.2 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Cash Interest Coverage Ratio of the Loan Parties for such period was (0.79):1.00, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(c) the Borrowers' failure to maintain their Total Equity as of March 31, 2018, in an amount not less than $32,000,000 as required by Section 8.3 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Total Equity of the Borrowers as of such date was $26,434,273, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(d) the Borrowers' failure to maintain their Capital Expenditures as of December 31, 2018, in an amount not to exceed $11,000,000 as required by Section 8.5(b) of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Capital Expenditures of the Borrowers as of such date was $11,604,224, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(e) the Borrowers' failure to maintain their Total Equity as of February 28, 2019, in an amount not less than $23,000,000 as required by Section 8.3 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Total Equity of the Borrowers as of such date was $20,864,766, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(f) the Borrowers' failure to maintain their EBITDA, as of March 31, 2019 for the fiscal quarter then ended, in an amount not less than $1,000,000 as required by Section 8.1 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual EBITDA of the Borrowers for such period was ($3,087,367), resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(g) the Borrowers' failure to maintain their Total Equity as of March 31, 2019, in an amount not less than $23,000,000 as required by Section 8.3 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Total Equity of the Borrowers as of such date was $22,059,764, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(h) the Borrowers' failure to deliver by May 1, 2019 a list of liabilities to be assumed and not assumed in connection with the Transaction (as defined in the Simplot LOI) as proposed by J. R. Simplot Company and the Parent as required by Section 6.13(b) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(i) the Borrowers' failure to deliver an updated statement of sources and uses with respect to the Transaction (as defined in the Simplot LOI) by May 6, 2019 as required by Section 6.13(d) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c) of the Credit Agreement;

(j) the Borrowers' failure to deliver a true, correct and complete copy of the Simplot LOI, duly executed by the Parent, not later than May 17, 2019, as required by Section 6.1(e)(iv)(E) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c)(ii) of the Credit Agreement;

(k) the Borrowers' failure to maintain actual Net Cash Flow, calculated as of May 17, 2019 for the three-week period then ending, in an amount not less than 90% of Net Cash Flow forecasted for such three-week period as set forth in the Borrowers' 13-week cash flow forecast delivered by the Borrowers to the Administrative Agent on May 8, 2019, as required by Section 8.6 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Net Cash Flow of the Borrowers for such period was $1,436,870 and the Net Cash Flow forecasted for such period was $5,724,755, resulting in a negative variance of 74.9%, which constitutes an Event of Default under Section 9.1(c)(i) of the Credit Agreement;

(l) the Borrowers' failure to maintain actual Net Cash Flow, calculated as of May 24, 2019 for the three-week period then ending, in an amount not less than 90% of Net Cash Flow forecasted for such three-week period as set forth in the Borrowers' 13-week cash flow forecast delivered by the Borrowers to the Administrative Agent on May 8, 2019, as required by Section 8.6 of the Credit Agreement; the Borrowers have advised the Administrative Agent and the Lenders that the actual Net Cash Flow of the Borrowers for such period was $7,615,128 and the Net Cash Flow forecasted for such period was $9,686,596, resulting in a negative variance of 21.4%, which constitutes an Event of Default under Section 9.1(c)(i) of the Credit Agreement;

(m) the Borrowers' failure to deliver by May 31, 2019 fully executed copies of an asset sale and purchase agreement with J.R. Simplot Company and any other Definitive Agreements delivered in connection therewith, each in form and substance acceptable to the Administrative Agent in its reasonable discretion, together with (x) evidence of consummation of the Simplot Asset Sale and (y) Payment In Full of the Obligations, each as required by Section 6.1(e)(iv)(E) of the Credit Agreement, resulting in a Default under Section 9.1(c)(ii) of the Credit Agreement;

(n) the Borrowers' failure to prepay Overadvances by June 30, 2019 in such amount as is required to reduce the Revolving Credit Facility Usage to the sum of the Borrowing Base calculated as of May 31, 2019 and the Temporary Borrowing Base Overadvance, as required by Section 2.13(a) of the Credit Agreement and Section 3(e) of the Forbearance Agreement, which failure constitutes an Event of Default under Section 9.1(a) of the Credit Agreement;

