John F. McGrory, Jr., OSB #813115
johnmcgrory@dwt.com
Joseph M. VanLeuven, OSB #824189
joevanleuven@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

    Attorneys for Plaintiff

IN THE UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In Re<br><br>NORPAC Foods, Inc. [TIN 9330], Hermiston Foods, LLC [TIN 3927], and Quincy Foods, LLC [TIN 7444],<br><br>                    Debtors. | Lead Bankruptcy Case No. 19-62584-pcm11 (Jointly Administered with Case Nos. 19-33102-pcm11 and 19-33103-pcm11) |
| NATIONAL FROZEN FOODS CORPORATION, as Assignee of PNW Veg Co., LLC<br><br>                    Plaintiff,<br><br>        v.<br><br>NORTH PACIFIC CANNERS & PACKERS, INC., fka NORPAC Foods, Inc.<br><br>                    Defendant. | Adversary Case No.<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF NOVEMBER 15, 2019 APA, AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** |

Plaintiff, National Frozen Foods Corporation ("National"), alleges as follows for its

claims against Debtor-Defendant, North Pacific Canners & Packers, Inc. ("Debtor").

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

## I.   NATURE OF ACTION

1.      This is an adversary proceeding arising out of the November 15, 2019 Asset Purchase Agreement (as amended, the "APA") between Debtor and Oregon Potato Company.  A copy of the APA is attached to this Complaint as Exhibit 1. Oregon Potato Company's rights in and under the APA were assigned to PNW Veg Co., LLC ("VegCo") before the transaction closed, and on March 3, 2020, VegCo assigned its right to certain payment claims under the APA to National. A copy of the Assignment is attached as Exhibit 2. National and VegCo are sister-affiliates owned by companies that are in turn owned by Frank Tiegs.

2.      Under the APA, VegCo was to purchase certain assets including all Debtor's bulk product inventory.  The purchase price paid at closing was based in part on an estimated inventory value, subject to adjustment up or down through a post-closing true-up process. VegCo paid the "estimated purchase price" at closing. The APA provides that if the parties cannot reach agreement on the "final purchase price" after the post-closing true-up, their differences are to be submitted to this Court for final resolution. The parties have not been able to reach agreement. National contends that the final purchase price should have been adjusted downward in the amount of at least $7,121,707.  National seeks a declaration that Debtor was overpaid by at least $7,121,707 (the total amount overpaid, as determined herein, is defined in APA Sec. 2.05(f) and referred to below as the "Purchase Price Shortfall"), and that Debtor must repay the Purchase Price Shortfall.

3.       In a related transaction, National agreed to purchase all of Debtor's finished goods inventory on the day immediately after the close of the APA.  On December 19, 2019, Debtor sent National an invoice reflecting a purchase price of $10,262,443 for the finished goods. National contends that it should be able to set-off the invoice amount ($10,262,443) by

Page 2 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main ᐧ (503) 778-5299 fax

the amount of the Purchase Price Shortfall. National seeks a declaration that it may set-off the Purchase Price Shortfall against the $10,262,443 invoice.

4.      As an alternative claim, National seeks damages for Debtor's breach of the APA. Debtor breached its representations and warranties that all inventory would be merchantable and fit for its intended purpose, that it would be of marketable grade, and that it would conform to applicable customer agreements. National has been damaged in the amount of at least $7,121,707 by paying for at least 19.7 million pounds of product that did not meet those standards.

5.      The APA required the parties to negotiate in good faith to resolve their differences in connection with the post-closing adjustments to the inventory purchase price. Debtor breached its duty of good faith and fair dealing by agreeing to National's positions in negotiations regarding adjustments, but at the same time refusing to refund the Purchase Price Shortfall.

## II.     JURISDICTION AND VENUE

6.      On August 22, 2019 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Oregon (the "Court").

7.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). Venue is proper under 28 U.S.C. §§ 1408 and 1409(a). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

8.      In addition, this Court has approved the APA, which provides in amended section 2.05(e) that this Court shall resolve disputes between the parties regarding post-closing adjustments to the purchase price.

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon 97201-5610
(503) 241-2300 main · (503) 778-5299 fax

### III.     THE PARTIES

9.     National is a Washington corporation with its principal place of business in Seattle, Washington.

10.     Debtor is the debtor in this Chapter 11 proceeding.

### IV.     RELEVANT FACTS

11.     Oregon Potato Company and Debtor entered into the APA as of November 15, 2019.  Before the closing, Oregon Potato Company assigned its interest in the APA to its wholly-owned subsidiary, VegCo.  This Court approved the APA after it was amended in response to objections filed by the Creditors Committee, and entered a Sale Order.

12.      Pursuant to the APA, VegCo acquired all of Debtor's bulk product inventory.

13.     Debtor's finished goods inventory was a different type of inventory than bulk product inventory and was not included in the APA. The finished goods inventory was sold to National in the ordinary course the day after the closing of the APA.   The sale to National dovetailed with the sale to VegCo and was part of an over-all transaction in which Debtor accomplished the sale of all of its inventory to Frank Tiegs' companies.

14.     Under Section 2.04 of the APA, the purchase price paid at closing was based in part on Debtor's good faith estimate of the "Inventory Value."  The Inventory Value was determined using the calculation set forth in Schedule 2.04 to the APA.  Under Schedule 2.04, the Inventory Value was to be equal to the product of (i) the book value of all the bulk product inventory *minus* the book value of "hold product," *multiplied by* (ii) 90 percent.  The intent and effect of this provision was that VegCo would acquire "hold product," but the book value of the hold product was not included in the purchase price to be paid by VegCo.

15.     "Hold product" has a meaning understood in the food packing industry to be

Page 4 - COMPLAINT

4811-9099-1798v.4 0115055-000001

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

product that cannot be sold "as is" because of potential food safety or quality issues. As indicated in Debtor's own grading procedure documents, "hold products" include products containing an initial high test level of enzymes, products that were too hot at time of processing, products that had not gone through metal detection procedures, products that contained sand, products with excessive stalks, and products containing critters or foreign materials. Product can be deemed "hold product" for a variety of other reasons relating to the condition of the product, including but not limited to microbial contamination, blanching, blemishes, mixed product, poor color, and size.

16.     Debtor had to determine how much of its inventory was hold product in estimating the Inventory Value, because the value of the hold product would not be included in the Inventory Value under Schedule 2.04.  Debtor provided that information to bidders during pre-closing due diligence.

17.     Section 2.05 of the APA provided for a 45 day "Adjustment Period" after closing during which the parties would attempt to reconcile the Estimated Inventory Value with the actual Inventory Value, and true-up the final purchase price accordingly.

18.     During the Adjustment Period, VegCo conducted a thorough and detailed inspection and analysis of the inventory it acquired and determined that Debtor miss-classified not less than 19.7 million pounds of inventory that should have been classified as hold product, thereby causing VegCo to overpay for the inventory by not less than $7,121,707 (i.e. the Purchase Price Shortfall).

19.     The APA provides that if the purchase price paid at closing was greater than what it should have been, Debtor shall promptly reimburse VegCo for the Purchase Price Shortfall. Debtor disputes and has refused to reimburse the Purchase Price Shortfall.  Section 2.05 of the

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

APA provides that this Court shall resolve disputes regarding adjustments to the purchase price.

20.     The APA provides for a $2 million "True-Up Escrow Fund" to be held in escrow under an Escrow Agreement executed in connection with the APA in order to secure payment of any Purchase Price Shortfall.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment on Purchase Price Shortfall)**

21.     National repeats and realleges the foregoing allegations as if set forth at length herein.

22.     Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

23.     There is a real, substantial, and justiciable controversy regarding whether the purchase price paid at closing is greater than it should have been and whether National, as assignee of VegCo, is entitled to reimbursement for an overpayment.

24.     National contends that Debtor mis-classified inventory that should have been deemed hold product and therefore not included in the purchase price pursuant to the formula set in 2.04.  Specifically, National contends Debtor mis-classified not less than 19.7 million pounds of inventory that should have been classified as hold product, thereby causing VegCo to overpay for the inventory by not less than $7,121,707.

25.      Debtor contends that it did not miss-classify any inventory that should have been classified as hold product, that VegCo did not overpay for the inventory, and that it owes

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

National nothing.

26.     National is entitled to a declaratory judgment to the effect that (a) Debtor mis-classified not less than 19.7 million pounds of inventory in its books and records that should have been classified as hold product; (b) that VegCo overpaid for the inventory by not less than $7,121,707; and (c) that National is entitled to the $2 million in the True-Up Escrow Account and a payment from Debtor of the remaining $5,121,707 (or such greater amount as is determined herein to have been overpaid).

## SECOND CLAIM FOR RELIEF
### (Declaratory Judgment – Set-Off)

27.     National repeats and realleges the foregoing allegations as if set forth at length herein.

28.     As explained above, Debtor sold its bulk product inventory, and not its finished goods inventory, to VegCo under the APA.  On the day after the closing of the APA, Debtor sold to National all of its finished goods inventory.

29.     On December 19, 2019, Debtor sent National an invoice reflecting a purchase price of $10,262,443 for the finished goods. A copy of the invoice is attached as Exhibit 3.

30.     National contends that it should be able to set-off and reduce the invoice amount ($10,262,443) by the amount of the Purchase Price Shortfall.

31.     Debtor contends that a set-off is not appropriate.

32.     There is a real, substantial, and justiciable controversy regarding whether National can set-off the Purchase Price Shortfall against amounts due on the invoice for the finished good inventory.

33.     National seeks a declaration that it may set-off the $10,262,443 invoice amount

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

by at least $7,121,707, the presently estimated amount of its overpayment under the APA, and that it be allowed to tender the difference, $3,140,736, into the Court pending the Court's final resolution of the amount of the APA overpayment.

### THIRD CLAIM FOR RELIEF
**(Breach of APA)**

### COUNT I
**(Breach of Representations and Warranties)**

34.     National repeats and realleges the foregoing allegations as if set forth at length herein.

35.     Under section 4.09(a) of the APA, Debtor represented and warranted that:

> "(a) All Inventory and Packaging Materials (i) are merchantable and fit for their intended purpose including, as applicable, for human consumption, (ii) are of marketable grade and quality; (iii) have not been adulterated or misbranded; and (iv) conform to the applicable customer agreement."

36.     Debtor breached the representations and warranties contained in section 4.09(a) of the APA by including in the purchase price at least 19.7 million pounds of inventory that was (i) not merchantable and fit for its intended purposes; (ii) not merchantable grade and quality; and (iii) not in conformance with applicable customer agreements.