(o) the Borrowers' failure to deliver by June 15, 2019 a letter of intent or offer letter with respect to a potential sale of the Borrowers or their assets, countersigned by the Parent, in form and substance acceptable to the Administrative Agent in its sole discretion, as required by Section 6.1(e)(iv)(E) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c)(ii) of the Credit Agreement;

(p) the Borrowers' failure to deliver audited financial statements for the fiscal year ended March 31, 2019 that are free of qualifications, as required by Section 6.1(b) of the Credit Agreement, resulting in an Event of Default under Section 9.1(c)(i) of the Credit Agreement;

(q) the Borrowers' filing of petitions under Chapter 11 of the Bankruptcy Code on August 22, 2019, resulting in Events of Default under Section 9.1(k) of the Credit Agreement;

(r) the Borrowers' failure to deliver financial statements of the Borrowers and their Subsidiaries, certified by a Compliance Officer of the Borrowers and accompanied by a narrative management discussion and analysis, within 30 calendar days after the month ending August 31, 2019, as required by Section 6.1(a) of the Credit Agreement, resulting in a Post-Petition Event of Default under Section 9.1(c)(i) of the Credit Agreement;

(s) the Borrowers' anticipated failure to deliver financial statements of the Borrowers and their Subsidiaries, certified by a Compliance Officer of the Borrowers and accompanied by a narrative management discussion and analysis, within 30 calendar days after the month ending September 30, 2019, as required by Section 6.1(a) of the Credit Agreement, which failure would constitute a Post-Petition Event of Default under Section 9.1(c)(i) of the Credit Agreement;

(t) the Borrowers' failure to pay the entire outstanding principal balance of the Loans and all other Obligations, including, without limitation, all accrued and unpaid interest thereon and unpaid fees with respect thereto (including unpaid DIP Facility Fees), on the Maturity Date, as required by Sections 2.1(d), 2.2(d), 2.7(b), 2.9(b) and 2.11 of the Credit Agreement, resulting in Post-Petition Events of Default under Section 9.1(a) of the Credit Agreement;

(u) the Borrowers' failure to consummate the transactions contemplated in the Specified Sale Order by October 31, 2019, as required by Section 6.14(d) of the Credit Agreement, resulting in a Post-Petition Event of Default under Section 9.1(c)(i) of the Credit Agreement; and

(v) any breach of the representations and warranties in Section 5.5 of the Credit Agreement as a result of the occurrence of any Specified Defaults.

"Stated Forbearance Termination Date" means November 15, 2019 or such later date as the Administrative Agent may agree in its sole discretion.

Section 2. *Acknowledgments and Agreements*. Each Borrower hereby reaffirms, acknowledges and agrees as follows:

(a) *Recitals*. The Recitals to this Agreement are true and correct.

(b) *Loan Documents*. Each Loan Document to which such Borrower is a party is the valid and binding agreement of such Borrower, enforceable in accordance with its terms, and as to each of which there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

4

(c) *Indebtedness*. The Obligations are not subject to any restriction, setoff, deduction, claim, counterclaim or defense of any Borrower of any kind or character whatsoever.

(d) *Collateral*. The Administrative Agent, for itself and on behalf of the Lenders, has a valid, enforceable and first-priority perfected security interest in and Lien on all assets and property of each Borrower to secure the payment and performance of the Obligations, as to which collateral there are no restrictions, setoffs, deductions, claims, counterclaims or defenses of any Borrower of any kind or character whatsoever.

(e) *Outstanding Loans.* As of October 31, 2019, (i) the outstanding principal balance of all Post-Petition Revolving Loans made under the Loan Documents was $6,000,000.00 together with accrued and unpaid interest thereon of $6,061.64 and an Unused Commitment Fee of $4,982.82; (ii) the outstanding principal balance of all Post-Petition Swing Line Loans made under the Loan Documents was $54,987.32 together with accrued and unpaid interest thereon of $666.63; (iii) the outstanding principal balance of all Pre-Petition Revolving Loans made under the Loan Documents was $82,500,000.00 together with accrued and unpaid interest thereon of $711,986.30 and an Unused Commitment Fee of $0.00; (iv) the Letter of Credit Obligations were $800,000.00 together with the accrued and unpaid Letter of Credit Fees in the aggregate amount of $0.00; (v) the outstanding principal balance of all Pre-Petition Swing Line Loans made under the Loan Documents was $4,200,000.00 together with accrued and unpaid interest thereon of $23,301.37; and (vi) the outstanding principal balance of the Term Loan made under the Loan Documents was $36,621,623.99 together with accrued and unpaid interest thereon of $316,049.63.