37.     As a result of Debtor's breach, VegCo was damaged by at least $7,121,707, the amount Debtor paid for the 19.7 million pounds of product sold in breach of the representations and warranties.  As VegCo's assignee, National now owns such damage claim.

### COUNT II
**(Failure to Negotiate – Act in Good Faith)**

38.     National repeats and realleges the foregoing allegations as if set forth at length herein.

39.     Pursuant to paragraph 2.05(c) and (d) of the APA, Debtor was obligated to act in

Page 8 - COMPLAINT

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

"good faith" in calculating the purchase price and adjusted purchase price of the inventory.

40.     Pursuant to paragraph 2.05(e) of the APA, in the event there were disagreements with the adjusted purchase price, the parties were obligated to attempt "in good faith" to resolve their differences.

41.     Debtor breached its duty to act in good faith in calculating the purchase price by negligently or recklessly charging VegCo for 19.7 million pounds of hold product.

42.     NORPAC breached its duty to negotiate in good faith by agreeing to National's positions in negotiations regarding adjustments, but at the same time refusing to refund the Purchase Price Shortfall.

43.     As a result of NORPAC's failure to act in good faith, VegCo has been damaged in the amount of $7,101,707.  As VegCo's assignee, National now owns the resulting damage claim.

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

44.     National repeats and realleges the foregoing allegations as if set forth at length herein.

45.     The APA, like all contracts in the States of Oregon and Washington, contains an implied covenant of good faith and fair dealing, the purpose of which is to prevent a contracting party from engaging in conduct which frustrates the other party's right to the benefit of the contract.

46.     The covenant of good faith and fair dealing finds particular application in cases such as this one, where one party, here Debtor, is invested with discretionary power affecting the rights of the other party, here VegCo.

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

47.     Debtor breached the covenant of good faith and fair dealing by unilaterally, and without regard to industry standard and the rights of VegCo, failed to designate certain inventory as hold product, with the intent and effect of frustrating VegCo's rights to fully receive the benefits of the APA.

48.     VegCo was damaged in the amount of at least $7,121,707 for having to pay for inventory which it should not have had to pay for under the APA. In addition, VegCo has been damaged because it had to expend substantial resources to inspect and analyze the inventory in order to determine whether Debtor had improperly failed to designate inventory as hold product. VegCo is entitled to an amount to be determined at trial for the costs of having to investigate and discover Debtor's conduct, and in addition VegCo is entitled to damages for the substantial costs of attempting to negotiate with Debtor over the designation of hold product, also in an amount to be determined. As VegCo's assignee, National now owns the damage claims.

## VI.     PRAYER FOR RELIEF

WHEREFORE, National requests that the Court enter a judgment against Debtor and in favor of National as follows:

1.     On its First Claim for Relief, for a declaration that National is entitled to a declaratory judgment to the effect that (a) Debtor mis-classified not less than 19.7 million pounds of inventory in its books and records that should have been classified as hold product; (b) that VegCo overpaid for the inventory by not less than $7,121,707; and (c) that National is entitled to the $2 million in the True-Up Escrow Account and a payment from Debtor of the remaining $5,121,707 (or such greater amount as is determined herein to have been overpaid).

2.     On its Second Claim for Relief, for a declaration that National seeks a declaration that it may set-off the $10,262,443 invoice amount by at least $7,121,707, the presently

Page 10 - COMPLAINT


4811-9099-1798v.4 0115055-000001          DAVIS WRIGHT TREMAINE LLP
                                          1300 S.W. Fifth Avenue, Suite 2400
                                          Portland, Oregon  97201-5610
                                          (503) 241-2300 main · (503) 778-5299 fax

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

estimated amount of its overpayment under the APA, and that it be allowed to tender the difference, $3,140,736, into the Court pending the Court's final resolution of the amount of the APA overpayment.

3.      On its Third Claim for Relief for damages in the amount of at least $7,101,707, with respect to Counts I, II, and III, and also with respect to Count III, an additional amount for VegCo's costs of investigation and negotiation, in an amount to be determined at trial.

4.      For such other further and equitable relief as the Court deems appropriate.

DATED this 6th day of March, 2020.

**DAVIS WRIGHT TREMAINE** LLP


By  /s/ John F. McGrory
    John F. McGrory, Jr., OSB #813115
    johnmcgrory@dwt.com
    Joseph M. VanLeuven, OSB #824189
    joevanleuven@dwt.com
    Telephone: (503) 241-2300
    Facsimile: (503) 778-5299

    Of Attorneys for Plaintiff

4811-9099-1798v.4 0115055-000001

DAVIS WRIGHT TREMAINE LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, Oregon  97201-5610
(503) 241-2300 main · (503) 778-5299 fax

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

# ASSET PURCHASE AGREEMENT

BY AND AMONG

## NORPAC FOODS, INC.

## QUINCY FOODS, LLC

## HERMISTON FOODS, LLC

AND

## OREGON POTATO COMPANY

DATED AS OF

## NOVEMBER 15, 2019

# FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment, dated as of December 11, 2019 (this "Amendment") to the Asset Purchase Agreement dated November 15, 2019 (the "Agreement"), is entered into by and among NORPAC Foods, Inc., an Oregon corporation ("NORPAC") with its wholly-owned subsidiaries Quincy Foods, LLC, a Washington limited liability company ("Quincy Foods") and Hermiston Foods, LLC, an Oregon limited liability company ("Hermiston Foods" and collectively with NORPAC and Quincy Foods, the "Sellers" and each a "Seller") and Oregon Potato Company, a Washington corporation ("Buyer").

## RECITALS

A.   Buyer and Sellers entered into the Agreement effective November 15, 2019.

B.   As a result of an auction held on December 10, 2019, Buyer and Sellers have agreed to amend the Agreement in certain respects with respect to certain terms.

NOW THEREFORE, the parties agree as follows:

1.   Section 2.05(e), the final four sentences, beginning at "If, however," are deleted and replaced with: If, however, Sellers and Buyers are unable to resolve their differences, Sellers and Buyers shall submit any disputed items to the Bankruptcy Court for final resolution, with the parties bearing their own costs and fees to resolve the dispute. ~~(27)~~ January 15, 2020, *[initials]*

2.   Section 3.01 is amended as follows: Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Davis Wright Tremaine LLP located in Portland, Oregon, <u>effective</u> at 12:01 AM, Pacific standard time, on the day that is two (2) Business Days after all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature are to be satisfied on the Closing Date), but in no event <u>later</u> than ~~December 18, 2019~~, or at such other time, date or place as Sellers and Buyers may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the **"Closing Date."** <u>If the parties do not close the transactions contemplated by the Agreement on or before the December 20, 2019 at 11:59 PM due to the fault of the Buyer, Buyer shall pay to Sellers an increase in the Purchase Price of $200,000.00 for each day of the delay after the Closing Date as consideration for the additional losses Sellers will incur as a result of the delay</u>.

3.   Section 6.01 is amended as follows: **Preservation of Quincy Assets Prior to the Closing.** From the date hereof until the Closing or the earlier

termination of this Agreement, Sellers will use their best efforts (given their financial constraints) to preserve the Quincy Assets to their highest value.

4.  Section 10.12, the Release provision, is stricken in its entirety.

5.  The first sentence of Schedule 2.04 to the Agreement is amended as follows: "Inventory Value shall equal: (a) $13,600,000.∞ (WM) plus (b) the product of (i) the Book Value of Bulk Product minus the Book Value of hold product minus storage costs of 0.0628 cents per pound on Bulk Product, multiplied by (ii) 90%."

IN. WITNESS WHEREOF, the parties hereto have caused this Amendment to the Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized

**SELLERS NORPAC Foods; Inc.,**
an Oregon corporation
By: _~~Steven Hawkinberry~~_      _Winston Mar_
Name: _~~Steven Hawkinberry~~_
Title: _~~Vice President + General Counsel~~_ 12/11/2019    CRO

**Quincy Foods, LLC,**
a Washington limited liability company
By: NORPAC Foods, Inc.
Its: Member
By: _[signature]_
Name: _Winston Mar_
Title: _CRO_

**Hermiston Foods, LLC,**
an Oregon limited liability company
By: NORPAC Foods, Inc.
Its: Member
By: _[signature]_
Name: _Winston Mar_
Title: _CRO_

**BUYER: Oregon Potato Company,**
a Washington corporation

By: _Steven Odenberg_

Name: _Steven Odenberg_

Title: _Vice President & General Counsel_

_12/11/2019_

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of November 15, 2019, is entered into by and among NORPAC Foods, Inc., an Oregon corporation ("**NORPAC**") with its wholly-owned subsidiaries Quincy Foods, LLC, a Washington limited liability company ("**Quincy Foods**") and Hermiston Foods, LLC, an Oregon limited liability company ("**Hermiston Foods**" and collectively with NORPAC and Quincy Foods, the "**Sellers**" and each a "**Seller**") and Oregon Potato Company, a Washington corporation ("**Buyer**").

### RECITALS

**WHEREAS**, the Sellers are engaged in the acquisition of agricultural products from growers located throughout the Pacific Northwest and the processing, repacking and sale of food products at the Quincy Plant (*defined below*) (as conducted by Sellers prior to the Closing Date, the "**Business**");

**WHEREAS**, Sellers are debtors and debtors-in-possession voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court, District of Oregon (the "**Bankruptcy Court**") in cases jointly administered under lead case No. 19-62584-pcm11 (the "**Bankruptcy Case**");

**WHEREAS**, the Sellers wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from the Sellers, certain specified assets owned by the Sellers, and assume certain liabilities of the Sellers relating to the Business, in each case as more specifically provided herein and upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 101(a), 363 and 365 of the Bankruptcy Code;

**WHEREAS**, the transactions contemplated by this Agreement are, as more specifically provided herein, subject to the approval by the Bankruptcy Court of this Agreement and will only be consummated pursuant to the Sale Order entered in the Bankruptcy Case;

**WHEREAS**, a portion of the Purchase Price payable by Buyer to Sellers shall be placed in escrow by Buyer to secure certain obligations of the Sellers, the release of which shall be contingent upon certain events and conditions, all as set forth in this Agreement and the Escrow Agreement; and

**WHEREAS**, in connection with the sale of assets hereunder, Buyer will grant to Sellers a limited license to use certain intellectual property assets that are being sold to Buyer under this Agreement, for the express purpose of selling off the Finished Goods which will be retained by Sellers after the Closing.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.01**    **Definitions.** Capitalized terms used herein have the meanings set forth in this Agreement or Schedule 1.01 hereto.