(f) *Specified Defaults*. The Specified Defaults identified in the definition thereof have occurred and are continuing as of the date hereof. As a result of the Specified Defaults, (i) the Lenders do not have any obligation to make any Loan, (ii) the Issuing Lender does not have any obligation to issue any Letter of Credit, and (iii) the Administrative Agent and the Lenders are entitled to exercise rights and remedies under the Loan Documents and all other rights and remedies otherwise available to them, including, without limitation, the right to demand immediate payment of the entire outstanding principal balance of the Loans, all unpaid accrued interest thereon and all other Obligations.

(g) *No Waiver of Defaults or Rights and Remedies*. Neither this Agreement, nor any action taken in accordance with this Agreement or any other Loan Document, nor any correspondence, any oral or written communications, nor any making of any Loan or issuing of any Letter of Credit, nor any acceptance of repayment of any Loan or other amount, nor any forbearance, amendment or consent or any other action or omission on the part of the Administrative Agent or any Lender shall be, or shall be construed to be, a waiver, modification or release of any Default or Event of Default (including, without limitation, any Specified Default), as to which all rights and remedies of the Administrative Agent and each Lender are and shall continue at all times to be expressly reserved by the Administrative Agent and the Lenders.

(h) *Conduct*. The Administrative Agent and the Lenders have fully and timely performed all of their obligations and duties in compliance with the Loan Documents and applicable law, and have acted reasonably, in good faith and appropriately under the circumstances.

(i) *Engagement of Consultants by Administrative Agent*. Without limiting any provision of the Credit Agreement, including but not limited to Sections 6.6 and 11.3(a) thereof, the Borrowers (x) acknowledge that the Administrative Agent may from time to time engage

financial advisors or other consultants on terms and conditions acceptable to the Administrative Agent, in each case at the Borrowers' expense, (y) agree that the Borrowers shall, and shall cause their officers, employees and advisors to, cooperate with any such advisors and consultants and provide all information reasonably requested by any such advisor or consultant, which information shall be true, correct and complete, and (z) agree that the Borrowers shall, promptly after demand therefor, reimburse the Administrative Agent for all costs, fees, charges and disbursements of each such advisor or consultant. The Borrowers hereby acknowledge and agree that no Loan Party may rely on any statements made by, or any analysis, reports or other documents (if any) prepared and/or provided by, a financial advisor or other consultant of the Administrative Agent or any Lender.

Section 3. <u>Forbearance; Consequences of Forbearance Termination Event</u>.

(a) *Forbearance*. Subject to the terms and conditions of this Agreement, during the Forbearance Period, the Administrative Agent and the Lenders agree to forbear from exercising remedies under Section 9.2(b) of the Credit Agreement (other than Section 9.2(b)(iii) thereof) as a result of the Specified Defaults. Each of the Borrowers acknowledges and agrees that the Administrative Agent may at any time, including during the Forbearance Period, apply for the appointment of a receiver over the Borrowers and all assets of the Borrowers on terms and conditions acceptable to the Administrative Agent in its sole discretion.

(b) *Consequences of Forbearance Termination Event, Etc*. The termination of the Forbearance Period upon the occurrence of a Forbearance Termination Event shall not terminate, rescind or otherwise modify or affect any amendment or other change or modification to any Loan Document or any other term or provision of this Agreement. The agreement to temporarily forbear set forth in this Agreement is for the limited purpose set forth in this Agreement and shall be limited to the precise meaning of the words as written in this Agreement. Each Borrower acknowledges and agrees that the Administrative Agent and the Lenders have no obligation to extend or renew the Forbearance Period or to grant any additional forbearance to the Borrowers or any other Loan Party. Immediately upon the occurrence of a Forbearance Termination Event, all of the rights and remedies available to the Administrative Agent and the Lenders under the Credit Agreement and the other Loan Documents and at law, in equity or otherwise (including, without limitation, with respect to the Specified Defaults) will be available to the Administrative Agent and the Lenders fully and without restriction, limitation or modification of any kind, as if the temporary forbearance under this Agreement had not occurred.