### ARTICLE II
### PURCHASE AND SALE

**Section 2.01**    **Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, free and clear of any Encumbrances to the maximum extent permitted by Section 363(f) of

1

the Bankruptcy Code (other than Permitted Encumbrances), all of Sellers' right, title and interest in, to and under the following assets (collectively, the "**Purchased Assets**") and no other assets of the Sellers:

(a)      the real property assets located in Quincy, Washington as more fully described on **Schedule 2.01(a)** (the "**Quincy Plant**"), and the following assets associated with operation of the Quincy Plant (collectively, the "**Quincy Assets**"):

      (i)      all tangible personal property, including all furniture, fixtures, equipment, parts, machinery, tools, vehicles, inventory, materials, office equipment, supplies, computers, telephones owned by Quincy Foods, including but not limited to, those assets set forth on **Schedule 2.01(a)(i)** (the "**Quincy Personal Property**");

      (ii)      all intangible property and assets owned by Quincy Foods, including those set forth on **Schedule 2.01(a)(ii)**;

      (iii)      all Permits, including Environmental Permits, which are held by a Quincy Foods and required for ownership and use of the Purchased Assets, including, without limitation, those set forth on **Schedule 2.01(a)(iii)** (the "**Assigned Permits**");

      (iv)      copies of all books and records pertaining to the Quincy Assets, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, PSM program documents and mechanical integrity documents, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating solely to the Purchased Assets ("**Quincy Books and Records**"); *provided, however,* that the Quincy Books and Records do not include any of the Attorney Records.

(b)      The following additional assets:

      (i)      the Contracts set forth on **Schedule 2.01(b)(i)** (the "**Assigned Contracts**");

      (ii)      all Intellectual Property rights, including those set forth on **Schedule 2.01(b)(ii)** (the "**Intellectual Property Assets**");

      (iii)      all of Sellers' Inventory;

      (iv)      the machinery and equipment, including all harvesting equipment used in the Columbia Basin, wherever located, listed on **Schedule 2.01(b)(v)**;

      (v)      all of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets; and

      (vi)      all of Sellers' rights and entitlements related to Sellers' customers and suppliers and the economic benefit of the relationship with same other than accounts

2

receivable as of Closing ("**Sellers' Book of Business**"), except as expressly permitted under Section 2.11.

**Section 2.02     Assumed Liabilities**. Subject to the terms and conditions set forth herein, (a) Seller agrees to pay all Cure Costs associated with the three Lineage Assigned Contracts listed on **Schedule 2.01(b)(i)**, and (b) Buyer agrees to (i) pay the Cure Costs, and (ii) assume, pay, perform and discharge all other obligations and Liabilities of Sellers under the other Assigned Contracts set forth on **Schedule 2.01(b)(i)** (collectively, the "**Assumed Liabilities**"), and no other Liabilities of Sellers. Without limitation of the foregoing, it is expressly agreed that Buyer shall not assume any Liabilities associated with employees of Sellers or the Business, including those relating to or resulting from, any single or multi-employer pension plan of any Seller.

**Section 2.03     Excluded Assets**. Notwithstanding anything to the contrary contained in this Agreement, Buyer is not acquiring any of Sellers' assets other than the Purchased Assets (collectively, the "**Excluded Assets**"). The Excluded Assets are specifically excluded from the sale contemplated by this Agreement and include, without limitation, accounts receivable and Finished Goods.

**Section 2.04     Purchase Price**. The aggregate purchase price for the Purchased Assets due at Closing shall be an amount equal to (i) Twenty One Million Five Hundred Thousand Dollars ($21,500,000), *plus* (ii) the Estimated Inventory Value (the "**Purchase Price**"). The Purchase Price shall be paid to Sellers (the "**Purchase Price Payment**") and otherwise as set forth in Section 2.05.

**Section 2.05     Payment of Purchase Price**.

(a)     Within one (1) business day of execution of this Agreement, Buyer shall deposit Five Million Dollars ($5,000,000) in an account designated by Sellers to be held by Sellers as earnest money (the "**Earnest Deposit**") which shall be applied at Closing to the Closing Purchase Price Payment; for the avoidance of doubt, the Earnest Deposit shall be immediately returned to Buyer upon valid termination of this Agreement by Buyer in accordance with Article VIII hereof.

(b)     The amount paid by Buyer to Sellers at Closing (the "**Closing Purchase Price Payment**") shall equal (i) the Purchase Price, *minus* (ii) the True-up Escrow Amount, *minus* (iii) the Earnest Deposit which shall be deemed released to Sellers immediately upon Closing.

(c)     No later than five (5) days before Closing, Sellers shall deliver to Buyer a spreadsheet setting forth the Estimated Inventory Value, and its good faith calculation of the Closing Purchase Price Payment, in a form reasonably satisfactory to Buyer (the "**Closing Flow of Funds**").

(d)     During the forty-five (45) days after the Closing Date (the "**Adjustment Period**"), Sellers and Buyer shall work together to reconcile the Estimated Inventory Value with the actual Inventory Value, as of the Closing Date (the "**Purchase Price Adjustment**") and at the end of the Adjustment Period, Sellers shall deliver to Buyer their good faith calculation of the Purchase Price Adjustment and the resulting final Purchase Price (the "**Final Purchase Price**"), in form substantially similar to the Closing Flow of Funds (the "**Final Flow of Funds**").

(e)     No later than fifteen (15) days after delivery of the proposed Final Flow of Funds, Buyer will give notice that it either accepts or rejects the Purchase Price Adjustment set forth in the Final Flow of Funds. If Buyer accepts the Purchase Price Adjustment, or if Buyer fails to give notice to Sellers of any objection within fifteen (15) days after delivery of the proposed Final Flow of Funds, the Final Purchase Price set forth in the Final Flow of Funds shall be the final and binding

4823-2490-0524v.4 0055621-000009

EXHIBIT 1 - Page 7 of 38

calculation of the Final Purchase Price and no further amounts will be due to either Buyer or Sellers pursuant to this Section 2.05. If Buyer gives notice to Sellers of an objection to Purchase Price Adjustment within fifteen (15) days after delivery of the proposed Final Flow of Funds, Sellers and Buyer shall attempt in good faith to resolve their differences. If Sellers and Buyer are able to resolve their differences, the Final Purchase Price set forth in the Final Flow of Funds, as modified to reflect the resolution of the differences between Sellers and Buyer, shall be the final and binding calculation of the Final Purchase Price. If, however, Sellers and Buyer are unable to resolve their differences, Sellers and Buyer shall submit any disputed items to final and binding arbitration in Seattle, Washington by a mutually agreed upon single arbitrator with experience related to food product inventories in Washington. Each party shall submit what it believes would be the accurate Purchase Price Adjustment together with its supporting evidence at a single arbitration hearing. The parties shall use their good faith efforts to complete any such arbitration within thirty (30) days of the request for arbitration. The determination of the Purchase Price Adjustment and Final Purchase Price by the arbitrator shall be final and binding on Sellers and Buyer. The fees and expenses of the arbitrator shall be paid when due 50% by Sellers and 50% by Buyer.

(f)     If the Closing Purchase Price Payment is greater than the Final Purchase Price (a "**Purchase Price Shortfall**"), Sellers shall promptly pay the difference as directed by Buyer within three (3) Business Days in the form of a release from the True-up Escrow Fund. If the Closing Purchase Price Payment is less than the Purchase Price Payment, Buyer shall promptly pay the difference as directed by Sellers within three (3) Business Days of the final determination.

**Section 2.06     Allocation of Purchase Price.** Sellers and Buyer agree that the Final Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets in accordance with Code Section 1060 and applicable Treasury Regulations as shown on the allocation schedule (the "**Allocation Schedule**"). A draft of the Allocation Schedule shall be prepared by Buyer and delivered to Sellers within sixty (60) days following the Closing Date. If Sellers notify Buyer in writing that Sellers object to one or more items reflected in the Allocation Schedule, Sellers and Buyer shall negotiate in good faith to resolve such dispute; *provided, however,* that if Sellers and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within ninety (90) days following the Closing Date, such dispute shall be resolved by the determination of an independent accountant, to be appointed by the parties at such time. The fees and expenses of such accounting firm shall be borne equally by Sellers and Buyer. Buyer and Sellers shall file all Tax Returns (including, but not limited to IRS Form 8594), in a manner consistent with the Allocation Schedule, provided, however, that no discrepancy between the Allocation Schedule and any Tax Returns already filed with respect to transfer Taxes described in Section 6.022 shall require the parties to amend such Tax Returns. Neither Buyer nor Sellers shall take any position (whether in audits, Tax Returns or otherwise), that is inconsistent with the Allocation Schedule unless required to do so by applicable Law.

**Section 2.07     Closing Costs.** With regard to the transfer of the Quincy Plant, Buyer, on the one hand, and Sellers on the other will each pay for one-half of (i) title coordination fees, (ii) real estate escrow fees, and (iii) any title cancellation fees. Sellers will pay title premiums for standard coverage title insurance policy for the Quincy Plant, and Buyer will pay any excess premiums for extended coverage and/or any endorsements that Buyer chooses to obtain, *provided, however,* that Sellers shall pay for any title endorsements reasonably requested by Buyer to affirmatively insure over any title exceptions raised by the title company after reviewing the title surveys.

**Section 2.08     Prorations.**

(a)     The parties agree that the following prorations shall be made and satisfied in accordance with Section 2.08(b) below:

(i)     The Sellers will be responsible for all ad valorem Taxes on the Purchased Assets, including real and personal property taxes and assessments, and installments of special assessments relating to the Purchased Assets (collectively "**Property Taxes**"), attributable to periods occurring on or before the Closing Date. Property Taxes attributable to a Tax period beginning before and ending after the Closing Date shall be prorated between Sellers and Buyer. Sellers shall be responsible for the portion of such Property Taxes determined by multiplying the Property Taxes for the entire period by a fraction, the numerator of which is the number of calendar days in the portion of such period ending on the Closing Date, and the denominator of which is the number of calendar days in the entire period. If any Tax authority accelerates the collection of Property Taxes from a post-Closing Tax year to the Tax year in which the Closing occurs, such Taxes shall be considered Taxes due and payable in the Tax year in which the Closing occurs for purposes of this Section 2.08(a)(i). The Buyer shall be responsible for all other Property Taxes attributable to the Purchased Assets.