(c) *Interest Rate During the Forbearance Period*. During the Forbearance Period, the Obligations shall bear interest at the rates per annum as set forth in the Credit Agreement. Notwithstanding the foregoing, the Administrative Agent and the Required Lenders reserve the right to require that the Obligations bear interest at the Default Rate as of the date of the earliest occurrence of a Post-Petition Event of Default (including a Specified Default) upon the occurrence of any Forbearance Termination Event.

(d) *Principal and Other Amounts During the Forbearance Period*. All Obligations shall be due and payable on the dates and in the manner set forth in the Credit Agreement and the other Loan Documents and shall not be deferred or delayed. Without limiting the foregoing, interest and fees shall continue to accrue and be due and payable in accordance with the Loan Documents.

(e) *Credit Extensions During the Forbearance Period*. Section 4.2 of the Credit Agreement provides that no Lender (including the Issuing Lender) has any obligation to make

any Loan or issue any Letter of Credit (each, a "Credit Extension") so long as any Default or Event of Default is continuing. Notwithstanding the foregoing, the Administrative Agent may consider requests for DIP Advances submitted from time to time by the Borrowers. If the Administrative Agent in its sole discretion approves any such request, the Revolving Lenders will fund such approved DIP Advances during the Forbearance Period under the terms and conditions of this Agreement and the other Loan Documents, provided that (1) no Forbearance Termination Event has occurred before or after giving pro forma effect to such requested Credit Extension, (2) each of the conditions precedent to such Credit Extension as set forth herein and in the other Loan Documents have been satisfied (other than those that cannot be satisfied solely as a result of the existence of the Specified Defaults or any other Default or Event of Default that has not been designated by the Administrative Agent in its sole discretion as a Forbearance Termination Event), and (3) each such requested Credit Extension is in compliance with all of the other requirements of the Loan Documents. For the avoidance of doubt, the Administrative Agent does not have any obligation to approve any requested DIP Advance, whether during the Forbearance Period or otherwise. Each Borrower acknowledges and agrees that any and all Credit Extensions funded by the Lenders during the Forbearance Period shall constitute DIP Advances entitled to super-priority administrative expense status and secured by the Post-Petition Collateral. In addition, each Borrower acknowledges and agrees that, so long as any Default or Event of Default has occurred and is continuing, no Borrower may request, convert to, or renew any Fixed Rate Loans and Section 4.2 of the Credit Agreement provides that no Lender has any obligation to make or convert any Fixed Rate Loan.

(f) *Bankruptcy Cases and Relief from Automatic Stay.* Each Borrower acknowledges and agrees that, as a result of the Specified Defaults that constitute Post-Petition Events of Default, the Administrative Agent may seek relief from the automatic stay in the Bankruptcy Cases in accordance with Section 9.3 of the Credit Agreement, including during the Forbearance Period, and, each Borrower hereby agrees that the Borrowers will not object to such relief from the automatic stay.

(g) *Use of Cash Collateral.* The Administrative Agent hereby consents to the Borrowers' Use of Cash Collateral; provided, however, that (i) the Borrowers are in compliance with Section 7.19(e) of the Credit Agreement and (ii) no Forbearance Termination Event has occurred. Any Use of Cash Collateral shall be subject to the terms and conditions of the Credit Agreement.

Section 4. <u>No Other Changes</u>. Except as expressly set forth herein, all terms of the Loan Documents remain in full force and effect.

Section 5. <u>Representations and Warranties</u>. Each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a) Subject to approval by the Bankruptcy Court, each Borrower has all requisite power and authority, corporate or otherwise, to execute and deliver this Agreement and any other documents delivered hereunder and to perform its obligations under this Agreement, the Credit Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly and validly executed and delivered to the Administrative Agent by the Borrowers, and this Agreement, the Credit Agreement and the other Loan Documents constitute such Borrower's legal, valid and binding obligations, enforceable in accordance with their respective terms.