(ii)     Utilities and other services provided at or related to the Quincy Plant shall be prorated between Sellers and Buyer with respect to their ownership of the Quincy Plant before and after the Closing Date. Sellers shall be responsible for payments incurred or relating to any period prior to the Closing Date and Buyer shall be responsible for payments incurred or relating to any period beginning on or after the Closing Date.

(b)     Any fees, Liabilities or charges subject to proration under this Section 2.08 shall be paid by Buyer as they become due. In the event statements or bills are sent to a Seller by any Tax authority or Person demanding payment, Sellers shall forward such statements to Buyer. Buyer shall be entitled to recover Sellers' prorated portion of such payments by providing written notice to Sellers or, at its sole discretion, by demanding disbursement from the True-up Escrow Fund.

**Section 2.09     Employees.**

(a)     Sellers shall terminate all Quincy Foods' employees who are employed in connection with the Purchased Assets (the "**Business Employees**") effective no later than the Closing Date.

(b)     Buyer has the right to offer employment to any Business Employees whom Buyer determines, in its sole and absolute discretion, to be suitable to the operations of such businesses, on terms to be agreed between Buyer and each Business Employee; provided, however, that in no event shall Buyer have any obligation whatsoever to hire any employee of any Seller. Buyer is not assuming any of Sellers' obligations or liabilities under any collective bargaining agreement, including any liability for any pension or other retiree benefit.

(c)     For the avoidance of doubt, Sellers shall be solely responsible and Buyer shall have no obligation whatsoever, for any Liabilities relating to the following: (i) payment of all compensation and wages (including salaries, commissions, and bonuses) and payroll Taxes through the Closing Date, (ii) payment of all benefits, including severance, accrued vacation, pension and profit sharing contributions, seniority rights, and other forms of benefits of any type or nature on account of said employees' or any former employees' employment by any Seller through the Closing Date, (iii) satisfying Sellers' obligations on account of employment or former employment by Seller, including obligations for providing COBRA health plan continuation coverage to former employees and their dependents (whether they are on COBRA health plan continuation coverage on the day before the Closing Date, are employees of a Seller who are not employed by Buyer on the Closing Date or their dependents, or otherwise), (iv) performing any obligations required by

4823-2490-0524v.4 0055621-000009

EXHIBIT 1 - Page 9 of 38

Case 19-62584-pcm11     Doc 677     Filed 03/06/20

the Fair Labor Standards Act of 1938, the Equal Pay Act, applicable wage and hour laws, or any other applicable laws, (v) giving any required notices under the Warn Act, (vi) all Losses relating to or arising under NORPAC's single employer or multi-employer pension plans (including any withdrawal liability assessed against NORPAC), and (vii) any and all other liabilities and obligations to Sellers' employees, former employees, and their respective dependents and for compliance with all applicable employment laws.

(d)      Sellers shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims are incurred prior to the Closing Date. Sellers also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which are incurred prior to the Closing Date. For purposes of this Agreement, the following claims shall be deemed to be incurred as follows: (i) life, accidental death and dismemberment, short-term disability, and workers' compensation insurance benefits, on the event giving rise to such benefits; (ii) medical, vision, dental, and prescription drug benefits, on the date the applicable services, materials or supplies were provided; and (iii) long-term disability benefits, on the eligibility date determined by the long-term disability insurance carrier for the plan in which the applicable employee participate. Sellers shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

**Section 2.10      Withholding Tax.** Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law with respect to the transactions contemplated by this Agreement. All such withheld and remitted amounts shall be treated as delivered to Sellers hereunder.

**Section 2.11      License Back.** Effective as of the Closing, Buyer hereby grants to Sellers, an express license to use and reproduce, such of the Intellectual Property Assets as may be required to sell and distribute Finished Goods retained by Sellers as of the Closing (the "**License Back**"), subject to the following limitations: (i) the License Back shall terminate as of February 29, 2020 with no further action or notice required by either party; (ii) Sellers shall have no right to sub-license or assign any of the Intellectual Property Assets; (iii) no ownership rights to the Intellectual Property Assets shall be transferred by virtue of the License Back; (iv) Sellers shall use the Intellectual Property Assets in compliance with applicable Laws and consistent with past practices of the Business; and (v) the Intellectual Property Assets shall only be used in connection with the sale of Finished Goods to customers of Sellers in existence as of the Closing.

<center>

**ARTICLE III**
**CLOSING**

</center>

**Section 3.01      Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Davis Wright Tremaine, LLP located in Portland, Oregon, at 12:01 AM, Pacific standard time, on the day that is two (2) Business Days after all of the conditions to Closing set forth in <u>ARTICLE VII</u> are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Sellers and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**."

<center>6</center>

**Section 3.02    Closing Deliverables**

(a)    At the Closing, Sellers shall deliver to Buyer the following:

(i)    the Escrow Agreement duly executed by Seller;

(ii)    bills of sale in form and substance satisfactory to Buyer (the "**Bills of Sale**") and duly executed by Sellers, transferring the Purchased Assets to Buyer;

(iii)    an assignment and assumption agreement in form and substance satisfactory to Buyer (the "**Assignment and Assumption Agreement**") and duly executed by Sellers, effecting the assignment to Buyer of the Assigned Contracts;

(iv)    intellectual property assignments in form and substance satisfactory to Buyer (the "**Intellectual Property Assignments**") and duly executed by Sellers, transferring all of Sellers' right, title and interest in and to the Intellectual Property Assets to Buyer;

(v)    with respect to the Quincy Plant, a general warranty deed subject only to the applicable Permitted Encumbrances and otherwise in form and substance satisfactory to Buyer (the "**Deed**") and duly executed and notarized by Quincy Foods;

(vi)    the Seller Secretary Certificate;

(vii)    the FIRPTA Certificates; and

(viii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers the following:

(i)    the Closing Purchase Price Payment by wire transfer of immediately available funds to an account designated in writing by Sellers to Buyer;

(ii)    the Escrow Agreement duly executed by Buyer; and

(iii)    the Assignment and Assumption Agreement duly executed by Buyer.

(c)    At the Closing, Buyer shall deliver to the Escrow Agent:

(i)    the True-up Escrow Amount (such amount, including any interest or other amounts earned thereon and less any disbursements therefrom in accordance with the Escrow Agreement, the "**True-up Escrow Fund**") by wire transfer of immediately available funds to accounts designated by the Escrow Agent; and

(ii)    the Escrow Agreement.

4823-2490-0524v.4 0055621-000009

EXHIBIT 1 - Page 11 of 38

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Each Seller represents and warrants to Buyer that the statements contained in this <u>ARTICLE IV</u> are true and correct in all material respects as of the date hereof.

**Section 4.01     Organization and Qualification of NORPAC.** NORPAC is a corporation duly organized, validly existing and in good standing under the Laws of the state of Oregon and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Quincy Plant as currently conducted by it. NORPAC is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Quincy Plant as currently conducted by it makes such licensing or qualification necessary.

**Section 4.02     Organization and Qualification of Quincy Foods and Hermiston Foods.**

(a)     Quincy Foods is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Washington and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by it. Quincy Foods is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted by it makes such licensing or qualification necessary.

(b)     Hermiston Foods is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Oregon and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by it. Hermiston Foods is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted by it makes such licensing or qualification necessary.

**Section 4.03     Authority of Sellers.** Each Seller has full corporate or limited liability company power and authority to enter into this Agreement and the Ancillary Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement by each Seller and any Ancillary Document to which such Seller is a party, the performance by each Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Seller.

**Section 4.04     Title to Purchased Assets.** Sellers have good and valid title to, or a valid leasehold interest in, all of the Purchased Assets. Sale of the Purchased Assets (including leasehold interests) shall be free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(a)     Encumbrances for Taxes not yet due and payable; and

(b)     zoning or other governmentally established restrictions or encumbrances affecting real property which are not violated by any current use, occupancy or activity conducted by the Sellers.

(c)     Encumbrances permitted under <u>Section 4.05(a)</u>.

8

## Section 4.05    Quincy Plant

(a)    Sellers have good and marketable fee simple title to the Quincy Plant, free and clear of all Encumbrances, except the following exceptions set forth in Schedule B, Part II of the Quincy Title Commitment, which are Permitted Encumbrances (provided, however, that if such exceptions are deleted from updated or supplemental versions of the Quincy Title Commitment issued after the date of this Agreement, such exceptions shall not be considered Permitted Encumbrances): (i) Special Exceptions 4 and 5, modified to reflect no assessments are due and owing as of the policy date; (ii) Special Exception 16, modified to reference only the specific tenants identified in the applicable owner's affidavit delivered by Quincy Foods in advance of Closing; and (iii) Special Exceptions 17 through 63, inclusive.

(b)    Sellers have not leased or otherwise granted to any Person the right to use or occupy the Quincy Plant or any portion thereof;

(c)    There are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase the Quincy Plant or any portion thereof or interest therein.

(d)    Sellers have not, in the five (5) year period preceding the date hereof, received any written notice of (i) any material violation of any building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Quincy Plant, (ii) existing, pending or threatened condemnation proceedings affecting the Quincy Plant, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which would reasonably be expected to adversely affect the ability to operate the Quincy Plant as currently operated. Neither the whole nor any material portion of any Quincy Plant has been damaged or destroyed by fire or other casualty, which damage or destruction has not been repaired or replaced.

## Section 4.06    Intellectual Property.

(a)    **Schedule 2.01(b)(ii)**    contains a correct, current and complete list of: (i) all Intellectual Property Registrations, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered or filed; the patent, registration or application serial number; the issue, registration or filing date; and the current status; and (ii) all material unregistered Intellectual Property included in the Intellectual Property Assets.

(b)    Sellers are the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, in each case, free and clear of Encumbrances other than Permitted Encumbrances.

(c)    All of the Intellectual Property Assets are valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect. Sellers have taken all necessary steps to maintain and enforce the Intellectual Property Assets. All required filings and fees related to the Intellectual Property Registrations have been timely submitted with and paid to the relevant Governmental Authorities and authorized registrars.

There are no Actions (including any opposition, cancellation, revocation, review, or other proceeding), whether settled, pending or threatened in writing or, to Sellers' Knowledge, orally (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by any Seller in the conduct of the Business; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of

4823-2490-0524v.4 0055621-000009

EXHIBIT 1 - Page 13 of 38

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

any Intellectual Property Assets; or (iii) by Sellers or, to Sellers' Knowledge, any other Person alleging any infringement, misappropriation, or other violation by any Person of any Intellectual Property Assets.