(b) The execution, delivery and performance by each Borrower of this Agreement, and the performance of the Credit Agreement and the other Loan Documents to which such

Borrower is a party, have been duly authorized by all necessary corporate or other action of such Borrower and do not and will not (i) require any authorization, consent or approval by any Governmental Authority, (ii) violate such Borrower's Organizational Documents or any provision of any law, rule, regulation or order presently in effect having applicability to such Borrower, (iii) result in a breach of or constitute a default under any indenture or agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any Lien of any nature upon or with respect to any of the properties now owned or hereafter acquired by any Borrower (other than as required under the Loan Documents or as otherwise permitted by the Loan Documents).

(c) (i) The representations and warranties of each Borrower in the Credit Agreement and the other Loan Documents which are not otherwise qualified by materiality shall be true, correct and complete in all material respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all material respects as of the applicable earlier date(s); and (ii) the representations and warranties of each Borrower in the Credit Agreement and the other Loan Documents which are qualified by materiality shall be true, correct and complete in all respects on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true, correct and complete in all respects as of the applicable earlier date(s).

(d) Other than the Specified Defaults, no event has occurred and is continuing, or would result from the execution and delivery of this Agreement, which constitutes a Default, Event of Default or any other breach or default under the Loan Documents.

Section 6. <u>Effectiveness</u>. Section 3 hereof shall be effective only if the Administrative Agent has received, on or before the date of this Agreement (or such later date as the Administrative Agent may agree in writing), or waived in its sole discretion, each of the following, each in form and substance acceptable to the Administrative Agent in its sole discretion:

(a) this Agreement, duly executed by an Authorized Officer of each Borrower and an officer of each Lender;

(b) evidence of entry by the Bankruptcy Court of an order that approves this Agreement and authorizes the Borrowers to enter into this Agreement and the transactions contemplated herein;

(c) a liquidation plan of the Borrowers, as certified by the CRO, in form, detail and substance acceptable to the Administrative Agent in its sole discretion;

(d) an updated Budget, in form, detail and substance acceptable to the Administrative Agent in its sole discretion;

(e) payment of all fees and expenses of the Administrative Agent (including the fees and expenses of the Administrative Agent and its counsel, advisors and consultants) to the extent invoiced prior to the date hereof; and

(f) such other assurances, certificates, documents, consents, reports or opinions as the Administrative Agent may require.

Section 7. <u>Release</u>. Each Borrower hereby absolutely and unconditionally releases and

forever discharges each of the Administrative Agent and Lenders, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns, together with all of the present and former Directors, officers and employees, agents, attorneys and consultants of any of the foregoing, from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which such Borrower has had, now has or has made claim to have against any such Person for or by reason of any act, omission, matter, cause or thing whatsoever occurring or arising from the beginning of time to and including the date of this Agreement, whether such claims, demands and causes of action are matured or unmatured or known or unknown.

Section 8. <u>Costs and Expenses</u>. Each Borrower hereby reaffirms its agreement under Section 11.3 of the Credit Agreement, among other things, to pay or reimburse the Administrative Agent, any Lender or the Issuing Lender on demand for all out-of-pocket expenses incurred by the Administrative Agent, any Lender or the Issuing Lender (including the fees, charges and disbursements of counsel, collateral audits, financial advisors, appraisals, environmental assessments or other experts for the Administrative Agent, any Lender or the Issuing Lender), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other documents, agreements and certificates contemplated hereunder (whether or not the transactions contemplated hereby or thereby shall be consummated), in connection with any Debtor Relief Proceeding with respect to any Loan Party or in connection with the enforcement or protection of its rights. Each Borrower hereby authorizes CoBank to make DIP Advances at any time and from time to time for immediate application to such payment or reimbursement of any such fees, costs or expenses under this Section 8, Section 11.3 of the Credit Agreement or any other provision of the Loan Documents.

Section 9. <u>Miscellaneous</u>. This Agreement is a Loan Document. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Colorado (other than its conflicts of laws rules). This Agreement, together with the Credit Agreement and the other Loan Documents, comprise the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Agreement, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by e-mail transmission of a PDF or similar copy shall be equally as effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterpart signature page to this Agreement by facsimile or by e-mail transmission shall also deliver a manually executed counterpart of this Agreement but the failure to deliver a manually executed counterpart shall not affect the validity, enforceability or binding effect of this Agreement.