**Section 4.07     Environmental Matters.**

(a)     The operations of the Quincy Plant and the Purchased Assets are currently, and have been for the five-year period preceding the date hereof, in all material respects in compliance with all Environmental Laws. Sellers have not received from any Person, with respect to the Quincy Plant or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which remains pending or unresolved or is the source of ongoing obligations or requirements as of the Closing Date.

(b)     Sellers have obtained and are in material compliance with all Environmental Permits necessary for the operation of the Quincy Plant as currently conducted or the ownership, lease, operation or use of the Purchased Assets and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Sellers through the Closing Date in accordance with Environmental Law, and Sellers are not aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the operation of the Quincy Plant as currently conducted or the ownership, lease, operation or use of the Purchased Assets. With respect to any such Environmental Permits, Sellers have undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of the same, and to Sellers' Knowledge, no condition, event or circumstance exists that might prevent or impede the transferability of the same, and Sellers have not received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same.

(c)     None of the real property parcels included in the Quincy Plant is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d)     There has been no Release of Hazardous Materials in contravention of Environmental Law or the terms of an Environmental Permit with respect to the Quincy Plant, the Purchased Assets or any real property currently or, to Sellers' Knowledge, formerly owned, leased or operated by any Seller in connection with the Quincy Plant. Sellers have not received an Environmental Notice that any of the Quincy Plant (including soils, groundwater, surface water, buildings and other structure located thereon) has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim, or a violation of Environmental Law or term of any Environmental Permit.

(e)     Sellers have provided Buyer with a complete and accurate list of all active or abandoned aboveground or underground storage tanks located on the Quincy Plant.

(f)     Sellers have not received any Environmental Notice regarding potential Liabilities with respect to off-site Hazardous Materials treatment, storage, or disposal facilities or locations used in connection with the Quincy Plant.

(g)     Quincy Foods has not retained or assumed, by contract or operation of Law, any Liabilities or obligations of third parties under Environmental Law.

10

(h)     Sellers have provided or otherwise made available to Buyer: (i) any and all environmental reports, studies, audits, surveys, records, sampling data, site assessments, risk assessments, economic models and other similar documents in either Seller's possession or control with respect to the Quincy Plant related to compliance with Environmental Laws or the Release, presence, investigation or remediation of, or exposure to, Hazardous Materials; (ii) any and all documents and correspondence in either Seller's possession or control related to Environmental Claims or Environmental Notices; and (iii)  any and all material documents in either Seller's possession or control concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current or future Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

(i)     Sellers are not aware of nor do they reasonably anticipate, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the Quincy Plant as currently carried out.

**Section 4.08     Employee Benefit Matters.**

(a)     Sellers have provided Buyer a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not Tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by any Seller for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of Quincy Foods or any spouse or dependent of such individual, or under which any Seller or any of its ERISA Affiliates has or may have any Liability with respect to any current or former employee, officer, director, retiree, independent contractor or consultant of Quincy Foods or any spouse or dependent of such individual (each, a "**Benefit Plan**").

(b)     With respect to each Benefit Plan other than a Multiemployer Plan, Sellers have made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, summaries of benefits and coverage; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service and any legal opinions issued thereafter with respect to such Benefit Plan's continued qualification; (vi) in the case of any Benefit Plan for which a Form 5500 must be filed, a copy of the two most recently filed Forms 5500, with all corresponding schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters or other correspondence from

11

FINAL

the Internal Revenue Service, Department of Labor, Department of Health and Human Services, Pension Benefit Guaranty Corporation or other Governmental Authority relating to the Benefit Plan.

(c)        Each Benefit Plan and any related trust (other than any multiemployer plan within the meaning of Section 3(37) of ERISA (each a "**Multiemployer Plan**")) has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA, the Code and any applicable local Laws). Each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified and received a favorable and current determination letter from the Internal Revenue Service with respect to the most recent five year filing cycle, or with respect to a prototype or volume submitter plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan or volume submitter plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Sellers' Knowledge, nothing has occurred that would reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. To Sellers' Knowledge, nothing has occurred with respect to any Benefit Plan that has subjected or would reasonably be expected to subject any Seller or any of its ERISA Affiliates or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to Tax or penalty under Sections 4975 or 4980H of the Code. No Benefit Plan which is a pension plan (other than a Multiemployer Plan) which is subject to minimum funding requirements, including any multiple employer plan (each a "**Single Employer Plan**"), has an "accumulated funding deficiency," whether or not waived, or is subject to a lien for unpaid contributions under Section 303(k) of ERISA or Section 430(k) of the Code. No Single Employer Plan covering employees of Quincy Foods which is a defined benefit plan has an "adjusted funding target attainment percentage," as defined in Section 436 of the Code, less than 80%. All benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with GAAP.

(d)        Neither Sellers nor any of their ERISA Affiliates has (i) incurred or reasonably expects to incur, either directly or indirectly, any material Liability under Title I or Title IV of ERISA or related provisions of the Code or applicable local Law relating to employee benefit plans with respect to any Benefit Plan; (ii) failed to timely pay premiums to the Pension Benefit Guaranty Corporation; (iii) withdrawn from any Benefit Plan; (iv) engaged in any transaction which would give rise to Liability under Section 4069 or Section 4212(c) of ERISA with respect to any Benefit Plan; (v) incurred Taxes under Section 4971 of the Code with respect to any Single Employer Plan; or (vi) participated in a multiple employer welfare arrangements (MEWA) covering employees of Quincy Foods.

(e)        There has been no amendment to, announcement by Quincy Foods relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year (other than on a de minimis basis) with respect to any director, officer, employee, consultant or independent contractor of Quincy Foods, as applicable. Neither Sellers nor any of their respective Affiliates have any commitment or obligation or has made any representations to any director, officer, employee, consultant or independent contractor of Quincy Foods, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement.

12

(f)      Each Benefit Plan that is subject to Section 409A of the Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including, notices, rulings and proposed and final regulations) thereunder. Sellers do not have any obligation to gross up, indemnify or otherwise reimburse any individual for any excise Taxes, interest or penalties incurred pursuant to Section 409A of the Code.

(g)      Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of Quincy Foods to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code; or (vi) cause a complete or partial withdrawal by Seller from any Multiemployer Plan.

(h)      As of the date hereof, all compensation, including wages, commissions, bonuses, fees and other compensation, payable to all employees, independent contractors or consultants of Quincy Foods for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of Sellers with respect to any compensation, commissions, bonuses or fees.

(i)      Quincy Foods is and has been in compliance with the terms of all applicable contracts and Laws pertaining to employment and employment practices to the extent they relate to employees, consultants and independent contractors of Quincy Foods, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave and unemployment insurance. All individuals characterized and treated by Sellers as consultants or independent contractors of Quincy Foods are properly treated as independent contractors under all applicable Laws. All employees of Quincy Foods classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified.

(j)      Quincy Foods is in compliance with, and has complied, with the Immigration Reform and Control Act of 1986, as amended, with all applicable regulations related thereto with respect to the employment status of its employees and the preparation of the Employment Eligibility Verification Form (Form I-9) for each employee.

(k)      Quincy Foods has disclosed to Buyer all Actions against Quincy Foods pending, or to Sellers' Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant or independent contractor of Quincy Foods, including, without limitation, any charge, investigation or claim relating to unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, employee classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of

13

absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable Laws.

**Section 4.09    Inventory.**

(a)    All Inventory and Packaging Materials (i) are merchantable and fit for their intended purpose including, as applicable, for human consumption, (ii) are of marketable grade and quality; (iii) have not been adulterated or misbranded; and (iv) conform to the applicable customer agreement.

(b)    Quincy Foods is registered and complies with all applicable requirements under the Public Health Security and Bioterrorism Preparedness and Response Act, as amended and the implementing rules and regulations of the FDA and are in compliance with the HACCP food safety systems requirements of the FDA and its own HACCP plan and the HARP-C food safety program (as applicable).

(c)    Quincy Foods has obtained all permits, licenses, and approvals necessary to process, package, store and/or supply the Inventory and Packaging Materials (including those required by FDA).

**Section 4.10    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of any Seller.

**Section 4.11    No Other Representations or Warranties.** Except for the representations and warranties contained in this <u>ARTICLE IV</u>, no Seller or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of any Seller, Quincy Foods, the Purchased Assets or the Assumed Liabilities.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers that the statements contained in this <u>ARTICLE V</u> are true and correct as of the date hereof.

**Section 5.01    Organization of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the state of Washington.

**Section 5.02    Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by the General Enforceability Exceptions.

14

**Section 5.03    No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, except such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a material adverse effect.

**Section 5.04    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 5.05    Source of Funds.** At the Closing, Buyer will have sufficient cash available (including funds available under any debt facility) to enable it to pay the full Purchase Price payable hereunder and to make all other necessary payments by it in connection with the transactions contemplated herein and in the Ancillary Documents. The source of funds for payment of the Purchase Price shall not violate any Law, and Buyer shall not fund the Purchase Price in violation of any Law.

**Section 5.06    Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that (a) in making its decision to enter into this Agreement and the Ancillary Documents and to consummate the transactions contemplated herein and therein, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in ARTICLE IV and in the Ancillary Documents, and (b) no Seller or any other Person has made any representation or warranty as to any Seller, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in ARTICLE IV. Notwithstanding the foregoing, nothing in this Section 5.06 shall limit any liability or obligation of any Seller under this Agreement.

<div align="center">

**ARTICLE VI**
**COVENANTS**

</div>

**Section 6.01    Operation of Quincy Plant Prior to the Closing.** From the date hereof until the Closing or the earlier termination of this Agreement, Sellers will use its best efforts (given Quincy Foods' financial constraints) to operate the Quincy Plant in the ordinary course in accordance with past practice.

**Section 6.02    Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Sellers when due. The parties shall use reasonable best efforts to timely file any Tax Return or other document with respect to such Taxes or fees.

**Section 6.03    Tax Clearance Certificates.** If requested by Buyer, Sellers shall request a tax clearance certificate (a "**Tax Clearance Certificate**") from any Tax authority in the jurisdictions that

<div align="center">15</div>

impose Taxes on a Seller or where a Seller has a duty to file Tax Returns and, if requested by Buyer, Sellers shall notify any such Tax authority of the transactions contemplated by this Agreement in the form and manner required by such Tax authorities, if the making or failure to make such notification could affect the liability of Buyer for any Taxes of Seller. If any Tax authority asserts that a Seller is liable for any Tax attributable to periods occurring on or before the Closing Date, such Seller shall promptly give Buyer notice of the same, and if such Tax or any part of the same becomes due upon failure to appeal or upon a final determination of liability, or if such Tax must be paid by such Seller to permit an appeal, such Seller shall promptly pay any and all such amounts and shall provide evidence to Buyer that such Liabilities have been paid in full or otherwise satisfied.