*Signature pages follow.*

9

US.125195139.05

EXHIBIT 1
Page 9 of 11

Case 19-62584-pcm11    Doc 340    Filed 11/06/19

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**NORPAC FOODS, INC.**, as a Borrower

By: */s/ Shawn Campbell*
Name: Shawn Campbell
Title: President

**HERMISTON FOODS, LLC**, as a Borrower

By: */s/ Shawn Campbell*
Name: Shawn Campbell
Title: President

**QUINCY FOODS, LLC**, as a Borrower

By: */s/ Shawn Campbell*
Name: Shawn Campbell
Title: President

**COBANK, ACB**, as Administrative Agent, Issuing
Lender, Swing Line Lender and a Lender

By _____
Name: Justin A. Barr
Title:  Vice President

*Signature Page to Forbearance Agreement*

**EXHIBIT 1**
**Page 11 of 11**
Case 19-62584-pcm11    Doc 340    Filed 11/06/19

**NORPAC Foods, Inc**
*DIP Budget Forecast (11/3/19)*
*($s in 000s)*

|  | 0<br>Actual<br>10/25/19 | 1<br>Forecast<br>11/1/19 | 2<br>Forecast<br>11/8/19 | 3<br>Forecast<br>11/15/19 | 3 Week<br>Total |
|---|---:|---:|---:|---:|---:|
| **Total Net Sales** | $6,922 | $6,188 | $7,408 | $7,408 | $21,004 |
| **Receipts** | | | | | |
| Accounts Receivable Collections | 5,662 | 8,000 | 6,000 | 6,000 | 20,000 |
| **Operating Disbursements** | | | | | |
| Salaried Payroll and Related Taxes | – | 810 | – | 500 | 1,310 |
| Hourly & Seasonal Labor | 789 | 1,306 | 612 | 1,514 | 3,431 |
| Workers Compensation Payouts | 11 | 15 | 15 | 15 | 45 |
| Grower Payables: 2019 Co-Op | – | 282 | – | – | 282 |
| Grower Payables: 2019 Cash | – | – | – | – | – |
| Total Grower Payables | 418 | 282 | – | – | 282 |
| Payroll Related Insurance & Benefits | 11 | 635 | 183 | 513 | 1,331 |
| Ingredients | 1,638 | 2,000 | 500 | 500 | 3,000 |
| Broker | 0 | – | – | 277 | 277 |
| Utilities | 305 | 200 | 250 | 250 | 700 |
| Insurance | – | – | – | – | – |
| Freight | 672 | 1,000 | 1,125 | 625 | 2,750 |
| Storage | 1,222 | 420 | 525 | 525 | 1,470 |
| Packaging | 650 | 650 | 150 | 150 | 950 |
| Selling & Marketing | 78 | 100 | 125 | 125 | 350 |
| Other | 964 | 600 | 600 | 1,660 | 2,860 |
| **Total Operating Disbursements** | 6,758 | 8,017 | 4,085 | 6,654 | 18,756 |
| **Net Cash Flow from Operations** | (1,096) | (17) | 1,915 | (654) | 1,244 |
| **Non-Operating / Restructuring Disbursements** | | | | | |
| Professional / UST Fees | 394 | – | – | – | – |
| Insurance - Transaction Related | – | – | – | – | – |
| Utility Deposits | – | – | – | – | – |
| 503(b)(9) Claims | – | – | – | – | – |
| Pre-Petion PACA Claims | 3,006 | – | – | – | – |
| Warehousemans' Lien Claims | – | – | – | – | – |
| Other Legal | 2 | – | – | – | – |
| Accounting | – | – | – | – | – |
| Bank Fees | – | – | – | – | – |
| DIP Fees | – | – | – | – | – |
| CoBank Loan Interest | – | 1,127 | – | – | 1,127 |
| **Net CF before Borrowing** | (4,499) | (1,144) | 1,915 | (654) | 117 |
| Starting Cash | 2,616 | 1,118 | 2,974 | 1,000 | 1,118 |
| Net Cash before Financing | (4,499) | (1,144) | 1,915 | (654) | 117 |
| Revolver Draw / (Repayment) | 3,000 | 3,000 | (3,889) | 654 | (235) |
| Ending Cash | 1,118 | 2,974 | 1,000 | 1,000 | 1,000 |

**EXHIBIT 2**
**Page 1 of 1**