Section 6.04    **Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

<div align="center">

ARTICLE VII
CONDITIONS TO CLOSING

</div>

Section 7.01    **Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    No Action shall have been commenced against Buyer or Sellers, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

Section 7.02    **Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Seller contained in Sections 4.03, 4.04, 4.05 and 4.10 of this Agreement shall be true and correct in all material respects as of the Closing Date.

(b)    Sellers shall have delivered to Buyer duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(a).

(c)    Quincy Foods shall have filed for and obtained a change of the registered name of the entity with the Washington Secretary of State's Office.

(d)    Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Sellers certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Sellers authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and

<div align="center">16</div>

FINAL

effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby (the "**Seller Secretary Certificate**").

(e)  Buyer shall have received on behalf of each Seller a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (collectively, the "**FIRPTA Certificates**"), in form and substance reasonably satisfactory to Buyer, that such Seller is not a foreign person within the meaning of Section 1445 of the Code, duly executed by NORPAC.

(f)  Sellers shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(g)  Buyer shall be satisfied, in its reasonable discretion, by the terms of the Sale Order.

(h)  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed as of the Closing Date.

(i)  The objection deadline shall have passed for all counterparties to Assigned Contracts to object to the assumption and assignment of such Assigned Contracts, and any timely objection has been resolved.

(j)  NORPAC shall have legally changed its name so that "NORPAC" is no longer included.

(k)  The Inventory as of the Closing, shall meet or exceed the thresholds set forth in **Schedule 7.02(k)**.

Section 7.03  **Conditions to Obligations of Sellers.** The obligations of Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)  The representations and warranties of Buyer contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)  Buyer shall have delivered to Sellers duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(b).

(c)  Buyer shall have delivered the True-up Escrow Amount to the Escrow Agent.

(d)  Buyer shall have delivered to Sellers such other documents or instruments as Sellers reasonably request and are reasonably necessary to consummate the transactions contemplated by this Agreement.

### ARTICLE VIII
### TERMINATION

Section 8.01  **Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)  by the mutual written consent of Sellers and Buyer;

17

(b)     by Buyer by written notice to Sellers if:

(i)     any of the conditions set forth in <u>Section 7.01</u> or <u>Section 7.02</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by January 15, 2020, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(ii)     if the Bankruptcy Court issues an order (i) converting the Bankruptcy Case into cases under chapter 7 of the Bankruptcy Code, or (ii) dismissing the Bankruptcy Case;

(c)     by Sellers by written notice to Buyer if:

(i)     any of the conditions set forth in <u>Section 7.01</u> or <u>Section 7.03</u> shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by January 15, 2020, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(d)     by Buyer or Sellers in the event that:

(i)     the Sale Order has not been entered by the Bankruptcy Court on or before December 31, 2019;

(ii)     there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited,

(iii)     any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become a Final Order.

**Section 8.02     Effect of Termination**

(a)     In the event of the termination of this Agreement in accordance with this <u>Article VIII</u>, this Agreement shall forthwith become void and there shall be no Liability on the part of any party hereto except that nothing herein shall relieve any party hereto from Liability for any willful breach of any provision hereof.

(b)     As set forth in <u>Section 2.05(a)</u>, immediately upon termination in accordance with this <u>Article VIII</u>, Sellers shall transfer the full Earnest Deposit to an account designated by Buyer in immediately available funds.

## ARTICLE IX
## BANKRUPTCY COURT MATTERS

**Section 9.01     Binding Effect; Entry of Sale Order.** Sellers and Buyer acknowledge and agree that their obligations to close the transactions contemplated by this Agreement (collectively, the "**Transaction**") are conditioned upon the entry by the Bankruptcy Court of the Sale Order.

18

## ARTICLE X
## MISCELLANEOUS

**Section 10.01    Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 10.02    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 10.02</u>):

|  |  |
|---|---|
| If to Sellers: | NORPAC Foods, Inc.<br>PO Box 14444<br>Salem, OR 97309-5012<br><u>E-mail</u>: Winston Mar<br><u>Attention</u>: wmar@scpllc.com |
| *with a copy to:* | Tonkon Torp LLP<br>888 SW Fifth Avenue, Suite 1600<br>Portland, OR 97204<br><u>E-mail</u>: Michael.fletcher@tonkon.com<br><u>Attention</u>: Michael Fletcher |
| If to Buyer: | Oregon Potato Company<br>P.O. Box 3110<br>Pasco, WA 99302<br><u>E-mail</u>: sschossberger@oregonpotato.com<br><u>Attention</u>: Steven Schossberger, General Counsel |
| *with a copy to:* | Davis Wright Tremaine, LLP<br>920 Fifth Avenue, Suite 3300<br>Seattle, WA 98104<br><u>E-mail</u>: joevanleuven@dwt.com<br><u>Attention</u>: Joe VanLeuven |

**Section 10.03    Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as

19

amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 10.04    **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 10.05    **Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 10.06    **Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, Schedules and Exhibits, the statements in the body of this Agreement will control.

Section 10.07    **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however*, that prior to the Closing Date, Buyer may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning party of any of its obligations hereunder.

Section 10.08    **No Third Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.09    **Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.10    **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

4823-2490-0524v.4 0055621-000009

EXHIBIT 1 - Page 24 of 38

(a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Washington without giving effect to any choice or conflict of law provision or rule (whether of the State of Washington or any other jurisdiction).

(b)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder or thereunder, or the Transaction contemplated hereunder or thereunder, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

Section 10.11   **Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 10.12   **Release.** The parties hereby acknowledge and agree that the Asset Purchase Agreement by and between the parties hereto, dated as of August 12, 2019 (the "**Prior APA**"), is hereby terminated in accordance with Section 9.01(a) thereof. The parties further agree to mutually release one another of and from any claims, liability and damages for breach of or otherwise concerning or related to the Prior APA, including any amendments thereto, and any statements made to the press or third parties regarding Buyer's notice of termination of that agreement made prior to the date hereof. Such releases shall be effective only upon Closing.

Section 10.13   **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The parties agree that electronic signatures shall be accepted and deemed effective in all respects through use of a reputable electronic signature services such as DocuSign.

*[Signature Page Follows]*

21

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

<div style="text-align:right">

SELLERS:     **NORPAC Foods, Inc.,**
an Oregon corporation

By_____

Name: _____

Title: _____


**Quincy Foods, LLC,**
a Washington limited liability company
   By: NORPAC Foods, Inc.
   Its: Member

By_____

Name: _____

Title: _____


**Hermiston Foods, LLC,**
an Oregon limited liability company
   By: NORPAC Foods, Inc.
   Its: Member

By_____

Name: _____

Title: _____


BUYER:     **Oregon Potato Company,**
a Washington corporation

By_____
Name: Frank Tiegs
Title: President

</div>

[Signature Page to Asset Purchase Agreement]

<div align="center">

**Schedule 1.01**
**DEFINITIONS**

</div>

The following terms used in the Agreement have the meanings specified or referred to in this **Schedule 1.01**:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Documents**" means the Escrow Agreement, the Bill of Sale, the Assignment and Assumption Agreement, Intellectual Property Assignment, Deed, and the other agreements, instruments and documents required hereunder to be delivered at the Closing.

"**Attorney Records**" means with respect to the Sellers, all of the books, files, documents and records of attorneys relating to their respective representations of the Sellers in connection with the negotiation, execution and delivery of this Agreement, the Ancillary Documents and the transactions contemplated herein and therein.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Seattle, Washington are authorized or required by Law to be closed for business.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Cure Costs**" means the amounts required to be paid to satisfy 11 USC Sec. 365(b)(1) A with respect to the Assigned Contracts, plus all amounts owed for goods, services or other benefits provided under the Assigned Contracts prior to the Closing Date. In the case of leases and other Assigned Contracts under which rent or other periodic payment is paid, Cure Costs shall be pro-rated as of the Closing Date.

"**Dollars or $**" means the lawful currency of the United States.

"**Encumbrance**" means any interest, charge, claim (including but not limited to claim for successor liability), community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, Labor Obligation, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, approval, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with any Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**Escrow Agent**" means Bank of America, National Association.

"**Escrow Agreement**" means the Escrow Agreement to be entered into by Buyer, Sellers and the Escrow Agent at the Closing, in form and substance satisfactory to Buyer, Sellers and the Escrow Agent.

"**Estimated Inventory Value**" means Sellers' good faith estimate of the Inventory Value at Closing.

"**Final Order**" means an order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect and is no longer subject to appeal; provided, the if an appeal of the Sale Order is timely filed pursuant to Bankruptcy Rule 8002, but no stay of the execution of such order is issued by the court pending resolution of the appeal, then Buyer may elect to treat such order as a Final Order in its sole discretion.

"**Finished Goods**" means the finished goods of the Business that are fully packaged, labeled products held in inventory as of the Closing Date.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Intellectual Property**" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); or (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**").

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

"**Inventory**" means all of Sellers' Bulk Product and packaging materials, but does not include Finished Goods.

"**Inventory Value**" means the value of all Inventory as determined using the calculation set forth on Schedule 2.04.

"**Knowledge of Sellers**" or "**Sellers' Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of either Seller, after due inquiry.

"**Labor Obligations**" means (a) legal and/or contractual obligations relating to the employment of labor including, without limitation, any provisions relating to wages, hours, equal employment, occupational safety and health, workers' compensation, unemployment insurance, collective bargaining, immigration, affirmative action, and the payment and withholding of social security and other taxes; (b) terms of all collective bargaining agreements, and any and all other agreements and understandings that are in place with any labor unions, trade associations, or other employee organizations that represent or have written a demand for recognition with respect to any Business Employees; (c) retirement, pension, employee, or welfare-benefits obligations with respect to any Business Employees; and (d) any obligations to fund or contribute to any Benefit Plans ever maintained or contributed to by any Seller or any related entities, whether or not covering Business Employees including but not limited to withdrawal liability or successor liability under ERISA.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, Taxes, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however,* that "Losses" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or other third party that is not an Affiliate of the Person claiming Losses.

"**Non-Governmental Authority**" means any certification authority of any nature, or any industry group or private body which establishes widely accepted standards or guidelines.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pre-Closing Tax Period**" means any Taxable period ending on or before the Closing Date and, with respect to any Taxable period beginning before and ending after the Closing Date, the portion of such Taxable period ending on and including the Closing Date.

"**Quincy Title Commitment**" means the preliminary commitment for title insurance issued by First American Title Insurance Company under Commitment No. NCS-969352-WA1 dated July 9, 2019.

"**Release**" in the context of environmental matters means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Sale Order**" means an order of the Bankruptcy Court, issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance reasonably acceptable to Buyer and Seller, containing findings of fact and conclusions of law establishing, among other things, that: (a) Sellers are authorized to transfer to Buyer all interests of Sellers in the Purchased Assets free and clear of Encumbrances (except Permitted Encumbrances), to the fullest extent allowable under the Bankruptcy Code; (b) Sellers are authorized to assume and assign the Assigned Contracts to Buyer; (c) Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; and (d) the fourteen-day stay provision of Bankruptcy Rule 6004 is waived.

"**Tax**" or "**Taxes**" means all federal, state, local, non-U.S. income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, value added, alternative or add-on minimum, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental (including taxes under Code Section 59A), stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever imposed by any federal, state, local or non-U.S. taxing authority, together with any interest, additions or penalties with respect thereto, whether or not disputed, including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**True-up Escrow Amount**" means Two Million Dollars ($2,000,000).

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

<center>**Schedule 2.01**
**Purchased Assets**</center>

**Schedule 2.01(a) – Quincy Plant**

> All interests of Sellers in and to the real property (including, without limitation, all buildings, structures, improvements and fixtures situated thereon, and all easements, rights-of-way and other rights and privileges appurtenant thereto) located at 222 Columbia Way and 2374 NW Road J, Quincy, Washington and associated with Tax Parcel Numbers R040410312 and R151772000.

**Schedule 2.01(a)(i) – Quincy Personal Property**

> All tangible personal property, including all furniture, fixtures, equipment, parts, machinery, tools, vehicles, Inventory, materials, office equipment, supplies, computers, telephones owned by any Sellers, including but not limited to, the assets described in **ANNEX A – Quincy Personal Property**.

**Schedule 2.01(a)(ii) – Intangible Assets**

1. All lists, information, communications and data concerning any past, present or potential customer relations of the Business.

2. All lists, information, communications and data concerning any past, present or potential supplier or third-party contractor relations of the Business.

3. All information technology data, backups and system information associated with the Purchased Assets.

4. Goodwill of the Business associated with the Purchased Assets.

5. All rights to and associated with the trade name "Quincy Foods".

6. All formulas, trade secrets, know how, concepts, methods, processes, recipes and other proprietary information relating to the Business.

**Schedule 2.01(a)(iii) – Assigned Permits**

1. All business permits held by any Seller relating to the Business

2. Environmental Permits:

   - Air Containment Discharge Permit, no expiration, applying for renewal biannually

   - Industrial Stormwater Permit, expires December 31, 2019

   - State Waste Discharge Permit, apply for renewal annually

   - Dangerous Waste Report, no expiration but need to do annual reporting

   - Wastewater Discharge Permit, Expires April 30, 2023

**Schedule 2.01(b)(i) – Assigned Contracts**

1. All rights and entitlements of Sellers under the following Contracts with Lineage Logistics:

- Lease Agreement by and between Lineage Logistics, LLC and Quincy Foods, LLC, dated August 7, 2018.

- First Amendment to Amended and Restated Storage and Freezing Services Agreement by and between Lineage Logistics, LLC and Quincy Foods, LLC, dated July 10, 2019.

- Amended and Restated Storage and Freezing Services Agreement by and between Lineage Columbia, LLC and Quincy Foods, LLC, dated August 3, 2016.

2. Services Agreement by and between Diagraph Marking & Coding and Quincy Foods, LLC, dated June 20, 2019.

3. The following operation and supply contracts or agreements:

- 1Worldsync    Cloud License & Support for data sync to GS1 product catalog    IT/IS Services    3.00 IT/IS Services

- Adesso Solutions, L.L.C.    Cloud License & Support for trade promotion management    IT/IS Services    3.00 IT/IS Services

- Aligntrac/Gs1    Cloud License & Support for GS1 product catalog    IT/IS    Services    3.00 IT/IS Services

- Itrade Network Cloud License & Support for EDI data from and to 15 customers IT/IS Services    3.00 IT/IS Services    Y    (Cure amount 3,671)

- Sps Commerce  Electronic Data Interchange Value Added Network partner that connects NORPAC with all its customers and warehouses    IT/IS Services    3.00 IT/IS Services

- W3Developing, LLC    Website Hosting and Support for www.norpac.com and www.norpacgrowers.com for a monthly charge    IT/IS Services    3.00 IT/IS Services

- BC Frozen Foods    Peas    Ingredients    15.00 Ingredients

- BC Frozen Foods    Wax Beans    Ingredients    15.00 Ingredients

- Boardman Foods    Green Zucchini Ingredients    15.00 Ingredients

- Bonduelle Usa  Peas    Ingredients    15.00 Ingredients

- Brecon Edamame 72    Ingredients    15.00 Ingredients

- Brecon Edamame 73    Ingredients    15.00 Ingredients

- Brecon Waterchestnuts Ingredients    15.00 Ingredients

- Cebro   Tomatoes    Ingredients    15.00 Ingredients

- Ch Foods    Green Zucchini 20    Ingredients    15.00 Ingredients

- Ch Foods    Green Zucchini 83    Ingredients    15.00 Ingredients

- Ch Foods    Squash Ingredients    15.00 Ingredients

FINAL

- Ch Foods        Zucchini        Ingredients       15.00 Ingredients
- Columbia Fruit   Contract 7045   Ingredients       15.00 Ingredients
- Eckert Cold Storage        Diced Red Peppers 4412        Ingredients        15.00 Ingredients
- Fry Foods        BB Onions        Ingredients       15.00 Ingredients
- Fry Foods        Onion Rings       Ingredients       15.00 Ingredients
- Glanbia Nutritionals     Red Dye        Ingredients      15.00 Ingredients
- Grimmway        Carrots Ingredients       15.00 Ingredients
- Grimmway        Potatoes        Ingredients       15.00 Ingredients
- Johnson Foods Inc.        Asparagus       Ingredients      15.00 Ingredients
- Kywa   Asparagus 3938 Ingredients      15.00 Ingredients
- Kywa    Contract 3760   Ingredients      15.00 Ingredients
- Kywa    Asparagus 3939 Ingredients      15.00 Ingredients
- Kywa    Broccoli 3754    Ingredients       15.00 Ingredients
- Larsen's Creamery        Butter 4311      Ingredients      15.00 Ingredients
- Mb Global        Edemame 4071 Ingredients      15.00 Ingredients
- Mb Global        Edemame 4301 Ingredients      15.00 Ingredients
- Mb Global        Edamame 4070 Ingredients      15.00 Ingredients
- MEMBA        Raspberries 4269       Ingredients      15.00 Ingredients
- MEMBA        Raspberries 7097       Ingredients      15.00 Ingredients
- Michigan Freeze Pack   Zucchini        Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4317   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4318   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4319   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4320   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4321   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4329   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4330   Ingredients      15.00 Ingredients
- Oregon Spice   Dry Mix 4331   Ingredients      15.00 Ingredients

- Oregon Spice     Dry Mix 4332     Ingredients     15.00 Ingredients
- Oregon Spice     Dry Mix 4333     Ingredients     15.00 Ingredients
- Oregon Spice     Dry Mix 4334     Ingredients     15.00 Ingredients
- Oregon Spice     Dry Mix 4335     Ingredients     15.00 Ingredients
- Pictsweet     Leafy Greens_7106     Ingredients     15.00 Ingredients
- Pictsweet     Spinach 3395     Ingredients     15.00 Ingredients
- Pictsweet     Okra 3514     Ingredients     15.00 Ingredients
- Pictsweet     Okra 3515     Ingredients     15.00 Ingredients
- Pictsweet     Spinach 3396     Ingredients     15.00 Ingredients
- Pictsweet     Spinach 6928     Ingredients     15.00 Ingredients
- Pictsweet     Spinach 6929     Ingredients     15.00 Ingredients
- Pictsweet     Kale 3452     Ingredients     15.00 Ingredients
- Rainsweet     Onions 3808     Ingredients     15.00 Ingredients
- Rainsweet     Bean Sprouts     Ingredients     15.00 Ingredients
- Rainsweet     Marionberries     Ingredients     15.00 Ingredients
- Rainsweet     Onions 3809     Ingredients     15.00 Ingredients
- Rainsweet     Onions 3810     Ingredients     15.00 Ingredients
- Smith Frozen Foods     Petite Peas     Ingredients     15.00 Ingredients
- South Mill Mushrooms     Mushrooms     Ingredients     15.00 Ingredients
- Superior     SS Peas Ingredients
- Sure Fresh     Bok Choy     Ingredients
- Sure Fresh     Celery 3677     Ingredients
- Sure Fresh     Celery 3678     Ingredients
- Sure Fresh     Celery 3679     Ingredients
- Trinidad Benham Corp     Black Beans 4416     Ingredients
- Trinidad Benham Corp     Black Beans/Small Reds 4415     Ingredients
- Trinidad Benham Corp     Navy Beans 4414     Ingredients
- Ventura Foods     Margarine 4322 Ingredients
- Ventura Foods     Margarine 4356 Ingredients

- Vlm Foods Usa  Edamame 4069  Ingredients

- Vlm Foods Usa  Baby Cob 3492   Ingredients

- Vlm Foods Usa  Bamboo Shoots Ingredients

- Vlm Foods Usa  Brussel Sprouts 3773        Ingredients

- Vlm Foods Usa  Edamame 4068  Ingredients

- Vlm Foods Usa  Peas        Ingredients

- Vlm Foods Usa  Peppers 4048    Ingredients

- Vlm Foods Usa  Waterchestnuts Ingredients

- Ecolab Supply Agreement,  August 1, 2019

## Schedule 2.01(b)(ii) – Intellectual Property Assets

All rights and interests in all Intellectual Property (registered and unregistered) held by any Seller, including but not limited to, the following:

- The tradenames "NORPAC", "Quincy Foods" and "Hermiston Foods" and all associated trademarks and logos

- The tradename "Flav-R-Pac" and all associated trademarks and logos

- See **ANNEX B – Trademarks**

## Schedule 2.01(b)(v) – Miscellaneous Machinery & Equipment

1. All printing plates and related equipment required to produce Packaging Materials or otherwise bearing the trademarks or tradenames listed in **Schedule 2.01(b)(ii)**.

2. Cob packaging line at Stayton

3. Triangle Dump system with scale & bagger at repacking facilities

4. Pacmac Bagger

5. See **ANNEX C – Columbia Basin Equipment**

**Schedule 2.04**
**Inventory Value**

<u>Inventory Pricing</u>

Inventory Value shall equal the product of (i) the Book Value of Bulk Product *minus* the Book Value of hold product *minus* storage costs of 0.0628 cents per pound on Bulk Product, *multiplied by* (ii) 90%. See below excel spreadsheet for the detailed application of the Inventory Value to the Inventory.

<u>Definitions</u>

The following terms shall have the meaning assigned herein for the purpose of this **<u>Schedule 2.04</u>**:

> **"Book Value"** means the balance sheet account balance of such assets as of the Closing Date calculated in accordance with GAAP.

> **"Bulk Product"** means the bulk product Inventory of the Business as of the Closing Date, including hold Inventory, <u>but</u> excluding micro hold Inventory and soup-related Inventory such as soup #2 meats, soup ingredients, dry soup-cheese frozen and dry #2 base/flay.

> **"Packaging Materials"** means the packaging materials of the Business existing as of the Closing Date bearing either customer trademarks or the Purchased Marks.

> **"Purchased Marks"** means the trademarks of the Business set forth on **<u>Schedule 2.01(b)(ii)</u>**.

**Schedule 7.02(k)**
**Inventory Thresholds**

1. The Inventory Value calculated in accordance with **Schedule 2.04**, shall be equal to or greater than the following thresholds, determined based upon the actual Closing Date:

| Closing Date | | | Inventory Value |
|---|---|---|---|
| December 1, 2019 | *through* | December 13, 2019 | $72,000,000 |
| December 14, 2019 | *through* | December 20, 2019 | $70,000,000 |
| December 21, 2019 | *through* | December 27, 2019 | $68,000,000 |
| December 28, 2019 | *through* | January 3, 2020 | $66,000,000 |
| January 3, 2020 | *through* | January 15, 2020 | $64,000,000 |

2. The hold Inventory shall be equal to or greater than Eighteen Million (18,000,000) pounds.

# ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "Assignment") is dated as of March 3, 2020, by and between PNW Veg Co., LLC ("VegCo") as assignor and National Frozen Foods Corp. ("National") as assignee.

## RECITALS

VegCo acquired inventory and other assets from Norpac Foods, Inc. (n/k/a North Pacific Canners & Packers, Inc. and hereafter, "Debtor") pursuant to an Asset Purchase Agreement dated as of November 15, 2019 (the "APA"), in a court approved transaction in Debtor's bankruptcy case. (Oregon Potato Company, which executed the APA, is VegCo's corporate parent and assigned its rights as Buyer under the APA to VegCo prior to closing.) Capitalized terms used but not defined herein are defined in the APA.

Under Section 2.04 of the APA, the purchase price paid at closing was based in part on Debtor's good faith estimate of the Inventory Value. The Inventory Value was determined using the calculation set forth in APA Schedule 2.04. Under the APA, VegCo was not required to pay for any hold product. Section 2.05 of the APA provided for a 45 day "Adjustment Period" during which the parties would attempt to reconcile the Estimated Inventory Value with the actual Inventory Value, and true-up the final purchase price accordingly.

During the Adjustment Period, VegCo conducted a thorough investigation of the inventory it acquired and determined that Debtor miss-classified not less than 19.7 million pounds of inventory in its books and records that should have been classified as hold product, thereby causing VegCo to overpay for the inventory by not less than $7,121,707.09.

The APA provides that if the purchase price paid at closing is greater than what it should have been, Sellers shall promptly reimburse the Buyer for the overpayment. Debtor disputes and has refused to reimburse the overpayment claimed by VegCo. Section 2.05 of the APA provides for the bankruptcy court in Debtor's bankruptcy case to resolve that dispute (the "Resolution Proceeding") in order to determine the amount of the overpayment (defined in the APA as the "Purchase Price Shortfall").

The APA provides for a $2 million "True-Up Escrow Fund" to be held in escrow under an Escrow Agreement executed in connection with the APA in order to secure payment of any Purchase Price Shortfall.

VegCo's above-described overpayment claims against Debtor under the APA and rights to the True-Up Escrow Fund under the Escrow Agreement are referred to herein as the "Claims and Rights." VegCo desires to assign the Claims and Rights to National in return for a credit against outstanding accounts payable owed by VegCo to National (the "Credit").

EXHIBIT 2 - Page 1 of 3

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

# AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, VegCo and National hereby agree as follows:

(1)     Assignment.  VegCo, in exchange for the Credit, does hereby assign, grant, transfer, convey, and set over unto National all of VegCo's rights, title and interest in and to the Claims and Rights, together with such other rights, causes of action and remedies as may arise by operation of law, in law or equity, in connection with the Claims and Rights.

(2)     Determination of Credit.  The parties will arbitrate their dispute with Debtor regarding the Purchase Price Shortfall asserted by VegCo.  The amount of the Credit will be the amount of the Purchase Price Shortfall (a) that the bankruptcy court orders to be paid to National (in cash or as a credit against invoices owed by National to Debtor), or (b) that is agreed in settlement between Debtor, VegCo and National.

(3)     Reasonable Efforts; Cooperation.  VegCo and National shall take all such necessary actions as may be reasonably requested by any other party, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable to consummate and make effective as promptly as practicable the provisions contained herein and to cooperate with each other in connection with the foregoing and in particular in the contemplated Resolution Proceeding to determine the amount of the Purchase Price Shortfall and in any litigation between National and Debtor relate to this Assignment.

(4)     Right of Rescission.  Notwithstanding the above, if National is not (a) allowed to offset the amount of the Purchase Price Shortfall (as determined in the above-described Resolution Proceeding or by settlement), against invoices owed by National to Debtor, or (b) paid the Purchase Price Shortfall in cash by Debtor, then National may rescind this Assignment and the parties will be restored to their pre-Assignment positions, such that the Rights and Claims will be owned by VegCo and there will be no Credit.

(5)     Binding Effect.  This Assignment is binding upon and shall inure to the benefit of the parties thereto and their respective successors and assigns.

(6)     Counterparts.  This Assignment may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.  Facsimile signatures or signatures sent by e-mail in .pdf format shall be treated as if they were originals.

Signatures on following page.

EXHIBIT 2 - Page 2 of 3

Case 19-62584-pcm11    Doc 677    Filed 03/06/20

# SIGNATURE PAGE TO ASSIGNMENT

**ASSIGNOR**:
PNW Veg Co., LLC

By: _Steven Schoberger_ _____
Name: Steven Schoberger
Title: Vice President, Oregon Potato Company, Manager
3/4/2020

**ASSIGNEE:**
National Frozen Foods Corp.

By: _Janelle McClory_ _____
Name: Janelle McClory
Title:   Vice President

EXHIBIT 2 - Page 3 of 3

Case 19-62584-pcm11    Doc 677    Filed 03/06/20



## NORPAC FOODS INC.

REMIT TO: NORPAC FOODS, INC.

TELEPHONE (503) 480-2100
FAX (503) 480-2198
FID

PAGE 1

| INVOICE NO. | Invoice Date |
|---|---|
| | MO DAY YR |
| NPSALES - 1 | 12 19 19 |

<table>
<tr><td>B<br>I<br>L<br>L</td><td>National Frozen Foods Corp<br>PO Box 9366<br>Seattle, WA 98109<br>UNITED STATES</td></tr>
</table>

| | |
|---|---|
| CUSTOMER | |
| BROKER | |
| ORDER DATE | |
| CARRIER | |
| SHIP DATE FRT DESN | |

S
H
I
P

| | |
|---|---|
| SALES MEMO | |
| PURCH ORDER 1 | 191209 |
| PURCH ORDER 2 | |
| DUE DATE | **1/19/2020** |
| TERMS | Net 30 days |

Past due invoice shall accrue interest at 1 1/2% per month. If overdue accounts are referred to an attorney, you agree to pay our attorneys fees plus the costs of all legal action a an additional charge under the contract of sale covered by this incoice. Additionally, al interest and attorney fees are sums owing in connection with the produce transaction.

"The perishable agricultural commodities listed on this Invoice are sold subject to the statutory trust authorized by Section 5(c) of the Perishable Agricultural Commodities Act, 1930 (U.S.C.499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derivied from these commodities, and any receivables or proceeds from the sale of these commodities unitl full payment is received."

| LABEL | SIZE | PRODUCT | CASES | UNITS | UNIT PRICE | CASE PRICE | AMOUNT | CONTRACT |
|---|---|---|---|---|---|---|---|---|

Terms of PO:

National Frozen Foods to purchase all Finished Goods inventory the day immediately following a successful close of the existing APA with Oregon Potato Company

Storage costs to be paid by National Frozen Foods, immediately upon transfer of inventory into their own accounts

Valuation: Adjusted NRV (Total less slow moving and discounted SKUs) x 75% plus $50,000

NRV is defined as Market Value less 10.1%

Slow moving/discontinued SKUs are defined as: SKUs that have not sold over the past 6 months, plus SKUs that have been discontinued

See attachment for detailed calculation of purchase price

Finished Goods Purchase Price                                                                 $  10,262,443.32

Any donation of NORPAC product requires advance approval by Tracie McGill, NORPAC Foods, Inc. 503-480-2100

### ALL SALES FINAL

| | |
|---|---|
| Gross Invoice | $10,262,443.32 |
| Total Cash Discount | $0.00 |
| Net Invoice | $10,262,443.32 |

Customer Copy

EXHIBIT 3 - Page 1 of 2

## NORPAC Foods, Inc.

Finished Goods
OPC Purchase Calculation

| | | 12/19/2019 |
|---|---|---|
| Total Finished Goods (Market Value) | $ | 15,850,352 |
| Less Slow Moving / Obsolete | | (703,977) |
| Adjusted Finished Goods (Market Value) | | 15,146,375 |
| Less NRV Write Down @ 10.1% | | (1,529,784) |
| Adjusted Finished Foods (NRV) | | 13,616,591 |
| Less OPC Discount (25%) | | (3,404,148) |
| Plus Slow Moving / Obsolete Credit | | 50,000 |
| Finished Goods Purchase Price | $ | 10,262,443 |

EXHIBIT 3 - Page 2 of 2

Case 19-62584-pcm11    Doc 677    Filed 03/06/20